REDACTED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: TRIBUNE COMPANY FRAUDULENT CONVEYANCE LITIGATION | Consolidated Multidistrict Action<br>11 MD 2296 (RJS)<br>12 MC 2296 (RJS) |

THIS DOCUMENT RELATES TO:

MARC S. KIRSCHNER, as Litigation Trustee for the
TRIBUNE LITIGATION TRUST,

*Plaintiff*,

-against-

No. 12 CV 2652 (RJS)

DENNIS J. FITZSIMONS, et al.

*Defendants*.

*And*

MATTERS LISTED ON APPENDIX ONE

---

### LITIGATION TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO PHASE TWO MOTIONS TO DISMISS NOS. 1-7

David M. Zensky
Mitchell P. Hurley
Deborah J. Newman
AKIN GUMP STRAUSS
HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000

Jeffrey T. Golenbock
Douglas L. Furth
GOLENBOCK EISEMAN ASSOR BELL &
PESKOE LLP
437 Madison Ave
New York, NY 10022
Telephone: (212) 907-7300

Michael L. Waldman
Mark A. Hiller
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411L
Washington, DC 20006
Telephone: (202) 775-4500

*Attorneys for Plaintiff Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT.................................................................................1

STATEMENT OF RELEVANT FACTS...............................................................3

A.    Tribune's Capital Structure Before And After The LBO ........................3

B.    The Publishing Industry—And Tribune To A Greater Extent—Were In The Midst Of A Severe Secular Decline Prior To The LBO ...........................4

C.    The Chandler Trusts, Tribune's Largest Shareholder, Foment The LBO To Cash Out Of Their Investments In A Rapidly Declining Tribune...........................5

D.    The Controlling Shareholders Begin To Work Together And Inject Themselves Into The Company's Board And Special Committee Process ............7

E.    Zell Proposes The Highly-Leveraged LBO, And Revises It To Respond To The Controlling Shareholders' Demands................................9

F.    Zell Induces The Officer And Subsidiary D&O Defendants To Recommend The LBO, Notwithstanding The Company's Declining Performance .......................................................11

G.    The Officer Defendants Create Fraudulent, Unrealistic Projections To Facilitate The LBO And To Procure A Solvency Opinion....................13

H.    The Structure Of Zell's Investment In The LBO Enables Him To Gain Control Of Tribune Without Risking A Material Amount Of Capital..................15

I.    All of Tribune's Advisors Had Serious Conflicts Of Interest ................16

J.    Tribune Struggles To Obtain A Solvency Opinion Then Manipulates Analysis At Step One .......................................................17

K.    The Tribune Board And Special Committee Breached Their Fiduciary Duties To Tribune By Approving The LBO..........................20

L.    Tribune Structures The Financing For The LBO To Hinder, Delay, Or Defraud Its Existing Creditors .................................22

M.    Rating Agencies, Wall Street Analysts, News Publications, And Investors React Negatively To The LBO..................................23

N.    The Special Committee, Tribune Board, and Subsidiary D&O Defendants Breached Their Fiduciary Duties By Permitting Step One To Close....................25

O.    Tribune Significantly Underperforms The February Projections And Is Further Downgraded ...........................................25

P.    The Officer Defendants Create Another Set Of Unreliable, Overly Optimistic Projections In Order To Obtain A Solvency Opinion At Step Two ...............................................................26

Q.    Manipulation Of VRC's Solvency Opinion At Step Two .....................27

R.      The LBO Closes And Tribune Collapses Under Its Massive Debt Burden ...........29

APPLICABLE LEGAL STANDARD ........................................................................31

I.      MOTION TO DISMISS STANDARD .............................................................31

ARGUMENT .............................................................................................................33

II.      THE COMPLAINT MORE THAN SUFFICIENTLY PLEADS THAT TRIBUNE WAS INSOLVENT AT THE TIME OF BOTH STEP ONE AND STEP TWO ...............33

      A.      Tribune Was Insolvent Under All Three Definitions Of Insolvency ....................33

      B.      Courts Carefully Scrutinize Management's Financial Projections Used To Consummate A Failed LBO ...................................................................37

III.      THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR BREACHES OF FIDUCIARY DUTY AGAINST TRIBUNE'S DIRECTORS, INCLUDING ZELL AND THE CHANDLER TRUST REPRESENTATIVES .................................................39

      A.      Where A Corporation Is Or Becomes Insolvent, Directors Owe Their Duties Of Care, Loyalty And Good Faith To The Corporation And Its Creditors....................................................................................39

      B.      The Moving Directors Violated All Of Their Fiduciary Duties, And Bear The Burden Of Proving That The LBO Was Entirely Fair To Tribune And Its Creditors....................................................................................40

            i.      The Moving Directors Breached The Duty of Care....................................40

            ii.      The Moving Directors Breached The Duty To Act Loyally And In Good Faith .............................................................................44

                  1.      The Moving Directors Were Interested in the LBO......................44

                  2.      The Moving Directors Acted in Bad Faith.....................................46

                  3.      The Motion 1 Directors Lacked Independence..............................49

             iii.      The Trustee's Claims Cannot Be Dismissed Based On The Exculpation Clause In Tribune's Certificate Of Incorporation .................51

            iv.      DGCL Section 141(e) Does Not Apply ....................................52

             v.      The Moving Directors Do Not Have The Benefit Of The Business Judgment Rule, And Instead Must Prove That The LBO Was Entirely Fair .............................................................................53

      C.      The Chandler Trust Representatives Breached Their Fiduciary Duties.................54

      D.      Zell Breached His Fiduciary Duties........................................................58

      E.      The Subsidiary D&O Defendants Breached Their Fiduciary Duties....................60

            i.      The Subsidiary D&O Defendants Breached Their Fiduciary Duties By Approving The Subsidiary Guarantees While Facing Conflicts Of Interest And Conducting No Due Diligence .........................................60

            ii.      Defendant Monsma's Arguments Are Meritless .......................................63

IV.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR BREACH OF
       FIDUCIARY DUTY AGAINST THE CONTROLLING SHAREHOLDERS ................65

       A.     The Controlling Shareholders Exercised Actual Control Over Tribune And
              Therefore Owed Fiduciary Duties To Tribune And Its Creditors, Which
              They Breached By Inducing Tribune To Undertake The LBO ............................66

       B.     The Complaint Adequately Alleges That The Controlling Shareholders
              Exercised Actual Control Over The LBO Transaction ..........................................67

              i.      The Controlling Shareholders' Stock Holdings, Board
                      Representation, And Relationship With Management Provided The
                      Predicates For Control Over Tribune With Respect To The LBO ............69

              ii.     The Controlling Shareholders' Role In Initiating And Shaping The
                      LBO Reflects Their Control Over Tribune With Respect To The
                      LBO.......................................................................................................70

              iii.    The Controlling Shareholders Acknowledged Their Actual Control
                      Over Tribune With Respect To The LBO ..................................................74

       C.     The Complaint Adequately Alleges That The Controlling Shareholders
              Acted In Concert .....................................................................................................75

V.     THE SHAREHOLDER PAYMENTS WERE ILLEGAL DIVIDENDS AND/OR
       STOCK BUY BACKS UNDER DELAWARE CORPORATE LAW ...............................78

       A.     The Step Payments Violated The Letter And Purpose Of Delaware Law
              Forbidding Dividend Payments And Stock Purchases By Insolvent
              Companies................................................................................................................79

       B.     The Trustee Alleges That Tribune's Capital Was Impaired At Step One..............81

       C.     The Step Two Shareholder Payments Were Made By Tribune, Not By
              EGI-TRB, And The Doctrine Of Independent Legal Significance Is
              Inapplicable.............................................................................................................83

       D.     The Moving Directors' Reliance On VRC's Solvency Opinion Is
              Unavailing...............................................................................................................87

       E.     Directors Are Liable For All Illegal Dividends And Stock Purchases Made
              During Their Service On Board, Even If They Did Not Vote On The
              Transaction ..............................................................................................................88

VI.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR AIDING AND
       ABETTING BREACH OF FIDUCIARY DUTY AGAINST ZELL, THE
       CHANDLER TRUST REPRESENTATIVES, AND THE CONTROLLING
       SHAREHOLDERS ...........................................................................................................89

       A.     It Is Undisputed That The Complaint Alleges The Existence And Breach
              Of Fiduciary Duties By Tribune's Directors And Officers And Resulting
              Damages...................................................................................................................89

B.   The Zell Defendants Knowingly Participated In Breaches Of Fiduciary Duty By The D&O Defendants And The Controlling Shareholder Defendants ...........................................................................................90

C.   The Complaint Adequately Alleges That The Chandler Trust Representatives And The Controlling Shareholders Knowingly Participated In Breaches Of Fiduciary Duty By The D&O Defendants ...............98

D.   The Complaint Adequately Alleges That Monsma Aided And Abetted Breaches Of Fiduciary Duty By The D&O Defendants .....................................100

VII.   THE TRUSTEE HAS ADEQUATELY STATED CLAIMS FOR AVOIDANCE OF THE PAYMENTS MADE TO THE OFFICER AND SUBSIDIARY D&O DEFENDANTS ...........................................................................................100

A.   The Executive Transition Payments Should Be Avoided (Count Thirty-Four Of The *FitzSimons* Complaint And Count Two Of The Tag-Along Complaints)...........................................................................................102

i.   The Obligations Were Incurred Within Two Years Of Petition...............103

ii.   Tribune Did Not Receive Reasonably Equivalent Value For Transfers..................................................................................................104

B.   Trustee's Preference Claims Are Adequately Stated (Count Thirty-Five Of The FitzSimons Complaint  And Count One Of The Tag-Along Actions)..........108

VIII.   THE COMPLAINT ADEQUATELY ALLEGES PREFERENCE AND FRAUDULENT TRANSFER AGAINST THE ZELL DEFENDANTS.......................111

A.   The Subject Matter Of Counts Seven, Nine, Ten And Eleven ............................111

B.   The Trustee's Claims to recover the EGI-TRB Transfers Should Not Be Dismissed Based on a Set-Off Defense ...............................................................112

C.   Section 546(e) Does Not Apply ........................................................................117

D.   The Complaint May Not Be Dismissed On The Basis Of A New Value Defense ...........................................................................................................119

IX.   THE COMPLAINT ADEQUATELY ALLEGES ALTER EGO CLAIMS AGAINST ZELL, EGI, AND SAM INVESTMENT TRUST .......................................120

X.   THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR UNJUST ENRICHMENT AGAINST ALL THE NAMED DEFENDANTS ................................124

A.   Illinois Law Governs The Trustee's Unjust Enrichment Claim...........................125

B.   The Existence Of Contracts Does Not Bar The Trustee's Unjust Enrichment Claim ............................................................................................126

C.   The Existence Of A Remedy At Law Does Not Bar The Trustee's Unjust Enrichment Claim .............................................................................................127

D.   Section 546(e) Does Not Bar The Trustee's Unjust Enrichment Claim Predicated On Conduct Akin To Intentional Fraudulent Transfer ......................128

E.     The Defendants Engaged In Inequitable Conduct And Were Unjustly Enriched Thereby ................................................................................................ 131

XI.   THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR EQUITABLE SUBORDINATION AND DISALLOWANCE ............................................................. 133

XII.  THE COMPLAINT ADEQUATELY ALLEGES CLAIMS TO AVOID ANY INDEMNIFICATION OBLIGATION TRIBUNE MAY HAVE TO THE D&O DEFENDANTS, THE SUBSIDIARY D&O DEFENDANTS, AND OTHER SPECIFIED TRIBUNE OFFICERS ............................................................................... 137

A.     Tribune Incurred The Indemnification Obligations On April 1, 2007, At The Earliest .................................................................................................... 137

B.     The Trustee Has Alleged Ample Bases For Lack Of Reasonably Equivalent Value ................................................................................................ 139

XIII. DEFENDANTS' USE OF MATERIALS EXTRINSIC TO THE COMPLAINT IS INAPPROPRIATE ON A MOTION TO DISMISS ........................................................ 141

XIV. IN THE ALTERNATIVE, THE TRUSTEE SHOULD BE GRANTED LEAVE TO AMEND .................................................................................................................... 143

CONCLUSION ...................................................................................................................... 146

## CROSS-REFERENCE BETWEEN MOTIONS AND OPPOSITION

*Motions to Dismiss*                    *Location of Response in This Brief* [1]

Motion 1: Certain Directors' Motion to Dismiss
    *FitzSimons* Counts 2, 3, 31, 33, and 36

    Count 2 (Illegal Dividends) ...................................................................Section V
    Count 3 (Breach of Fiduciary Duty) .........................................Section III(A-B)
    Count 31 (Unjust Enrichment).................................................................Section X
    Count 33 (Equitable Subordination and Disallowance)...................... Section XI
    Count 36 (Avoidance of Indemnification Obligations).......................Section XII


Motion 2: Zell, EGI, EGI-TRB and Sam Investment Trust' Motion to Dismiss
    *FitzSimons* Counts 2, 5, 6, 7, 8, 9, 10, 11, 31, 32, 33, and 36

    Count 2 (Illegal Dividends) ...................................................................Section V
    Count 5 (Breach of Fiduciary Duty) .........................................Section III(A, D)
    Count 6 (Aiding and Abetting Breach of Fiduciary Duty) ............Section VI(B)
    Count 7 (Avoidance and Recovery of EGI-TRB Transfers)............Section VIII
    Count 8 (Alter Ego Liability)............................................................. Section IX
    Count 9 (Preference to Recover Exchangeable Note and EGI Fee Transfers) ..Section VIII
    Count 10 (Preference to Recover EGI Reimbursements)..................Section VIII
    Count 11 (Avoidance of EGI Reimbursements as Fraudulent Transfers).........Section VIII
    Count 31 (Unjust Enrichment).................................................................Section X
    Count 32 (Recharacterization of the
        Exchangeable Note)..................................Preliminary Statement, Sections VIII (B)
    Count 33 (Equitable Subordination and Disallowance)...................... Section XI
    Count 36 (Avoidance of Indemnification Obligations).......................Section XII


Motion 3: Durham Monsma's Motion to
    Dismiss *FitzSimons* Counts 12, 13

    Count 12 (Breach of Fiduciary Duty) ................................... Section III(E)(i)-(ii)
    Count 13 (Aiding and Abetting Breach of Fiduciary Duty) ..........Section VI(D)

---

[1] The Preliminary Statement, Statement of Relevant Facts, and Sections I, II, XIV, and XV are applicable to each of Motions 1-7.  In addition, for the sake of efficiency, sections of this memorandum incorporate and cross-reference other sections of this memorandum, as well as (i) a separate memorandum (the "IFT Brief") in opposition to the motion filed by the Exhibit A Shareholder Defendants ("Motion 12"), and (ii) a separate memorandum (the "Trustee Br. (#8-11)") in opposition to Motions 8-11 filed by the Advisor Defendants and Morgan Stanley Capital Services, Inc. , which are being filed concurrently herewith.

Motion 4: Foundations and Chandler Trusts' Motion
    to Dismiss *FitzSimons* Counts 14, 15, 31

Count 14 (Breach of Fiduciary Duty ............................................................ Section IV(C)
Count 15 (Aiding and Abetting Breach of Fiduciary Duty) ............................... Section VI
Count 31 (Unjust Enrichment) .............................................................................. Section X

Motion 5: Chandler Trust Representatives' Motion
    to Dismiss *FitzSimons* Counts 2, 3, 15, 31

Count 2 (Illegal Dividends) ....................................................................................Section V
Count 3 (Breach of Fiduciary Duty) ......................................................... Section III(A-C)
Count 15 (Aiding and Abetting Breach of Fiduciary Duty) ......................... Section VI(C)
Count 31 (Unjust Enrichment) .............................................................................. Section X

Motion 6: Certain D&O Defendants' Motion to Dismiss
    *FitzSimons* Count 34 and Count 2 of Tag-Along Actions

Count 34/Count 2 (Recovery of Insider Payments as
        Fraudulent Conveyances) ...................................................................... Section VII

Motion 7: Certain D&O Defendants' Motion to Dismiss
    *FitzSimons* Count 35 and Count 1 of Tag-Along Actions

Count 35/Count 1 (Recovery of Insider Payments as Preferences) .................... Section VII

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re 105 E. Second St. Assocs*,
   207 B.R. 64 (Bankr. S.D.N.Y. 1997)................................................................................114

*In re 360networks (USA) Inc.*,
   338 B.R. 194 (Bankr. S.D.N.Y. 2005)..............................................................................119

*In re Actrade Fin. Techs. Ltd.*,
   337 B.R. 791 (Bankr. S.D.N.Y. 2005)..............................................................................105

*Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*,
   554 F. Supp. 2d 538 (D. Del. 2008)....................................................................................51

*In re Adelphia Commc'ns Corp.*,
   365 B.R. 24 (Bankr. S.D.N.Y. 2007).........................................................................34, 116

*Adkins v. Nestle Purina PetCare Co.*,
   973 F. Supp. 2d 905 (N.D. Ill. 2013)................................................................................128

*In re Agriprocessors, Inc.*,
   No. 08-02751, 2011 WL 4621826 (Bankr. N.D. Iowa Sept. 30, 2011)................................108

*In re Am. Bus. Fin. Servs., Inc.*
   361 B.R. 747 (Bankr. D. Del. 2007)..................................................................................135

*Am. Hardware Mfrs. Ass'n v. Reed Elsevier, Inc.*,
   No. 03 Civ. 9421, 2004 WL 3363844 (N.D. Ill. Dec. 28, 2004)........................................127

*AP Servs. LLP v. Silva*,
   483 B.R. 63 (S.D.N.Y. 2012).............................................................................................129

*In re Apex Auto. Warehouse, L.P.*,
   238 B.R. 758 (Bankr. N.D. Ill. 1999)................................................................................106

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................................32, 68

*AT&T Corp. v. Walker*,
   No. C04-5709FDB, 2006 WL 2927659 (W.D. Wash. Oct. 12, 2006) ...........................47, 52

*In re Autobacs Strauss, Inc.*,
   473 B.R. 525 (Bankr. D. Del. 2012) .......................................................................39, 44, 120

*In re AutoStyle Plastics, Inc.*,
  269 F.3d 726 (6th Cir. 2001) ........................................................116

*In re Balducci Oil Co., Inc.*,
  33 B.R. 847 (Bankr. D. Colo. 1983) .............................................113

*In re Bay Plastics, Inc.*,
  187 B.R. 315 (Bankr. C.D. Cal. 1995).......................................46, 96

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................32, 68

*In re Bernard L. Madoff Inv. Sec. LLC*,
  458 B.R. 87 (Bankr. S.D.N.Y. 2011)....................................... passim

*In re Bernard L. Madoff Inv. Securities LLC*,
  424 B.R. 122 (Bankr. S.D.N.Y. 2010) ...........................................135

*Borden v. Sinskey*,
  530 F.2d 478 (3d Cir. 1976)....................................................50, 105

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ...............................................................44

*In re Brown Schs.*,
  368 B.R. 394 (Bankr. D. Del. 2007) ..................................51, 91, 100

*In re Buckhead Am. Corp.*,
  178 B.R. 956 (Bankr. D. Del. 1994) ....................................46, 80, 87, 123

*Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc.*,
  135 F.3d 526 (7th Cir. 1998) ........................................................128

*Butner v. United States*,
  440 U.S. 48 (1979)........................................................................113

*In re C.R. Stone Concrete Contractors, Inc.*,
  434 B.R. 208 (Bankr. D. Mass 2010) ............................................109

*Capmark Fin. Group Inc. v. Goldman Sachs Credit Partners L.P.*,
  491 B.R. 335 (S.D.N.Y. 2013).......................................................109

*Carsanaro v. Bloodhound Techs., Inc.*,
  65 A.3d 618 (Del. Ch. 2013).....................................................78, 81

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993) ...............................................................44

ix

*In re Chandre Corp.*,
No. 05–9009 (CGM), 2005 WL 3789129 (Bankr. S.D.N.Y. Oct. 28, 2005)................144, 145

*Citizens Bank of Md. v. Strumpf*,
516 U.S. 16 (1995)....................................................................................................115

*Citron v. E.I. Du Pont De Nemours & Co.*,
584 A.2d 490 (Del. Ch. 1990)..........................................................................56, 58, 60

*Citron v. Merritt–Chapman & Scott Corp.*,
409 A.2d 607 (Del. Ch. 1977), *aff'd*, 407 A.2d 1040 (Del. 1979)........................106

*Citron v. Steego Corp.*,
No. Civ. A. 10171, 1988 WL 94738 (Del. Ch. Sept. 9, 1988)................................73

*Claire's Stores, Inc. v. Abrams*,
No. 86 C 9851, 1989 WL 134959 (N.D. Ill. Oct. 16, 1989)..................................105

*In re Collegeville/Imagineering, L.P.*,
No. 95–1619, 1999 WL 33220041 (D. Del. Oct. 5, 1999) ....................................140

*In re Consol. Indus. Corp.*,
292 B.R. 354 (N.D. Ind. 2002), *rev'd on other grounds sub nom. Freeland v. Enodis Corp.*, 540 F.3d 721 (7th Cir. 2008) ..............................................................110

*Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb*,
385 F. Supp. 2d 449 (D. Del. 2004)...................................................................45, 46

*In re Crescent Res., LLC*,
No. 09-11507-CAG, 2012 WL 195528 (Bankr. W.D. Tex. Jan. 23, 2012)..........................109

*Crescent/Mach I Partners, L.P. v. Turner*,
846 A.2d 963 (Del. Ch. 2000)..............................................................44, 95, 96

*Crowthers McCall Pattern, Inc. v. Lewis*,
129 B.R. 992 (S.D.N.Y. 1991)......................................................................48, 87

*Cruz v. Rose Assocs., LLC*,
No. 13 Civ. 0112 (JPO), 2013 WL 1387018 (S.D.N.Y. Apr. 5, 2013)...........................31, 138

*In re Cysive, Inc. S'holders Litig.*,
836 A.2d 531 (Del. Ch. 2003).......................................................................68

*Dalton v. Am. Inv. Co.*,
No. 6305, 1981 WL 7618 (Del. Ch. June 4, 1981) ..............................................55

*In re DBSI, Inc.*,
447 B.R. 243 (Bankr. D. Del 2011) ..............................................................34

*In re Del Monte Foods Co. S'holders Litig.*,
  25 A.3d 813 (Del. Ch. 2011)......................................................................54, 90

*In re Direct Response Media, Inc.*,
  466 B.R. 626 (Bankr. D. Del. 2012) .....................................................47, 51, 61

*Docutronics, Inc. v. Reitman*,
  509 S.E.2d 348 (Ct. App. Ga. 1998) ................................................................83

*Dubroff v. Wren Holdings, LLC,*
  No. Civ. A. 3940-VCN, 2009 WL 1478697 (Del. Ch. May 22, 2009) ("*Dubroff I*") ............76

*Dubroff v. Wren Holdings, LLC,*
  No. Civ. A. 3940-VCN, 2011 WL 5137175 (Del. Ch. Oct. 28, 2011) ("*Dubroff II*").......77, 78

*eBay Domestic Holdings, Inc. v. Newmark*,
  16 A.3d 1 (Del. Ch. 2010)...............................................................................76

*EBS Litig. LLC v. Barclays Global Investors, N.A.*,
  304 F.3d 302 (3d Cir. 2002)............................................................................82

*In re EECO Inc.*,
  138 B.R. 260 (Bankr. C.D. Cal. 1992)...........................................................110

*In re Emerald Oil Co.*,
  695 F.2d 833 (5th Cir. 1983) ........................................................................103

*Emerald Partners v. Berlin,*
  726 A.2d 1215 (Del. 1999) ..............................................................................51

*Emerald Partners v. Berlin,*
  787 A.2d 85 (Del. 2001) ............................................................................39, 53

*Emerald Partners v. Berlin*,
  No. Civ. A. 9700, 2003 WL 21003437 (Del. Ch. Apr. 28, 2003) *aff'd*, 840 A.2d 641
  (Del. 2003) ...............................................................................................50, 58

*Emerson Radio Corp. v. Int'l Jensen Inc.*,
  No. Civ. A. 15130, 1996 WL 483086 (Del. Ch. Aug. 20, 1996)............................73

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
  651 F.3d 329 (2d Cir. 2011).........................................................................118

*In re F & S Cent. Mfg. Corp.*,
  53 B.R. 842 (Bankr. E.D.N.Y. 1985)......................................................109, 110

*Field v. Allyn,*
  457 A.2d 1089 (Del. Ch. 1983).......................................................................85

*Foman v. Davis,*
    371 U.S. 178 (1962)...................................................................................144

*Francis ex rel. Francis v. N.Y.C.,*
    197 F. App'x 26 (2d Cir. 2006) ................................................................143

*Friedl v. N.Y.C.,*
    210 F.3d 79 (2d Cir. 2000)........................................................................142

*FTC v. Anheuser-Busch, Inc.,*
    363 U.S. 536 (1960)...................................................................................113

*In re G. Survivor Corp.,*
    217 B.R. 433 (Bankr. S.D.N.Y. 1998) .....................................................103

*Gatz v. Ponsoldt,*
    925 A.2d 1265 (Del. 2007) ..........................................................................92

*Gesoff v. IIC Indus., Inc.,*
    902 A.2d 1130 (Del. Ch. 2006)....................................................................54

*Gilbert v. El Paso Co.,*
    490 A.2d 1050 (Del. Ch. 1984)....................................................................90

*Global Network Commc'ns, Inc. v. N.Y.C.,*
    458 F.3d 150 (2d Cir. 2006).......................................................................142

*Grace Bros. Ltd. v. Uniholding Corp.,*
    No. Civ. A. 17612, 2000 WL 982401 (Del. Ch. June 13, 2000) ...............86

*In re Granite Partners, L.P.,*
    210 B.R. 508 (Bankr. S.D.N.Y. 1997) .....................................................135

*In re Greater Se. Cmty. Hosp. Corp. I,*
    353 B.R. 324 (Bankr. D.D.C. 2006) ....................................................41, 63

*In re Grossman's Inc.,*
    607 F.3d 114 (3d Cir. 2010).......................................................................138

*Growe v. Bedard,*
    No. Civ. 03–198–B–S, 2004 WL 2677216 (D. Me. Nov. 23, 2004)...........89

*In re Grumman Olson Indus., Inc.,*
    329 B.R. 411 (Bankr. S.D.N.Y. 2005).........................................................64

*In re Hall,*
    131 B.R. 213 (Bankr. N.D. Fla. 1991).........................................................34

*Harbinger Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*,
   906 A.2d 218 (Del. Ch. 2006) .................................................115

*Hariton v. Arco Elecs., Inc.*,
   188 A.2d 123 (Del. 1963) .................................................85

*In re Healthco Int'l Inc.*,
   195 B.R. 971 (Bankr. D. Mass. 1996) ("*Healthco I*") .................................................40, 42, 43

*In re Healthco Int'l, Inc.*,
   208 B.R. 288 (Bankr. D. Mass. 1997) ("*Healthco II*") ................................................. passim

*In re Hechinger Inv. Co. of Del.*,
   327 B.R. 537 (D. Del. 2005) .................................................54

*In re High Strength Steel, Inc.*,
   269 B.R. 560 (Bankr. D. Del. 2001) .................................................39, 66

*Hollinger Int'l, Inc. v. Hollinger Inc.*,
   No. 04 C 0698, 2005 WL 589000 (N.D. Ill. Mar. 11, 2005) .................................................106

*Hospitalists of Del., LLC v. Lutz*,
   No. 6221-VCP, 2012 WL 3679219 (Del. Ch. Aug. 28, 2012) .................................................91

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
   545 N.E.2d 672 (Ill. 1989) .................................................125, 127, 128

*Hurst v. Gen. Dynamics Corp.*,
   583 A.2d 1334 (Del. Ch. 1990) .................................................125

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
   62 F.3d 69 (2d Cir. 1995) .................................................142

*Ivanhoe Partners v. Newmont Mining Corp.*,
   535 A.2d 1334 (Del. 1987) .................................................73

*In re IXC Commc'ns, Inc.*,
   No. C.A. 17324, 1999 WL 1009174 (Del. Ch. Oct. 27, 1999) .................................................73

*Jardel Co. v. Hughes*,
   523 A.2d 518 (Del. 1987) .................................................41

*In re John Q. Hammons Hotels Inc. S'holder Litig.*,
   No. 758-CC, 2011 WL 227634 (Del. Ch. Jan. 14, 2011) .................................................56, 58

*Johnston v. Wolf*,
   487 A.2d 1132 (Del. 1985) .................................................80

*Kahn v. Lynch Commc'n Sys., Inc.*,
   638 A.2d 1110 (Del. 1994) ..............................................................................66, 70

*Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*,
   913 F.2d 846 (10th Cir. 1990) .................................................................................118

*Kaye v. Lone Star Fund V (U.S.), L.P.*,
   453 B.R. 645 (N.D. Tex. 2011)...................................................................................63

*In re KDI Holdings, Inc.*,
   277 B.R. 493 (Bankr. S.D.N.Y. 1999) ......................................................134, 135

*Kendall v. Cuomo*,
   No 12 Civ. 3438, 2013 WL 5425780 (S.D.N.Y. Sept. 27, 2013) ...........................32

*Klang v. Smith Food & Drug Ctrs., Inc*,
   702 A.2d 150 (Del. 1997) ...................................................................................80, 81

*In re Le Cafe Creme, Ltd.*,
   244 B.R. 221 (Bankr. S.D.N.Y. 2000) ......................................................134, 136

*In re Lehman Bros. Holdings Inc.*,
   469 B.R. 415 (Bankr. S.D.N.Y. 2012)......................................................128, 129

*In re Lehman Bros. Sec. & ERISA Litig.*,
   903 F. Supp. 2d 152 (S.D.N.Y. 2012)......................................................................143

*Levine v. Columbia Labs., Inc.*,
   03 CIV 8943 (LAK), 2004 WL 1392372 (S.D.N.Y. June 22, 2004)......................85

*Liberty Mut. Ins. Co. v. Decking & Steel, Inc.*,
   301 F. Supp. 2d 830 (N.D. Ill. 2004) ......................................................................127

*In re Lids Corp.*,
   281 B.R. 535 (Bankr. D. Del. 2002) ..........................................................................38

*In re Loral Space & Commc'ns Inc.*,
   No. Civ. A. 2808-VCS, 2008 WL 4293781 (Del. Ch. Sept. 19, 2008) ...........74, 75

*Lozada v. Warden Downstate Corr. Facility*,
   No. 10 Civ. 8425 (RWS), 2012 WL 2402069 (S.D.N.Y. June 26, 2012) ............144

*In re Lukens S'holders Litig.*,
   757 A.2d 720 (Del. Ch. 1999).....................................................................................96

*Mabon, Nugent & Co. v. Texas Am. Energy Corp.*,
   No. Civ. A. 8578, 1990 WL 44267 (Del. Ch. Apr. 12, 1990) ...............................123

*In re Magnesium Corp.*,
   399 B.R. 722 (Bankr. S.D.N.Y. 2009) ..............................................................62, 64

*Malpiede v. Townson*,
   780 A.2d 1075 (Del. 2001) ....................................................................... passim

*Manzo v. Rite Aid Corp.*,
   No. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002) ...............................52

*McCall v. Scott*,
   239 F.3d 808 (6th Cir. 2001), *amended on denial of reh'g*, 250 F.3d 997 (6th Cir. 2001) ............................................................................................................48

*Mercier v. Inter–Tel (Del), Inc.*,
   929 A.2d 786 (Del. Ch. 2007).....................................................................54

*Moody v. Sec. Pac. Credit, Inc.*,
   971 F.2d 1056 (3d Cir. 1992).................................................................34, 38

*Morgan v. Cash*,
   No. 5053, 2010 WL 2803746 (Del. Ch. July 16, 2010).........................................97

*In re Morse Tool, Inc.*,
   148 B.R. 97 (Bankr. D. Mass. 1992) ...........................................................38

*In re Musicland Holding Corp.*,
   398 B.R. 761 (Bankr. S.D.N.Y. 2008) .................................................62, 88, 132

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
   930 A.2d 92 (Del. 2007) ....................................................................39, 45, 90

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
   537 F.3d 168 (2d Cir. 2008).................................................................120, 121

*In re NextWave Pers. Commc'ns, Inc.*,
   235 B.R. 305 (Bankr. S.D.N.Y. 1999), *aff'd*, 241 B.R. 311 (S.D.N.Y. 1999), *rev'd on other grounds*, 200 F.3d 43 (2d Cir. 1999) ...........................................................46

*In re Nine Sys. Corp. S'holders Litig.*,
   No. Civ. A. 3940-VCN, 2013 WL 771897 (Del. Ch. Feb. 28, 2013).........................68

*In re Novell, Inc. S'holder Litig.*,
   No. Civ. A. 6032-VCN, 2013 WL 322560 (Del. Ch. Jan. 3, 2013)..........................73

*In re O'Day Corp.*,
   126 B.R. 370 (Bankr. D. Mass. 1991) .........................................................37, 38

*O'Reilly v. Transworld Healthcare, Inc.,*
   745 A.2d 902 (Del. Ch. 1999)...........................................................................70, 72

*Official Comm. of Unsecured Creditors of Smtk Expedite, Inc. v. Donaldson, Lufkin &
   Jenrette Sec. Corp.,*
   No. 00 Civ. 8688(WHP), 2002 WL 362794 (S.D.N.Y. Mar. 6, 2002)....................64

*Official Comm. of Unsecured Creds. of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
   322 F.3d 147 (2d Cir. 2003)..................................................................................144

*In re Old Carco LLC,*
   454 B.R. 38 (Bankr. S.D.N.Y. 2011) ....................................................................144

*In re OODC, LLC,*
   321 B.R. 128 (Bankr. D. Del. 2005) .............................................................117, 135

*Orman v. Cullman,*
   794 A.2d 5 (Del. Ch. 2002).....................................................................................53

*Orr v. Kinderhill Corp.,*
   991 F.2d 31 (2d Cir. 1993).......................................................................................33

*OTK Assocs., LLC v. Friedman,*
   85 A.3d 696 (Del. Ch. 2014)..................................................................52, 91, 100

*Paramount Commc'ns Inc. v. QVC Network Inc.,*
   637 A.2d 34 (Del. 1993) ..........................................................................................54

*Partipilo v. Hallman,*
   510 N.E.2d 8 (App. Ct. Ill. 1st Dist. 1987) ..........................................................128

*Peddinghaus v. Peddinghaus,*
   692 N.E.2d 1221 (App. Ct. Ill. 1st Dist. 1998).............................................126, 127

*Peltz v. Hatten,*
   279 B.R. 710 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.,* 60 F. App'x
   402 (3d Cir. 2003).............................................................................................33, 38

*Penn Mart Realty Co. v. Becker,*
   298 A.2d 349 (Del. Ch. 1972)................................................................................100

*Pereira v. Cogan,*
   294 B.R. 449 (S.D.N.Y. 2003), *rev'd on other grounds*, 413 F.3d 330 (2d Cir. 2005).....55, 58

*Pereira v. Cogan,*
   No. 00 Civ. 619, 2001 WL 243537 (S.D.N.Y. Mar. 8, 2001) .................................41

*Phansalkar v. Andersen Weinroth & Co., L.P.*,
    344 F.3d 184 (2d Cir. 2003) .................................................................................105

*In re Phillips Petroleum Sec. Litig.*,
    738 F. Supp. 825 (D. Del. 1990) .........................................................................121

*Phoenix Can. Oil Co. Ltd. v. Texaco Inc.*,
    560 F. Supp. 1372 (D. Del. 1983) .......................................................................125

*In re Pine Lake Vill. Apartment Co.*,
    21 B.R. 478 (Bankr. S.D.N.Y. 1982) .................................................................115

*In re Plassein Int'l Corp.*,
    No. 03-11489, 2008 WL 1990315 (Bankr. D. Del. May 5, 2008) ..........................38

*In re Pratt & Whitney Co.*,
    143 B.R. 19 (Bankr. D. Conn. 1992) ...................................................................138

*In re Primedia Inc. Derivative Litig.*,
    910 A.2d 248 (Del. Ch. 2006) ...........................................................68, 69, 70, 74

*In re Primedia, Inc. S'holders Litig.*,
    67 A.3d 455 (Del. Ch. 2013) .................................................................................52

*Probulk Carriers Ltd. v. Peraco Chartering USA LLC*,
    No. 11 Civ. 5686 (RJS), 2012 WL 3095319 (S.D.N.Y. July 20, 2012) ...............31

*Production Res. Grp., L.L.C. v. NCT Grp., Inc.*,
    863 A.2d 772 (Del. Ch. 2004) ...............................................................................40

*Propp v. Sadacca*,
    175 A.2d 33 (Del. Ch. 1961) .....................................................................56, 58, 89

*Rabkin v. Philip A. Hunt Chem. Corp.*,
    No. 7547, 1987 WL 28436 (Del. Ch. Dec. 17, 1987) ...........................................41

*Rauch. v. RCA Corp.*,
    861 F.2d 29 (2d Cir. 1988) ....................................................................................86

*In re Refco Sec. Litig.*,
    779 F. Supp. 2d 372 (S.D.N.Y. 2011) ...................................................................32

*In re Reg'l Diagnostics, LLC*,
    372 B.R. 3 (Bankr. N.D. Ohio 2007) ....................................................................31

*In re Revco D.S., Inc.*,
    118 B.R. 468 (Bankr. N.D. Ohio 1990) ...............................................................115

*Roberts v. United States*,
   18 Cl. Ct. 351 (Cl. Ct. 1989) ................................................................................114

*In re RSL COM Primecall, Inc.*,
   No. 01 Civ. 11457, 2003 WL 22989669 (Bankr. S.D.N.Y. Dec. 11, 2003) ...............61, 62, 63

*In re Rural Metro Corp. Stockholders Litig.*,
   88 A.3d 54 (Del. Ch. 2014) ............................................................................90, 135

*Ryan v. Lyondell Chem. Co.*,
   Civ. A. 3176-VCN, 2008 WL 4174038 (Del. Ch. Aug. 29, 2008) ........................................41

*Schoon v. Troy Corp.*,
   948 A.2d 1157 (Del. Ch. 2008) ..........................................................................139

*In re Scott Acquisition Corp.*,
   344 B.R. 283 (Bankr. D. Del. 2006) .......................................................................62

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
   Nos. 05 Civ. 4742, 05 Civ. 2623, 2006 WL 3754823 (N.D. Ill. Dec. 18, 2006) ..................128

*Seligson v. N.Y. Produce Exch.*,
   394 F. Supp. 125 (S.D.N.Y. 1975) .........................................................................36

*In re Sentinel Prods. Corp.*,
   192 B.R. 41 (N.D.N.Y. 1996) ............................................................................117

*Shandler v. DLJ Merch. Banking, Inc.*,
   No. 4797-VCS, 2010 WL 2929654 (Del. Ch. July 26, 2010) .............................................123

*In re Sheffield Steel Corp.*,
   320 B.R. 405 (Bankr. N.D. Okla. 2004) .............................................................47, 79, 80

*In re Sheffield Steel Corp.*,
   320 B.R. 423 (Bankr. N.D. Okla. 2004) ....................................................................88

*In re Shoe-Town, Inc. Stockholders Litig.*,
   C.A. No. 9483, 1990 WL 13475 (Del. Ch. Feb. 12, 1990) ................................................49

*ShopLocal LLC v. Cairo, Inc.*,
   No. 05 Civ. 6662, 2006 WL 495942 (N.D. Ill. Feb. 27, 2006) .........................................127

*Smith v. Good Music Station, Inc.*,
   129 A.2d 242 (Del. Ch. 1957) .............................................................................45

*Smith v. Van Gorkom*,
   488 A.2d 858 (Del. 1985) *overruled on other grounds by Gantler v. Stephens*, 965
   A.2d 695 (Del. 2009) .....................................................................................52

*In re Soporex, Inc.*,
    463 B.R. 344 (Bankr. N.D. Tex. 2011)..................................................................48

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) .....................................................................39, 46

*In re Suburban Motor Freight, Inc.*,
    124 B.R. 984 (Bankr. S.D. Ohio 1990)..................................................34

*Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*,
    Civ. A. No. 1668-N, 2006 WL 2521426 (Del. Ch. Aug. 25, 2006)...........................74

*SV Inv. Partners, LLC v. Thoughtworks, Inc.*,
    7 A.3d 973 (Del. Ch. 2010)..................................................82, 83, 86

*In re Synthes, Inc. S'holder Litig.*,
    50 A.3d 1022 (Del. Ch. 2012)................................................................96

*In re Teligent. Inc*.,
    325 B.R. 81 (Bankr. S.D.N.Y. 2005) .....................................................113

*Telxon Corp. v. Meyerson*,
    802 A.2d 257 (Del. 2002) ......................................................................49

*Tourangeau v. Uniroyal, Inc.*,
    138 F. Supp. 2d 259 (D. Conn. 2001) ...................................................139

*In re TOUSA, Inc.*,
    437 B.R. 447 (Bankr. S.D. Fla. 2010) ........................................ passim

*In re TOUSA, Inc.*,
    442 B.R. 852 (Bankr. S.D. Fla. 2010) ..................................................109

*In re Tower Air, Inc.*,
    416 F.3d 229 (3d Cir. 2005)......................................................31, 41, 51, 53

*Trans Union LLC v. Credit Research, Inc.*,
    No. 00 C 3885, 2001 WL 648953 (N.D. Ill. June 1, 2001) .................................124

*Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*,
    936 F. Supp. 2d 376 (S.D.N.Y. 2013).....................................................51

*In re Transkaryotic Therapies, Inc.*,
    954 A.2d 346 (Del. Ch. 2008)................................................................97

*In re Transpacific Carriers Corp.*,
    50 B.R. 649 (Bankr. S.D.N.Y. 1985) *aff'd*, 113 B.R. 139 (S.D.N.Y. 1990) .......................103

*In re TransTexas Gas Corp.*,
  597 F.3d 298 (5th Cir. 2010) ...................................................................104, 105

*In re Tri-Star Pictures Inc. Litig.*,
  No. 9477, 1995 WL 106520 (Del. Ch. Mar. 9, 1995).................................54, 56, 57

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  499 B.R. 310 (S.D.N.Y. 2013)...................................................................113, 129

*In re Troll Commc'ns, LLC*,
  385 B.R. 110 (Bankr. D. Del. 2008) ..........................................................35, 50, 53

*In re Tronox, Inc.*,
  429 B.R. 73 (Bankr. S.D.N.Y. 2010) .................................................................32

*In re Tronox Inc.*,
  503 B.R. 239 (Bankr. S.D.N.Y. 2013) ...................................................34, 38, 112

*In re TSIC, Inc.*,
  428 B.R. 103 (Bankr. D. Del. 2010) ......................................................104, 105, 140

*In re Tyson Foods, Inc. Consol. S'holder Litig.*,
  919 A.2d 563 (Del. Ch. 2007)...........................................................................31

*U.S. Bank N.A. v. Bank of Am., N.A.*,
  No. 12 Civ. 4873 (CM), 2012 WL 6136017 (S.D.N.Y. Dec. 11, 2012)..............................142

*U.S. Bank N.A. v. Verizon Commc'ns Inc.*,
  817 F. Supp. 2d 934 (N.D. Tex. 2011) ..............................................................87

*In re U.S. Mortgage Corp.*
  491 B.R. 642 (Bankr. D.N.J. 2013) ...................................................................129

*In re USA Detergents, Inc.*,
  418 B.R. 533 (Bankr. D. Del. 2009) .............................................................51, 99

*In re USACafes, L.P. Litig.*,
  600 A.2d 43 (Del. Ch. 1991)...........................................................................95

*In re USDigital, Inc.*,
  443 B.R. 22 (Bankr. D. Del. 2011) ..................................................................105

*Valeant Pharms. Int'l v. Jerney*,
  921 A.2d 732 (Del. Ch. 2007)......................................................................54, 58

*In re Vaniman Int'l, Inc.*,
  22 B.R. 166 (Bankr. E.D.N.Y. 1982).................................................................109

*In re Verestar, Inc.*,
  343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...................................................................51

*In re Walt Disney Co. Derivative Litig.*,
  825 A.2d 275 (Del. Ch. 2003) ...............................................................................49

*In re Walt Disney Co. Derivative Litig.*,
  906 A.2d 27 (Del. 2006) (*"Disney II"*) ...........................................................47, 53

*In re Walt Disney Co. Derivative Litig.*,
  907 A.2d 693 (Del. Ch. 2005) (*"Disney I"*), *aff'd* 906 A.2d 27 (Del. 2006).........................41

*In re Wash. Mut., Inc.*,
  No. AP 10-53158 (MFW), 2013 WL 3757330 (Bankr. D. Del. July 16, 2013) ...................105

*In re Webusenet, Inc.*,
  No. 05-6532, 2006 WL 6589014 (Bankr. N.D. Ga. Mar. 7, 2006).......................................109

*Weinberger v. UOP, Inc.*,
  457 A.2d 701 (Del. 1983) ...............................................................................55, 57

*In re Western Nat'l Corp. S'holders Litig.*,
  No. 15927, 2000 WL 710192 (Del. Ch. May 22, 2000) ..........................................................72

*In re Wheelabrator Technologies, Inc. S'holder Litig.*,
  No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) ............................................56, 58, 98

*Wieboldt Stores, Inc. v. Schottenstein*,
  94 B.R. 488 (N.D. Ill. 1988) ............................................................................45

*Williamson v. Cox Commc'ns, Inc.*,
  No. Civ. A. 1663-N, 2006 WL 1586375 (Del. Ch. June 5, 2006) .....................................68, 69

*In re Worldcom Inc.*,
  No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ...................................107

*In re Yellowstone Mt. Club*,
  436 B.R. 598 (Bankr. D. Mont. 2010) .................................................................37

*Zimmerman v. Crothall*,
  No. Civ. A. 6001-VCP, 2012 WL 707238 (Del. Ch. Mar. 5, 2012), *as revised* (Mar. 27, 2012) ....................................................................68, 77, 78

STATUTES

77 Del. Laws. Chapter 14 (2009) ................................................................................139

11 U.S.C.

    § 101(12) ................................................................................................115
    § 101(31) ................................................................................................108
    § 101(32) ..........................................................................................33, 82
    § 101(54) ................................................................................................113
    § 510 .....................................................................................................134
    § 546 .....................................................................................................117
    § 547 .....................................................................................................119
    § 548 .................................................................................................passim
    § 553 .....................................................................................................117

Del. Code Ann. Title 8
    § 102 .......................................................................................................51
    § 141 .......................................................................................................52
    § 145 .....................................................................................................135
    § 160 ..........................................................................................79, 84, 87
    § 170 ..............................................................................................79, 81
    § 172 .......................................................................................................87
    § 173 ..........................................................................................79, 84, 87
    § 174 ..................................................................................79, 84, 88, 89
    § 242 .....................................................................................................139
    § 259 .....................................................................................................139

OTHER AUTHORITIES

2 Norton § 32.29 ..........................................................................................110

Bayless Manning & James J. Hanks Jr., LEGAL CAPITAL (4th ed. 2013) .....................................85

BLACK'S LAW DICTIONARY (10th ed.) ............................................................................86

Fed. R. Civ. P. 8 ........................................................................................................31

Fed. R. Civ. P. 9 ........................................................................................................64

FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5310 ................................................115

Restatement (Second) of Conflict of Laws §145 ..................................................................126

Restatement (Second) of Conflict of Laws §221 ..................................................................126

Plaintiff Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust (the "Trustee")[1] submits this memorandum of law in opposition to Motions 1 through 7 ("Trustee Br. (#1-7)"), pursuant to which some, but not all, Defendants seek to dismiss, in whole or in part, Counts Two, Three, Five through Fifteen, and Thirty-One through Thirty-Six of the Fifth Amended Complaint in *Kirschner v. FitzSimons* ("Complaint" or "FC") and certain counts in other actions listed in Appendix One appended to this memorandum. A chart cross-referencing each of the defendants' motions and the corresponding portions of this memorandum responding to the motion is included herein at *supra* vi-vii.[2]

## <u>PRELIMINARY STATEMENT</u>

This lawsuit arises out of the selfishness and greed that devastated one of the nation's most venerable media companies. In 2007, when its financial health was in severe decline, Tribune Company ("Tribune" or the "Company") borrowed a jaw-dropping $10.7 billion to repurchase all of its shares in a leveraged buyout (the "LBO") and become a private company controlled by Samuel Zell. Tribune's creditors, meanwhile, were left with a hopelessly insolvent company that quickly arrived at the doors of the bankruptcy court. That the LBO would prove such a disaster was foreseen by Tribune's officers, directors, and advisors. The deal was done by falsifying financial projections, tampering with valuation techniques and solvency criteria, and spreading enough financial inducements around so those involved would go along.

---

[1] Capitalized terms used in this memorandum are defined herein or by reference in the Complaint.

[2] The Trustee adopts the numbering used by the Defendants to identify their 12 motions to dismiss, referring, for example, to the motion to dismiss filed by Tribune's putative outside directors (ECF 5923) as "Motion 1" or "Mot. 1," and referring to the motion filed by Sam Zell and his affiliates (ECF 5947) as "Motion 2" or "Mot. 2," and so on.

While many smart and cunning businessmen and women were involved in negotiating, financing and closing the LBO, no one in the room was looking out for the company and its creditors, proving the adage of unknown origin, "if you are not at the table you are on the menu." According to the Defendants, the Board was looking out for the shareholders and only the shareholders, and the Controlling Shareholders and Zell were looking out for themselves and only themselves. Management of course had but one thing on its mind, the enormous personal lucre promised by the LBO. All of these actors devised and agreed on a structure for the LBO financing that would push the new LBO debt ahead of Tribune's existing creditors in the line for repayment in any subsequent bankruptcy. The sole entity ostensibly left to protect the company and its creditors was Valuation Research Corporation ("VRC"), a solvency opinion shop not only far out of its league but one which, in exchange for the largest fee it had ever received, was also easily corrupted by Tribune management. VRC rendered solvency opinions, which were readily accepted by the Board, that were so riddled with improper and non-standard methodologies and assumptions that the opinions were not worth the paper they were printed on.

Tribune's Chief Executive Officer and Board Chairman, Dennis FitzSimons, does not move to dismiss Count Three (breach of fiduciary duty against Tribune's directors), nor does he or any other Tribune officer seek to dismiss Count Four (breach of fiduciary duty against Tribune's officers).[3] The Trustee's remaining allegations likewise are well pleaded, and his causes of action are well grounded in the law. Each of the Defendants' motions to dismiss should be denied.

---

[3] In addition, only one of the nineteen Subsidiary D&O Defendants has moved to dismiss the claims for breach of fiduciary duty and aiding and abetting such breaches against them (Counts Twelve and Thirteen), and no Defendant has challenged the claims to avoid as fraudulent transfers the Company's transfers of phantom equity and success bonuses to Tribune employees (Count Thirty-Four).

## STATEMENT OF RELEVANT FACTS[4]

### A.  Tribune's Capital Structure Before And After The LBO

Tribune's Board of Directors (the "Board") approved the LBO and all related transactions on April 1, 2007; it thereafter closed in two steps on June 4 and December 20, 2007.  (FC ¶¶ 238, 287, 353.)  Immediately prior to the LBO, Tribune had approximately $5.6 billion in funded debt obligations, and the Subsidiary Guarantors—which held the majority of the Company's value—had none.  (FC ¶ 119.)  After the LBO, Tribune had nearly $14 billion in debt—far more than the company was worth—and had far too little capital (if any) to be able to conduct its business going forward.  (FC ¶¶ 20, 120, 125.)  Weeks later, it laid off 5% of its staff; months later, Tribune was interviewing bankruptcy lawyers; and on December 8, 2008, less than a year after Step Two, Tribune filed for bankruptcy.  (FC ¶ 358.)

Between the two Steps, Tribune borrowed $10.7 billion (the "LBO Debt") in order to distribute to its shareholders a total of $8.3 billion in exchange for their stock.  (FC ¶ 120.)  More than $2 billion of this went to Tribune's Controlling Shareholders (as defined below) and other insiders.  (FC ¶ 118.)  The balance of the LBO Debt not paid out to shareholders was used to pay $150 million in further special monetary incentives to the Tribune insiders who helped facilitate and consummate the deal, to pay $284 million in fees to Tribune's advisors and the banks that arranged the LBO Debt, and to retire $2.8 billion of Tribune's existing bank debt, which had carried significantly lower interest rates than the LBO Debt and was not guaranteed by the subsidiary guarantors.  (FC ¶ 120.)  All of the LBO Debt was guaranteed by the Subsidiary Guarantors, thereby redirecting 95% of Tribune's value so that in the event of a bankruptcy, the

---

[4] These facts are taken from the Complaint and must be presumed true at this pre-answer stage of the case.  A more complete recitation of the facts on which the Complaint is based is set forth in the Complaint itself.

parties lending into the LBO would be paid first, leaving little or nothing for Tribune's pre-existing creditors who were owed close to $3 billion.  (FC ¶ 119.)

**B.  The Publishing Industry—And Tribune To A Greater Extent—Were In The Midst Of A Severe Secular Decline Prior To The LBO**

It would be hard to identify a poorer candidate for a leveraged buyout than Tribune *circa* 2006-2007.  (FC ¶ 7.)  When the LBO was first announced, the *New York Times* aptly characterized it as "one of the most absurd deals ever."  (FC ¶ 125.)  Zell has since characterized it as "the deal from hell."  (FC ¶ 2.)

Tribune's operations were conducted through two primary business segments: newspaper publishing—which accounted for approximately 75% of Tribune's revenues—and broadcasting/entertainment.  (FC ¶¶ 7, 116.)  In the years leading up to the LBO, the newspaper publishing business was experiencing a severe and accelerating secular decline that was widely reported on in the media.  (FC ¶¶ 7, 122.)  Newspaper publishers were also undergoing a fundamental shift of advertising away from print media, and advertising expenditures were rapidly declining.  (FC ¶¶ 123–24.)  Industry experts agreed that these declines were not likely to abate.  (FC ¶ 124.)  On March 23, 2007, Morgan Stanley & Co., LLC ("Morgan Stanley") observed that "February will likely go on record as one of the worst months for the newspaper industry in recent years," and that "new revenue streams are simply not enough to offset the secular shift of print to online." (FC ¶ 124.)  That same month, a leading industry newsletter observed that the "business environment faced by publishers and media companies today has changed forever."  (FC ¶ 124.)

The news for Tribune was even worse.  In September 2006, daily circulation for the Company's seven largest newspapers decreased year over year by 4.9%, as compared to the industry average decrease of 4.0% for the same period.  (FC ¶ 125.)  Similarly, in March 2007

daily circulation of the Company's newspapers decreased year over year by 4.1%, as compared to the industry average decrease of 2.7% over the same period.  (FC ¶ 125.)  Thus, in the period immediately preceding the Board's consideration and approval of the LBO, Tribune's daily circulation fell at a rate that was 50% greater than that of the newspaper publishing industry as a whole.  (FC ¶ 125.)  The Company's loss in classified advertising revenues—which represented over 28% of Tribune's publishing segment's total 2006 revenue—in the first quarter of 2007 was also greater than the industry average loss across all major categories.  (FC ¶ 125.)

### C. The Chandler Trusts, Tribune's Largest Shareholder, Foment The LBO To Cash Out Of Their Investments In A Rapidly Declining Tribune

In 2006, defendants the Chandler Trusts were the largest Tribune shareholder, owning (by the fall of that year) 20% of the Company.  (FC ¶ 127.)  Tribune's next largest shareholders, the Robert R. McCormick Foundation and the Cantigny Foundation[5] (together, the "Foundations"), owned 13%.  (*Id.*)  Deeply displeased with Tribune's direction and prospects, the Chandler Trusts began actively engaging with and exerting their influence over Tribune.  (FC ¶ 128.)  In a letter to the Tribune Board dated June 13, 2006 signed by defendant William Stinehart Jr., a Tribune Board member and trustee of the Chandler Trusts, Stinehart stated that "[o]ver the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different."  (FC ¶ 129.)  Stinehart commented further that the Company was "confronted with a fundamental erosion in both of its core businesses," and that:

> Not only has Tribune underperformed the industry averages, but the company has lagged business segment performance for *each* of the companies in the comparable list over the last two years. . . . This trend is only expected to continue for the next two years.

---

[5] The Cantigny Foundation is an affiliate of the Robert R. McCormick Foundation.  (FC ¶ 74.)

Much as they have in the previous two years, management doggedly projects a turnaround, with steady revenue and operating cash flow growth over the next four years.  This projected turnaround is hard to believe with no proposed change in strategy and little prospect for an upturn in the core businesses.  Management has already revised estimates down since December 2005, suggesting the likely direction of future changes.  (FC ¶ 129.)

Stinehart pointedly reminded the Board that "the [Chandler] Trusts are the largest investor in the Company, and, more than any other shareholder, it is in their interest to see that either current value is maximized or a value enhancing strategic repositioning occurs."  (FC ¶ 130.)  To that end, Stinehart demanded that the Tribune Board "promptly appoint a committee of independent directors to oversee a thorough review of the issues facing Tribune and to take prompt decisive action to enhance stockholder value."  (FC ¶ 130.)

One of the actions urged by Stinehart in his letter was the exploration of a leveraged buyout.  (FC ¶ 131.)  After observing that realistic projections suggested that the Company's per share value could be as low as (or even lower than) $21 per share, Stinehart posited that a leveraged buyout would "provide shareholders cash value at or above the high end value implied in management's plans without any exposure to the huge downside risk of the as yet unaddressed fundamental strategic challenges of Tribune's business."  Stinehart concluded by stating that while the Chandler Trusts were "prepared to work directly and cooperatively with [a special] committee to further [their] common objective of maximizing value," if timely action was not taken, the Chandler Trusts would "begin actively purs[uing] possible changes in Tribune's management and other transactions to enhance value realized by all Tribune stockholders."  (FC ¶¶ 131-32.)

Similarly, at the next Board meeting the Chandler Trusts demanded that the Company act "in a short timeframe," because "Tribune is not a growth company, [and] time is not on our side."

Stinehart later described his and the Chandler Trusts' views on Tribune leading up to the Tribune Board's consideration of the LBO as follows:

> We looked out and we saw a ski slope.  Management looked at the ski slope as though it [were] a bunny hill and you can traverse across by cost-cutting and catch the Internet chair lift and go to the top, but what the [Chandler] Trusts saw was a four-star black-diamond run headed straight downhill.  Cost-cutting gets you nowhere, and the chair lift's broken.  Essentially there were two different versions of where the world was going, and we wanted off the ski slope.  We originally wanted to get everybody off the ski slope, but we saw the world differently, and we had a special constituency that wanted off.  (FC ¶¶ 134–35.)

### D. The Controlling Shareholders Begin To Work Together And Inject Themselves Into The Company's Board And Special Committee Process

In September 2006, the Tribune Board was composed of its chairman FitzSimons (who also served as Chairman/director of the Foundations), the Chandler Trust Representatives (Stinehart, Jeffrey Chandler, and Roger Goodan), Enrique Hernandez Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft and Miles D. White.  (FC ¶¶ 27, 38, 136, 136 n4.)  In response to the Chandler Trusts' demands, the Board announced that it had established a Special Committee to oversee the Company's exploration of strategic alternatives.  (FC ¶ 136, n4.)  The Special Committee comprised Hernandez, Holden, Morrison, Osborn, Reyes, Taft, and White, each of whom was highly sophisticated and experienced in complex financial matters.  (FC ¶ 136, 220–21.)[6]  Had these savvy directors been truly independent, disinterested and acting in good faith, they were more than capable of declining to approve, or thereafter stopping Tribune from proceeding with the LBO, and avoiding its predictably devastating consequences.

---

[6]Each member of the Special Committee had either previously served as chief executive officer or director of at least one large multinational corporation, or was qualified as an "audit committee financial expert" under the securities laws.  (FC ¶ 220–21.)

The supposedly "independent" Special Committee members were not left to meet and deliberate on their own.  Rather, FitzSimons and Donald C. Grenesko (Senior Vice President of Finance and Administration), both of whom played key roles in the preparation and dissemination of Tribune's fraudulent projections and procurement of the two flawed and corrupted solvency opinions, attended all but one of the Special Committee meetings.  (FC ¶ 136.)  FitzSimons personally made the final recommendation on behalf of the Officers that Tribune proceed with the LBO.  (FC ¶ 163.)

The Controlling Shareholders, who were nominally excluded from membership on the Special Committee, made sure that they remained at the center of the process, and that their power and influence was brought to bear on the members of the Special Committee.  On October 2, 2006, Stinehart again wrote to the Tribune Board on behalf of the Chandler Trusts to ensure that the Chandler Trusts would have full access to and play a significant role in the Special Committee's deliberations.  (FC ¶ 138.)  Stinehart stressed that collaboration between the Chandler Trusts and the Company was "important to assure that the Chandler Trusts will be in a position to support the conclusions of the special committee . . . especially . . . since several of the alternatives under consideration would likely require a vote of the stockholders and possibly other affirmative action by the [Chandler] Trusts."  (FC ¶ 138.)  Stinehart also agreed that the Chandler Trust Representatives would not participate in the Special Committee, provided they were "assured full and bona fide cooperation and regular communication" with the Special Committee.  (FC ¶ 138).

Controlling Shareholder pressure on the Tribune Board intensified further when the Foundations also began advocating for change.  (FC ¶ 139.)  The Foundations told the Special Committee that it would be "difficult to do a transaction" without the support of both the

Foundations and Chandler Trusts (together the "Controlling Shareholders"), who collectively owned 33% of Tribune.  (FC ¶ 141.)  That same day, the Foundations' advisors acknowledged that it was time for the Special Committee to "know[] very specifically what the goals and objectives of 33 percent of the owners [are]."  The advisors stated further that while the Special Committee's independence "has been important up till now . . . it is time for everyone to declare their intentions."  (FC ¶ 141.)

On January 22, 2007, the Chandler Trusts' counsel contacted the Foundations to explore pooling their combined holdings to exert even greater control over the "[d]irection . . . Tribune should go."  (FC ¶ 143.)  The Controlling Shareholders agreed to do just that.  The McCormick Foundation acknowledged the decisive role the Controlling Shareholders ultimately played in Tribune's adoption of the LBO—and the disaster it promised for Tribune and its creditors—in a prophetic email penned on the day the LBO was approved:  "God understands, but may not forgive us, for what are bout to do to good old TRB."  (FC ¶ 210.)

### E.  Zell Proposes The Highly-Leveraged LBO, And Revises It To Respond To The Controlling Shareholders' Demands

In late January 2007, Zell emerged as a potential buyer of Tribune, via his investment vehicle defendant Equity Group Investments, L.L.C. ("EGI").  (FC ¶¶ 145–46.)  On February 2, 2007, EGI proposed to the Board and/or Special Committee a transaction in which an EGI affiliate (ultimately, defendant EGI-TRB, L.L.C. ("EGI-TRB")) would acquire all of Tribune's outstanding common stock for $30 per share.  (FC ¶ 146.)  EGI's February 2007 proposal contemplated that EGI-TRB would provide approximately $1 billion of equity financing, and obtain debt financing in the aggregate amount of $10.7 billion.  (FC ¶ 146.)  Under the initial proposal, Tribune would elect to be treated as an S corporation for federal income tax purposes.  (FC ¶ 146.)  In an effort to create further tax savings, a newly formed employee stock ownership

plan ("ESOP") would then acquire the majority of Tribune's common stock for approximately $800 million.  (FC ¶ 146).

On February 19, 2007, Zell submitted a revised term sheet to Tribune (including FitzSimons and Grenesko).  (FC ¶ 147.)  The revised terms increased the consideration to be paid to shareholders to $33 per share, relied on more new debt, and, remarkably, *reduced* Zell's proposed equity investment from $1 billion to $225 million.  (FC ¶ 147.)  The term sheet also provided that Tribune would enter into an Investor Rights Agreement that would grant EGI-TRB the right to designate two members to the Tribune Board, and provide Zell with other minority consent rights (including the right to serve as chairman of the Tribune Board).  (FC ¶ 147.)

On or about February 24, 2007, the Special Committee directed Tribune's management and financial advisors to solicit the Controlling Shareholders' views on Zell's proposal.  (FC ¶ 148.)  Tribune's financial advisors sent materials to the Controlling Shareholders, and engaged in discussions with them respecting Zell's proposal.  (FC ¶ 148.)  The Controlling Shareholders expressed concerns over the delays and completion risk associated with Zell's proposal.  (FC ¶ 149.)  Consequently, the Special Committee requested that any further proposal submitted by EGI include a recapitalization that would provide an upfront distribution to Tribune's stockholders.  (FC ¶ 150.)  EGI responded by submitting a revised proposal on March 4, 2007, which contemplated that Tribune would effect a first step tender offer at $33 per share in cash, in advance of the actual merger.  (FC ¶ 150.)

The Controlling Shareholders' support for the LBO stood in stark contrast to their prior—and rightful—concern over the wisdom of burdening the Company with large amounts of debt. (FC ¶ 151, 206.)  In May 2006, Stinehart, Goodan, and Chandler had balked at the 2006 Leveraged Recapitalization, in which Tribune repurchased 55 million of its own shares, based on

their "concern regarding adding the . . . leverage" associated with the transaction "given the uncertainties of the Company's operating performance." (FC ¶ 206.) The 2006 stock buyback had brought the Company's total debt from $3.7 billion to $5.8 billion. (FC ¶ 206.) By contrast, the LBO—in which all remaining (about 250 million) shares were repurchased—raised Tribune's debt to *nearly $14 billion*, at a time when the Company was—as the Chandler Trusts had predicted—performing significantly worse. (FC ¶ 206.)

The Foundations had also previously expressed concern regarding the Company's ability to handle additional leverage, stating that they would not be comfortable with leverage that was more than seven times the Company's EBITDA. (FC ¶ 209.) But once they realized that the LBO would enable them to exit the Company completely—"get off the ski slope," as Stinehart put it—the Foundations' concerns about leverage vanished, and they agreed to saddle the Company with an 11.5x debt to EBITDA (2007) ratio. (FC ¶¶ 209, 250.)

The explanation for the Controlling Shareholders' change of heart is that they no longer cared about the Company's future viability. (FC ¶ 207.) Unlike the 2006 Leveraged Recapitalization and other alternatives considered in early 2007, the Zell LBO enabled them to terminate their interest in the Company and leave the risk of the LBO's certain failure solely on Tribune itself and its creditors. (FC ¶¶ 72-74, 207.) Given the Controlling Shareholders' and Chandler Trust Representatives' dismal views of Tribune's future prospects, there is no way they could have believed that Tribune could survive with the nearly $14 billion of debt that the Company incurred in the transaction. (FC ¶¶ 128–35, 208–09.)

### F.   Zell Induces The Officer And Subsidiary D&O Defendants To Recommend The LBO, Notwithstanding The Company's Declining Performance

Tribune continued its downward spiral during the early months of 2007, causing FitzSimons to temporarily get "cold feet on the leverage" Zell was proposing. (FC ¶¶ 155, 157.)

Not to be deterred, Zell induced FitzSimons and the Officer Defendants to support the LBO by enticing them with and later increasing lucrative financial benefits that would be awarded only if the LBO was consummated.  (FC ¶ 158.)  In February 2007, EGI sent a proposed management equity incentive plan ("Phantom Equity") to, among others, Grenesko and Crane H. Kenney (Tribune's General Counsel), with a copy to Zell.  (FC ¶ 158.)  The plan (initially for 5% of the equity of company, later raised to 8%) was then forwarded to FitzSimons and Treasurer Chandler Bigelow.  (FC ¶¶ 158-59.)  An internal EGI list of "deal points" suggested that a 5% stock option plan for management could be used to induce management to represent that the Company could achieve $100 million in cash savings.  (FC ¶ 158.)

In addition to Phantom Equity, Zell agreed that Tribune would pay its executives and employees who played "a critical role in overseeing the completion of the transaction" millions of dollars in cash awards (the "Success Bonus Payments").  (FC ¶ 159.)  Officer Defendants Harry Amsden, Bigelow, FitzSimons, Grenesko, Daniel G. Kazan, Kenney, Thomas D. Leach, and R. Mark Mallory, and Subsidiary D&O Defendants Robert Gremillion, David Dean Hiller, Timothy P. Knight, Timothy J. Landon, John E. Reardon, Scott C. Smith, John J. Vitanovec, and Kathleen M. Waltz all received Success Bonus Payments and/or Phantom Equity payments.  (FC ¶ 159.)  Further, the consummation of the LBO caused the immediate vesting of millions of dollars in restricted stock units and stock options[7] held by all of these Defendants.  (FC ¶¶ 49, 71, 160, Ex. C.)

Finally, the D&O Defendants and Subsidiary D&O Defendants knew that consummation of the LBO would trigger enormous "change of control" severance payments (the "Executive

---

[7] Claims to recover these specific restricted stock payments were assigned under the Tribune Plan of Reorganization to the reorganized debtors, rather than the Tribune Litigation Trust.  The Trustee cites them in the Complaint as further motivating factors for the damaging and in some cases deceitful conduct of the Defendants.

Transition Payments") for officers let go after the LBO equal to three times the employee's highest annual salary during the prior three years and six times the employee's target bonus for the current year. (FC ¶ 160.). These Tribune insiders released after the LBO and before the bankruptcy received a total of $40.4 million in these lucrative golden parachute payments. (FC ¶¶ 160, Ex. C.) All in, the D&O Defendants, Subsidiary D&O Defendants and Additional Officer Recipients were paid in excess of $120 million in Success Bonuses, Phantom Equity payments, payments for restricted stock units, options, and Executive Transition Payments, plus $68.8 million for their individually-held common stock. (FC ¶¶ 49, 71, 160-61, 163, Ex. C.)

Zell agreed to increase the price Tribune would pay its shareholders to $34 per share, and set his total investment at $315 million, less than 2.5% of Tribune's proposed total capitalization following the LBO. (FC ¶¶ 203, 211.) Despite the temporary "cold feet" on leverage, the Officer and Director Defendants recommended to the Board that the Company proceed with the Zell proposal. (FC ¶¶ 162, 163.)

### G. The Officer Defendants Create Fraudulent, Unrealistic Projections To Facilitate The LBO And To Procure A Solvency Opinion

While certain of the Officer Defendants—including Bigelow, Grenesko, and Kazan—began negotiating with Zell over the special monetary incentives they and their colleagues would receive if the LBO was consummated, those same Officer Defendants prepared a revised set of long-term financial projections (the "February Projections") on which the LBO would be premised. (FC ¶ 170.) The Officer Defendants were aware of the deteriorating state of the newspaper industry and Tribune's publishing business in particular, but nevertheless prepared unrealistically optimistic projections they knew the Company would not be able to achieve. (FC ¶¶ 170-71.) Indeed the February Projections were prepared in the midst of a sales process and

clearly were undertaken not to serve as a realistic forecast of financial performance but instead to justify the premium price the defendants hoped to achieve for their stock.

The Officer Defendants, including FitzSimons, Bigelow, Grenesko, Amsden, and Kazan, knew that the February Projections were premised on unrealistic assumptions, including that Tribune would outperform 2006 in the second half of 2007.  (FC ¶ 171.)  They also knew that the February Projections had been prepared (intentionally) without input from other members of Tribune management who may have questioned certain assumptions respecting Tribune's joint venture investments.  (FC ¶ 172.)  The February Projections were also premised on aggressive assumptions respecting reduction of capital expenditures that the Officer Defendants knew the Company could not even explain, much less achieve.  (FC ¶¶ 172–74 (defendant Kazan: "[o]n the capex, we don't really have an explanation for the $35 million reduction").)

The LBO could not be consummated unless the Company obtained solvency opinions certifying that it was solvent at both Step One and Step Two.  (FC ¶¶ 175, 187.)  In order to obtain these opinions, Tribune needed to proffer accurate long-term projections on which the solvency opinions could be based.  (FC ¶¶ 170, 202.)  The D&O Defendants, Controlling Shareholders and Zell continued to tout and utilize the unrealistic February Projections to close Step One, even as each month's performance showed that they simply could never be achieved. (FC ¶ 258.)  For example, as of month-end May 2007, prior to the June 4 closing of Step One, operating cash flow for six newspapers accounting for more than 91% of the Company's publishing business was 24% off of 2006 results, and 14% off of the February Projections.  (FC ¶ 259.)  Similarly, the Company's publishing segment as a whole was 21.5% off of its 2006 results, and 12% off of the February Projections.  (FC ¶ 259.)  To now achieve the February Projections for the full calendar year, the publishing segment's weekly operating cash flow for the remaining

14

seven months would have to be 38% higher than it was from January through May.  (FC ¶ 260.)

No one could have expected this turn-around to occur given, *inter alia*, the state of the publishing

industry and the Company's historical performance.  (FC ¶ 261.)

Both the Officer and Director Defendants were aware of the Company's dismal

performance, as they received up-to-date financial information showing that the February

Projections were unrealistic almost immediately after they were disseminated.  (FC ¶ 262.)  Such

up-to-date financial information was also likely known by, and was certainly available to, the

Controlling Shareholders, Tribune's advisors, and Zell.  (FC ¶ 262.)  While the Officer

Defendants did not provide the Tribune Directors with an official update to the February

Projections until after Step One closed, the Officer Defendants (including at least Bigelow,

Kazan, and Amsden) were discussing the need for such an update as early as March 20, 2007,

and appear to have begun developing the update weeks before the Step One closing.  (FC ¶¶ 263-

64.)

### H.  The Structure Of Zell's Investment In The LBO Enables Him To Gain Control Of Tribune Without Risking A Material Amount Of Capital

The LBO was clearly an option play for Zell, whereby Zell gained control and 40% of the

economic upside (if one ever materialized) of a multibillion-dollar company, but risked a

relatively small amount of his own capital compared to the size of the overall transaction and his

great wealth.  (FC ¶¶ 354, 356.)  Zell was willing to make this longshot bet because he was

gambling almost exclusively with other people's money—specifically, the assets of Tribune that

should have been available for repayment of Tribune's existing creditors.

Zell purported to structure the majority of his Tribune investment as debt, and effected

his involvement through EGI-TRB, an underfunded subsidiary controlled by Zell with no office

of its own, no board of directors or similar board of managers, and no employees of its own other

than Zell and employees of EGI, a private investment company controlled by Zell.  (FC ¶¶ 83, 444-45, 447.)  EGI-TRB at all relevant times lacked sufficient capital to meet any liabilities that might arise from the LBO, has no assets other than claims alleged against the Tribune bankruptcy estate, and is insolvent.  (FC ¶¶ 451-52.)

Zell made his initial investment in Tribune prior to Step One.  (FC ¶ 228.)  An Investor Rights Agreement executed prior to Step One granted Zell the power to veto major transactions, even though his ultimate investment in the Company was structured as a warrant and nominal "debt" rather than equity.  (FC ¶ 227.)  On May 9, 2007, a month before Step One closed, Zell was appointed a member of the Tribune Board.  (FC ¶ 227.)  Hence, Zell was a member of Tribune's board at the time that both Step One and Two payments were made.

The parties involved in the LBO routinely referred to Zell's "loans" to the Company as equity investments.  (FC ¶ 227.)  The Zell Defendants have not moved to dismiss Count Thirty-Two, which seeks to recharacterize this initial "loan" as equity.  (FC ¶¶ 613-24.)  At the close of Step Two, Zell's total net investment in Tribune was slightly more than $300 million.  (FC ¶ 354, 356.)  Zell's investment contributed nothing to Tribune's capital or its ability to survive the LBO, as it was not even enough to cover fees and expenses paid to various lenders and advisors ($284 million) and bonuses and other financial benefits (approximately $80 million) paid over to the Officer Defendants and Subsidiary D&O Defendants he induced to cut the deal.  (FC ¶¶ 49, 71, 356.)[8]

### I.   All of Tribune's Advisors Had Serious Conflicts Of Interest

Tribune retained various financial advisors to aid in the consideration of the various capital transactions under consideration starting in 2006.  The Special Committee retained

---

[8] The details and structure of Zell's investment, and the transfers he received are described in the Complaint.  (FC ¶¶ 227-28, 354-56.)

Morgan Stanley (FC ¶ 137), and Tribune itself retained both Citigroup Global Markets, Inc. ("Citigroup") and Merrill, Lynch, Pierce, Fenner & Smith Inc. ("Merrill").  (FC ¶¶ 92-93, 126.) In practice, however, there was no real division between the Special Committee and Tribune itself as Citigroup and Merrill repeatedly presented to and interacted with  Morgan Stanley and the Special Committee (FC ¶ 167), and Morgan Stanley was asked to advise the plenary Board. (FC ¶¶ 330-31.)  The advisors were all financially interested in the LBO.  For example, by Tribune agreeing to the LBO, Citigroup and Merrill could—and did—each earn tens of millions of dollars in fees for arranging the LBO financing, on top of the fees already being paid to advise Tribune on the transaction.  (FC ¶¶ 14, 92-93, 137, 164-66.)  Morgan Stanley negotiated for the right to receive a discretionary fee based on the results of whatever transaction occurred, and continued to position itself as a lender in any potential deal, even though it had been selected as an advisor to the Special Committee specifically in an effort to avoid such a conflict.  (FC ¶¶ 15, 169.)  Given their interest in the LBO, none of these advisors could be counted on to provide candid advice to the Board or the Special Committee.  (FC ¶¶ 168-69, 379(j).)

### J.   Tribune Struggles To Obtain A Solvency Opinion Then Manipulates Analysis At Step One

Valuation Research Corporation ("VRC"), the relatively unknown firm that gave the solvency opinions in connection with the LBO, was not Tribune's first—or even second—choice to deliver the necessary opinions.  (FC ¶¶ 197-98).  Duff & Phelps, Tribune's first choice, concluded it only could find Tribune solvent if it improperly included approximately $1 billion in future tax savings that Tribune hoped to achieve by converting to an S Corporation wholly owned by the ESOP.  (FC ¶¶ 180-81.)  In a March 19, 2007 meeting, Duff & Phelps advised GreatBanc, the ESOP trustee, that "there [was] no case law to support considering tax savings of

the ESOP in [determining] solvency" and, as a result, any "Solvency Opinion to the Board [could not] factor in ESOP tax benefits."  (FC ¶ 182.)

The Board terminated Duff & Phelps after learning that Duff & Phelps would not improperly "consider[] tax savings," and therefore could not find Tribune solvent.  (FC ¶¶ 182, 187.)[9]  Tribune thereafter sought to retain another nationally prominent valuation firm, Houlihan Lokey ("Houlihan"), but Houlihan concluded that they could not provide an industry standard solvency opinion in connection with the LBO.  (FC ¶¶ 197-98.)

Defendants Bigelow and Grenesko scrambled to find a firm that would be willing to provide a non-standard opinion that they could use to close the transaction.  (FC ¶ 198.)  On March 30, 2007—just two days before Tribune's board approved the LBO—they reached out to VRC.  (FC ¶ 198.)  Although VRC recognized that Houlihan's declining the engagement "[r]aise[d] the risk" associated with the engagement, it was willing to render an opinion in exchange for $1.5 million, the highest fee it had ever charged for a solvency opinion.  (FC ¶ 200.)

Even with the inflated February Projections as its basis, a Step One solvency opinion utilizing standard, accepted methodology would have shown that the LBO rendered Tribune *in*solvent, *in*adequately capitalized, and *un*able to pay its debts as they came due at Step One. (FC ¶¶ 187, 198, 268, 270, 515.)  Undeterred, various Officer Defendants prevailed upon VRC to use a series of customized, improper and non-standard methodologies to prepare its Step One solvency opinion, which modifications VRC agreed to adopt.  (FC ¶¶ 198, 201-02, 274.)

---

[9] Duff & Phelps ultimately agreed to give a "viability opinion" to GreatBanc in which it considered the tax savings as part of fair value.  (FC ¶ 188.)  However, the "viability opinion" expressly stated that it was not making a determination of solvency within the meaning of the Bankruptcy Code or state fraudulent transfer laws and "d[id] not include the standard analyses and determinations typically included in a standard Duff & Phelps solvency opinion."  (FC ¶ 189.)

Specifically, Tribune insisted and VRC agreed to modify the legal and industry standard definition of "fair value," so that instead of assuming that Tribune was being purchased by a "hypothetical buyer," VRC assumed, for purposes of its solvency opinion, that the party purchasing Tribune was "an S-Corporation, owned entirely by an ESOP, which receives favorable federal income tax treatment."  (FC ¶ 201.)  This manipulation of the standard definition of "fair value," which was set out in VRC's April 11, 2007 engagement letter with Tribune, eviscerated the protections that should have been afforded to the Company and its creditors by the solvency opinion requirements set forth in the LBO transaction documents, and materially assisted Tribune in hindering, delaying, and defrauding its creditors.  (FC ¶ 201.)

In addition, Bigelow and Mark W. Hianik directed VRC, and VRC agreed, to disregard the debt to be incurred to consummate Step Two when issuing its Step One solvency opinion.  (FC ¶¶ 270-71.)  This was wrong because the LBO was conceived of and promoted, first to Tribune and then to the public, as a single, unitary transaction with fully committed financing.  (FC ¶¶ 238-43.)  For example, the Tribune Board approved both Steps of the transaction on April 1, 2007, in advance of Step One, and Step One only made sense in connection with the purported tax savings which could not be accomplished until after Step Two.  (FC ¶ 238.)  Likewise, the commitment letters for the LBO financing at each step were signed simultaneously, and a single loan agreement covered both Steps.  (FC ¶ 240.)  Indeed, in its original draft opinions, VRC correctly included the aggregate amount of debt at both Steps of the transaction in its Step One solvency analysis.  (FC ¶ 275.)  That changed, however, when the Officer Defendants revised VRC's draft solvency opinion and instructed VRC to consider only the Step One debt.  (FC ¶ 276.)

VRC's Step One solvency analysis was improper in numerous additional respects:

- VRC changed how it weighted the discounted cash flow ("DCF") valuation methodology in its analysis relative to the "comparable transactions" methodology in order to increase Tribune's overall valuation.

- VRC's DCF model failed to deduct the costs of the planned Tribune Interactive business acquisition and the costs of internal development investments in determining cash flow, resulting in a substantial overstatement in operating asset value.

- VRC used discount rates in its DCF analysis that were too low (resulting in an overstatement of value) given the uncertainty associated with Tribune's ability to achieve expected long-term growth.

- The exit multiples in VRC's DCF analysis assumed long-term growth rates that were unreasonable in light of the general secular decline in the publishing business and in Tribune's profitability.

- VRC failed to apply any minority or marketability discounts in connection with its determination of the value of Tribune's equity investments.

- VRC relied on comparable company and transaction valuation approaches informed by companies materially different than Tribune or its investments.

(FC ¶¶ 277-78.)  On May 24, 2007, VRC delivered to Tribune its Step One solvency opinion, which concluded that the Company would be solvent immediately after and giving effect to the consummation of the Step One transactions.  (FC ¶ 279.)

### K.  The Tribune Board And Special Committee Breached Their Fiduciary Duties To Tribune By Approving The LBO

On April 1, 2007, the Special Committee unanimously recommended that the Tribune Board approve the "Zell/ESOP transaction to acquire Tribune for $34 per share," even though the Motion 1 Directors (as defined below) knew or should have known that the LBO would render Tribune insolvent at Step One and Step Two.  (FC ¶ 211.)  The Director Defendants (other than Taft who was absent and Stinehart, Goodan, and Chandler, who attended the meeting but abstained from voting) then voted to agree to Zell's proposal, and caused Tribune to enter into the documentation necessary to complete the LBO.  (FC ¶ 211.)  In approving the LBO, neither the Special Committee nor the Tribune Board considered the effect that incurring an additional

20

$10.7 billion of additional debt, for an ultimate total of $13.7 billion of debt, would have on Tribune or its existing creditors as the residual owners of an insolvent company.  (FC ¶ 213.) The Board also ignored the condemnation that the deal had already received from those without a financial stake in its outcome.  (FC ¶¶ 152-54, 213.)  For example, on March 29, 2007, Standard & Poor's ("S&P") wrote to Tribune via Bigelow and predicted the LBO would lead to a default on Tribune debt in 2009.  (FC ¶ 153.)

Moreover, the Directors failed to consider whether the Company's material underperformance relative to industry peers and material underperformance relative to the February Projections rendered those projections unreasonable and an insufficient basis on which to assume Tribune's post-LBO solvency.  (FC ¶¶ 129, 213, 258.)  Notably, the Tribune Board failed to insist on the type of downside testing of the Company's projections it had demanded less than a year earlier in connection with the 2006 Leveraged Recapitalization, which involved far less leverage than the LBO, and was consummated during a period of less dire financial performance for the Company and the industry as a whole.  (FC ¶¶ 217, 223.)  Indeed, prior to the submission of Zell's proposal, the Special Committee and/or Board as a whole considered various alternative transactions involving partial sales, leveraged recapitalizations and/or spin-offs, in which Tribune shareholders would continue to maintain some, albeit reduced ownership interest in the Company.  (FC ¶ 223.)  In evaluating these other potential transactions, the Special Committee and/or Board as whole spent substantial time reviewing the Company's projections, including downside testing, and Tribune's ability to handle the increased leverage associated with such other proposals (which was far less than that posed by the Zell LBO).  (FC ¶ 223.) Once the Special Committee turned its attention to an LBO enabling shareholders to cash out of the Company completely, the Special Committee's and Board's discussions about the reliability

21

of the Company's projections or risks posed by additional leverage ceased completely.  (FC ¶ 223.)

The decision to continue to rely on the outdated, unreliable February Projections at the close of Step One was a crucial failing by the Company's fiduciaries.  (FC ¶ 268.)  In fact, the two downside cases proposed by Tribune and used by VRC to test the LBO—(i) a 2%–3% decline in publishing revenue per year and 0%–1% decline in operating cash flow for broadcasting—were, at best, reasonable base cases off of which statistically lower downside cases should have been developed in light of industry and Company-wide trends.  (FC ¶ 268.)  In March 2007, in advance of the Board approving the LBO and months in advance of the Step One close, Bigelow wrote that if the Company consummated the LBO and performed in accordance with even its more modest downside case then the Company would have "no equity value," for 5 years—*i.e.*, it would be insolvent.  (FC ¶ 268.)  Incredibly, although Tribune's 2007 performance was tracking the more severe downside case, and getting worse, at the time Step One closed, none of the Company fiduciaries suggested, much less tried, to abandon or restructure the transaction.  (FC ¶ 268.)

**L.  Tribune Structures The Financing For The LBO To Hinder, Delay, Or Defraud Its Existing Creditors**

The financing for the LBO was provided by JPMorgan Chase Bank, N.A. ("JPMorgan"), Merrill, Citigroup and Bank of America, N.A, and affiliated entities of each of them (collectively, the "Lead Banks").  (FC ¶ 225.)  The Lead Banks (who settled their fraudulent transfer exposure as lenders in the bankruptcy court), knew that the LBO posed a high risk that the Company would have to file for bankruptcy.  (FC ¶ 230.)  In order to protect themselves against that risk, they agreed to arrange and finance the LBO only if the Company agreed to structurally subordinate Tribune's pre-existing debt to the LBO Debt, via the issuance of loan guarantees

from Tribune's subsidiaries, so that if the Company filed for bankruptcy, the lenders that extended the LBO Debt, or their successors (collectively, the "LBO Lenders"), would be paid before any of the Company's pre-existing funded indebtedness.[10]  (FC ¶ 231.)  The Subsidiary Guarantors did not receive anything in exchange for, or benefit in any way from, the Subsidiary Guarantees, which gave the LBO Lenders an effective priority position above the unsecured creditors of Tribune, since virtually all of Tribune's assets were found at the level of its wholly-owned subsidiaries.  (FC ¶¶ 232-33, 283.)  The Subsidiary D&O Defendants never met to consider whether the guarantees should be issued or what their impact would be on the solvency of the subsidiaries or anything else.  (FC ¶¶ 5, 54, 284-85, 329.)  Instead, these fiduciaries simply signed unanimous consents dated as of Steps One and Two, respectively.  (FC ¶¶ 282-86, 329.)

Prior to the LBO, Tribune's creditors could count on the value of the subsidiaries by virtue of Tribune's equity ownership of such entities.  But the Board's agreement to effectively pledge the value of substantially all of Tribune's subsidiaries to obtain $10.7 billion of LBO debt put roughly 95% of Tribune's direct and indirect assets out of the reach of its pre-existing, pre-LBO creditors, solely for the purpose of cashing out Tribune's shareholders.  (FC ¶¶ 119-20.)  The Special Committee and Tribune Board agreed to this aspect of the LBO financing without the slightest bit of discussion or analysis.  (FC ¶ 231.)

### M. Rating Agencies, Wall Street Analysts, News Publications, And Investors React Negatively To The LBO

Ratings agencies, analysts, and financial reporters reacted immediately and negatively to the Zell proposal.  (FC ¶¶ 152-54, 244-57.)  Moody's wrote to Grenesko on March 29, 2007 to express its concern respecting the deal's proposed leverage, and downgraded Tribune after the

---

[10] The Lead Banks and the Company also took other steps that were intended to make it more difficult for the Company's non-LBO lenders to share with the new LBO Debt in any bankruptcy recoveries.  (FC ¶¶ 234-36.)

Board approved the LBO.  (FC ¶¶ 154, 245.)  In a letter to Bigelow dated March 29, 2007, S&P stated that if the Zell deal moved forward, "the company is expected to default in 2009 when its cash flow and revolving credit capacity are unable to cover its interest expense, capital expenditures, and working capital needs."  (FC ¶ 153.)  On April 2, 2007, the day the Board's approval of the LBO was announced, two of the three major credit rating agencies, Fitch and S&P, downgraded Tribune's existing debt.  (FC ¶¶ 226, 244.)  On April 19, 2007, S&P downgraded Tribune's credit rating on its existing unsecured notes to CCC+ indicating a high default risk.  (FC ¶ 245.)  S&P reported that "given the amount of priority debt ahead of these notes, we will assign them a recovery rating of '5' upon the close of the proposed bank transaction, indicating the expectation for "negligible (0%–25%) recovery of principal in the event of a payment default."  (FC ¶ 245.)  Fitch was of the same view.  (FC ¶ 246.)

Analysts reacted similarly.  (FC ¶¶ 247-50.)  Two weeks before the Tribune Board approved the LBO, Lehman Brothers ("Lehman") issued an equity research report stating:  "We think putting this much debt on Tribune's newspapers and TV stations is way too risky and makes it very possible to put the company into bankruptcy somewhere down the road, especially if the economy slows, with or without the added tax savings from the ESOP financing."  (FC ¶ 152.)  On April 2, 2007 Barclays Capital stated "it is possible that TRB is leveraged higher than the total asset value of the company (after taxes)."  (FC ¶ 247.)  Lehman weighed in again on April 26, 2007, noting that Tribune's "debt-to-2007E-EBITDA of 11.5x . . . is far too high for secularly declining businesses" and would soon "overwhelm EBITDA."  (FC ¶ 250.)

The financial press agreed that the LBO was extremely risky and foolish.  (FC ¶¶ 251-55.)  On April 16, 2007, *Businessweek* commented:  "How leveraged?  . . .  [I]ts debt exceeds last year's EBITDA by about ten times.  This is an angina-inducing multiple even for veteran media

players accustomed to playing with debt, some of whom get nervous above six." (FC ¶ 254; *see also* FC ¶ 251 (*Baltimore Sun*); FC ¶ 252 (*New York Times*); FC ¶ 253 (*Wall Street Journal*).)

### N.   The Special Committee, Tribune Board, and Subsidiary D&O Defendants Breached Their Fiduciary Duties By Permitting Step One To Close

During the period between the time that the LBO was approved (April 1, 2007) and the time that Step One closed (June 4, 2007), the Tribune Board, which now included Zell, met only twice, and the Special Committee met only once. (FC ¶ 280.) The Directors had access to the widespread ridicule heaped on the deal by the analysts and rating agencies. (FC ¶¶ 10, 152-54, 215.) Both the Special Committee and Tribune Board had access to up-to-date financial information showing Tribune's dismal performance, and thus knew—or were reckless or grossly negligent in not knowing—that VRC's opinion, delivered to the Board on May 24, was premised on flawed projections and a flawed and inadequate downside case. (FC ¶¶ 269, 280.) Additionally, the Directors knew, or were reckless or grossly negligent in not knowing, of the methodological flaws in the VRC Step One solvency opinion, including the highly unusual modification to the definition of "fair value," and the consideration of only a portion of the LBO Debt. (FC ¶ 280.)

### O.   Tribune Significantly Underperforms The February Projections And Is Further Downgraded

Tribune's downward trajectory continued unabated after Step One closed. (FC ¶¶ 289-96.) Second quarter consolidated revenues were down 7% from the prior year, and 5.9% behind the February Projections. (FC ¶ 292.) Given that the February Projections had been created only four months earlier, this was an enormous top-line miss that should have been alarming. (FC ¶ 292.) And while the February Projections forecasted that 2007 performance would exceed 2006, operating profit for publishing in the second quarter of 2007 was more than 50% below the same period in 2006. (FC ¶ 292.)

On August 14, 2007, Lehman cut its earnings estimate for Tribune and stated that "Tribune is significantly overlevered currently and should not be adding more debt to its capital structure given the ongoing secular decline in the fundamentals across Tribune's newspapers and TV stations."  (FC ¶ 294.)  Lehman concluded that final consummation of the LBO would leave the Company unable "to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year."  (FC ¶ 294.)  August and September 2007 saw further ratings downgrades and negative ratings commentary.  (FC ¶¶ 291, 294.)

P.   **The Officer Defendants Create Another Set Of Unreliable, Overly Optimistic Projections In Order To Obtain A Solvency Opinion At Step Two**

The February Projections were finally officially scrapped by the Officer Defendants and revisions were presented, in part, to the Tribune Board in October 2007.  (FC ¶¶ 13, 306.)  Although these revised projections (the "October Projections") lowered the Company's expected earnings for calendar year 2007 relative to the February Projections, they *increased* the Company's future growth rate for 2008 and beyond, notwithstanding that the outlook for the publishing industry and Tribune had only worsened since the February Projections were prepared.  (FC ¶ 306.)

Thus, for the years 2007-2010, the new October Projections assumed annual revenue growth of 5.1%, whereas the February Projections assumed an annual growth rate for this period of 3.9%, a 30% increase in Tribune's year-over-year growth.  (FC ¶ 307.)  Similarly, for the years 2010-2012 the new projections assumed 2.5% annual increases, compared to 0% increases in the February Projections.  (FC ¶ 307.)  There was no basis whatsoever to support any of these increases in projected growth rates.  (FC ¶ 307.)

The October Projections also erroneously assumed that the consolidated growth rate of 2.4% from 2011 to 2012—a year in which advertising revenues were forecast to spike due to the

2012 presidential election—would be replicated each and every year from 2013 through 2017. (FC ¶ 308.)  This fraudulent assumption resulted in a projected growth rate for the last five years of the ten-year projection period (critical in determining terminal value) that was five times greater than the growth rate projected by management just eight months earlier.  (FC ¶ 308.)  The Tribune officers manipulated the growth rate to counterbalance Tribune's 2007 financial performance and other negative trends to ensure the LBO—and the financial boon they expected from the LBO—would stay on track.  (FC ¶ 308.)  Tribune's Directors did not even discuss, much less challenge, the officers' fanciful 500% increase in the growth rate.  (FC ¶ 327.)

The October Projections were also dependent upon speculative growth assumptions in the Company's Interactive business.  (FC ¶ 309.)  At the time, the Company's Interactive business was a small Internet-based division that had grown over ten years to approximately 4% of the Company's total operating revenues in 2006, and had performed at more than 4% below expectations in 2007.  (FC ¶ 309.)  Without any factual basis for doing so, the Officer Defendants increased the compound annual growth rate for the Interactive business from 16.3% in the February Projections to 22.0% in the October Projections.  (FC ¶ 309.)

## Q. **Manipulation Of VRC's Solvency Opinion At Step Two**

In delivering its solvency opinion in connection with Step Two of the LBO, VRC again utilized Tribune management's unreasonable assumptions and projections—even when VRC's own internal work product demonstrated that those projections were unreliable.  (FC ¶ 319.)  VRC's own internal financial projections for Tribune were materially lower and had resulted in a DCF valuation that was approximately $1.24 billion lower than the valuation derived from Tribune's October Projections.  (FC ¶ 321.)  Yet VRC proceeded to use the inflated October Projections without change in its Step Two solvency opinion, including the "every year is a

presidential election year" assumption, which enabled VRC to modify its DCF approach and add approximately $613 million to Tribune's value at Step Two.  (FC ¶¶ 319-20.)

In addition to its unreasonable adoption of the October Projections, VRC's Step Two solvency analysis carried over many of the same flaws and skewed assumptions that infected its Step One solvency analysis, including VRC's novel and unjustified definition of "fair value," the improper equal weighting that VRC assigned to its different valuation methodologies, VRC's use of discount rates that did not properly reflect the risk of achieving forecasted future cash flows, VRC's failure to apply any minority or marketability discounts in connection with its determination of the value of Tribune's equity investments, and VRC's reliance on comparable company and transaction valuation approaches that used companies materially different from Tribune or its investments.  (FC ¶¶ 324-25.)  In its Step Two balance sheet solvency analysis, VRC also accepted the Officer Defendants' direction to use a value nearly $600 million lower than the face amount of certain subordinated notes (*i.e.*, the PHONES Notes) for purposes of calculating Tribune's liability arising from those obligations.  (FC ¶¶ 314, 325.)[11]  By lowering its known liabilities, VRC gave a false picture of Tribune's solvency.  Plainly aware of these methodological flaws and Tribune's obvious insolvency, the D&O Defendants nevertheless caused Tribune to proceed to consummate Step Two.  (FC ¶ 326.)

---

[11] The Officer Defendants prevailed upon VRC to understate the amount Tribune owed to the PHONES Notes by ascribing to them a liability of only $663 million, rather than the $1.256 billion face amount of the notes (less the $340 million value of Time Warner shares that could be netted against the liability upon redemption).  (FC ¶ 314.)  VRC valued the PHONES Notes at face value in its Step One solvency opinion, and in all of the drafts of the Step Two solvency opinion that it prepared prior to the Officer Defendants' directed change.  (FC ¶ 314.)  Additionally, both JPMorgan and Merrill used the face value of the PHONES Notes (minus the value of the Time Warner shares) in their Step One internal solvency analyses, as did Blackstone, the McCormick Foundation's financial advisor.  (FC ¶ 314.)  Furthermore, the company itself considered the PHONES Notes at face value in the rating agency presentations it prepared in March and October 2007.  (FC ¶ 314.)

**R.  The LBO Closes And Tribune Collapses Under Its Massive Debt Burden**

As noted above, the Tribune Board approved the LBO, including Step Two, on April 1, 2007.  (FC ¶ 326.)  On December 18, 2007, The Tribune Board (including Zell and Taft) met again in connection with Step Two, but did not hold an additional vote as to whether the Company should proceed with Step Two.  (FC ¶ 326.)  The Special Committee purportedly gathered separately for a meeting that lasted, at most, fifteen minutes, and, according to draft minutes that were never finalized, resolved to recommend to the Tribune Board that it rely on the VRC Step Two solvency opinion and direct management to take all steps necessary to consummate Step Two.  (FC ¶ 326.)

As with Step One, neither the Tribune Board nor the Special Committee board minutes reflect any meaningful analysis of the projections on which the VRC Step Two solvency opinion was based, or discussion of the faulty methodology employed by VRC.  (FC ¶ 327.)  Given the Company's worsening financial performance, the declining state of the publishing industry, and, by this time, the deteriorating state of the economy generally, no sentient person could have believed that incurring an additional $3.7 billion of debt to buy back Tribune's remaining stock would not plunge the Company into insolvency (assuming, arguendo, it was not already legally insolvent).  (FC ¶ 327.)  Allowing the Company to consummate Step Two of the LBO did, however, ensure that the Director Defendants, Officer Defendants, Foundations, and Zell would be able to sell their remaining shares in Tribune at a price that was well above the shares' actual value.  (FC ¶ 327.)  This was the "escape" plan that Stinehart laid out in July 2006.  (FC ¶ 327.)  Further, the Officer Defendants received the bounty of benefits Zell (at Tribune's expense) had promised and were otherwise triggered by a change in control.  (FC ¶ 328.)

On December 20, 2007, the Company completed Step Two and repurchased all of its remaining shares, bringing its total funded debt liabilities to approximately $13.7 billion.  (FC ¶¶

120, 353.)  JPMorgan downgraded its Tribune credit to workout status (following a series of

prior downgrades) the day after Step Two closed.  (FC ¶ 305.)  To no one's surprise, the

Company rapidly deteriorated under this massive debt burden.  (FC ¶ 357.)  Contrary to the

optimistic growth rates in the October Projections, a new 2008 business plan rolled out just

weeks after Step Two closed projected 2008  performance so anemic that management used

invented "dummy growth rates" for the subsequent years "so that the outcome [wasn't] so

negative."  (FC ¶ 357.)  As the Tribune employee preparing the model remarked, "[i]f we based

the model off of the 07-08 rates, we'd be in serious trouble."  (FC ¶ 357.)

        In early 2008, just weeks after the close of Step Two, the Company implemented a 5%

workforce reduction in its publishing segment.  (FC ¶ 358.)  In announcing this reduction in a

memo dated February 13, 2008, Zell, now Chairman of the Board and CEO, discussed "the

reality of [the Company's] significant debt levels," and "significant declines in advertising

volume at our newspapers . . . putting downward pressure on our cash flow."  (FC ¶ 358.)  On or

about March 5, 2008, *less than three months after Step Two closed*, Tribune hired bankruptcy

lawyers from Sidley Austin LLP to advise the Company on ways to escape the detrimental

ramifications of the LBO Debt, including a potential bankruptcy filing.  (FC ¶ 359.) On

December 8, 2008, less than a year after Step Two closed, Tribune and nearly all of the

Subsidiary Guarantors filed voluntary petitions for relief under Title 11 of the United States Code

(the "Bankruptcy Code").  (FC ¶ 359.)

        The Debtors remained in bankruptcy for more than four years.  (FC ¶ 360.)  On August

10, 2012, Tribune's then President and Chief Executive Officer stated in a sworn affidavit that as

of that date, the Company had incurred approximately $400 million in fees and expenses in

connection with the bankruptcy proceeding.  (FC ¶ 360.)  During the pendency of the bankruptcy

proceeding, neither Tribune nor the LBO Lenders presented any evidence that the Company was solvent at the close of Step Two.  (FC ¶ 360.)  Nor did the Company proffer a single witness who could attest to the honesty or reasonableness of any aspect of the February Projections or the October Projections.  (FC ¶ 312.)

## APPLICABLE LEGAL STANDARD

### I.       MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 8 applies to the Trustee's claims at issue in Motions 1 through 7, other than the limited parts of Counts Seven, Eleven, Thirty-Four, Thirty-Six based on intentional fraudulent conveyance under section 548(a)(1)(A) of the Bankruptcy Code, and requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).[12]

The Court, when deciding a motion to dismiss pursuant to Rule 12(b)(6), must "accept as true all of the factual allegations contained in the complaint, drawing all inferences in the light most favorable to the non-moving party's favor."  *Cruz v. Rose Assocs., LLC*, No. 13 Civ. 0112 (JPO), 2013 WL 1387018, at *2 (S.D.N.Y. Apr. 5, 2013) (internal quotations and citations omitted); *see also Probulk Carriers Ltd. v. Peraco Chartering USA LLC*, No. 11 Civ. 5686 (RJS), 2012 WL 3095319, at *4 (S.D.N.Y. July 20, 2012).  In order for a complaint to survive a motion

---

[12] Defendants' reliance on cases construing Delaware Chancery Rule 23.1, which requires the plaintiff in a derivative action to plead with particularity the efforts made to cause the directors to take action themselves, is misplaced.  This is a *direct* action governed by *federal* pleading standards, and therefore the Trustee was not required to plead his fiduciary claims with particularity.  *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 582 (Del. Ch. 2007) (noting "frequent confusion" arising from resemblance of Delaware state pleading requirements "for demand futility" to "test for determining whether a duty of loyalty claim survives a motion to dismiss under Rule 12(b)(6)," and holding that former requires particularized pleading while latter does not); *see also In re Reg'l Diagnostics, LLC*, 372 B.R. 3, 30 (Bankr. N.D. Ohio 2007) (Chancery Court particularity requirement does not apply when pleading a "fiduciary duty claim under Delaware law in federal court") (*citing In re Tower Air, Inc.*, 416 F.3d 229, 237 (3d Cir. 2005)).

to dismiss it must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs need not provide "proof" or even a "probability" of illegality.  *Twombly*, 550 U.S. at 556.  A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Id*. (internal quotations omitted).  Rather, a complaint's allegations must merely raise that potential for relief "above the speculative level." *Id.* at 555.  "Therefore, on a motion to dismiss, the appropriate inquiry is not whether a plaintiff is likely to prevail, but whether he is entitled to offer evidence to support his claims.  Dismissal for failure to state claim on which relief could be granted is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Kendall v. Cuomo*, No 12 Civ. 3438, 2013 WL 5425780, at *3 (S.D.N.Y. Sept. 27, 2013) (internal quotations and citations omitted).  Moreover, a "motion to dismiss is not designed to be a game of 'gotcha,' that ignores the clear thrust of hundreds of pages of specific allegations in favor of a line or two here or there that is arguably inconsistent with that thrust." *In re Refco Sec. Litig.*, 779 F. Supp. 2d 372, 377 (S.D.N.Y. 2011); *see also In re Tronox, Inc.*, 429 B.R. 73, 89 (Bankr. S.D.N.Y. 2010) (complaint "must be read as a whole," and "defendants cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder.") (internal quotations omitted).

## ARGUMENT

**II.      THE COMPLAINT MORE THAN SUFFICIENTLY PLEADS THAT TRIBUNE WAS INSOLVENT AT THE TIME OF BOTH STEP ONE AND STEP TWO**

### A.   Tribune Was Insolvent Under All Three Definitions Of Insolvency

That Tribune was rendered insolvent by the LBO is significant to many of the Trustee's claims in this case.  Among other things, (a) when a corporation is rendered insolvent, directors and officers owe their fiduciary duties to the corporation and its creditors, not its shareholders; (b) Delaware corporations are forbidden by statute and common law from repurchasing stock or paying dividends if doing so would render the corporation insolvent, and (c) insolvency is an element of the Trustee's claims for constructive fraudulent conveyance.  A company is insolvent when (i) the fair value of its assets exceeds its liabilities, *or* (ii) it is left with unreasonably small capital for the ongoing functioning of its business, *or* (iii) it has incurred or intends to incur debts beyond its ability to pay.  11 U.S.C. § 548(a)(1)(B).

Under the first test, commonly referred to as "balance sheet" insolvency, the Court considers whether "the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation."  11 U.S.C. § 101(32)(A); *Peltz v. Hatten*, 279 B.R. 710, 743 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 402 (3d Cir. 2003).[13]  The "unreasonably small capital" test refers to financial impairment that falls short of any other test for insolvency but that

---

[13] The Complaint alleges that, in assessing Tribune's solvency at the time of Step One, the debt Tribune had already agreed it would incur just a few months later to consummate Step Two, must be included.  (FC ¶¶ 238-43.)  In assessing solvency, courts consider the totality of the obligations incurred and the overall financial consequences those transactions have on creditors, even in instances where separate steps of the transactions are separated by many months.  *See, e.g.*, *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35-36 (2d Cir. 1993) (considering as a single transaction for fraudulent transfer purposes, two steps that occurred nine months apart).

is "likely to lead to insolvency at some time in the future." *In re Tronox Inc.*, 503 B.R. 239, 321 (Bankr. S.D.N.Y. 2013) (internal citations omitted).

In addition to focusing on adequacy of the debtor's cash flow, courts applying the unreasonably small capital test typically consider (i) the amount of the company's leverage, (ii) whether the company is heading into an industry downturn or secular decline, (iii) the volatility and cyclicality of the industry in which the company operates, and (iv) the company's credit rating. *See In re Suburban Motor Freight, Inc.,* 124 B.R. 984, 999 (Bankr. S.D. Ohio 1990). If management's projections of cash flows are unreasonable, they suggest the debtor's inability to generate sufficient cash flow from operations. *See Moody v. Sec. Pac. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).

The "inability to pay debts when due" test can be satisfied where, among other things, participants in an LBO acknowledge substantial risk that the company's capital resources are insufficient to meet its financial obligations as they mature. *See In re Suburban Motor Freight, Inc.*, 124 B.R. at 1001 (test met where the company shareholders "expressed serious concerns over [the debtors'] financial health" and minutes of the board of directors were "replete with references to [the debtors'] uncertain future viability").[14]

"Insolvency is generally a factual determination not appropriate for resolution on a motion to dismiss." *In re DBSI, Inc.*, 447 B.R. 243, 247-48 (Bankr. D. Del 2011) (allegations that the debtors never generated a profit, had liabilities in excess of their assets, depended on client funds, and failed to keep proper accounts sufficiently pled insolvency); *see also In re*

---

[14] Even if the Step Two debt were not considered for balance sheet purposes at the time of Step One, such debt would have to be considered when assessing Tribune's capital adequacy and ability to pay debts as they come due, as both tests are forward looking and explicitly require consideration of contemplated future transactions. *See In re Hall,* 131 B.R. 213, 217 (Bankr. N.D. Fla. 1991).

*Adelphia Commc'ns Corp.*, 365 B.R. 24, 37 (Bankr. S.D.N.Y. 2007); *In re Troll Commc'ns, LLC*, 385 B.R. 110, 123-24 (Bankr. D. Del. 2008).  As discussed below, the Trustee pleads dozens of specific facts showing that Tribune was insolvent at Step One and at Step Two under each of the three tests, and that those involved in, and observing the transaction contemporaneously determined that the LBO would render Tribune insolvent.[15]

**Balance Sheet Insolvency**

- At the close of Step Two Tribune had nearly $14 billion of debt but it and all of its subsidiaries, collectively, had assets worth no more than $10.4 billion (FC ¶ 20);

- Duff & Phelps was retained by Tribune to issue a solvency opinion but concluded, in advance of Step One, that the LBO would leave Tribune insolvent under standard valuation methodologies (FC ¶¶180-82, 185);

- Houlihan determined it would be tough to opine Tribune was solvent at Step One, and later stated that Tribune was insolvent at the time of Step One and was more insolvent at the time of Step Two (FC ¶ 197);

- A solvency opinion prepared using traditional methodologies would have shown that the LBO would render Tribune balance sheet insolvent, inadequately capitalized, and unable to pay its debts as they came due.  (FC ¶¶ 270, 313-14, 319-24, 379(e));

- In advance of the Step One close, S&P reduced the rating on Tribune's notes to CCC+, and stated that in the event of a default this pre-existing debt would recover at best 25% of principal (FC ¶ 245);

- Prior to Step One, Tribune's year to date performance was already tracking the downside case "B" included in the February Projections.  Tribune's Treasurer had acknowledged before Step One closed that if Tribune performed in line with that case there would be no equity value in Tribune for five years after the LBO (FC ¶ 268);

- Tribune's advisors believed Tribune would be rendered insolvent by the LBO, at least by Step Two (FC ¶¶ 332-35);

---

[15] Many facts and allegations are relevant to more than one test; the Trustee's sorting of the allegations here is wholly without prejudice to the ultimate applicability of such facts to any and all tests of solvency or impairment.

- The Lead Banks themselves believed that Tribune was rendered insolvent by the LBO.  (FC ¶¶ 230, 237, 299-301, 304.)  In March of 2007, three months before closing just Step One, JPMorgan was already assessing its entitlement to post-petition interest if Tribune went bankrupt.  (FC ¶ 230.)  The Lead Banks nevertheless closed the deal only due to pressure from Zell, fear of litigation, and because the Subsidiary Guarantees put them first in line to be repaid (FC ¶¶ 231, 237, 302-03, 347-49);

- Bigelow stated under oath that for the quarterly period ended September 28, 2008—a mere nine months after completing Step Two—Tribune's assets were worth only $7.6 billion, $6.9 billion less than its total liabilities.  (FC ¶ 359.)[16]

## Unreasonably Small Capital and Inability to Pay Debts

- Tribune's publishing segment accounted for 75% of its revenue.  At the time the LBO was proposed, approved and consummated the publishing industry was in the midst of an unprecedented decline which was not expected to abate, and Tribune was underperforming its peers (FC ¶¶ 7, 123-35, 261, 289-91);

- At the time the LBO was approved Tribune was performing so poorly that there could be no reasonable expectation it would be able to satisfy the debt incurred to finance the LBO (FC ¶¶ 125, 208);

- Following Tribune's approval of the LBO, and before closing Step One and later Step Two, its financial performance only worsened (FC ¶¶ 268, 327);

- Even VRC, with its acceptance of Tribune's  projections, use of unprecedented methodologies and other obvious errors infecting its solvency opinions, concluded that Tribune would be unable to pay its debts as they came due in 2014 and 2015, unless a substantial amount of debt was refinanced (FC ¶¶ 313-18);

- The leverage imposed by the LBO was far greater than that incurred in connection with the 2006 buyback, which the Chandler Trust Representatives had opposed, and was incurred at a time when Tribune's current and future earnings were substantially lower than in 2006 (FC ¶ 206);

- The Foundations had also previously expressed concern with Tribune incurring leverage of anything more that 7x EBITDA, yet the leverage ultimately incurred in connection with the LBO was a staggering 10x 2006 EBITDA and 11.5x 2007 EBITDA.  (FC ¶¶ 209, 250, 254.)  This multiple was far above the leverage levels typically carried by media companies (FC ¶¶ 253-54);

---

[16] Courts recognize that experts may in certain cases "retroject" the value of a company at an earlier point in time based on its value at a later date.  *See Seligson v. N.Y. Produce Exch.*, 394 F. Supp. 125, 130-31 (S.D.N.Y. 1975).

- Had the Board conducted the type of downside testing in connection with the LBO previously used in connection with the 2006 stock repurchase the Board would have seen that Tribune could not survive if the downside materialized (FC ¶ 219);

- In March 2007, S&P reported that the debt contemplated by the LBO would leave Tribune unable to satisfy its interest expense, cap-ex and working capital needs by 2009 (FC ¶ 153);

- In advance of the close of Step One, equity analysts and financial reporters opined that the leverage associated with the LBO would leave Tribune in a precarious financial position, that debt would overwhelm EBITDA, and that absent some miracle Tribune would not survive the LBO (FC ¶¶ 249-50);

- Shortly after Step One closed, Lehman reported that after Step Two Tribune would be unable to cover its estimated annual interest expense from operations, let alone have free cash to pay down debt each year (FC ¶ 294);

- Right after Step Two closed, Tribune began laying off employees, and only 11 weeks after the Step Two close, Tribune was already interviewing bankruptcy lawyers to advise on a potential bankruptcy filing.  (FC ¶¶ 358-59.)

### B. Courts Carefully Scrutinize Management's Financial Projections Used To Consummate A Failed LBO

The Trustee contends that projections prepared by Tribune management were fraudulent and self-evidently wrong, and that reliance on those projections by VRC, the Board and others was manifestly unreasonable.  These are quintessential questions of fact that cannot be resolved on a motion to dismiss.  Reasonableness is based on information that was then known or knowable.  *See In re O'Day Corp.*, 126 B.R. 370, 406 (Bankr. D. Mass. 1991) (rejecting management projections in a fraudulent transfer case because, *inter alia*, there existed "unwarranted deviation[s] between projected data and actual historical figures"); *In re Yellowstone Mt. Club*, 436 B.R. 598, 647-48 (Bankr. D. Mont. 2010) (rejecting experts' solvency, cash flow, and capitalization analyses because they uncritically relied on "management's over-inflated cash flow projections" and ignored the fact that the "[d]ebtors' actual historical financial

37

performance did not support [the] [d]ebtor's future projections"); *In re Lids Corp.,* 281 B.R. 535, 544 (Bankr. D. Del. 2002) (rejecting experts' analysis based on management projections because the debtor had "consistently failed to meet its projections"); *In re Plassein Int'l Corp.*, No. 03-11489, 2008 WL 1990315, at *9-10 (Bankr. D. Del. May 5, 2008) (management's failure to update its projections between two phases of a leveraged buyout process raised a question as to the reasonableness and prudence of the projections).

Courts routinely recognize that management projections tend to be optimistic and therefore require them to be "tested by an objective standard anchored in the company's actual performance."  *Moody*, 971 F.2d at 1073; *Tronox,* 503 B.R. at 320 (same); *In re Morse Tool, Inc.*, 148 B.R. 97, 133 (Bankr. D. Mass. 1992); *Peltz*, 279 B.R. at 744.  Indeed, courts have found that management will often adhere to unreasonably optimistic projections despite clear indications that the projections are unreliable.  *See In re O'Day Corp.*, 126 B.R. at 407 (management should have known that the actual results would be substantially below "worst case" projections).

Here the Complaint contains dozens of detailed allegations which, if proven, would establish that the February Projections and the October Projections each were wholly unreasonable when made and even more so when each Step of the LBO closed.  (FC ¶¶ 258-68 306-14, 319-25.)  The Complaint sufficiently alleges, in turn, that VRC's opinion of solvency was dependent (in part) on the use of the fraudulent projections it received from Tribune, and that any assessment of Tribune's value using objectively reasonable base case and downside projections would show that the LBO rendered Tribune insolvent at both Steps.  (FC ¶¶ 274-79, 308, 312-25, 512-15.)  As such, given that the allegations of the Complaint and all reasonable inferences therefrom must be deemed true at this stage, the Court must assume that Tribune's financial projections were improper and unreasonable when made and/or relied upon, and that

Tribune was in fact insolvent, rather than solvent at the time of each step of the LBO.

### III.      THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR BREACHES OF FIDUCIARY DUTY AGAINST TRIBUNE'S DIRECTORS, INCLUDING ZELL AND THE CHANDLER TRUST REPRESENTATIVES

#### A.   Where A Corporation Is Or Becomes Insolvent, Directors Owe Their Duties Of Care, Loyalty And Good Faith To The Corporation And Its Creditors

Traditionally, Delaware courts have described the duties owed by directors to corporations as a "triad" consisting of the duties of care, loyalty, and good faith.  *E.g., Emerald Partners v. Berlin,* 787 A.2d 85, 90-91 (Del. 2001).  More recently, the Delaware Supreme Court has clarified that the duty of good faith is an element of the duty of loyalty rather than a standalone, separate duty.  *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

When a corporation is solvent, fiduciaries are "obligated only" to consider "the best interests of the [corporation] and its shareholders."  *In re TOUSA, Inc.*, 437 B.R. 447, 458 (Bankr. S.D. Fla. 2010) (citations omitted).  However, when a corporation is insolvent, or may be rendered insolvent by a transaction or other board action, the fiduciaries' attention must shift to the interests of the corporation's creditors, who are the effective owners and residual risk takers of an insolvent enterprise.  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-02 (Del. 2007) ("When a corporation is insolvent . . .  its creditors take the place of the shareholders as the residual beneficiaries of any increase in value."); *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 560 (Bankr. D. Del. 2012) (insolvency shifts duties to corporation and its creditors).

Hence, directors considering a transaction that could result in insolvency must seek to "maximize the value of the assets for payment of unsecured creditors."  *In re High Strength Steel, Inc.*, 269 B.R. 560, 569 (Bankr. D. Del. 2001); *see also TOUSA*, 437 B.R. at 459 ("That creditors are owed fiduciary duties upon insolvency is 'uncontroversial,' since 'directors

continue to have the task of attempting to maximize the economic value of the firm.'") (quoting *Production Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 792 (Del. Ch. 2004)); *In re Healthco Int'l Inc.*, 195 B.R. 971, 985 (Bankr. D. Mass. 1996) ("*Healthco I*") ("When a transaction brings a corporation to insolvency or the brink of insolvency, the rights of creditors become paramount."). As alleged in the Complaint, the LBO rendered Tribune insolvent at both Step One and Step Two, and the fiduciary defendants in this case therefore owed their fiduciary duties of care, loyalty and good faith to Tribune and its creditors in connection with that transaction.

**B.** **The Moving Directors Violated All Of Their Fiduciary Duties, And Bear The Burden Of Proving That The LBO Was Entirely Fair To Tribune And Its Creditors**[17]

**i.   The Moving Directors Breached The Duty of Care**

There can be no serious doubt that Tribune's Directors breached the duty of care in connection with their review, approval and consummation of the disastrous LBO. Indeed, so detailed and compelling are the Complaint's allegations establishing breaches of the duty of care that the Motion 1 Directors themselves make only a half-hearted attempt to refute them, confining their arguments to a single footnote in their 34-page brief. (*See* Mot. 1 at 9 n. 6.)

The Motion 1 Directors were wise not to dwell on the duty of care. As alleged in the Complaint and discussed in more detail below, the conduct of the Directors rises well beyond gross negligence to the level of bad faith, and easily satisfies the lower standard for showing

---

[17] Count Three alleges breaches of fiduciary duties against all of Tribune's directors. Tribune's so-called outside Directors (the "Motion 1 Directors"), have moved to dismiss Count Three and the Chandler Trust Representatives and Zell have joined in that Motion (together with the Motion 1 Directors, the "Moving Directors"). FitzSimons, Tribune's CEO and Chairman of the Board, has not moved to dismiss the breach of fiduciary duty claims asserted against him.

breach of the duty of care.[18]  Under Delaware law, the directors of a corporation are required to

"use that amount of care which ordinarily careful and prudent men would use in similar

circumstances."  *Disney I*, 907 A.2d at 749.  The standard for a due care violation—"gross

negligence"—is somewhat "nebulous."  *See Jardel Co. v. Hughes,* 523 A.2d 518, 530 (Del.

1987).  While the term "signifies more than ordinary inadvertence or inattention," it "is

nevertheless a degree of negligence," as distinct from recklessness, which "connotes a different

type of conduct akin to the intentional infliction of harm."  *In re Greater Se. Cmty. Hosp. Corp. I*,

353 B.R. 324, 339 (Bankr. D.D.C. 2006) (citing *Jardel*, 523 A.2d at 530).[19]

The standard "appears to be synonymous with engaging in an irrational decision-making

process," *Tower Air*, 416 F.3d at 241, either through a failure to obtain information necessary to

make an informed decision, or by reaching conclusions that are irrational in light of the

information that is available.  *Id.*; *see also TOUSA*, 437 B.R. at 462 (equating gross negligence

---

[18] Indeed, it is logical and commonplace for the facts supporting a claim for a breach of the duty of care to overlap with the facts giving rise to claims for bad faith and intentional misconduct.  *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 745-56 (Del. Ch. 2005) ("*Disney I*") ("issues of good faith are (to a certain degree) inseparably and necessarily intertwined with the duties of care and loyalty"), *aff'd* 906 A.2d 27, 65 n.104 (Del. 2006) (a director that fails to inform himself in making decisions out of subjective hostility demonstrates both bad faith and gross negligence); *see also Ryan v. Lyondell Chem. Co.*, Civ. A. 3176-VCN, 2008 WL 4174038, at *2 n.27 (Del. Ch. Aug. 29, 2008) ("simply because the basis for legal liability is academically distinguishable does not mean that conduct possibly amounting only to a breach of the duty of care will necessarily be factually distinguishable from conduct resulting also in a breach of the good faith component of the duty of loyalty").

[19] Claims for breach of the duty of care based on affirmative acts by fiduciaries—such as the Motion 1 Directors' vote to approve the LBO—are subject to the gross negligence standard, but at least one court has held that claims based on director *inaction*—such as the Directors' subsequent failure to prevent the LBO from being consummated—are subject to a standard of ordinary negligence.  *Disney I*, 907 A.2d at 748 (*citing Rabkin v. Philip A. Hunt Chem. Corp.*, No. 7547, 1987 WL 28436, at *1-3 (Del. Ch. Dec. 17, 1987)).  As discussed herein, the Trustee has alleged facts that are more than sufficient to state a claim for breach of fiduciary duty under either standard.  *See Pereira v. Cogan*, No. 00 Civ. 619, 2001 WL 243537, at *14 n.17 (S.D.N.Y. Mar. 8, 2001) (complaint satisfied both negligence standards under "liberal reading required by Rule 12(b)(6)").

with "an unintelligent or unadvised judgment," or "an irrational decision making process.")

(internal quotation marks omitted). A fiduciary's burden to act with care is heightened where a

major corporate transaction like the Tribune LBO is being considered:

> The more significant the subject matter of the decision, the greater is the
> requirement to probe and consider alternatives. For example, when the decision is
> to sell the company or to engage in a recapitalization that will change control of
> the firm, the gravity of the transaction places a special burden on the directors to
> make sure they have a basis for an informed view.

*In re Healthco Int'l, Inc.*, 208 B.R. 288, 305 (Bankr. D. Mass. 1997) ("*Healthco II*") (applying

Delaware law) (internal quotation marks omitted); *see also TOUSA*, 437 B.R. at 463 (same).

Board action with respect to such a transaction "will fail to meet the standard of due care" if it

suggests "indifference to the potential risk of harm" to the corporation and its creditors. *Id.* at

462.

The court's decision in *Healthco*, a case that also involved a disastrous two-step LBO, is

particularly instructive. In determining that the directors violated their fiduciary duties—

including, but not limited to, the duty of care—the *Healthco* court catalogued a series of missteps

leading up to approval and consummation of the LBO that are strikingly similar to those

committed by the Tribune Directors in this case. *Healthco II,* 208 B.R. at 306-07. The Healthco

board approved a highly leveraged going-private transaction in which virtually all of the funds

borrowed by the corporation "were paid to shareholders and for expenses related to the

shareholder distributions . . . ." *Healthco I*, 195 B.R. at 979. As a result, Healthco was left with

"huge new indebtedness but without the funds whose loan created the debt." *Id.* (*Compare* FC

¶¶ 1, 6, 20, 118.) As in this case, the directors gave no thought to the impact of the transaction

on existing creditors, but instead looked only to the interests of the shareholders, a circumstance

that was sufficient by itself to demonstrate gross negligence. *Healthco II,* 208 B.R. at 306

(holding that a court cannot presume an action was taken "in the best interests of the company"

where the directors considered only the interests of shareholders, and not those of the insolvent

company and its creditors).  (*Compare* FC ¶¶ 213, 217, 280 (alleging that Special Committee

completely disregarded the interests of the Company and its existing creditors in favor of

shareholders).)

> *Healthco* reserved its most scathing criticism for the board's reliance on overly optimistic

financial projections prepared by parties interested in ensuring the LBO was consummated no

matter what.  The directors knew that Healthco's financial performance was in a steady decline

and had failed to meet management projections for prior reporting periods, but nevertheless

relied on "unreasonable and unrealistic" projections of future performance in reviewing the

transaction and certifying the solvency of the enterprise.  *Healthco I,* 195 B.R. at 979.  As with

the Tribune LBO, an impartial review of the projections of future company performance by the

board would "likely have resulted in the board withholding its approval of the LBO."  *Healthco*

*II*, 208 B.R. at 307.  The board's decision to nevertheless rely on those projections was

inconsistent with the directors' obligation to handle the affairs of the corporation with care:

> The projections lacked reality. Their assumption that immediate savings would be
> achieved from the distribution restructuring was clearly too optimistic in light of
> the fact the restructuring had been going on for years without completion or
> demonstrable results.  And perhaps most significant, the projections left no
> margin for error.  [The acquiring company] was largely playing with other
> people's money.  This is unlikely to promote conservatism.  The directors should
> have known that.

*Id.*  The Healthco board likewise breached its duties by accepting uncritically a solvency opinion

provided by VRC—the same company that Tribune's Board relied on in this case—despite

deficiencies in that opinion which were "known to all." *Id.* (*See also* FC ¶¶ 280, 327, 395(h); Trustee Br. (#8-11) at 11-15.)[20]

### ii.  The Moving Directors Breached The Duty To Act Loyally And In Good Faith

The duty of loyalty is "an affirmative obligation to protect and advance the interests of the corporation and mandates that [the director] absolutely refrain from any conduct that would harm the corporation." *Autobacs*, 473 B.R. at 562 (internal quotations omitted).  A complaint sufficiently pleads breach of the duty of loyalty if it alleges that the fiduciaries (1) were interested in the transaction at issue, *or* (2) acted in bad faith, *or* (3) lacked independence.  *See Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 981 (Del. Ch. 2000) (declining to dismiss duty of loyalty claim where only single basis pled); *Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000).  All three species of disloyalty are present here.

### 1.  The Moving Directors Were Interested in the LBO

The Moving Directors were "interested" in the transaction for at least two reasons.  First, the Directors received a benefit from the LBO (payment for their stock in Tribune) that, while shared pro rata by other *shareholders*, was not shared by Tribune and its *creditors*, the residual risk takers of the insolvent corporation.  (FC ¶¶ 39-40.)  In denying that they were "interested" in the LBO, the Moving Directors rely on the test applied to transactions involving *solvent* companies:  whether the fiduciary possesses any interest "not shared by *the stockholders* generally."  (Mot. 1 at 12-13 (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (emphasis added)).)  As long as a company remains solvent, this test makes sense, since it is reasonable to assume that a director will advance the interests of the solvent company by

_____

[20] As discussed in *infra*, Section III(B)(iii), DGCL Section 102(b)(7) and Tribune's exculpation clause do not justify dismissal of any of the Trustee's breach of fiduciary duty claims, including his claims based on breach of the duty of care.

acting in his or her own self-interest as a shareholder.  *See Smith v. Good Music Station, Inc.*, 129 A.2d 242, 247 (Del. Ch. 1957) (observing that a stock-owning fiduciary will "will be somewhat restrained from 'shortchanging' himself").

However, where a transaction like the Tribune LBO "renders a corporation insolvent, or brings it to the brink of insolvency, the rights of creditors become paramount," and it is no longer safe to assume that "what is good for a corporation's stockholders is good for the corporation." *Healthco II*, 208 B.R. at 300; *see also Gheewalla*, 930 A.2d at 102  (holding that creditors are "the principal constituency injured by any fiduciary breaches that diminish the firm's value") (internal quotations omitted).  Therefore, the relevant comparison in evaluating director "interestedness" in a transaction involving an insolvent corporation, or that renders a corporation insolvent, is whether the authorizing directors received a benefit not shared by *creditors*, the residual corporate risk takers and owners.  *See Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 510 (N.D. Ill. 1988) ("directors [who] owned shares of Wieboldt stock before the tender offer" that rendered corporation insolvent were deemed interested in transaction).  Viewed in this light, the Moving Directors clearly had an interest adverse to the corporation and its remaining risk takers, since they received millions of dollars in shareholder transfers (at a premium price), while Tribune's creditors received nothing, and the corporation was saddled with a mountain of debt rendering the repayment of existing creditors a virtual impossibility.  (FC ¶¶ 21, 39, 244-46, 394.)

Moreover, based on the very nature of the transaction at issue, Tribune's Directors were "interested" because leveraged buyouts are *inherently* self-dealing.  *E.g. Continuing Creditors' Comm. of Star Telecomms. Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 461 n.12 (D. Del. 2004) (citing *Healthco II*, 208 B.R. at 303).  The *Edgecomb* court explained that "the sale of stock to a

third party, who financed the purchase through the use of debt assumed by the company, [i]s in

essence a transaction between the directors and the company.  Consequently . . . directors who

own[] a small percentage of company stock could still be considered interested if they were

approving an LBO." *Id.*  Similarly, in *In re Bay Plastics Inc.*, the court observed that

shareholders in an LBO are "paid indirectly with the assets from the corporation itself" rather

than by a third-party purchaser as in an ordinary arm's-length corporate acquisition.  187 B.R.

315, 334 (Bankr. C.D. Cal. 1995).

Hence, stock-owning directors who approve an LBO—like the Moving Directors in this

case—engage in self-dealing by effectively paying themselves a dividend out of the

corporation's coffers.  *Id.*; *see also In re Buckhead Am. Corp.*, 178 B.R. 956, 961, 968 (Bankr. D.

Del. 1994) (declining to dismiss claim for breach of duty of loyalty and self-dealing against

directors where company was allegedly rendered insolvent by LBO, payments of $9.6 million

were made to directors and their affiliates to exercise stock options and purchase additional

shares from them as part of LBO); *In re NextWave Pers. Commc'ns, Inc.*, 235 B.R. 305, 313

(Bankr. S.D.N.Y. 1999) ("The inherently 'inside' nature of these LBO transactions generates a

split of interest within the 'estate' between the acquiring equity interest and their lender-funders

versus the debtor's existing or 'old' creditors."), *aff'd*, 241 B.R. 311 (S.D.N.Y. 1999), *rev'd on

other grounds*, 200 F.3d 43 (2d Cir. 1999).

### 2.   The Moving Directors Acted in Bad Faith

A fiduciary is also liable for a breach of the duty of loyalty where he or she fails to act in

good faith.  *Stone*, 911 A.2d at 370 ("the fiduciary duty of loyalty is not limited to cases

involving a financial or other cognizable fiduciary conflict of interest . . . a director cannot act

loyally towards the corporation unless she acts in the good faith belief that her actions are in the

corporation's best interest") (internal quotations omitted).  "[A] successful claim for the breach

of the duty of good faith requires a plaintiff to demonstrate one of three actions: '1) where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'" *In re Direct Response Media, Inc.*, 466 B.R. 626, 652 (Bankr. D. Del. 2012) (quoting *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) ("*Disney II*")).  All three actions are sufficiently alleged here.

First, as described in the Trustee's IFT Brief, the Directors intentionally acted with a purpose other than advancing the best interests of the Company when they authorized the fraudulent transfers associated with the LBO.  (*See* IFT Brief at 26-34 (detailing intentional conduct on part of Tribune fiduciaries including directors).)  *See also Direct Response*, 466 B.R. at 652-53 (director defendants alleged to have "acted with a purpose other than advancing the best interests of corporation" by requiring corporation "to take on large amounts of debt without fair consideration or reasonably equivalent value," facts which, "if taken as true, form the basis of a claim for breach of the duty of good faith").

Second, the Directors "intentionally violated applicable positive law" when they authorized and permitted the LBO payments to be made, contrary to Sections 160, 173 and 174 of the Delaware General Corporate Law (the "DGCL").  (*See infra* § V; FC ¶¶ 382-88 (alleging illegal shareholder transfers were "willful or negligent").)  *See also In re Sheffield Steel Corp.*, 320 B.R. 405, 422 (Bankr. N.D. Okla. 2004) (finding breach of duty of loyalty and good faith allegations sufficient where fiduciaries knowingly authorized illegal payments to stockholders in violation of DGCL)*; AT&T Corp. v. Walker*, No. C04-5709FDB, 2006 WL 2927659, at *3 (W.D. Wash. Oct. 12, 2006) (illegal dividends claim, coupled with allegations that defendants "should

not have allowed the companies to take on the debt" or funnel proceeds to insiders, sufficient to allege bad faith under "violation of applicable positive law" standard); *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1001 (S.D.N.Y. 1991) (similar).

Third, the Directors consciously disregarded their known duties to act for the good of Tribune and its creditors. *See In re Soporex, Inc.*, 463 B.R. 344 (Bankr. N.D. Tex. 2011) (applying Delaware law) (failure to act in face of known duty constitutes bad faith). As alleged in the Complaint, the Directors knew that the LBO would render Tribune insolvent, and therefore knew that their duty was to consider the interests of the corporation and its creditors in connection with that transaction. (FC ¶ 395.) Instead, the Trustee alleges that the Directors considered only the interests of shareholders, including themselves and the Controlling Shareholders. (FC ¶ 395(i).) These facts alone are sufficient to state a claim that the Directors disregarded known duties and therefore acted in bad faith. *Soporex*, 463 B.R. at 416.

In addition, the Complaint is rife with facts indicating that the Directors knowingly abdicated their duty to safeguard the interests of the corporation and its creditors in connection with the LBO. For instance, the Moving Directors knew that the projections created by management were wildly optimistic in view of the declining profitability of the publishing industry generally and Tribune in particular, but still relied on those projections uncritically in approving the LBO. (FC ¶¶ 258-69, 395.) The Moving Directors likewise knew that Duff & Phelps, the company's original solvency expert, refused to opine that Tribune was solvent before Step One, but blithely moved ahead with the transaction. (FC ¶¶ 180-82, 187, 197-98.) *See McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001), *amended on denial of reh'g*, 250 F.3d 997, 1000-01 (6th Cir. 2001) (applying Delaware law) (ignoring "red flags" like company resignations in advance of a transaction is indicative of bad faith).

48

The Moving Directors knew before Step One closed that the Company's actual performance for the year was already lagging far behind management's projections.  (FC ¶¶ 280-81); *see supra* Statement of Facts ("SOF") § P.)  The Moving Directors also knew, but ignored, that VRC had twisted the definition of "fair value" and distorted their analysis in numerous other unjustified ways in order to deliver its solvency opinion.  (FC ¶¶ 272-79; *see supra* SOF § J.)  The Moving Directors also acquiesced in weaker stress testing of the LBO than management undertook with respect to prior contemplated transactions, despite the LBO's vastly greater leverage and the Company's deteriorating performance.  (FC ¶¶ 217, 262.)  Combined with the myriad other facts alleged in the Complaint, these allegations are more than sufficient to state a claim for bad faith conduct under Delaware law.  *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003) (directors violate the duty of good faith by "adopting a 'we don't care about the risks' attitude concerning a material corporate decision").

### 3.    The Motion 1 Directors Lacked Independence

Contrary to the Motion 1 Directors' assertion, the Trustee alleges that they were influenced and dominated by the Controlling Shareholders and others, and therefore "lacked independence."  (*Compare* Mot. 1 at 12; FC ¶¶ 141-44, 214, 395(b).)  Allegations that an ostensibly independent special committee was dominated by interested parties are sufficient to state a claim for breach of the fiduciary duty of loyalty sufficient to withstand a motion to dismiss.  *See In re Shoe-Town, Inc. Stockholders Litig.*, C.A. No. 9483, 1990 WL 13475, at *4-5 (Del. Ch. Feb. 12, 1990); *see also Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) (holding that a director will lose the shield of his or her putative independence in the face of allegations that she or he was operating under influence of interested parties).

As described in detail in Section IV, *infra*, the Motion 1 Directors lacked true independence from the Controlling Shareholders and others.  FitzSimons—who was also

Chairman of the McCormick Foundation and on the Board of the Cantigny Foundation—and the Chandler Trust Representatives were excluded from the Special Committee because of putative conflicts.  In reality, FitzSimons attended all but one of the Special Committee's Meetings and the other Directors present at those meetings were under the control of the Chandler Trusts and the Foundations.  (FC ¶¶ 136, 143-4, 163, 638.)  These Controlling Shareholders sought and obtained direct access to the members of the Special Committee, agreed to pool their resources and influence in a bid to influence the Special Committee, and ultimately prevailed on the Special Committee to approve a deal strikingly similar in its economic terms to the type of transaction the Chandler Trusts sought from the beginning.  (*Id.*; *see also* FC ¶ 131 (quoting June 2006 letter from Chandler Trusts to Board urging consideration of leveraged buyout of Tribune shareholders at approximately $35 per share); *see also* § IV, *infra*.)

The Motion 1 Directors may wish to argue that their domination by the Controlling Shareholders was not the reason that they delivered the transaction the Controlling Shareholders asked for, but that is a question of fact for later resolution, and cannot justify dismissal on the pleadings.  *See Borden v. Sinskey*, 530 F.2d 478, 495 (3d Cir. 1976) (holding that "issue of director 'interest' or 'domination' is largely a question of fact to be determined from all the relevant facts and circumstances," and does not require financial interest where board members are alleged to have been under control of dominant shareholders); *see also Emerald Partners v. Berlin*, No. Civ. A. 9700, 2003 WL 21003437, at *23 (Del. Ch. Apr. 28, 2003) *aff'd*, 840 A.2d 641 (Del. 2003) (rejecting fiduciary duty claims after lengthy trial, but noting that "[n]either [company CEO nor President] should have been present at any of the non-affiliated directors' meetings or deliberations, or allowed to have any direct contact with their advisors"); *Troll Commc'ns*, 385 B.R. at 119 (unnecessary to provide detailed factual allegations concerning

domination and control at pleading stage); *In re Verestar, Inc.*, 343 B.R. 444 (Bankr. S.D.N.Y. 2006) (similar).

### iii. The Trustee's Claims Cannot Be Dismissed Based On The Exculpation Clause In Tribune's Certificate Of Incorporation

Section 102(b)(7) of the DGCL authorizes a corporation to eliminate monetary liability for its directors for breaches of fiduciary duty except, *inter alia*, for "any breach of [the] . . . duty of loyalty" and "acts or omissions not in good faith." Del. Code Ann. tit 8, § 102(b)(7). The Moving Directors assert that Tribune's certificate of incorporation includes a 102(b)(7) "exculpation clause," and that the Trustee's breach of fiduciary duty claims should be dismissed. (Mot. 1 at 7-10.)

However, under Delaware law, an "exculpation clause is an affirmative defense . . . [and] the viability of that defense is not proper at [the dismissal] stage." *In re Brown Schs.*, 368 B.R. 394, 401 (Bankr. D. Del. 2007); *see also Tower Air*, 416 F.3d at 238 (same); *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 561 (D. Del. 2008) (same); *Direct Response*, 466 B.R. at 651 (same).

In addition, the Trustee plainly alleges that the Directors breached their duties of loyalty and good faith in addition to due care (*see supra* § III(B)(i)-(ii)), and thus no part of his fiduciary duty claim can be dismissed. Del. Code Ann. tit. 8, § 102(b)(7); *see also Emerald Partners v. Berlin,* 726 A.2d 1215, 1223–24 (Del. 1999) (exculpation clause only effective "where the factual basis for a claim *solely* implicates a violation of the duty of care") (emphasis in original); *Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 399-400 (S.D.N.Y. 2013) (applying Delaware law) (holding that "102(b)(7) provision cannot operate to negate plaintiffs' duty of care claim on a motion to dismiss" where breach of duty of loyalty also alleged) (internal quotations omitted); *Direct Response,* 466 B.R. at 651 (same); *In re USA*

*Detergents, Inc.*, 418 B.R. 533, 545 (Bankr. D. Del. 2009) (same); *OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 725 (Del. Ch. 2014) (similar).

### iv.   DGCL Section 141(e) Does Not Apply

The Motion 1 Directors' bid for dismissal based on Section 141(e) of the DGCL and their alleged reliance on information provided by Tribune's management, the Company's advisors, and the Special Committee's advisors should also be rejected.  First, Section 141(e) constitutes an affirmative defense, and cannot be resolved on a 12(b)(6) motion to dismiss on the pleadings. *See In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 489-90 (Del. Ch. 2013); *Manzo v. Rite Aid Corp.*, No. 18451-NC, 2002 WL 31926606, at *3 n.7 (Del. Ch. Dec. 19, 2002).

Second, directors can take refuge in the Section 141(e) safe harbor only if they relied "in good faith" on information and opinions provided by a person with relevant "professional or expert competence" who "has been selected with reasonable care by or on behalf of the corporation."  Del. Code Ann. tit. 8, § 141(e).  The Complaint is replete with allegations demonstrating that the Directors could not have relied in good faith on the information provided by Tribune's officers concerning Tribune's financial performance and the LBO, nor could they have believed that VRC was "selected with reasonable care," or relied on VRC's opinion of solvency in good faith.  (FC ¶¶ 170-74, 258-68, 306-18, 395(h).)  (*See also infra* § V(D).)  The Motion 1 Directors' purported reliance on Morgan Stanley is even more far-fetched, since they do not identify in the Complaint a single affirmative statement or opinion by Morgan Stanley (as opposed to silence) concerning the companies' flawed projections or Tribune's purported solvency upon which the Special Committee relied.

The Motion 1 Directors cannot rely on Section 141(e) under these circumstances.  *AT&T*, 2006 WL 2927659, at *2 (applying Delaware law) (§ 141(e) inapplicable where solvency expert allegedly interested and relied on faulty financial assumptions); *Smith v. Van Gorkom*, 488 A.2d

858, 875 (Del. 1985) (defense requires "good faith, not blind, reliance") *overruled on other*

*grounds by Gantler v. Stephens*, 965 A.2d 695 (Del. 2009).

### v. The Moving Directors Do Not Have The Benefit Of The Business Judgment Rule, And Instead Must Prove That The LBO Was Entirely Fair

The Moving Directors cannot obtain dismissal of the claims against them based on the

"business judgment rule."  First, the business judgment rule is an affirmative defense that will

justify dismissal only when the "defense appears on [the] face" of the complaint.  *Tower Air*, 416

F.3d at 238.  Here, the Complaint demonstrates the rule is inapplicable.  Second, the business

judgment rule is nothing more than a rebuttable presumption. Under the rule, courts presume that

"in making a business decision the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company."  *In re*

*Troll Commc'ns, LLC*, 385 B.R. at 118 (quoting *Orman v. Cullman*, 794 A.2d 5, 19–20 (Del. Ch.

2002)).  "A plaintiff can rebut the presumption of the business judgment rule by showing that

'the board of directors, in reaching its challenged decision, violated any one of its triad of

fiduciary duties: due care, loyalty, or good faith."  *Id.* (quoting *Emerald Partners v. Berlin*, 787

A.2d 85, 91 (Del. 2001)); *see also Disney II,* 906 A.2d at 52 (same).  As discussed at length in

Sections III(B)(i-ii, v) above, the Trustee has alleged such violations and the business judgment

rule does not apply.

Accordingly, the Defendants will bear the unenviable burden of proving at trial that the

LBO was "entirely fair."  *Disney II*, 906 A.2d at 52 (where breaches of fiduciary duty alleged,

"the burden then shifts to the director defendants" to prove "transaction was entirely fair").  To

show entire fairness in the context of an LBO the Directors must prove "the LBO did not leave

[the company] insolvent (in either the bankruptcy or equity sense) or with unreasonably small

capital. . . . If they fail to sustain their burden, they are responsible for the resulting damages

incurred by [the company] and derivatively by its creditors." *Healthco II*, 208 B.R. at 305; *see also In re Hechinger Inv. Co. of Del.,* 327 B.R. 537, 548-49 (D. Del. 2005) (genuine issue of material fact regarding solvency of post-LBO corporation precluded summary judgment).[21] Whether the Directors will be able to carry this heavy burden is for another day; for now, their motion to dismiss based on application of the business judgment rule must be denied.

### C.   The Chandler Trust Representatives Breached Their Fiduciary Duties

The Chandler Trust Representatives were directors when the LBO was approved, attended Board meetings and advocated for the LBO, and are not shielded from liability merely because they abstained from the formal vote. As cases cited in Defendants' brief make clear, there is "no *per se* rule [that] unqualifiedly and categorically relieves a director from liability solely because that director refrains from voting on the challenged transaction." *In re Tri-Star Pictures Inc. Litig.*, No. 9477, 1995 WL 106520, at *3 (Del. Ch. Mar. 9, 1995). A "director [who] plays a role in the negotiation, structuring, or approval" of a transaction may be liable even if he or she formally abstains from any vote. *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 753 (Del. Ch. 2007); *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1166 (Del. Ch. 2006) (same).

So here. The Chandler Trust Representatives were thoroughly enmeshed in the LBO from start to finish. While the Chandler Trust Representatives abstained from the formal vote, they attended and actively participated in the April 1, 2007 Board meeting in which the LBO was

---

[21] At a minimum, the board's actions would be subject to at least "enhanced scrutiny" because the LBO involved a change in control. *Mercier v. Inter–Tel (Del), Inc*., 929 A.2d 786, 810 (Del. Ch. 2007); *In re Del Monte Foods Co. S'holders Litig*., 25 A.3d 813, 830 (Del. Ch. 2011) (enhanced scrutiny applied to change in control transactions even in absence of bad faith, disloyalty or lack of independence). Under the test of "enhanced scrutiny," directors "bear the burden of persuasion to show that their motivations were proper and not selfish." *Mercier*, 929 A.2d at 810. Claims subject to enhanced scrutiny are not subject to dismissal on the pleadings. *See id.* at 800, 817; *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 51-52 (Del. 1993).

approved and remained on the board through the closing of Step Two.  (FC ¶¶ 211, 224, 326.)

The Chandler Trust Representatives knew that the LBO would ruin Tribune.  Indeed, as far back

as June 2006, Stinehart stated publicly that Tribune was "confronted with a fundamental erosion

in both of its core businesses" and that there was "scant evidence to suggest" that Tribune would

not continue to "significantly underperfor[m] industry averages."  (FC ¶ 129.)  At that time, the

Chandler Trust Representatives had refused to vote in favor of a prior transaction that involved

much less leverage than the LBO.  (FC ¶ 206.)  And yet, despite their knowledge that the LBO

would be catastrophic for Tribune, the Chandler Trust Representatives *did absolutely nothing* to

avoid that result.  (FC ¶¶ 151, 207-08, 224, 281.)

     In short, the Chandler Trust Representatives played a decisive role in making the LBO a

reality and cannot immunize themselves from liability based on their formal abstention from the

board vote.  *See, e.g.*, *TOUSA,* 437 B.R. at 452, 455 (director "not shielded from liability as a

matter of law" despite abstaining from decision respecting subject transaction where director

"contributed to analysis showing that . . . transaction would result in adverse consequences[,] . . .

was aware of red flags surrounding the transaction[,] . . . chose . . . not [to] disclose a

memorandum on strategic alternatives . . . and . . . took no other action to warn the company");

*Pereira v. Cogan*, 294 B.R. 449, 525-26 (S.D.N.Y. 2003) (similar), *rev'd on other grounds*, 413

F.3d 330 (2d Cir. 2005); *see also Dalton v. Am. Inv. Co.*, No. 6305, 1981 WL 7618, at *2 (Del.

Ch. June 4, 1981) (similar); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710-11 (Del. 1983)

(conflicted board member who participated in negotiation of merger cannot escape liability by

skipping vote).

     The transcript appended by Defendants from *Plymouth County Retirement Ass'n v.*

*Brookfield Homes Corp.* makes the same distinction between directors who simply do not vote

and those who were materially involved in pushing forward an unfair transaction and—in the pages which the Defendants did not include in their excerpt—categorically rejects the argument that a conflicted fiduciary may participate in negotiations and then walk away from the vote. (*See* Zensky Decl. Ex. 2.)  The Chandler Trust Representatives fall into the extreme of the latter category.  They did everything *but* vote for the LBO.  (FC ¶¶ 136-44, 148-51, 204-08, 224, 281.)

The Chandler Trust Representatives contend that they did not in fact play any role in bringing the LBO to pass.  At most, these arguments raise disputed issues of fact that cannot defeat the Trustee's well-pled allegations that the Chandler Trust Representatives were extensively involved in the decision to undertake the LBO, including by shaping the very terms of the LBO, and cannot justify dismissal on the pleadings.  (*E.g.* FC ¶¶ 136-44, 148-51, 204-08.) Their reliance on cases—most of which were decided after trial or on summary judgment—that involved defendants who were not even alleged to have any role in the transactions at issue is likewise misplaced.  *E.g., In re Wheelabrator Technologies, Inc. S'holder Litig.*, No. 11495, 1992 WL 212595 (Del. Ch. Sept. 1, 1992) (abstaining directors not alleged to have participated in the transaction at issue).[22]

Defendants' cases are also distinguishable because the Chandler Trust Representatives' only real conflict of interest with respect to the LBO was the same one shared by all of Tribune's other directors—they and their principals stood to receive millions of dollars in shareholder

---

[22] *See also Tri-Star*, 1995 WL 106520, at *2 (summary judgment; "[T]he critical undisputed fact is that [the three conflicted directors] did not attend or otherwise participate in the Tri-Star board meeting at which the Combination was considered and approved"); *Citron v. E.I. Du Pont De Nemours & Co.*, 584 A.2d 490 (Del. Ch. 1990) (trial; "throughout the entire decision making process no Du Pont representative and no Remington director affiliated with DuPont . . . participated in any of the Merger Committee's deliberations or attempted to influence its decisions"); *Propp v. Sadacca*, 175 A.2d 33, 39 (Del. Ch. 1961) (trial; judgment rendered for director who abstained "[o]n the basis of all the relevant facts of record"); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, No. 758-CC, 2011 WL 227634 (Del. Ch. Jan. 14, 2011) (trial; similar).

transfers while bankrupting Tribune at the expense of its creditors.  The Chandler Trust Representatives' fiduciary duty therefore was to stop the LBO in its tracks, not try to duck liability by abstaining from the Board vote.

The excuses offered by the Chandler Trust Representatives for skipping the vote are transparently inadequate.  First, they claim they were conflicted because the Chandler Trusts they represent had submitted a proposal to buy certain assets.  (Mot. 5 at 2-3.)  Their assertions stray far outside the four corners of the Complaint—which nowhere even mentions the bid—and relies on rank hearsay that cannot be considered on this motion for any purpose.  (*See supra* § XIII.)  In any case, the February 12, 2007 Tender Offer referenced by the Chandler Trust Representatives provides expressly that the Trust's proposal to buy Tribune assets would not be recommended to the board of directors, and thus was no longer even a competing option by the time the LBO was approved almost two months later, and consummated two months after that.

Next, they argue that they were conflicted because the Chandler Trust had obtained registration rights for its unregistered Tribune shares in exchange for the Chandler Trust's agreement to vote all of its shares in favor of the LBO.  But the Trust's registration rights agreement did no more than put the Trust in the same position as Tribune's other shareholders— including the Motion 1 Directors—by ensuring they could sell all of their shares, and in no way justified their abstention from voting on the transaction itself.  In contrast, in the cases relied upon by the Chandler Trust Representatives, the abstaining directors were squarely on the other side of the transaction as it was being negotiated—for example, a controlling shareholder or major shareholder with director designees in a merger transaction *with that controlling/major shareholder*, or directors who were senior executives at the company from which a corporation acquired assets.  *Weinberger v. UOP, Inc.*, 457 A.2d 701; *Tri-Star*, 1995 WL 106520, at **1-2;

*Citron*, 584 A.2d at 494; *Wheelabrator*, 1992 WL 212595, at *1; *Propp*, 175 A.2d at 39; *Emerald Partners*, 2003 WL 21003437, at *24; *Hammons Hotels*, 2011 WL 227634, at **3, 6-7.  These cases serve only to highlight the absence of a conflict with respect to the Chandler Trust Representatives sufficient to justify their abstention.

### D.  <u>Zell Breached His Fiduciary Duties</u>

Zell is liable for the breaches of care, loyalty and good faith that occurred after he joined the Board on May 9, 2007.  (FC ¶ 227.)  Like the Chandler Trust Representatives, however, Zell suggests that he cannot have breached his fiduciary duties to Tribune because he did not "participate[] in any board decision relating to the Transaction" before the closing of Step Two. (Mot. 2 at 15.)  First, this ignores the Trustee's explicit allegation that Zell attended the Board's final meeting in connection with Step Two on December 18, 2007, at which point he was unquestionably a Tribune fiduciary.  (FC ¶ 326.)   At that meeting, the Board was presented with the VRC Step Two solvency opinion, but utterly failed to conduct any analysis of the October Projections on which the VRC opinion was based, or the faulty assumptions utilized by VRC. (FC ¶¶ 326-27.)  The extent to which he participated in the Board's discussions is plainly a factual matter not ripe for consideration.  (*See supra* § I.)  Moreover, as discussed above, a director who absents himself from formal decision-making does not limit his liability—if he plays a "role in the negotiation, structuring, or approval" of the offending transaction.  *See Valeant Pharms.*, 921 A.2d at 753.  *See also Pereira v. Cogan*, 294 B.R. at 525-26 (after trial, finding that absence of board vote did not exonerate directors and that directors will not be excused from liability if they "knew about a challenged expenditure yet unreasonable failed to take action").

As a member of the Tribune Board beginning on May 9, 2007, Zell was in the same position as all the other Tribune Directors to know precisely how flawed the Company's

projections were, how flawed the VRC solvency opinion was, and to understand the grave

danger that the LBO posed to the Company.  (FC ¶ 227, 258-69, 280, 326-28.)  Despite that

known risk—which was obvious to anyone who could read a balance sheet—Zell personally

worked, during the time when he was on the Tribune Board, to make sure that Step Two of the

LBO closed, and in doing so completely abandoned Tribune's interests.  (FC ¶ 328.)  In order to

close, it was obviously necessary for the lenders to fund the deal, but in the days leading up to

the close of Step Two, the lenders seriously considered backing out.  "[I]n the days leading up to

the LBO, when the Lead Banks were weighing the pros and cons of backing out of the LBO," it

was Zell who "had a long call" with JPMorgan.  (FC ¶ 349.)  The report of the conversation went

straight to JPMorgan CEO Jamie Dimon, who was told that Zell had personally confirmed that

"the company was solvent" and that Zell would "make good on his commitment" to "make this

deal work."  (FC ¶ 349.)  As FitzSimons therefore acknowledged in a December 19, 2007 press

release, the LBO could not have happened had it not been for Zell.  (FC ¶ 351.)

       Zell would minimize the importance of this work to ensure that the LBO closed,

suggesting that the allegations that he intervened with JPMorgan was just "br[inging] parties to

the table."  (Mot. 2 at 16.)  But what he did was far more than kicking off a negotiation.  Instead,

he personally intervened at the highest level of decision-making at one of the LBO lenders, right

as that lender was considering whether to walk away from Step Two of the LBO entirely because

of concerns about Tribune's solvency.  (FC ¶¶ 297-305, 345-51.)  To be clear, had JPMorgan not

funded Step Two, the Step Two redemptions would not have happened and billions of dollars that

wrongly flowed to shareholders would instead have been available to repay Tribune's creditors.

Zell, to ensure that JPMorgan would proceed despite its concerns, then personally vouched for

Tribune's solvency.  (FC ¶ 349.)

Nothing in *Citron*, 584 A.2d at 499, or any other case the Trustee has identified holds that a director is immune from liability when he, as Zell did, personally intervenes to ensure that the company to which he owes fiduciary duties closes on a transaction in which has a personal interest. Instead, Delaware law requires Zell to answer for the critical role he played in directly and massively harming the Company he had a duty to protect. Zell's motion to dismiss Count Five of the Complaint should therefore be denied.

### E.  The Subsidiary D&O Defendants Breached Their Fiduciary Duties

Count Twelve alleges that the Subsidiary D&O Defendants breached their fiduciary duties to the Subsidiary Guarantors and their creditors. (FC ¶¶ 471-81.) Of the nineteen Subsidiary D&O Defendants, only one—Durham J. Monsma—has moved to dismiss this claim. (*See* Mot. 3.) His arguments lack merit.

#### i.  The Subsidiary D&O Defendants Breached Their Fiduciary Duties By Approving The Subsidiary Guarantees While Facing Conflicts Of Interest And Conducting No Due Diligence

As a precondition to lending the LBO Debt that was used to consummate the LBO, the LBO Lenders required guarantees from the Subsidiary Guarantors, which held most of Tribune's value. (FC ¶¶ 119, 282, 286.) On June 4, 2007, and December 20, 2007, the Subsidiary D&O Defendants signed unanimous consents authorizing the Subsidiary Guarantors to guarantee all of the LBO Debt. (FC ¶¶ 282, 329.) Yet, in return for issuing the guarantees, the Subsidiary Guarantors received none of the proceeds of the LBO Debt, nor any other direct or indirect benefit. (FC ¶ 283.) Instead, all $10.7 billion of the proceeds of the LBO Debt was immediately used for other purposes, such as buying Tribune's shares or (as described below) paying inducements to the Subsidiary D&O Defendants and others, or paying off parent Company debt for which the subsidiaries were never obligated. (FC ¶ 283.) By guaranteeing the massive LBO

60

Debt, without receiving any value in return, the Subsidiary Guarantors were rendered insolvent. (FC ¶ 472.)

Because the Subsidiary Guarantors were insolvent, the Subsidiary D&O Defendants owed fiduciary duties not only to the Subsidiary Guarantors, but also to their creditors.  *In re RSL COM Primecall, Inc.*, No. 01 Civ. 11457, 2003 WL 22989669, at *13 (Bankr. S.D.N.Y. Dec. 11, 2003); *Direct Response*, 466 B.R. at 649; *TOUSA*, 437 B.R. at 457.  The Subsidiary D&O Defendants thus were required to act with due care, loyalty, and good faith.  *Id.* at 460-63.  But in approving the guarantees, the Subsidiary D&O Defendants did none of these things.  Even though the guarantees made the Subsidiary Guarantors *unconditionally liable on more than $10.7 billion* in LBO Debt, the Subsidiary D&O Defendants conducted *no* due diligence or independent investigation before approving the guarantees.  (FC ¶ 284.)  Indeed, the Subsidiary D&O Defendants did not hold a single board meeting to consider the execution of the guarantees, nor did the Subsidiary D&O Defendants consider whether the guarantees were in the best interests of the Subsidiary Guarantors or their creditors.  (FC ¶ 284-85.)  Instead, the Subsidiary D&O Defendants simply approved the guarantees at Tribune's request.  (FC ¶ 284.)  As Subsidiary D&O Defendant, Landon candidly admitted, his role as a director of a Subsidiary Guarantor was "perfunctory."  (FC ¶ 285.)

Moreover, in approving the guarantees, the Subsidiary D&O Defendants labored under clear conflicts of interest.  (FC ¶ 286.)  Nearly all of the Subsidiary D&O Defendants stood to gain substantial monetary special incentives that would be awarded if—but only if—the LBO was consummated.  (FC ¶¶ 71, 286.)  And, many of the Subsidiary D&O Defendants stood to receive millions of dollars by selling or redeeming their Tribune stock in connection with the LBO, but again, only if the LBO was consummated.  (FC ¶¶ 71, 286.)  Combined, these

redemptions and insider payments totaled over $122 million.  (FC ¶ 71.)  The Subsidiary D&O

Defendants were therefore self-dealing by approving the guarantees because they knew the

guarantees were "a condition precedent to the Lenders making advances" on the LBO Debt that

would be used to pay their special incentives.  (FC ¶ 286.)  *E.g.*, *In re Magnesium Corp.*, 399

B.R. 722, 772-74 (Bankr. S.D.N.Y. 2009) (denying motion to dismiss where directors of

subsidiaries caused subsidiaries to borrow money to pay a large dividend to the corporate parent

and to pay bonuses to themselves); *In re Musicland Holding Corp.*, 398 B.R. 761, 787-89

(Bankr. S.D.N.Y. 2008) (similar); *In re Scott Acquisition Corp.*, 344 B.R. 283, 286-90 (Bankr. D.

Del. 2006) (similar).

By approving the guarantees without conducting due diligence and while facing conflicts

of interest, the Subsidiary D&O Defendants breached their fiduciary duties of care, loyalty, and

good faith.  *See, e.g.*, *RSL COM Primecall, Inc.*, 2003 WL 22989669; *TOUSA*, 437 B.R. at 460-

63.  In *RSL*, as here, the directors of an insolvent subsidiary signed unanimous consents

approving guarantees of $1.6 billion of the parent's debt, without conducting any diligence

beforehand.  2003 WL 22989669, at *11.  In denying the defendants' motion to dismiss, the court

held that the business judgment rule was overcome because the defendants' "patently

inequitable" conduct amounted to self-dealing.  *Id.* ("[E]specially in view of the enormous size

of the guarantees and the lack of any record of any review of their propriety, the Plaintiffs' have

adequately alleged self-dealing.").  In addition, "the business judgment rule does not protect

conduct of directors where material decisions are made in the absence of any information and

any deliberation." *Id.* at *12.  The court concluded that the defendants' conduct put "directly in

question whether the board's decision-making processes were employed in a good faith effort to

advance corporate interests." *Id.*

*TOUSA* similarly held that the plaintiff stated claims for the breach of the duties of care, loyalty, and good faith where the directors of insolvent subsidiaries granted liens to repay a $500 million debt that was owed by the parent but not by the subsidiaries.  437 B.R. at 460-63.  As the court stated, "[t]here is no basis in law for the proposition that the directors of an insolvent subsidiary can permit it to be plundered for its parent's benefit."  *Id.* at 462.  *See also Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 678-682 (N.D. Tex. 2011) (similar); *Greater Se. Cmty. Hosp.*, 353 B.R. at 342-43 (similar); *Healthco II*, 208 B.R. at 306-07 (similar).

Here, as in the cases above, the Subsidiary D&O Defendants breached their fiduciary duties by approving the guarantees while facing conflicts of interest and without conducting the slightest diligence.  (FC ¶¶ 282-86, 471-81.)

### ii.  Defendant Monsma's Arguments Are Meritless

Each of Monsma's arguments lacks merit.  *First*, Monsma argues primarily that he did not breach a fiduciary duty because, unlike the other Subsidiary D&O Defendants, he did not stand to receive monetary special incentives if the LBO was completed.  (Mot. 3 at 1-3.)  For similar reasons, he contends that the business judgment rule bars the claims against him.  (Mot. 3 at 7.)  This argument fails for two independent reasons.  First, Monsma ignores that he received *other* monetary payments—███████ in proceeds from tendering his Tribune shares—that were not received by the stakeholders that remained after Tribune completed the LBO.  (FC ¶ 71.)  This payment rendered Monsma conflicted and, thus, caused him to breach his duty of loyalty.  (*See supra* §§ III(B)(2), III(E)(i).)  Second, even if Monsma had received no payments, his utter failure to consider the interests of the Subsidiary Guarantors or their creditors is a breach of the duty of good faith that overcomes the business judgment rule.  *RSL*, 2003 WL 22989669, at *11-*12; *TOUSA*, 437 B.R. at 461-63.

*Second*, Monsma contends that he did not owe a fiduciary duty to the Subsidiary Guarantors' creditors, but only to the sole shareholder, Tribune.  (Mot. 3 at 6.)  Monsma misstates the law.  His contentions fail to take into account the allegations of insolvency in the complaint here, and the legal principle that while officers and directors of subsidiaries may legitimately advance the interests of the corporate parent when the subsidiaries are not insolvent, they may no longer do so when the subsidiaries are insolvent, or would be rendered insolvent by the contemplated action.  *Magnesium*, 399 B.R. at 773.  Thus, "Delaware law is clear that directors and officers of an insolvent, wholly-owned subsidiary owe fiduciary duties to the subsidiary and it creditors."  *TOUSA*, 437 B.R. at 457 (citing cases).

*Third*, to get around this black letter law (which Monsma fails to acknowledge), he claims that the two Subsidiary Guarantors of which he was a director were, in fact, not insolvent.  But the Court must accept the Complaint's well-pled allegation that "the Subsidiary Guarantors were rendered insolvent by the LBO."  (FC ¶ 472; *see also id.* ¶¶ 119-20.)  And in any event, Monsma himself concedes the point.  (*See* Mot. 3 at 1 ("Nor are the two subsidiaries of which Mr. Monsma was previously an officer and director insolvent, *with the sole exception of the guarantee*." (emphasis added)).)  In addition to being not cognizable on this motion, the bankruptcy schedules that Monsma cites confirm that the Subsidiary Guarantees are not factored in.  (*See infra* § XIII; Mot. 3 at 3-4.)

*Fourth*, Monsma contends that the Complaint uses impermissible "group pleading" and, alone among the moving Defendants, argues that the Trustee's fiduciary duty claims are subject to Rule 9(b).  (Mot. 3 at 4-7.)  In the first place, Rule 9(b) does not apply to Count Twelve.[23]  But

---

[23] Rule 8(a) applies to fiduciary duty claims based on negligence, self-dealing, disloyalty, and bad faith.  *See In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 430 (Bankr. S.D.N.Y. 2005); *see also Official Comm. of Unsecured Creditors of Smtk Expedite, Inc. v. Donaldson, Lufkin &*

even if it did, the Complaint answers, in detail, Monsma's rhetorical question "why [am I] being

sued?" (Mot. 3 at 1.) On June 4, 2007, as a director of two Subsidiary Guarantors—Southern

Connecticut Newspapers, Inc. and TMLS1, Inc. (FC Ex. B at 2-3)—Monsma signed unanimous

consents authorizing these subsidiaries to guarantee all of the LBO Debt. Monsma did so while

(i) conducting no due diligence (FC ¶ 284); (ii) failing to consider the interests of these two

subsidiaries or their creditors (*id.* ¶ 285); and (iii) facing a clear conflict of interest by virtue of

the ███████ he received by selling or redeeming his Tribune stock in the LBO (FC ¶¶ 71, 286).

Monsma is well-informed of the precise allegations against him, as are the 18 other Subsidiary

D&O Defendants who have not moved to dismiss Count Twelve.

> *Finally*, Monsma points out that he was not a director or officer of a Subsidiary

Guarantor during Step Two of the LBO. (Mot. 3 at 1.) This is irrelevant. As shown above,

Monsma breached his fiduciary duties based on his conduct at Step One of the LBO, when he

approved the guarantees on June 4, 2007 while facing conflicts of interest and conducting no

diligence.

> For these reasons, the Court should deny Monsma's motion.

## IV.       THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR BREACH OF FIDUCIARY DUTY AGAINST THE CONTROLLING SHAREHOLDERS

> Count Fourteen of the Complaint alleges that Tribune's Controlling Shareholders

breached their fiduciary duties to Tribune's creditors. (FC ¶¶ 490-502.) Consumed by self-

interest, the Controlling Shareholders caused Tribune to undertake the LBO so they could cash

out their equity investments at an inflated price, while leaving Tribune to drown under more than

$8 billion in debt. (FC ¶¶ 497-500.) In moving to dismiss Count Fourteen, the Controlling

---

*Jenrette Sec. Corp.*, No. 00 Civ. 8688(WHP), 2002 WL 362794, at *8 (S.D.N.Y. Mar. 6, 2002)
(refusing to apply Rule 9(b) to breach of fiduciary duty claims that could be sustained without a
finding of fraud).

Shareholders do not even try to argue that their conduct complied with the fiduciary duties they owed to Tribune. Instead, they argue only that they owed no fiduciary duties in the first place because they did not exercise actual control over Tribune. That argument ignores the Complaint's well-pled allegations and is refuted by controlling law.

### A. The Controlling Shareholders Exercised Actual Control Over Tribune And Therefore Owed Fiduciary Duties To Tribune And Its Creditors, Which They Breached By Inducing Tribune To Undertake The LBO

The Controlling Shareholders—the Chandler Trusts and the Foundations—were Tribune's two largest shareholders, collectively owning 33% of Tribune's shares. (FC ¶¶ 72-75.) Under black letter law, they owed a fiduciary duty to Tribune and its creditors if they exercised "actual control" over Tribune's conduct with respect to approving the LBO. *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994); *see also In re High Strength Steel, Inc.*, 269 B.R. at 569 (controlling shareholders owe fiduciary duties to creditors when the corporation is insolvent). They did. As shown below, the Controlling Shareholders joined forces, insisted that Tribune undertake a major transaction that would allow them to cash out their investments, dictated the terms of the LBO, and then received exactly what they had demanded. But although the Controlling Shareholders had seized control of Tribune, they chose not to comply with the fiduciary duties that arise as a consequence of control over a corporation's affairs. Instead, in flagrant breach of the duties they owed to Tribune and its creditors, the Controlling Shareholders sought to advance only their own interests. The result was a disastrous LBO that rewarded Tribune's shareholders handsomely, even as it guaranteed that the Company would careen into bankruptcy, causing enormous losses to the Company and its pre-LBO creditors.

The Chandler Trusts—Tribune's largest shareholder—set Tribune along the course to the LBO when they began agitating in June 2006 for a strategic transaction that would allow them to cash out their investment, and threatened the Board with a management shakeup if it did not take

prompt action.  (FC ¶¶ 128-132.)  The Chandler Trusts' threats—soon augmented by pressure

from the Foundations who agreed to act in concert with the Chandler Trusts—led to the

appointment of the Special Committee, allowed the Controlling Shareholders to obtain a

privileged role in the Special Committee's deliberations, and guaranteed that the LBO's terms

would be structured to meet the Controlling Shareholders' demands.  (FC ¶¶ 136, 138, 141, 143,

144.)  As Tribune continued to consider the LBO, the Controlling Shareholders negotiated

directly with Zell and EGI over the terms of the transaction culminating in the Chandler Trusts'

execution of a voting agreement that virtually guaranteed shareholder approval of the LBO.  (FC

¶¶ 151, 203-05.)  In short, the Controlling Shareholders' fingerprints were all over the LBO.

By the time the LBO was approved in April 2007—and certainly when Step One of the

LBO closed—the Controlling Shareholders knew (or were reckless or grossly negligent in not

knowing) that the transaction would destroy Tribune as a going concern.  (FC ¶¶ 205-09, 497.)

But, rather than comply with their fiduciary obligations by attempting to avert the LBO, the

Controlling Shareholders instead *facilitated* it.  (FC ¶¶ 208, 209.)  In doing so, they breached

their fiduciary duties to the company's other stakeholders.  (*Id.*)

> **B.  The Complaint Adequately Alleges That The Controlling Shareholders
> Exercised Actual Control Over The LBO Transaction**

In their motion, the Controlling Shareholders contend that, despite all of the well-pled

allegations set forth above, the Trustee has failed to allege that they exercised actual control over

Tribune's conduct with respect to the LBO.  To support this argument, the Controlling

Shareholders use a "divide and conquer" strategy, arguing that certain allegations, standing

alone, do not "establish" or "demonstrate" actual control.  (Mot. 4  at 11, 12, 16.)

That is doubly wrong.  First of all, a complaint is not required to "establish" or

"demonstrate" that its allegations are true in order to survive a motion to dismiss under Rule

12(b)(6).  Rather, at the pleading stage the complaint need only "state[] a *plausible* claim for

relief." *Iqbal*, 556 U.S. at 679 (emphasis added).  So long as the complaint's well-pled

allegations at least "nudge[] [its] claims across the line from conceivable to plausible," dismissal

is inappropriate.  *Twombly*, 550 U.S. at 570.  (*See supra* § I.)

Second, to determine whether the Complaint adequately alleges actual control the Court

must view the allegations *collectively*, not in isolation as the Controlling Shareholders propose.

*See supra* § I.  This is because the "question of whether a large block holder is so powerful as to

have obtained the status of a 'controlling stockholder' is intensely factual," *In re Cysive, Inc.*

*S'holders Litig.*, 836 A.2d 531, 550-51 (Del. Ch. 2003), and is necessarily "highly

contextualized," *Williamson v. Cox Commc'ns, Inc.*, No. Civ. A. 1663-N, 2006 WL 1586375, at

*6 (Del. Ch. June 5, 2006).  Thus, the *Williamson* court noted that none of the complaint's

allegations could support a conclusion of control in isolation, but held that "[t]he complaint

succeeds because it pleads a nexus of facts all suggesting that the [defendants] were in a

controlling position and that they exploited that control for their own benefit." *Id.*; *see also, e.g.*,

*In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 257-59 (Del. Ch. 2006) (allegations of actual

control survived motion to dismiss based on combination of shareholder's board representation,

course of dealing suggesting actual control, and statements in corporation's SEC filings

suggesting actual control); *Zimmerman v. Crothall*, No. Civ. A. 6001-VCP, 2012 WL 707238

(Del. Ch. Mar. 5, 2012), *as revised* (Mar. 27, 2012) (holding that allegations of control survived

summary judgment based on combination of shareholders' stock holdings and various

communications supporting inference of actual control); *In re Nine Sys. Corp. S'holders Litig.*,

No. Civ. A. 3940-VCN, 2013 WL 771897, at *6 (Del. Ch. Feb. 28, 2013) (noting that whether a

group of shareholders exercised control over a corporation is "fact-intensive inquiry" that "is

often difficult" to resolve even on summary judgment, and denying summary judgment because the record "support[ed] a reasonable inference—not necessarily the better inference—that a control group existed").

Once one applies the *correct* standard that considers all of the Trustee's allegations *taken as a whole* and asks whether they permit a plausible inference that the Controlling Shareholders exercised actual control, there is no doubt that the Complaint sufficiently alleges actual control over the LBO transaction.

### i. The Controlling Shareholders' Stock Holdings, Board Representation, And Relationship With Management Provided The Predicates For Control Over Tribune With Respect To The LBO

A shareholder's *potential* control—as measured by its stock holdings, board representation, and the like—is an important factor supporting an inference of actual control. *See, e.g.*, *In re Primedia*, 910 A.2d at 258 ("The fact that an allegedly controlling stockholder appointed its associates to the board of directors is certainly an important factor that provides a court with insight when evaluating whether actual control is pleaded adequately."); *Williamson*, 2006 WL 1586375, at *4 (same).  Here, the Controlling Shareholders appointed their own representatives to Tribune's Board and had significant leverage over the Board, which allowed them to bend the Board to their own interests at the expense of the company's creditors.

At the time of the LBO, the Chandler Trusts were Tribune's largest stockholder, with approximately 20 percent of Tribune's outstanding stock.  (FC ¶ 127.)  In addition to these substantial stock holdings, the Chandler Trusts also appointed three members of Tribune's eleven-member Board.  (FC ¶¶ 35-37, 72.)  The Foundations were Tribune's second-largest shareholder, with 13 percent of Tribune's outstanding shares.  (FC ¶ 127.)  The Foundations were linked to Tribune's Board and management through FitzSimons, Tribune's Chief Executive Officer and Chairman of the Tribune Board, who was also a member of the boards of directors of

69

the Foundations.  (FC ¶ 27.)  Collectively, of course, the Controlling Shareholders held even

more significant leverage over the Tribune Board—approximately 33 percent of Tribune's

outstanding stock.  (FC ¶ 127.)

ii.  **The Controlling Shareholders' Role In Initiating And Shaping The LBO Reflects Their Control Over Tribune With Respect To The LBO**

A shareholder's record of success in forcing a corporation to comply with the

shareholder's demands and to pursue its objectives supports an inference of actual control.  In

*O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902 (Del. Ch. 1999), for example, the plaintiff

challenging a merger alleged that (i) the corporation's board had agreed to reduce the merger

price substantially after the shareholder had threatened that it would not consummate the merger

without a price reduction, and (ii) the corporation's board had cut off discussions with a potential

purchaser of a line of business after the shareholder indicated that continued discussions would

threaten the merger.  *Id.* at 913.  The court held that these allegations, in combination with others,

sufficed to raise a reasonable inference that the shareholder "had used its position as a large

stockholder and creditor to dictate the terms" of the merger.  *Id.*; *see also In re Primedia*, 910

A.2d at 258-59 (denying motion to dismiss based in part on allegations that a series of corporate

transactions favored controlling shareholder's interests, which supported inference of actual

control); *Kahn*, 638 A.2d at 1114 (upholding factual finding that large, non-majority shareholder

exercised actual control through threat that caused board to reject renewal of management

contracts and contemplated acquisition).

So too here.  The Controlling Shareholders' singularly successful efforts to induce

Tribune to proceed with the LBO, and then to shape the LBO's terms to suit their interests, raise

a natural inference that the Controlling Shareholders exercised actual control over the LBO

transaction and Tribune's board and Special Committee.  Time and again, the Controlling

70

Shareholders' threats to the Tribune Board and their influence over the Special Committee process led to the Controlling Shareholders receiving exactly what they wanted.  (FC ¶¶ 126-44.) Shortly after the Chandler Trusts wrote to the Tribune Board in June 2006 urging the Board to appoint a committee of independent directors to evaluate options to enhance shareholder value, the Tribune Board did just that by appointing the Special Committee to explore alternatives for the company.  (FC ¶¶ 130, 136.)  And since the Chandler Trusts had proposed an LBO as an option that would allow shareholders to cash out at a high price while escaping the "huge downside risks" that Tribune was facing, it was no surprise that the Special Committee pursued the highly leveraged LBO proposed by Zell.  (FC ¶¶ 138, 145-47.)

When the Controlling Shareholders thereafter made clear that they would not accept an LBO proposal that did not provide an upfront distribution to Tribune's shareholders, the proposed transaction was promptly adjusted to address the Controlling Shareholders' concerns— a dramatic restructuring of the transaction.  (FC ¶¶ 149-50.)  And even after that concession was made, the Controlling Shareholders continued to demand more money for Tribune's shareholders (and hence additional new debt, to the detriment of Tribune's existing creditors), and in fact the share price was ultimately increased based on negotiations that included the Chandler Trusts. (FC ¶¶ 151, 203.)  At every turn, the Controlling Shareholders received precisely what they wanted.

The Controlling Shareholders ask the Court to disregard that highly salient fact for three primary reasons.  None is valid.  First, the Controlling Shareholders suggest (*See* Mot. 4 at 12-14) that the Complaint offers insufficient detail regarding the nature of the Controlling Shareholders' threats to the Tribune Board, and how those threats induced the Board to comply with the Controlling Shareholders' demands.  But the Complaint explains that the Chandler

Trusts' June 2006 letter threatened that they would "begin actively purs[uing] possible changes in Tribune's management and other transactions" if the Board did not take timely action  (FC ¶ 132), and it explains that the Board's decision to appoint a Special Committee—the first step toward Tribune's disastrous LBO—was taken "[i]n response" to the Chandler Trusts' demands. (FC ¶ 136.)  Likewise, the Complaint explains that in January 2007, as the Foundations began to place pressure of their own on the Board, the Foundations advised the Special Committee that it would be "difficult to do a transaction" without the support of the Controlling Shareholders.  (FC ¶ 141.)  That thinly veiled threat to withhold support from any transaction that did not address the Controlling Shareholders' demands is precisely the same threat that supported a claim of actual control in *O'Reilly*, 745 A.2d at 913.

     *Second*, the Controlling Shareholders also invoke a series of cases holding that companies may solicit the views of a large shareholder without that shareholder thereby obtaining actual control, and that large shareholders are generally free to act in their own self-interest.  (*See* Mot. 4 at 19-20.)  But these cases—just one of which involved a motion to dismiss—do not address the facts as alleged here.  For example, *In re Western Nat'l Corp. S'holders Litig.*, No. 15927, 2000 WL 710192 (Del. Ch. May 22, 2000), held (on summary judgment) that the "mere fact that [a company] solicited the view of a [large] shareholder with respect to an extraordinary business transaction and ultimately agreed with the view expressed by that shareholder does not indicate a relationship of domination and control." *Id.* at *8.  But Tribune did not simply "solicit" the Controlling Shareholders views.  The Special Committee's request for the Controlling Shareholder's views on Zell's initial proposal came after Chandler Trusts had threatened a management shakeup if its demands were not complied with, after the Chandler Trusts had demanded access to the Special Committee, and after the Foundations had

threatened to withhold approval of any transaction that did not address the Controlling

Shareholders' concerns.  (FC ¶¶ 132, 138, 141.)

More broadly, the Chandler Trusts not only received regular updates from the Special

Committee and from Tribune management; they also injected themselves directly into

negotiations with Zell and EGI.  (FC ¶¶ 151, 203.)  These negotiations, of course, culminated in

the execution of a special voting agreement that virtually guaranteed shareholder approval of the

LBO—demonstrating again the pivotal role played by the Chandler Trusts.  (FC ¶¶ 204-05.)[24]

In sum, the relevant context, as alleged in the Complaint, makes abundantly clear that the

Controlling Shareholders were deeply involved in and dictated the outcome of the LBO

transaction.[25]

---

[24] The Controlling Shareholders attempt to discount the significance of the voting agreement by stressing that it did not entirely guarantee shareholder approval.  (*See* Mot. 4 at 16.)  But the cases they cite—neither of which was decided at the pleading stage—do not address the question whether a voting agreement reflects control for purposes of imposing a fiduciary duty.  Rather, these cases addressed allegations that the voting agreement itself was either illegal or a breach of fiduciary duty.  *See In re IXC Commc'ns, Inc.*, No. C.A. 17324, 1999 WL 1009174, at *8 (Del. Ch. Oct. 27, 1999); *Emerson Radio Corp. v. Int'l Jensen Inc.*, No. Civ. A. 15130, 1996 WL 483086, at *20 (Del. Ch. Aug. 20, 1996).

[25] The Controlling Shareholders' reliance on *In re Novell, Inc. S'holder Litig.*, No. Civ. A. 6032-VCN, 2013 WL 322560 (Del. Ch. Jan. 3, 2013), and *Citron v. Steego Corp.*, No. Civ. A. 10171, 1988 WL 94738 (Del. Ch. Sept. 9, 1988), is misplaced for the same reason.  The facts as alleged here simply belie any characterization that the Controlling Shareholder "merely made . . . a suggestion and obtain[ed] the desired response. . . ."  *In re Novell*, 2013 WL 322560, at *12.  Likewise, *Citron*—a preliminary injunction decision—did not involve the sort of coercive and pervasive demands on the board that are alleged in this case.  *See* 1988 WL 94738, at *3-6.  Finally, the observation in *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334 (Del. 1987), that a shareholder may act in its own self-interest is beside the point here.  *See id.* at 1344.  The Complaint does not, as the Controlling Shareholders appear to suppose, suggest that a shareholder's efforts to pursue its own objectives will equate to control.  Rather, the allegations here are that the Controlling Shareholders "made clear to the Tribune Board that *it had to* . . . advance their objectives."  (FC ¶¶ 491-492 (emphasis added).)  It is the shareholder's domination of the board's decision-making that constitutes actual control.

*Third*, the Controlling Shareholders suggest that the Chandler Trusts must have lacked

control because the Tribune Board approved a $1.8 billion recapitalization transaction over the

Chandler Trusts' objection in May 2006.  (*See* Mot. 4 at 22.)  But the relevant question here is

whether the Controlling Shareholders exercised "actual control with regard to the particular

transaction that is being challenged."  *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, Civ.

A. No. 1668-N, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006); *see also, e.g.*, *In re Primedia*,

910 A.2d at 257 ("Allegations of control over the particular transaction at issue are enough.").

The outcome of a *different* transaction therefore cannot foreclose an allegation of control at the

pleading stage.

### iii.  The Controlling Shareholders Acknowledged Their Actual Control Over Tribune With Respect To The LBO

In determining whether a shareholder has actual control over a corporation, Delaware

courts have also looked to the shareholder's acknowledgement, contemporaneously with the

challenged transaction, that it controlled the corporation.  In *In re Loral Space & Commc'ns Inc.*,

No. Civ. A. 2808-VCS, 2008 WL 4293781 (Del. Ch. Sept. 19, 2008), for instance, the court

found that a 36 percent shareholder had exercised actual control over the affairs of a corporation,

in part because, prior to the litigation, both the shareholder and the corporation had "consistently

and publicly maintained" that the shareholder controlled the corporation.  *Id.* at *21; *cf. In re

Primedia*, 910 A.2d at 258 (corporation's pre-litigation statements supported inference of

shareholder's actual control).

The Complaint's allegations reflect similar acknowledgements of actual control here.

Most notably, on the very day the Tribune Board voted to approve the LBO, McCormick

Foundation spokesperson Joseph Hays wrote to a McCormick Foundation financial advisor at

Blackstone, stating that "God understands, but may not forgive us for what are bout to do to

74

good Olde TRB." (FC ¶ 210.)  Hays's comment shows not only that he understood (as any

reasonable person would have) that the approval of the LBO would mean the end of Tribune as a

going concern, but also that he understood the LBO not as the product of Tribune's own free

choice, but rather as something that was being imposed upon—"do[ne] to"—the Company by the

Foundations and their ally, the Chandler Trusts.

The same sense is reflected in the Foundations' January 2007 letter to the Special

Committee, in which the Foundation advised that it would be "difficult to do a transaction"

without the support of the Controlling Shareholders.  (FC ¶ 210.)  The letter reflects an

acknowledgment that the Controlling Shareholders possessed the practical power to control

Tribune's selection of a strategic transaction.  *See Loral,* 2008 WL 4293781, at *21 (finding

control where shareholder used "practical power" to "shape[] the process for considering and

approving" a financing transaction).

In the end, these contemporary acknowledgments of the Controlling Shareholders' role

simply reinforce what the Complaint's other allegations make clear: the Controlling

Shareholders' stock holdings, board representation, and relationships with management gave

them significant power over Tribune's corporate affairs, and the Controlling Shareholders used

that power to spur on the LBO transaction and to dictate its terms.

C.  **The Complaint Adequately Alleges That The**
**Controlling Shareholders Acted In Concert**

The Complaint alleges that in January 2007 the Chandler Trusts and the Foundations

"reach[ed] an agreement and understanding to use their voting power and influence to control

Tribune," and that "the Chandler Trusts and the Foundations in fact acted in concert at all

relevant times."  (FC ¶ 143.)  As a consequence, the Controlling Shareholders may be treated

collectively as a "control group," and their stock holdings, board representation, and conduct

may be aggregated in determining whether they exercised actual control over Tribune with respect to the LBO. *See, e.g.*, *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 26 n.74 (Del. Ch. 2010).

Again, the Controlling Shareholders' motion does not dispute the basic legal framework. Instead, their motion contends that the Complaint does not adequately allege the existence of an agreement between the Chandler Trusts and the Foundations. The Complaint, they say, does not allege the terms, goals, and results of the agreement, and thus alleges only that the Controlling Shareholders had "parallel interests," which will not suffice to support a claim that shareholders have formed a control group. (*See* Mot. 4 at 17-18.)

But that contention wildly exaggerates the Trustee's pleading burden. For starters, the Controlling Shareholders cite no authority holding that a plaintiff must allege the particular "terms" of an agreement between the members of a control group—a particularly unattractive rule given that this information is likely to be within the particular control of those members.

The case the Controlling Shareholders do cite, *Dubroff v. Wren Holdings, LLC,* No. Civ. A. 3940-VCN, 2009 WL 1478697 (Del. Ch. May 22, 2009) ("*Dubroff I*"), certainly does not stand for such a rule. There, the court reasoned that an entirely unexplained reference to a "Stockholders Agreement" in a single letter—which apparently did not even identify the parties to the purported agreement—could not support an inference that certain shareholders had formed an agreement to work together. *Id* at *5. By contrast, the Complaint alleges the basic nature of the agreement between the Chandler Trusts and the Foundations: an agreement "to use their voting power and influence to control Tribune." (FC ¶ 143.) And it alleges that the Controlling Shareholders' subsequent actions with respect to the LBO transaction were undertaken "in concert," which answers the Controlling Shareholders' objection regarding the results of the

76

agreement.  (FC ¶ 143.)  The Complaint is thus much more like the one addressed in a later

opinion in the same *Dubroff* litigation, where the court concluded that another set of plaintiffs

had adequately pled the existence of a control group by affirmatively alleging that the alleged

members had acted as a single group in planning and causing a corporation to engage in a series

of transactions, and that the terms of the transactions had been worked out in meetings among

the members of the control group.  *See Dubroff v. Wren Holdings, LLC*, No. Civ. A. 3940-VCN,

2011 WL 5137175, at *7 (Del. Ch. Oct. 28, 2011) (*Dubroff II*).

The Controlling Shareholders' argument that the Complaint alleges only parallel interests

is wrong.  Rather, the Complaint clearly alleges an *agreement* to act in concert.  (FC ¶ 143.)

Moreover, if the Controlling Shareholders mean to suggest that the Complaint does not contain

allegations permitting a plausible inference of concerted action, that argument would be wrong

as well.  As an initial matter, although parallel interests standing alone cannot demonstrate a

control group, they are not irrelevant to the inquiry.  The Complaint's allegations that the

Chandler Trusts and the Foundations were Tribune's two largest shareholders and held similar

views about the Company's financial prospects lend support to the Complaint's allegation that

the Controlling Shareholders agreed to act in concert.  *See Zimmerman*, 2012 WL 707238, at *11

(allegations that two venture capital investors were corporation's two largest shareholders and

thus had parallel economic interests, in combination with other allegations, supported reasonable

inference at summary judgment stage that the investors had acted as a control group). (FC ¶ 143.)

In addition, the Complaint contains a number of other allegations supporting an inference

that the Controlling Shareholders acted in concert.  For instance, in January 2007 the

Foundations advised the Special Committee that it would be "difficult to do a transaction"

without the support of the Controlling Shareholders (FC ¶ 141), a communication that makes

clear that the Foundations sought to bring the Controlling Shareholders' *combined* influence to bear on the Tribune Board.  That same day, advisors to the Foundation acknowledged in an internal email that the time had come for the Controlling Shareholders to assert their control over the Special Committee, suggesting that the Special Committee needed to know "the goals and objectives of 33 percent of the owners"—that is, of *both* the Chandler Trusts and the Foundations.  (FC ¶ 141.)  Shortly thereafter, counsel for the Chandler trusts contacted the Foundations to explore the possibility of pooling their combined holdings, making clear that the Chandler Trusts also saw the advantage of working together.  (FC ¶ 143.)  Thus, although the Controlling Shareholders profess not to have reached any agreement with one another (FC ¶ 143), the surrounding context—including the Controlling Shareholders' shared economic interests, and communications showing that the Controlling Shareholders understood the advantage of acting in concert—amply supports a plausible inference that the Controlling Shareholders did in fact act in concert.[26]

## V.  THE SHAREHOLDER PAYMENTS WERE ILLEGAL DIVIDENDS AND/OR STOCK BUY BACKS UNDER DELAWARE CORPORATE LAW

In Count Two, the Trustee alleges that the LBO payments constituted illegal stock repurchases, redemptions and/or dividends in violation of Delaware law, and that all of Tribune's Directors are therefore liable to Tribune and its creditors for the full amount of those payments.  (FC ¶¶ 382-88.)  As discussed below, Count Two is well-pled and should not be dismissed.

---

[26] There is no basis for the Controlling Shareholders' apparent assumption that a plaintiff alleging the existence of a control group must point to a formal, executed agreement among the group's members.  To the contrary, the law recognizes that shareholders may just as readily seize control of a company's affairs through informal concerted action.  *See, e.g.*, *Dubroff II*, 2011 WL 5137175, at *7; *Zimmerman*, 2012 WL 707238, at *11; *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 659 (Del. Ch. 2013).  Shareholders who act in concert cannot avoid the implications of control group status simply by deciding not to make a paper record.

**A.** **The Step Payments Violated The Letter And Purpose Of Delaware Law Forbidding Dividend Payments And Stock Purchases By Insolvent Companies**

Section 174 of the DGCL provides that the directors of a Delaware corporation shall be "jointly and severally liable" for "any wilful or negligent violation" of Sections 160 or 173 that occurs while such directors are members of the board. Del. Code Ann. tit. 8, § 174(a). Section 160 of the DGCL forbids any corporation from purchasing or redeeming its own shares of stock "when the capital of the corporation is impaired, or when such purchase or redemption would cause any impairment of the capital of the corporation. . . ." *Id.* § 160(a)(1). Section 173 of the DGCL forbids the payment by Delaware corporations of dividends to shareholders except out of the corporation's "surplus" or, if no surplus exists, out of its net profits for the fiscal year in which the dividend is declared. *See id.* § 173 (forbidding payment of dividends except in accordance with the DGCL); *id.* § 170 (identifying surplus and net profits as sole sources for payment of dividends). Directors who violate the statute are liable to the "corporation, and to its creditors in the event of its dissolution or insolvency" for the "full amount unlawfully paid . . . with interest. . . ." *Id*. § 174.

The Complaint alleges that the Directors violated Sections 160, 173, and 174 because the LBO payments were made to Tribune's shareholders at a time that "Tribune lacked a sufficient surplus or net profits," and that Tribune was insolvent or its capital was otherwise impaired. (FC ¶ 386.) To sustain a claim under the statute, "[i]t is not necessary to plead that the directors *knew* the [payments] were unlawful; under Section 174(a) liability flows even from negligent violations. . . ." *Sheffield Steel,* 320 B.R. at 413 (emphasis in original). Here, the Trustee alleges that the Directors knew or should have known that Tribune lacked the surplus necessary to make dividend or stock repurchase payments (FC ¶ 386), allegations which "exceed[] the least

79

culpable state of mind necessary to establish a claim under Section 174(a)," *Id.* at 413, and Count Two therefore necessarily must survive the motion to dismiss.

Sections 160, 173, and 174 of the DGCL (and similar common law doctrines) were created to protect the rights of a corporation's creditors.  It is a "firmly rooted" doctrine of Delaware "jurisprudence [] that the capital stock of a corporation is a trust fund for the payment of the corporate indebtedness, before any distribution among the shareholders."  *Buckhead*, 178 B.R. at 972 (internal quotations and citations omitted).  The "'purpose of Section 174 . . . is to provide a cause of action to creditors who have extended credit to a corporation based on that corporation's stated capital.  And when the corporation impairs that capital by an illegal redemption of stock, it depletes the creditor's "trust fund" and seriously jeopardizes their means to recover their debts.'"  *Id*. (quoting *Johnston v. Wolf*, 487 A.2d 1132, 1136 (Del. 1985)).  The "General Assembly enacted the statute to prevent boards from draining corporations of assets to the detriment of creditors and the long-term health of the corporation."  *Klang v. Smith Food & Drug Ctrs., Inc*, 702 A.2d 150, 154 (Del. 1997).

That is precisely what happened here.  In connection with the LBO, the Directors levered the entire value of the Tribune enterprise (and then some), and handed over the cash proceeds to themselves and the other Tribune shareholders in the form of illegal stock purchases and/or dividends, leaving Tribune and its existing creditors nothing to show for its billions of dollars of newly acquired debt.  (FC ¶¶ 1, 280, 382-88.)  As a direct consequence, Tribune's "trust fund" for repayment of its creditors was eliminated.  (FC ¶¶ 20, 382-88.)  In short, "the very evil these restrictions seek to address is present here," *In re Buckhead Am. Corp.*, 178 B.R. at 972-73 (internal quotations and brackets omitted), and the Directors must be held liable for their roles in the LBO exactly as contemplated by the statute.

The Moving Directors make three arguments.  *First*, with respect to the $4.3 billion paid to shareholders at Step One, the Moving Directors contend that the Trustee does not sufficiently allege that Tribune's capital was impaired; *second*, with respect to the $4 billion paid to shareholders at Step Two, the Moving Directors claim the shareholder payments were not made by Tribune at all, and would be protected in any case by the doctrine of independent legal significance; and *third*, the Moving Directors deny they can have any liability under Section 174 because they supposedly relied in good faith on VRC's solvency opinion.  (Mot. 1 at 16-26.) None of the Moving Directors' arguments is well taken, and all must be rejected on this motion to dismiss.

## B.  The Trustee Alleges That Tribune's Capital Was Impaired At Step One

The Moving Directors acknowledge that Tribune's repurchase of stock at Step One was subject at least to Section 160 of the DGCL, but argue that Count Two should nevertheless be dismissed because, supposedly, the Trustee failed to adequately allege that Tribune's capital was "impaired" at or by Step One.  (Mot. 1 at 17.)  In fact, the Trustee alleges impairment within the meaning of the statute in more than sufficient detail at both Step One and Step Two of the LBO.

Under Delaware law, a redemption or "repurchase impairs capital if the funds used in the repurchase exceed the amount of the corporation's 'surplus . . .'"  *Carsanaro*, 65 A.3d at 644 (*citing Klang*, 702 A.2d at 153).  Delaware law ordinarily also requires a "surplus" for the payment of dividends.  Del. Code Ann. tit. 8, §§ 170, 173 (dividends can only be paid out of surplus or net profits).  "Surplus," in turn, is defined in DGCL Section 154 by reference to a corporation's "net assets," meaning the "amount by which total assets exceed total liabilities," less the par value of the corporation's stock.  *Carsanaro*, 65 A.3d at 644 (internal quotations omitted).

Hence, if a stock purchase, redemption or dividend payment will render a corporation "balance sheet" insolvent within the meaning of the Bankruptcy Code—*i.e.*, if the sum of the corporation's debts after payment is greater than the value of all of its property, *see* 11 U.S.C. § 101(32)(A)—then it has no "surplus," its capital is "impaired," and the dividend or stock purchase is illegal under the DGCL.  *See SV Inv. Partners, LLC v. Thoughtworks, Inc.*, 7 A.3d 973, 982 (Del. Ch. 2010) ("As a practical matter, the [capital impairment] test operates to prohibit distributions to stockholders that would render the company balance-sheet insolvent. . . ."); *EBS Litig. LLC v. Barclays Global Investors, N.A.*, 304 F.3d 302, 305-06 (3d Cir. 2002) (holding that shareholder payments made "when [the corporation] was insolvent, or rendered [the corporation] insolvent [were] illegal under . . . [DGCL] § 174(a).").

The Trustee alleges in the clearest possible terms that Tribune was rendered balance sheet insolvent by the LBO at Step One, and that Tribune therefore had no "surplus" from which dividend or stock repurchase payments could be made under the DGCL.  (FC ¶¶ 288, 383-88.) Likewise, the Trustee alleges that the Step One transfers were made "while Tribune lacked a sufficient surplus or net profits or was otherwise insolvent, in violation of the DGCL," and that the transfers were therefore made "when the capital of [Tribune was] impaired or when such purchase or redemption would cause . . . impairment of the capital" of Tribune.  (FC ¶¶ 383-86.)

The Moving Directors contend that these allegations are "implausible."  (Mot. 1 at 12-13.)  But the Trustee supplies detailed allegations of insolvency that are more than sufficient to survive a motion to dismiss on the pleadings.  (*See supra* § II.)  Among other things, the Trustee unmistakably alleges that the Step Two debt must be considered in evaluating balance sheet insolvency at Step One, and that the liabilities of Tribune far exceeded the fair value of Tribune's assets considering the transaction as a whole.  (FC ¶¶ 181, 185, 188, 274, 277, 299.)  The

Directors' claim that Step Two debt should be ignored in evaluating Tribune's insolvency is not only contrary to the law (*see supra* § II), it also depends on putative "facts" concerning the details of the transaction and expectations of the parties that are counter to the well-pled allegations of the complaint and cannot be determined on a motion to dismiss.  (*See supra* § I.)

Separate and apart from Sections 160 and 173 of the DGCL, "[a]n unbroken line of decisional authority dating back to the late nineteenth century prohibits a corporation from redeeming shares when the payment would render the corporation insolvent."  *SV Inv. Partners*, 7 A.3d at 976; *Docutronics, Inc. v. Reitman*, 509 S.E.2d 348, 350 (Ct. App. Ga. 1998) (applying Delaware law) (holding that when a corporation is insolvent, its capital is "by definition impaired").  The Complaint clearly alleges that Tribune was insolvent under all three commonly used tests of insolvency (*see supra* § II), and that the Directors are therefore liable for the Step payments under Sections 160, 173, 174 and Delaware common law.

### C.  The Step Two Shareholder Payments Were Made By Tribune, Not By EGI-TRB, And The Doctrine Of Independent Legal Significance Is Inapplicable

The Moving Directors tacitly admit that Tribune's capital was impaired at Step Two of the LBO, but claim that the Step Two payments to Tribune shareholders were made by "EGI-TRB, an entity affiliated with Zell," rather than by Tribune itself, and that the Directors of Tribune therefore cannot be liable for the Step Two payments.  (*See* Mot. 1 at 23.)

The Moving Directors are simply wrong on the facts.  As alleged in the Complaint, it was *Tribune* that repurchased the stock outstanding at Step Two from Tribune's shareholders, and it was *Tribune* that borrowed the approximately $3.7 billion necessary to do so, not EGI-TRB or anyone else.  (FC ¶ 353 (alleging that the Tribune Company "repurchased the remaining 119 million shares of common stock outstanding at" Step Two); FC ¶ 386 (alleging that Tribune paid cash to its shareholders to consummate the LBO); FC ¶ 354 (alleging that the Tribune Company

"took on another approximately $3.7 billion of debt" to fund Step Two).)  After repurchasing its remaining stock, Tribune survived the Step Two merger and became a wholly owned subsidiary of the ESOP—a separate entity unrelated to Zell and EGI-TRB—but that has nothing to do with which entity actually bought back Tribune shares at Step Two in violation of Sections 160 and 173.  (*See* Mot. 1 at 23 (quoting FC ¶ 355).)  Those purchases were made by *Tribune*, not by EGI-TRB, and it is *Tribune's* directors who are subject to liability for the payments made to shareholders at Step Two based on the plain terms of Section 174.  Del. Code Ann. tit. 8, §§ 160, 173, 174.[27]

Next, the Directors argue that even if they did violate Sections 160 or 173 of the DGCL, they are immune from liability based on the doctrine of "independent legal significance."  (Mot. 1 at 23.)  According to the Directors, the Step Two payments were made pursuant to a merger agreement, and as long as that merger complied with all of the requirements of Section 251 of the DGCL (governing mergers), Tribune was free to violate Sections 160 and 173 by transferring billions of dollars of value to Tribune's shareholders at Step Two, even assuming that Tribune's capital was impaired at the time.

There are at least two problems with the Directors' argument.  First, the Complaint does not so much as mention Section 251 of the DGCL, much less allege that the Step Two merger complied with that or any other provision of the DGCL.  The central predicate of the Directors' argument—that the LBO satisfied at least one provision of the DGCL, even if it violated Sections 160 and 173—is therefore extrinsic to the pleadings, and cannot form a basis for

---

[27] Elsewhere in the brief, the Moving Directors again make another basic error of fact, claiming that the board approved a transaction whereby an "EGI affiliate . . . ultimately, EGI-TRB" acquired "all of Tribune's outstanding stock."  (Mot. 1 at 4; *compare* FC ¶ 354.)  In fact, no EGI affiliate ever owned more than a small fraction of Tribune's stock, and following Step Two, EGI-TRB held its interest in the company through its ownership of a warrant and subordinated note.

granting the Directors' motion to dismiss.  (*See infra* § XIII.)  *See also Levine v. Columbia Labs., Inc*., 03 CIV. 8943 (LAK), 2004 WL 1392372, at *1 (S.D.N.Y. June 22, 2004) (affirmative defense may be raised on motion to dismiss "only where the defense appears on the face of the pleading and the documents incorporated therein")

Second, the Directors badly misconstrue the doctrine upon which they rely, which was developed almost exclusively in the context of aggrieved *shareholders* seeking to gain rights by arguing that a transaction labeled a "merger" is actually an asset sale, or vice versa.  *E.g., Hariton v. Arco Elecs., Inc.,* 188 A.2d 123, 125-26 (Del. 1963) (a transaction satisfying the DGCL's provisions governing an asset sale does not trigger rights under merger statute); *Field v. Allyn*, 457 A.2d 1089 (Del. Ch. 1983) (a transaction satisfying DGCL's provisions governing a merger does not trigger rights attendant to an asset sale).  The Directors do not and cannot cite to a single case holding that Delaware directors may, without any risk of liability, vote to render a corporation  insolvent through payments to equity so long as they do so in connection with a merger agreement.  The Directors argument is antithetical to the very purpose of the prohibition on such shareholder payments:

> If the hierarchical relationship of creditor to shareholder is to have any meaning at all, then the management must not be left free to shovel all the assets in the corporate treasury out to the shareholders when the corporation has insufficient assets to pay its creditors or when the shareholder distribution itself renders the corporation unable to pay its creditors.  The central point is to avoid the insolvency of the corporation.  (Bayless Manning & James J. Hanks Jr., LEGAL CAPITAL 68 (4th ed. 2013).)

If technical compliance with other aspects of the DGCL permitted shareholders to raid "the corporate treasury" at the expense of the creditors, it would render Sections 160 and 173 toothless, reverse the "hierarchical relationship of creditor to shareholder," and fly in the face of more than a century of settled law.  "It was long ago settled that inequitable action is not insulated from review simply because that action was accomplished in compliance with the

statutory and contractual provisions governing the corporation." *Grace Bros. Ltd. v. Uniholding Corp.,* No. Civ. A. 17612, 2000 WL 982401, at *14 (Del. Ch. June 13, 2000); *SV Inv. Partners*, 7 A.3d at 985-86.

Rauch v. RCA Corp., the case on which the Directors primarily rely, is inapposite. The *Rauch* plaintiff was a preferred shareholder (not a creditor) who claimed he was entitled to a liquidation preference in connection with a merger, relying on the language of the company's certificate of incorporation and Section 151 of the DGCL, not Sections 160 or 173. 861 F.2d 29, 30 (2d Cir. 1988). The *Rauch* court held only that a merger under Section 251 cannot be defeated by a shareholder's claim for a liquidation preference under Section 151. *Id.*[28] The Moving Directors' attempt to apply the limited doctrine of independent legal significance to eliminate their liability under Section 174(a) should be rejected.

Finally, the Moving Directors argue that "the Step Two merger payments were neither dividends [covered by Section 173], nor payments for the purchase of Tribune's shares [covered by Section 160]." (Mot. 1 at 2, 25.) They are mistaken. According to Black's Law Dictionary, a "purchase" means the "transmission of property from one person to another by voluntary act and agreement, founded on valuable consideration," while a "stock redemption" generally "consists in the buy back by the corporation of its own stock," including when a "public corporation . . . redeems its stock *for the purpose of going private*." Black's Law Dictionary (10th ed.) (emphasis added). The Step Two payments fit comfortably within these definitions even using the Moving Directors' own formulation, which describes Step Two as requiring Tribune to

---

[28] Moreover, even if the doctrine of "independent legal significance" were applicable here—and it is not—Tribune's supposed compliance with Section 251 would not relieve the Directors of their duty to comply with Delaware common law duties. *SV Inv. Partners*, 7 A.3d at 976 (relying on "unbroken line of decisional authority dating back to the late nineteenth century" that "prohibits a corporation from redeeming shares when the payment would render the corporation insolvent").

borrow "approximately $3.7 billion which would be paid to Tribune's shareholders *in exchange for their . . . Tribune shares in a go-private merger.*"[29]  (FC ¶ 211.)

### D.  The Moving Directors' Reliance On VRC's Solvency Opinion Is Unavailing

VRC's corrupt and flawed solvency opinion and Section 172 of the DGCL cannot support dismissal of the Trustee's unlawful shareholder payment claim.  The protection of Section 172 is available only as an affirmative defense and then only to a director who relies "*in good faith*" upon opinions presented by a person "as to matters the director *reasonably believes* are within such other person's professional or expert competence and who has been selected with *reasonable care* on behalf of the corporation . . ."  Del. Code Ann. tit. 8, § 172 (emphasis added).

The allegations of the Complaint are more than sufficient to call into doubt whether the Directors actually believed the VRC solvency opinions could or should be relied upon in good faith for any purpose, including with respect to whether or not a surplus existed from which dividend or share purchase payments could be made.  (*See supra* § V(B); SOF §§ N, Q.)  The Directors also knew that, far from being selected carefully by Tribune to conduct the solvency opinion, VRC was identified by Company management only after the expert originally selected by the Company—Duff & Phelps—refused to give a solvency opinion.  (FC ¶¶ 176-87, 197-98.)

---

[29] In any case, as noted above, courts evaluating claims under Sections 160 and 173 of the DGCL look to the substance of the challenged transaction, not its form.  Where, as here, payments were made by the corporation to shareholders (and to the detriment of creditors) at a time when the corporation lacked sufficient surplus, courts will impose liability regardless of the how the transaction is labeled.  *Buckhead*, 178 B.R. at 970 (holding that courts must not "concentrate on the form of the transaction" but should instead focus on the "substantive effect" of the transaction when considering claims under Sections 160 and 173 in the context of an LBO); *Crowthers McCall Pattern*, 129 B.R. at 1001 (denying motion to dismiss Section 160 claim where stock technically not purchased by corporation because "the economic substance of the transactions . . . brings them within the purview" of Section 160); *U.S. Bank N.A. v. Verizon Commc'ns Inc.*, 817 F. Supp. 2d 934, 945-46 (N.D. Tex. 2011) (applying Delaware law) (adopting an "expansive view of 'dividend'" in which a court looks to the substance of a transaction so that directors cannot escape liability for causing unlawful dividends "merely by labeling the distributions as leveraged buy–outs or . . . a tax-free reorganization.").

The Directors also knew that VRC would not give Tribune a solvency opinion unless VRC was directed to depart from the standard definition of "fair value" and otherwise distort accepted solvency analysis practices to reach the desired conclusion.  (FC ¶¶ 199-201.)  Section 172 can offer the Directors no shelter based on these allegations.[30]

The Defendants' reliance on the business judgment rule is similarly misplaced.  First, as this court held in *In re Musicland*, the business judgment rule does not apply to claims for illegal dividends and/or stock purchases.  398 B.R. at 784-85.  Second, even if the business judgment presumption could have some theoretical applicability to claims brought under Section 174(a), for the reasons discussed in Section III(B), above, the "presumption" of the business judgment rule has been thoroughly rebutted by the Trustee's detailed allegations of gross negligence, bad faith and disloyalty on the part of all of the Directors.

### E.  Directors Are Liable For All Illegal Dividends And Stock Purchases Made During Their Service On Board, Even If They Did Not Vote On The Transaction

Zell argues that he is not subject to liability for violating Sections 160 and 173 because he was not a Board member when the transaction was approved.  (Mot. 2 at 16.)  Zell misreads Section 174(a), which expressly imposes liability on "the directors under whose administration" any unlawful dividend or stock purchase payment is made, without regard to whether the director authorized the payment.  Del. Code Ann. tit. 8, § 174(a).  Since Zell was Chairman of Tribune's Board on the dates of both Step One and Two payments (FC ¶¶ 227, 356), he is subject to liability for both.  *Musicland*, 398 B.R. at 784 (refusing to dismiss claims under DGCL Section 174(a) brought against directors who were on board when payments made but not at time

---

[30] *See Musicland*, 398 B.R at 785 (holding that Section 172 is an affirmative defense not ripe for resolution on motion to dismiss); *In re Sheffield Steel Corp.*, 320 B.R. 423, 451 (Bankr. N.D. Okla. 2004) (same).

payments authorized); *see also Growe v. Bedard*, No. Civ. 03–198–B–S, 2004 WL 2677216 (D. Me. Nov. 23, 2004) (applying Delaware law) (similar); *Propp*, 175 A.2d at 38-39 (similar).  The only way a sitting director can avoid liability for an illegal payment made during his or her tenure is by "causing his or her dissent to be entered on the books containing the minutes of the proceedings of the directors. . . ."  Del. Code Ann. tit. 8, § 174(a).  Neither Zell, nor any other Tribune Director ever dissented from the shareholder payments at any time.

## VI.  THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST ZELL, THE CHANDLER TRUST REPRESENTATIVES, AND THE CONTROLLING SHAREHOLDERS

### A.  It Is Undisputed That The Complaint Alleges The Existence And Breach Of Fiduciary Duties By Tribune's Directors And Officers And Resulting Damages

The Complaint alleges that each of the Zell Defendants, the Subsidiary D&O Defendants, the Chandler Trust Representatives, and the Controlling Shareholders aided and abetted breaches of fiduciary duty by Tribune's Directors and Officers.  (FC ¶¶ 423-34, 482-89, 503-10 (Counts Six, Thirteen, and Fifteen).)  The elements of an aiding-and-abetting cause of action are (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) the defendant's knowing participation in that breach, and (4) resulting damages.  *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

All of the required elements are present here.  No one disputes that the Directors and Officers of Tribune owed fiduciary duties to Tribune, and the Trustee plainly alleges breaches by these fiduciaries of the duties of loyalty and care.  (FC ¶¶ 389-410; *see supra* §§ III(A-B), III(E).)  The Officer Defendants have not moved to dismiss Count Four alleging their breaches of fiduciary duty, and the Directors' breaches of loyalty, good faith and care are more than amply

pled.  (*See supra* §§ III.)[31]  As for damages, the Complaint clearly alleges that the breaches of

duty in question led directly to Tribune's bankruptcy and otherwise caused enormous losses to

Tribune and its creditors.  (*E.g.*, FC ¶¶ 398, 409, 433, 488, 501, 509.)

The alleged aiders and abettors largely concede that the Trustee has adequately alleged

the existence of fiduciary duties, their breach, and damages, and focus instead on the third

element of an aiding-and-abetting claim, arguing they did not "knowingly participate" in the

fiduciaries' breaches of duty.  As discussed below, the Complaint more than sufficiently pleads

the requisite knowing participation by each such Defendant.

### B.  The Zell Defendants Knowingly Participated In Breaches Of Fiduciary Duty By The D&O Defendants And The Controlling Shareholder Defendants

Between January and early April 2007, the Zell Defendants negotiated the LBO with

Tribune fiduciaries.  (FC ¶¶ 145, 211.)  A corporate buyer knowingly participates in a fiduciary's

breach if he "attempts to create or exploit conflicts of interest in the board," or "where the bidder

and the board conspire in or agree to the fiduciary breach."  *Malpiede*, 780 A.2d at 1097-98; *see*

*also Del Monte*, 25 A.3d at 837 (same).  A buyer may also be subject to aiding-and-abetting

liability when the buyer is alleged to be the "architect" of the transaction giving rise to the

primary breaches of duty.  *Healthco II*, 208 B.R. at 309.

A buyer may not "extract[] terms which require the opposite party to prefer its interests at

the expense" of those to whom the fiduciaries owe their duties.  *Gilbert v. El Paso Co.*, 490 A.2d

1050, 1058 (Del. Ch. 1984) (so holding as to shareholders); *see generally Gheewalla*, 930 A.2d

at 101-02 (duties run to creditors when the corporation is insolvent).  Moreover, and importantly

in this case, "the terms of [a] negotiated transaction themselves [may be] so suspect as to permit,

---

[31] The Directors' 102(b)(7) affirmative defense to damages liability for duty of care breaches, even if ultimately accepted, offers no shelter to the parties who aided and abetted those breaches. *See In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54, 85 (Del. Ch. 2014).

if proven, an inference of knowledge of the intended breach of trust."  *Hospitalists of Del., LLC v. Lutz*, No. 6221-VCP, 2012 WL 3679219, at *7 (Del. Ch. Aug. 28, 2012) (internal quotations omitted).  That includes the rule that sufficiently preferential treatment given to certain inside stakeholders supports an inference of knowing participation by a third party.  *Id.*

The Complaint clearly alleges that Zell is subject to "architect liability" for his role in the LBO.[32]  It was Sam Zell and his affiliates who proposed the Tribune LBO.  (FC ¶ 10.)  Zell's proposal called for Tribune to "increase its total debt from approximately $5.6 billion to . . . $13.7 billion" without any corresponding value for Tribune, and was designed to give Zell control of the multibillion-dollar company while risking only a small fraction of the purchase price.  (FC ¶¶ 10, 226.)  The danger that this structure posed to the Company was widely recognized.  (*See supra* SOF §§ H, L, M.)  At the time of the LBO, industry revenues were declining, and Tribune's were declining even faster than the industry average.  (FC ¶¶ 121-25.)  Zell proposed to pile increased debt service obligations onto a company with that declining revenue.  (FC ¶¶ 118-20, 146.)  The deal was a long-shot bet that Tribune's multi-year declines would suddenly—and unexpectedly—reverse and that its fortunes would miraculously improve.  (*E.g.*, FC ¶¶ 258-61.)  Zell knew there was a high risk that the deal would not pay off.  (FC ¶ 418(a).)  Indeed, Tribune was a particularly poor candidate for an LBO due to its chronic underperformance in a declining industry.  (FC ¶¶ 7, 121.)  And when the Controlling Shareholders demanded a higher price, the Zell Defendants just told the Tribune fiduciaries and

---

[32] In addition to aiding and abetting breaches of fiduciary committed by others, Zell has primary liability for his own breaches of fiduciary duties after he joined the board on May 9, 2007.  (*See supra* § III(D).)  In the event that the Court were to determine that Zell was not acting in his fiduciary capacity after he joined the Board, his conduct in connection with lobbying for, facilitating, and consummating the LBO would still state a claim for aiding and abetting liability.  *See In re Brown Schs.*, 368 B.R. at 402-03; *OTK Assocs.*, 85 A.3d at 715 n.1.

banks supplying the LBO Debt to raise the proposed debt Tribune itself would incur, rather than risk more of their own equity to provide a capital cushion going forward.  (FC ¶¶ 147, 157, 203.)

When a third-party conceives and structures an LBO that it knows may render the target company insolvent while funneling the value of the company to shareholders, that party will be liable for aiding and abetting the target's fiduciaries in their breaches of duty.  The facts here are on all fours with those in another major LBO-induced bankruptcy case that so held.  In *Healthco II*, as here, the company was struggling at the time of the LBO and there was every reason to believe its decline would not only continue, but would accelerate.  208 B.R. at 295-96.  The court sustained claims that the buyer had aided and abetted the target's directors and officers in breaching their fiduciary duties by approving the LBO, in part because the buyer was "the architect[] of the entire transaction," "had the same warning signs that should have alerted the board," and "proceeded with the transaction when it knew the risks."  *Id*. at 309.[33]

As in *Healthco II*, the Zell Defendants proposed and structured the LBO and were aware of the divergent interests of (i) the D&O Defendants, Controlling Shareholders and shareholders generally on the one hand, and (ii) Tribune itself and its residual risk takers, on the other.  (FC ¶¶ 10, 427-30.)  The highly sophisticated Zell Defendants knew that the chances of turning around Tribune's disastrous and declining financial performance were vanishingly small, and that the D&O Defendants were supporting the transaction at the likely expense of the Company—and in violation of their fiduciary duties.  By forging ahead with the transaction under those conditions, the Zell Defendants knowingly participated in the D&O Defendants' breaches of duty.  (FC ¶¶ 423-34.)

---

[33] *See also Gatz v. Ponsoldt*, 925 A.2d 1265, 1271, 1276 (Del. 2007) (reversing dismissal of aiding and abetting claim against acquiring shareholder who engineered recapitalization because acquiring shareholder "must have been aware . . .  that that transaction's effect (if not its intent) was to dilute" minority holders while allowing dominant shareholders to cash out of company).

Zell argues that he would never invest in a company he did not believe would succeed, and that the Trustee's theory is therefore implausible.  (Mot. 2 at 12.)  Zell is free to pursue that argument at trial, but the Complaint alleges more than enough facts to support the Trustee's contrary inference and defeat Zell's motion to dismiss on the pleadings.  Zell was "largely playing with other people's money," *Healthco II*, 208 B.R. at 307, and put a comparatively small portion of his own resources into the deal—an amount equal to less than 3% of the transaction value.  (FC ¶¶ 120, 356.)  Second, and even more significantly, the upside for Zell was enormous in the unlikely event the company pulled out of its nose dive and returned to solvency.  A Morgan Stanley analyst explained as much in an email dated October 9, 2007, in which she opined that the LBO was attractive to Zell even though it resulted in "negative equity value" for Tribune because Zell is "soo f-n rich" and "he's putting in $65MM to get 40% of a multi-billion dollar co."  (FC ¶ 333.)  If the Company did poorly—as all contemporaneous signs suggested it would—multi-billionaire Zell would lose only a fraction of his fortune, but if his longshot bet succeeded, he stood to make many times the amount he put at risk.  Investors, financiers, and speculators calculate and take just such risks every day.

Zell and his affiliates further "knowingly participated" in breaches of duty by Tribune's fiduciaries by creating and exploiting their conflicting interests.  Before Zell made his initial LBO proposal, the Controlling Shareholders were pressuring management to find a solution to the loss of value of their investment in Tribune and threatening management's jobs if they failed to act fast.  (FC ¶ 8.)  Zell spoke to the Controlling Shareholders about Tribune (FC ¶ 145), and it is fair to infer that he understood from those conversations (and suspected from public information) that management would be receptive to the arrival of a financial investor who would keep most of senior management.  Consistent with an effort to exploit management's self-

interested desire to avoid termination, Zell or his representatives promised to promote Bigelow to CFO, and retain other Tribune officers if the LBO closed.  (FC ¶ 162.)

Zell and his subordinates at EGI also relied on an extravagant set of existing and proposed personal financial inducements that would make many of the Tribune officers extremely rich if the LBO was consummated.  (FC ¶¶ 158-63, 430.)  In the deal that the Zell Defendants ultimately agreed to, the Officer Defendants collectively stood to receive more than $78 million.  (FC ¶ 49, 161, Ex. C.)  That sum included $36 million they would receive by redeeming their Tribune shares in connection with the LBO, plus more than $42 million in special monetary incentives if the LBO was consummated (FC ¶ 49, Ex. C.), including Success Bonus Payments, Phantom Equity payments, and the early vesting of millions of dollars in restricted stock units and stock options through an incentive compensation plan.  (FC ¶¶ 158-60.)  On top of that, the Officers knew that hefty Executive Transition Payments awaited anyone who was terminated following the change in control.  (FC ¶ 160.)  Zell and his subordinates were responsible for designing many of those incentives and/or confirming that they would be triggered by the LBO and honored by the post-merger entity.  (FC ¶¶ 158-63.)  Those monetary awards gave Tribune's officers a massive, personal interest in the LBO proceeding.

A telling episode in March 2007 throws into sharp focus the Tribune Officers' conflict and Zell's knowing participation in their breaches of duty.  FitzSimons, while contemplating the LBO, temporarily "got cold feet on the leverage."  (FC ¶ 157.)  Too much debt would put the Company's survival, and thus the Company's employees, pensioners and other creditors, at risk.  (FC ¶¶ 7, 121, 207.)  A higher share price meant more money in FitzSimons' own pocket (as well as the coffers of the Foundations and the Chandler Trusts with whom the Foundations were working), but more risk to Tribune and its creditors.  A lower price meant lower risk, but less

money to FitzSimons personally.  Zell bought FitzSimons's cooperation by *increasing* the

Phantom Equity payments from 5% to 8%.  (FC ¶¶ 157, 159.)

Since the LBO was funded with money borrowed on the backs of Tribune and its existing

creditors, any increase in the cost of the deal—including an increase in the amounts paid to

management—would make the leverage problem worse, not better.  Zell's response thus makes

no sense as an effort to respond to leverage concerns, but eminent sense as a means of inducing

Tribune's fiduciaries to disregard those concerns.  Paying a corporate fiduciary to ignore his

obligations to the company and stakeholders he serves is the epitome of aiding and abetting a

breach.  That is exactly what Zell did here.  As the Complaint clearly alleges, Zell offered the

higher price "knowing that a higher share price would be more attractive to the [D&O

Defendants] and the Controlling Shareholders individually as shareholders, but would burden

Tribune with more debt than was sustainable."  (FC ¶ 430.)  What is more, and worse, Tribune's

management demanded higher personal incentive payments immediately after voicing concern

about the amount of leverage involved in the deal.  (FC ¶¶ 157, 159, 163.)

These actions constitute aiding and abetting a breach of fiduciary duty under the rule that

prohibits "attempts to create or exploit conflicts of interest in the board."  *Malpiede*, 780 A.2d at

1097-98; *see also In re USACafes, L.P. Litig.*, 600 A.2d 43, 56 (Del. Ch. 1991) ("[w]hile the

payments . . . may be wholly legitimate, plaintiffs have included enough detail about their size

and nature to support, at [the motion to dismiss] stage, the assertion that they were inducements,

knowingly made, to breach a duty . . .").[34]

---

[34] Similarly, in *Crescent/Mach I Partners*, it was alleged that the defendants approached a
director with the idea of the merger, "formulated nearly a dozen contracts implementing the plan
of the merger," and that the defendants had "actual knowledge" of the director's side deals, such
as a contract paying the director $900,000 a year to continue his employment with the combined
entity, or an equity interest in the combined entity.  846 A.2d at 990.  The court rejected the

It is no answer to suggest, as Zell does, that aiding and abetting liability should not be found in the typical case where a buyer merely bargains hard against the seller. (*See* Mot. 2 at 8, 11.) In an ordinary corporate deal, the court can take comfort that the interests of the directors, as shareholders, are aligned with the interests of the corporation. *E.g.*, *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del. Ch. 2012). An LBO, on the other hand, creates a divide between the interests of shareholding directors on the one hand (who receive payment for their shares, usually at a premium), and the interests of the corporation on the other, which takes on debt in order to pay off the directors and other shareholders but receives nothing of value in return. *See In re Bay Plastics, Inc.*, 187 B.R. at 333 ("An LBO is not a routine business transaction that should normally be given deference by the courts. . . . Rather, an LBO is [a leveraging] of corporate assets . . . for the personal benefit of both old and new equity owners."). Zell's cases do not involve insolvency-creating leveraged transactions, and therefore do not address the conflict at the heart of the Tribune LBO. *See Malpiede*, 780 A.2d at 1079 (involving merger of corporation that became target in a bidding contest); *In re Lukens S'holders Litig.*, 757 A.2d 720 (Del. Ch. 1999) (involving merger in which stock was purchased for cash and stock).

The Zell Defendants all but concede that Tribune's *officers* suffered from debilitating conflicts of interest with respect to the LBO, but argue that the payoffs received by the officers are immaterial because they were not the "actual decision-makers." (Mot. 2 at 9.) In fact, even the cases cited by Zell acknowledge that payoffs to non-director fiduciaries are actionable if

---

argument that breaches could not be imputed because the "alleged 'side-deals' were only a very small fraction of the total merger consideration" and found that the plaintiffs had adequately pled specific facts to show that the defendants knew about the side-deals and knowingly participated, and that the issue would be resolved by the trier of fact. *Id.* Here, similarly, the Trustee has set forth detailed allegations regarding the size and nature of incentives directed to each of the D&O Defendants, and should be permitted to present the evidence of Zell's knowing participation in their breaches. (FC ¶¶ 39, 49, 158-63, Ex. C.)

those fiduciaries are alleged to have "swayed the board's decision making," as Tribune's officers are alleged to have done in this case.  *Morgan v. Cash*, No. 5053, 2010 WL 2803746, at *5-6 (Del. Ch. July 16, 2010); *accord Malpiede*, 780 A.2d at 1098 (recognizing materiality of non-director fiduciary conduct where fiduciary "conspired with board, or otherwise caused the board to make the decisions at issue").  *Morgan* thus does not limit aiding-and-abetting liability to inducements directed to formal decision-makers, but instead merely requires some causal connection between the aiding and abetting, the breach, and the ultimate harm.  2010 WL 2803746, at *5.  That causal link is present here, running through dozens of the Trustee's allegations.  (FC ¶¶ 158-63, 170-74, 201-03, 216-20, 258-81, 302-03, 306-28.)  Yet even if Zell were correct that the aiding and abetting liability can be directed solely at director "decision-makers" (*see* Mot. 2 n.8), the Trustee has plainly alleged facts sufficient to show Zell's knowing participation in, and furtherance of, the Tribune Directors' breaches of their own fiduciary duties—in addition to the myriad inducements offered to the Controlling Shareholders and Officer Defendants, whose decisions and actions proximately resulted in the LBO's approval. (FC ¶¶ 163, 203, 216, 258, 263, 326-28, 389-99.)

In sum, the Zell Defendants exploited the conflicts of interests of the D&O Defendants and enabled them to enrich themselves and leave Tribune's creditors holding the empty bag.[35]

---

[35] The Zell Defendants also exploited the conflicts of interest of the Controlling Shareholders. The Zell Defendants knew that the Chandler Trust Representatives had a fiduciary duty to represent the interests of Tribune to the exclusion of other interests, and that they separately had duties to the Chandler Trusts that were different from and inconsistent with their duties to Tribune.  (FC ¶ 429.)  Zell exploited this conflict of interest to further his own ends and effectuate the LBO by, among other things, modifying the terms of the proposed LBO from a one-step to a two-step transaction in order to lock in their support and gain their lobbying efforts on behalf of the LBO.  (FC ¶¶ 145-51, 204-07.)  Such efforts to accommodate the particular concerns of the Controlling Shareholders and exploit their conflicts of interest constitute knowing participation in the Controlling Shareholders' breaches of fiduciary duties.  *See In re Transkaryotic Therapies, Inc.*, 954 A.2d 346 (Del. Ch. 2008) (finding that supporting a director's

### C. __The Complaint Adequately Alleges That The Chandler Trust Representatives And The Controlling Shareholders Knowingly Participated In Breaches Of Fiduciary Duty By The D&O Defendants__

The Controlling Shareholders argue that they cannot be deemed to have participated in the other fiduciaries' breaches of duty because, supposedly, there is no "nexus" between their conduct and the violations alleged in the Complaint.  (Mot. 4 at 20.)  That is demonstrably false. As discussed at length in other sections of this memorandum and in the Complaint, the Controlling Shareholders were central figures in conceiving, structuring, and implementing the LBO, exerted relentless pressure on Tribune's fiduciaries to ensure the disastrous transaction was approved and consummated, and enjoyed a huge payday when the deal closed.  (*See supra* § IV; *see also* FC ¶¶ 72-75, 126-45, 148-51, 203-10, 240, 263.)  One of the Controlling Shareholders even went so far as to acknowledge its key role in an email.  (FC ¶ 210.)  In short, the Complaint more than sufficiently alleges the "nexus" between their conduct and the breaches of fiduciary duty they aided and abetted.

The Controlling Shareholders next argue that as Tribune shareholders they were "free to act in their own interests."  (Mot. 4 at 22-23.)  On the contrary, Delaware law proscribes knowing participation in breaches of fiduciary duties by any third party, even shareholders, and regardless of the size of their positions.  *See, e.g.*, *Malpiede*, 780 A.2d at 1097-98; *Healthco II*, 208 B.R. at 309.  *In re Wheelabrator Technologies Inc. Shareholder Litigation*, cited by Defendants, involved a case where it was "undisputed that [the non-controlling shareholders'] designees *played no role in negotiating* or approving" the transaction.  1992 WL 212595, at *10. Because the designees were "uninvolved," the court found that the complaint did not state a case for knowing participation.  *Id.*  But here, the Trustee has alleged that the Controlling

---

separate transaction could demonstrate knowing participation, where defendant knew of director's interest in consummating separate transaction).

Shareholders and their representatives—FitzSimons, Hiller, Smith, Stinehart, Goodan, and Chandler—*were* involved in negotiating the transaction with the Special Committee, the Company, and even Zell.  (*E.g.*, FC ¶¶ 27, 72-75, 138, 140-42, 157-61, 163, 203, 262.)  Such allegations are "ample indication" of knowing participation.  *Healthco II*, 208 B.R. at 309.  In *Healthco II*, at the summary judgment stage, the court sustained aiding-and-abetting claims against a controlling shareholder who placed three directors on the board with a mandate to sell its stock, attended several board meetings through a representative, "urged the board on at every step," and "knew all the essential details of the proposed transaction."  *Id.*  Similarly, in *In re USA Detergents, Inc.*, the court declined to dismiss aiding and abetting claims against a controlling shareholder who "pressured the Director Defendants to focus on minimizing losses for [the shareholder] rather than the Debtor."  418 B.R. at 546.  So here.

The Chandler Trusts Representatives' argument that the Complaint "impermissibly lumps them together," is both factually inaccurate and legally immaterial.  (Mot. 5 at 21.)  The Complaint includes numerous separate allegations describing the conduct of the Chandler Trust Representatives, the Chandler Trusts, the Foundations, and Dennis FitzSimons, who was a board member of the Cantigny Foundation and Chairman of the Board of the McCormack Foundation.  (*E.g.*, FC ¶¶ 27, 136, 138, 141-44, 147, 157-59, 163, 203, 208-10, 262, 330, 490-510.)  These detailed allegations include particularized acts by representatives of each of the aiders-and-abettors that are more than sufficient to state a plausible claim for relief.  In any event, the Controlling Shareholders cite no cases suggesting that "group pleading" of aiding-and-abetting claims is even forbidden (Mot. 5 at 21), and the Trustee cannot be realistically expected to provide any more detail than he has until discovery is completed.

The Chandler Trust Representatives' argument that a fiduciary cannot be liable for aiding and abetting a breach of fiduciary duty is also wrong.  *See Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972) (directors are fiduciaries, and are liable for aiding and abetting a breach "with any fiduciary, including corporate officials").  Moreover, even if the Chandler Trust Representatives' argument were correct, it would not justify dismissal, because they claim that they were not acting as fiduciaries in connection with the LBO.  (Mot. 5 at 8-9.)[36]

### D.  The Complaint Adequately Alleges That Monsma Aided And Abetted Breaches Of Fiduciary Duty By The D&O Defendants

By approving the subsidiary guarantees that were a precondition to borrowing the LBO Debt, the Subsidiary D&O Defendants aided and abetted the breaches of fiduciary duty committed by the D&O Defendants.  (FC ¶¶ 482-89 (Count Thirteen).)  Only Defendant Monsma moves to dismiss this claim, arguing that he did not knowingly aid the D&O Defendants' breach.  (*See* Mot. 3 at 8.)  Monsma, however, ignores the Trustee's (sufficient) allegations that he and the other Subsidiary D&O Defendants approved the subsidiary guarantees at Tribune's request knowing that, without the guarantees, Tribune could neither borrow the LBO Debt nor consummate the LBO.  (FC ¶¶ 284, 286.)

### VII.   THE TRUSTEE HAS ADEQUATELY STATED CLAIMS FOR AVOIDANCE OF THE PAYMENTS MADE TO THE OFFICER AND SUBSIDIARY D&O DEFENDANTS

Counts Thirty-Four and Thirty-Five of the Complaint and Counts One and Two of the Tag-Along Complaints (together with the Complaint, the "Complaints") seek to avoid and

---

[36] The Chandler Trust Representatives cannot both be shielded from primary liability for breach of fiduciary duty based on their abdication of those duties, and from aiding-and-abetting liability because they retained the formal title of a fiduciary despite having elected not to exercise the actual duties of a fiduciary in connection with the LBO.  (Mot. 5 at 8-9)  This cannot be, and is not, the law.  *See In re Brown Schs.*, 368 B.R. at 402-03 ("no case law . . . precludes such a claim" against a fiduciary for aiding and abetting breach); *OTK Assocs.*, 85 A.3d at 715 n.1 (rejecting argument since alternative theories may survive motion to dismiss).

recover as fraudulent transfers and preferences more than $86 million in "Insider Payments" paid by Tribune to the Officer Defendants, Additional Officer Recipients, Subsidiary D&O Defendants, and Tag-Along Defendants, certain of which have moved to dismiss such claims (collectively, the "Insider Payment Defendants").[37]  The Insider Payments consist of the enormous severance payments—or "Executive Transition Payments"—and related tax gross-up payments paid to employees terminated after the LBO, and the Phantom Equity payments and Success Bonus Payments that Zell determined Tribune would pay to executives and employees who played "a critical role in overseeing the completion of" the LBO.  (FC ¶¶ 159-60, 638, 644-46.)  The Insider Payments do not include the $43 million that Tribune paid to the D&O Defendants when they sold their shares in the LBO.  (FC ¶¶ 39, 49, 637.)

In Motion 6, the Insider Payment Defendants seek to dismiss the Trustee's claim to avoid as fraudulent transfers the Executive Transition Payments and related tax gross-up payments.  In Motion 7, the Insider Payment Defendants seek to dismiss the Trustee's claim to avoid as preferences the Executive Transition Payments and related tax gross-up payments and Phantom Equity payments.  The Tag-Along Defendants also seek pursuant to Motion 7 to dismiss the Trustee's claim to avoid as preferences the Success Bonus Payments received by the Tag-Along Defendants.[38]  Both motions should be denied.

---

[37] The Tag-Along Defendants are defendants in eighteen individual actions originally commenced by the Committee and transferred to the Court by May 21, 2013 order of the JPML. The Tag-Along Actions seek to recover preferential and fraudulent transfers made by Tribune to certain officers of Tribune and its subsidiaries.  Fourteen of the eighteen Tag-Along Defendants have moved to dismiss the preference and fraudulent conveyance claims against them; Tag-Along Defendants Young, Schacher, Shaw, and Malcolm have not moved.  (Mot. 7 at 1 n.1)

[38] The Officer Defendants, Additional Officer Defendants, and Subsidiary D&O Defendants have not moved to dismiss the Trustee's claims to avoid as preferences the Success Bonus Payments made to them.  None of the Insider Payment Defendants have moved to dismiss the Trustee's claims to avoid as fraudulent transfers the Success Bonus Payments or the Phantom Equity payments.

### A.  The Executive Transition Payments Should Be Avoided (Count Thirty-Four Of The *FitzSimons* Complaint And Count Two Of The Tag-Along Complaints)

Eighteen of the Insider Payment Defendants received Executive Transition Payments and related tax gross-up payments totaling more than $60 million.  (FC Ex. C; Tag-Along Compls. of Ellis, Malcolm, Schacher, Sewell, Murphy ¶ 22.)  The Executive Transition Payments equal three times these Insider Payment Defendants' salaries, and six times their target bonus, in the year they were terminated.  All of these Insider Payment Defendants were terminated, and the Executive Transition Payments were made, on or after December 18, 2007.  (FC Ex. C.)

Pursuant to Count Thirty-Four of the Complaint and Count Two of the Tag-Along Complaints, the Trustee seeks to avoid the Tribune's obligation to make the Executive Transition Payments and related tax gross-up payments (the "Obligations"), and the Executive Transition Payments themselves, as intentional and/or constructive fraudulent conveyances (the "Transfers").  Section 548(a) of the Bankruptcy Code permits the avoidance of transfers or obligations "made or incurred on or within 2 years before the date of the filing of the petition" if made with actual intent to hinder, delay or defraud creditors or if the debtor received less than reasonably equivalent value in exchange for the incurrence or transfer, and met one of the three tests for insolvency at the time the transfer was made or the obligation was incurred.  *See* 11 U.S.C. § 548(a)(1)(A)-(B).  The proponents of Motion 6 argue that the Trustee fails to allege that (i) the Obligations were incurred within two years before Tribune filed for bankruptcy, or (ii) that the Transfers were made for less than reasonably equivalent value.  As discussed below, the movants are wrong on both points.

### i. The Obligations Were Incurred Within Two Years Of Petition

The Trustee alleges that the Obligations can be avoided because they were incurred within two years before Tribune filed its bankruptcy petition—*i.e.*, that the Obligations were incurred on or after December 8, 2006.  (FC ¶ 638; Tag-Along Compls. ¶ 335-39.)  The Insider Payment Defendants nevertheless contend that the claim is time-barred, arguing that Tribune became obligated to pay them severance from the moment it adopted its "Transitional Compensation Plan for Executive Employees" (the "Plan") back in 1985 (or in 2006, when the Plan was last amended).  (Mot. 6 at 5.)  In other words, the Insider Payment Defendants contend that Tribune became obligated to pay at least some of them severance *before they were even employed by Tribune*.

The Insider Payment Defendants' position is patently absurd and should be rejected.  "[T]he more logical view . . . is that the debt is incurred on the date that the debtor becomes liable for it."  *See, e.g., In re Emerald Oil Co*., 695 F.2d 833, 837 (5th Cir. 1983) (debt incurred on the date that the debtor becomes obligated to pay for the services or goods); *accord In re Transpacific Carriers Corp.*, 50 B.R. 649, 652 (Bankr. S.D.N.Y. 1985) *aff'd*, 113 B.R. 139 (S.D.N.Y. 1990) ("A debt arises when the debtor becomes legally bound to pay.") (internal quotations omitted); *In re G. Survivor Corp.*, 217 B.R. 433, 441 (Bankr. S.D.N.Y. 1998) (severance obligation incurred at time of termination).  Under the terms of the Plan, Tribune did not become liable to make any severance payments to any of the Insider Payment Defendants until they were terminated (and the other conditions to payment under the Plan were met).  (*See* Cho Decl. Ex. C at 3 (describing conditions that must be met before Tribune severance obligation can arise).)

Alternatively, if the employee's date of termination is not the date of incurrence, the earliest Tribune could have incurred these obligations is April 1, 2007—when it entered into the Merger Agreement providing that the post-LBO Tribune entity would make the Executive Transition Payments.  (FC ¶¶ 76, 160.)  *In re TSIC, Inc*., 428 B.R. 103, 110 (Bankr. D. Del. 2010) is instructive.  In *TSIC*, the relevant date for incurrence of an obligation to pay severance to an employee was not the date of his original employment agreement, but the date of the parties' subsequent settlement agreement.  *Id.*  In reaching this holding, the court noted a strong Congressional intent to "eliminate excessive insider payments under employment contracts that prejudice general unsecured creditors," concluding that use of the later date was appropriate, in part, because "the effect of incurring the obligation under the Settlement Agreement unduly prejudiced the general unsecured creditors."[39]  *Id.*; *see also In re TransTexas Gas Corp*., 597 F.3d 298, 305 (5th Cir. 2010) (Section 548 was "clearly satisfied" where separation agreement was executed within two-year look-back period, notwithstanding that the original employment agreement fell outside that period).  The Trustee's claim to avoid the Obligations to make Executive Transition Payments is timely.

### ii.  Tribune Did Not Receive Reasonably Equivalent Value For Transfers

Even if the Obligations could somehow be deemed to have been incurred more than two years before the petition date and are no longer avoidable, the Trustee's claim to avoid the actual Transfers would still be timely, because the Transfers all were made in 2007 or 2008.  The Insider Payment Defendants do not dispute that Tribune was insolvent when the Transfers were

---

[39] While the Congressional statements quoted in *TSIC* related to 11 U.S.C § 548(a)(1)(B)(ii)(IV), there is no reason to believe that Congress's intent to eliminate prejudicial payments to insiders is limited to that provision.

made, but argue that the Trustee's claim should nevertheless be dismissed because Tribune supposedly received reasonably equivalent value in exchange for the Transfers.  (Mot. 6 at 7-8.)

The Insider Payment Defendants' contention is premature and incorrect.  The alleged provision of reasonably equivalent value "involve[s] factual inquiries inappropriate for a motion to dismiss."  *See In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 113 (Bankr. S.D.N.Y. 2011); *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 804 (Bankr. S.D.N.Y. 2005) (same); *In re Wash. Mut.*, *Inc.*, No. AP 10-53158 (MFW), 2013 WL 3757330, at *5 (Bankr. D. Del. July 16, 2013) (same).[40]  In any case, it is clear that Tribune did not receive reasonably equivalent value for the severance payments.

Severance, by definition, is paid only to former employees who no longer provide value of any kind to the transferring employer and who received regular salaries or other compensation for their work while they were employed.[41]  Hence, as a matter of law severance payments are made for less than reasonably equivalent value.  *See, e.g.*, *TSIC*, 428 B.R. at 114; *TransTexas*, 597 F.3d at 306-07 (holding that severance payments do not provide reasonably equivalent value to the transferor).  In addition, an employee who breaches the duty of loyalty owed to his or her employer has no right to severance or any other compensation or benefits.  *See, e.g., Borden*, 530 F.2d at 498 (affirming clawback of salaries and refusal to offset for value provided); *Claire's Stores, Inc. v. Abrams*, No. 86 C 9851, 1989 WL 134959, at *7 (N.D. Ill. Oct. 16, 1989) (similar); *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 205 (2d Cir. 2003) (similar);

---

[40]  Some courts have held that purely conclusory allegations may be insufficient to state a claim (*see* Mot. 6 at 7-8 (*citing In re USDigital, Inc.*, 443 B.R. 22, 39 (Bankr. D. Del. 2011)), but here the Trustee has alleged detailed facts concerning the lack of value given for the Transfers.  (FC ¶¶ 379-80, 635-41; Tag-Along Compls. ¶¶ 328-33.)

[41]  Tribune paid the Insider Payment Defendants over $43 million in Executive Transition Payments, in addition to the monies that the Insider Payment Defendants received as salaries. (FC Ex. C.)

*Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2005 WL 589000, at *29 n.25  (N.D. Ill.

Mar. 11, 2005) (quoting *Citron v. Merritt–Chapman & Scott Corp.*, 409 A.2d 607, 611 (Del. Ch.

1977), *aff'd*, 407 A.2d 1040 (Del. 1979)).  Payments to Defendants who allegedly breached their

fiduciary duties to Tribune (*see supra* §§ III, IV), were therefore entirely gratuitous, and not

made in exchange for reasonably equivalent value.

In *Madoff*, the trustee sought to avoid salary and bonus payments the debtor had made to

its former officers.  The defendants argued that the compensation paid to them could not be

avoided because their service as officers constituted reasonably equivalent value, and because the

trustee had not alleged that the amounts paid to them were out of proportion with compensation

provided to similarly situated employees in other companies.  The court acknowledged that their

provision of services to the debtor "might otherwise have constituted adequate consideration in

exchange for their receipt of salaries and bonuses" but denied the motion to dismiss anyway,

holding that if the defendants were found to have breached their fiduciary duties, as the trustee

alleged, they could not be deemed to have provided value.  458 B.R. at 112-13; *see also In re*

*Apex Auto. Warehouse, L.P.*, 238 B.R. 758, 773 (Bankr. N.D. Ill. 1999) (no reasonably equivalent

value received for bonus paid to CEO of firm that became unable to pay its debts under his

leadership).

Here, the Trustee has alleged that the moving Officer and Subsidiary D&O Defendants—

FitzSimons, Grenesko, Leach, Lewin, Mallory, Hiller, Knight, Landon, Malone, Reardon, Smith,

and Vitanovec—have all breached their fiduciary duties of loyalty to Tribune by, *inter alia*,

promoting and facilitating the LBO for their own pecuniary interests, despite their knowledge

that it would render the company insolvent.  (FC ¶¶ 27, 43, 50-53, 64-67, 258-69, 306-318, 400-

410 (Count Four).)  None of these Motion 6 movants have moved to dismiss the claims for

breach of fiduciary duty alleged against them.  These allegations are sufficient to state a claim that these Defendants did not provide reasonably equivalent value to Tribune, and thus that Tribune was not obligated to pay them the Executive Transition Payments and is entitled to recover the payments.

Third, all of the Executive Transition Payments were made by Tribune (*see, e.g.*, FC ¶ 160), but eleven of the Motion 6 movants were employees of Tribune subsidiaries (the "Subsidiary FC Defendants").[42]  Those Transfers were made for less than reasonably equivalent value.  While it is ordinarily the case that value at a subsidiary will flow up to its parent in the form of increased equity value, when the subsidiary has been rendered insolvent, the parent receives no value, because the subsidiary's stock is worthless.  *In re Worldcom Inc.*, No. 02-13533, 2003 WL 23861928, at *41 (Bankr. S.D.N.Y. Oct. 31, 2003).[43]  Accordingly, when a subsidiary is insolvent, transfers made to the subsidiary's employees do not provide reasonably equivalent value to the parent.  Here, any value provided by the Subsidiary FC Defendants to their employers provided no value to Tribune, as the Subsidiary Guarantors were insolvent when the payments were made.  (FC ¶ 472.)

Finally the Insider Payment Defendants argue that the Trustee fails to sufficiently allege that the Transfers can be avoided as intentional fraudulent transfers.  (*See* Mot. 6 at 7-10.)  This is incorrect.  The Trustee sufficiently pleads that the LBO itself was agreed to and consummated with an intent to hinder, delay and/or defraud Tribune's creditors.  (FC ¶ 639.)  Just as with the Shareholder Transfers, Tribune clearly understood and intended that these payments, which were

---

[42] Defendants Hiller, Knight, Landon, Malcolm, Malone, Reardon, Smith, Vitanovec, Waltz, Murphy, and Ellis. (FC ¶¶ 58-61, 64-67; Tag-Along Compls. of Ellis, Malcolm, Murphy ¶ 97.)

[43] The Trustee alleges that each of the subsidiaries was rendered insolvent by the LBO.  (FC ¶ 472.)

made pursuant to the Merger Agreement documenting the LBO and were intrinsically tied to and made part of the LBO (FC ¶160), and at a time when Tribune was undeniably insolvent, would further drain Tribune's resources and thereby hinder or delay creditors.[44]   The Complaint also alleges additional badges of fraud, including that the Executive Transition Payments (and related tax gross-up payments) were made to Tribune Insiders for less than reasonably equivalent value, following the Company's incurrence of debt that nearly tripled its leverage.

Motion 6 should be denied.

### B.   Trustee's Preference Claims Are Adequately Stated (Count Thirty-Five Of The FitzSimons Complaint  And Count One Of The Tag-Along Actions)

Motion 7 is entirely predicated on Defendants' assertions that they were not "insiders" of Tribune, or at least not at the time they received the payments.  The moving Tag-Along Defendants argue that the Trustee failed to allege they were "insiders" of Tribune at all, while the remaining Moving Preference Defendants argue that they were insiders, but just not at the time relevant to the Trustee's preference claim, which they claim is the date the payments actually were made (as opposed to arranged).  The Tag-Along Defendants join this argument in the alternative.  The Moving Preference Defendants are wrong on both points.

First, the Trustee's allegation that the Tag-Along Defendants were insiders is not conclusory, as they argue.  (*Compare* Mot. 7 at 7.)  Section 101(31) of the Bankruptcy Code provides that the term "insider" includes an "officer of the debtor."  The Tag-Along Complaints allege that the Tag-Along Defendants were officers by alleging that they received Insider Payments, which were only made to "*officers* let go after the LBO."  (FC ¶ 142.)  These allegations are more than sufficient to allege insider status.  *See In re Agriprocessors, Inc*., No.

---

[44] The alleged provision of reasonably equivalent value is not a defense to a claim of intentional fraudulent transfer.  11 U.S.C. § 548(a)(1)(A).

08-02751, 2011 WL 4621826, at *5 (Bankr. N.D. Iowa Sept. 30, 2011) ("allegation that [the]

defendant was an 'officer'" was sufficient to plead a plausible claim that defendant was an

insider); *see also Madoff*, 458 B.R. at 118 (similar); *In re Webusenet, Inc.*, No. 05-6532, 2006

WL 6589014, at *3 (Bankr. N.D. Ga. Mar. 7, 2006) (inferring insider status even where none was

alleged).[45]

The Tag-Along Defendants also join the other Moving Preference Defendants in arguing

that they cannot be liable for a preference unless they were insiders at the moment the challenged

payments were made.  These Defendants ignore, however, that courts within the Second

Circuit—where this multidistrict litigation is pending—and the Seventh Circuit—where the

allegedly preferential transfers were arranged—have rejected this narrow approach, holding

instead that a claim for preference may be stated if the transferee was an insider when the

payment was arranged, and the transfer was made within the one year look-back period

applicable to preference claims against insiders.  *See In re F & S Cent. Mfg. Corp.*, 53 B.R. 842,

848 (Bankr. E.D.N.Y. 1985); *In re Vaniman Int'l, Inc.*, 22 B.R. 166, 189 (Bankr. E.D.N.Y. 1982);

---

[45] The moving Defendants rely almost exclusively on *Caremerica*, (*see* Mot. 7 at 8) but that decision has not been followed in this Circuit, and has been criticized as exceeding the Rule 8 notice requirements and placing an undue burden on plaintiffs in advance of discovery.  *See In re TOUSA, Inc.*, 442 B.R. 852, 854-56 (Bankr. S.D. Fla. 2010) (refusing to follow *Caremerica* because it "require[s] more than the standard promulgated in *Twombly* and *Iqbal* and the liberal pleading policy underlying the civil rules" and likening standard used in *Caremerica* to the "gotcha" pleading standard rejected long ago by Supreme Court); *In re Crescent Res., LLC*, No. 09-11507-CAG, 2012 WL 195528, at *6 (Bankr. W.D. Tex. Jan. 23, 2012) (noting Circuit rejection of *Caremerica* and its misinterpretation of *Twombly* pleading standard); *see also In re C.R. Stone Concrete Contractors, Inc.*, 434 B.R. 208, 220–21 (Bankr. D. Mass 2010) ("so long as the complaint makes clear who transferred what to whom and when, a preference defendant will have enough information to mount whatever defenses may be available").  Their reliance on *Capmark Fin. Group Inc. v. Goldman Sachs Credit Partners L.P.* is also misplaced, as the plaintiff in *Capmark* was attempting to allege that certain lenders were insiders even though they were not in any of the categories of "insider" enumerated by the Bankruptcy Code.  By its very nature such a claim requires a factual explanation of why a defendant should be considered an insider that is unnecessary where, as here, the Defendant is alleged to be an insider within the express terms of the Bankruptcy Code.  491 B.R. 335, 351 (S.D.N.Y. 2013).

*In re Consol. Indus. Corp.*, 292 B.R. 354, 363 (N.D. Ind. 2002); *see also In re EECO Inc.,* 138 B.R. 260, 264 (Bankr. C.D. Cal. 1992).

For example, in *In re F & S Cent. Mfg. Corp.*, the court noted that "[t]he longer period of preference vulnerability for insiders was enacted in part to assure that those who control the debtor could not . . . frustrate the Code's preference policies by delaying" a debtor's bankruptcy filing. 53 B.R. at 848-49 (*citing* 2 Norton § 32.29). Reasoning that a policy that permitted insiders "to escape the insider provisions by delaying instead the date the debtor transfers its property" would frustrate this purpose, the court concluded that a "creditor who is an insider at the time the transfer of the debtor's property is arranged is an insider at the time of the transfer." *F & S Cent.*, 53 B.R. at 849; *see also In re EECO Inc.,* 138 B.R. at 264 ("[T]o hold that one could gain non-insider status [by resigning] would thwart § 547's goal of recovering assets from insiders.").

The Northern District of Indiana reached the same conclusion in *In re Consolidated Industries Corp.*, holding that the "law is well established" "that where a transfer is part of a larger single transaction, the transferee is an insider—and subject to the one year period—for the entire time it takes to consummate the deal." 292 B.R. at 363 (citing *F & S Cent.*, 53 B.R. at 849; *EECO,* 138 B.R. at 264), *rev'd on other grounds sub nom. Freeland v. Enodis Corp.*, 540 F.3d 721 (7th Cir. 2008). This reasoning is particularly applicable here, given that the LBO was the "Change of Control" that triggered the Company's payment of the Executive Transition Payments and Phantom Equity payments, and thus these payments were intrinsically tied to— and part of—the LBO. (FC ¶ 160.)

Indeed, the courts' concerns articulated in *F&S, EEOC*, and *Consolidated Industries* regarding insiders' ability to escape liability is all the more applicable here, where a number of

the Moving Preference Defendants are alleged to have been instrumental in the very transaction

that obligated post-LBO Tribune to make the payments and ultimately doomed the Company.

(*See, inter alia*, FC ¶¶ 27, 43, 50-52, 58-61, 64-65, 67, 258-69, 282-86, 306-18, 400-10, 471-81

(describing breaches of fiduciary duties by movants FitzSimons, Grenesko, Hiller, Knapp,

Knight, Landon, Leach, Mallory, Malone, Lewin, Reardon, Waltz).)  All of the Moving

Preference Defendants were employed by the Company or a Subsidiary Guarantor when these

payments were arranged.  (FC ¶¶ 642-48; Tag-Along Compls. ¶¶ 97, 328-33.)  The fact that some

payments were made shortly after the Moving Preference Defendants' termination should have

no bearing on the Trustee's ability to recoup them for the ratable benefit of Tribune's creditors.

## VIII.  THE COMPLAINT ADEQUATELY ALLEGES PREFERENCE AND FRAUDULENT TRANSFER AGAINST THE ZELL DEFENDANTS

### A.  The Subject Matter Of Counts Seven, Nine, Ten And Eleven

The Complaint seeks to recover from the Zell Defendants $259 million of avoidable

transfers (as further defined below, the "EGI-TRB Transfers") made to EGI-TRB at Step Two for

Zell's benefit.  As background, in connection with Step One of the LBO, Zell's investment entity

EGI-TRB paid Tribune $250 million for (i) $50 million worth of Tribune stock, and (ii) a

putative $200 million promissory note (the "Exchangeable Note") which the Trustee alleges

should itself be avoided, or recharacterized as an equity investment.  (FC ¶¶ 78, 80, 435-40, 613-

24.)  The Exchangeable Note was redeemable by EGI-TRB under certain conditions (the

"Exchangeable Note Obligation") and was exchangeable, at Tribune's option, for Tribune stock.

(FC ¶ 78.)  In connection with Step Two of the LBO, Tribune transferred to EGI-TRB principal

and accrued interest in the amount of $206,418,859 to redeem the Exchangeable Note (the

"Exchangeable Note Transfer"), and $50 million to redeem EGI-TRB's Tribune stock (the "EGI-

TRB Stock Transfer").  (FC ¶¶ 79-80.)  Additionally, Tribune transferred an additional $2.5

million to EGI-TRB ("EGI-TRB Fee Transfers") and $586,759 to EGI ("EGI Reimbursements") for expenses those entities allegedly incurred in connection with the LBO.  (FC ¶¶ 77, 79.)

Count Seven seeks to avoid Tribune's incurrence of the Exchangeable Note Obligation, and to avoid and recover the Exchangeable Note Transfer, the EGI-TRB Stock Transfer, and the EGI-TRB Fee Transfers (collectively the "EGI-TRB Transfers"), as intentional and constructive fraudulent transfers.  (FC ¶¶ 435-40.)  Count Nine seeks in the alternative to avoid the Exchangeable Note Transfer and the EGI-TRB Fee Transfers as preferential payments to an insider.  (FC ¶¶ 454-59.)  Separately, Counts Ten and Eleven seek to avoid and recover the EGI Reimbursements as a fraudulent and preferential transfer, respectively.  (FC ¶¶ 460-70.)

### B.   The Trustee's Claims to recover the EGI-TRB Transfers Should Not Be Dismissed Based on a Set-Off Defense

On December 20, 2007, the same day that the EGI-TRB Transfers totaling $259 million were supposed to be made to EGI-TRB for Zell's benefit, EGI-TRB purchased from Tribune a $225 million promissory note (the "Subordinated Note") and a $90 million warrant (the "Warrant"), for a total of $315 million.  (FC ¶ 80-81, 203.)  Thus, $259 million was to be paid *from* Tribune *to* EGI-TRB to cover the EGI-TRB Transfers, $256 million of which was gratuitous or at a minimum on account of equity; and $315 million was payable *by* EGI-TRB *to* Tribune for the Subordinated Note and Warrant.  (FC ¶ 81.)  Instead, however, these amounts were netted against one another, such that Tribune parted with the right to receive $259 million of the $315 million due to it, and EGI-TRB paid Tribune only the $56 million difference.  (FC ¶ 81.)

As a matter of fraudulent conveyance law, which focuses on the substance of transactions and not the form, *see, e.g., In re Tronox*, 503 B.R. at 268, the Complaint sufficiently alleges that Tribune's act of giving up its right to receive $259 million, or in the alternative, payment on

account of that investment, from EGI-TRB, constituted a constructive and intentional fraudulent transfer.[46]  The Zell Defendants argue to the contrary that Tribune's act of netting this amount against the $315 million that EGI-TRB owed Tribune was a "setoff" under Section 553 of the Bankruptcy Code, that a "setoff" is not a "transfer" as that term is defined by Section 101(54), and that the EGI-TRB Transfers therefore cannot be avoided.

The Bankruptcy Code defines "Transfer" broadly to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with (i) *property*; or (ii) *an interest in property*."  "Property" is defined broadly by applicable state law. *Butner v. United States*, 440 U.S. 48, 55 (1979).  "Generally speaking, the broad definition of 'transfer' is sufficiently robust to cover the release of an obligation to pay money," as "the right to collect a debt is 'property or ... an interest in property,' and the release disposes of or parts with it."  *In re Teligent. Inc*., 325 B.R. 81, 86 (Bankr. S.D.N.Y. 2005).  The EGI-TRB Transfers constituted a "mode . . . of . . . parting with . . . an interest in property," as Tribune parted with the right to collect $259 million of the purchase price EGI-TRB was to pay it for the Subordinated Note and Warrant. [47]  The EGI-TRB Transfers thus clearly fall within the Bankruptcy Code's definition of "Transfer."

---

[46] These Counts incorporate the Trustee's allegations respecting collapsing, lack of consideration to Tribune, insolvency and fraudulent intent respecting the LBO that make the Exchangeable Note Obligation and EGI-TRB transfers avoidable.  These issues are discussed elsewhere in this memorandum and in the IFT brief.

[47] The Zell Defendants' argument ignores the plain text of Section 101(54), and arises instead from a decision by the Bankruptcy Court for the District of Colorado holding that a setoff is not a "Transfer" based on the opinions of two individual members of Congress rather than the plain language of the statute.  *See, e.g.*, *In re Balducci Oil Co., Inc.*, 33 B.R. 847, 852 (Bankr. D. Colo. 1983).  This dubious legislative history should not trump the plain terms of the Bankruptcy Code itself.  *E.g.*, *In re Tribune Co. Fraudulent Conveyance Litig.,* 499 B.R. 310, 315-16 (S.D.N.Y. 2013) (plain meaning of statute controls)*; FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 553 (1960) (statement of one Congressman not controlling).

Beyond the plain meaning of "transfer," the doctrine of setoff does not apply to these facts, and the Zell Defendants do not cite any precedent so holding. Instead, the cases they cite involve typical setoff scenarios, in which A and B owe each other mutual trade debts, or bank A sets off a deposit against a borrower's debt. "Setoff is only allowed in very narrow circumstances in bankruptcy," *In re 105 E. Second St. Assocs*, 207 B.R. 64, 68 (Bankr. S.D.N.Y. 1997), however, and the Court should not lightly expand it beyond its traditional confines.[48]

Section 553 is inapplicable here for at least three specific reasons. *First*, Count Seven of the Complaint seeks to avoid, *inter alia,* the Exchangeable Note *Obligation itself*—which is Tribune's purported duty to pay Zell to redeem the Exchangeable Note. (FC ¶¶ 435-40.)[49] Zell does not dispute that the Complaint states a claim for avoidance of that *obligation* (as distinct from the later *transfers*), or contend that Section 546(e) bars the claim. Thus, for the purposes of this motion, it must be assumed that the Exchangeable Note Obligation will be avoided. In that event, EGI-TRB should not have been credited $206 million paid to it on account of that avoided obligation, and should have paid it to Tribune when it purchased the new Subordinated Note and Warrant, rather than the $56 million that it actually paid. Since Tribune parted with the right to receive that payment, it is no different in substance than if Tribune had simply gifted $206 million to EGI-TRB, and EGI-TRB (and any party responsible for EGI-TRB's debts, *see* Count Nine) should be made to pay that $206 million transfer.

---

[48] Additionally, "[t]he general principles of equity govern the application of [Section 553], and the rule in equity 'varies with the needs of the occasion.'" *Roberts v. United States*, 18 Cl. Ct. 351, 358 (Cl. Ct. 1989). Putting aside that, given the circumstances presented here, the Zell Defendants do not have a right to setoff under Section 553, dismissal of the Trustee's claims to avoid the EGI-TRB Transfers based on the Zell Defendants' assertion of Section 553 "prior to the development of relevant facts would be inappropriate." *Id.*

[49] Code section 548(a) allows for the avoidance of both transfers made and obligations incurred.

*Second.*  Section 553 only permits "creditors" of a debtor to offset "debt" they are owed

by the debtor against debt they owe the debtor.  11 U.S.C. § 553(a); *see Citizens Bank of Md. v.*

*Strumpf*, 516 U.S. 16, 18 (1995) (Section 553(a) merely preserves existing setoff rights).[50]  That

does not apply here.  Under the well-pled allegations of the Complaint, neither the Exchangeable

Note Transfer nor the EGI-TRB Stock Transfer were payments on "debts" owed by Tribune to

EGI-TRB, and by the same token EGI-TRB was not a "creditor" with respect to those transfers.

The $50 million of value transferred to EGI-TRB in exchange for EGI-TRB's sale of Tribune

stock was not debt, it was payment for equity.  Under the Bankruptcy Code, the term "debt"

means "liability on a claim," 11 U.S.C. 101(12).  "Simply put, an equity interest is not a claim

against the debtor for which the equity holder may assert a right to payment."  *In re Pine Lake*

*Vill. Apartment Co.*, 21 B.R. 478, 480 (Bankr. S.D.N.Y. 1982); *see also*, *e.g., In re Revco D.S.,*

*Inc.*, 118 B.R. 468, 474-75 (Bankr. N.D. Ohio 1990) ("the mandatory redemption provision of

[the] convertible preferred stock is an interest and not a claim"); *Harbinger Capital Partners*

*Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 225 & n.29 (Del. Ch. 2006) (holders

of redeemable preferred are not creditors; collecting cases); FLETCHER CYCLOPEDIA OF THE LAW

OF CORPORATIONS § 5310 ("Redemption rights do not make the shareholder a creditor.").

Tribune's redemption of EGI-TRB's Tribune stock at Step Two was not payment on a debt, and

thus, Tribune's act of netting the redemption payment against the amount that EGI-TRB paid to

Tribune in connection with the Warrant and Subordinated Note does not constitute a setoff under

Section 553(a).

---

[50] The Zell Defendants do not identify the state-law right of setoff that they are claiming or set
forth the elements of a setoff defense that would apply under the law of the applicable state.  The
text responds to the Zell Defendants' invocation of Section 553 with reference to the limitations
on setoff rights that are imposed by the Bankruptcy Code, but the Zell Defendants' setoff
argument should also be rejected for failing to identify the governing state law or the factual
allegations that they contend meet the elements of that law.

The same is true with respect to the Exchangeable Note Transfer.  Count Thirty-Two alleges that the Exchangeable Note (if not outright avoided) should be recharacterized as equity.[51]  (FC ¶¶ 613-24.)  EGI-TRB has articulated no challenge to the sufficiency of that claim. Thus, at this stage, any payment made or value credited to EGI-TRB on account of the Exchangeable Note must be deemed to have been a payment on account of equity rather than debt.  As with the EGI-TRB Stock Transfer, the $206 million credited to EGI-TRB on account of Tribune's redemption of the Exchangeable Note must be treated as a payment for equity, for which Tribune itself receives no value (FC ¶¶ 380, 439), and not payment on a claim. Thus, like the EGI-TRB Stock Transfer, Tribune's netting of the Exchangeable Note Transfer against the amount EGI-TRB paid for the Warrant and Subordinated Note also does not constitute a setoff under Section 553.

*Third.*  Even if the Court finds that Tribune owed a "debt" to EGI-TRB with respect to the Exchangeable Note Obligation, Exchangeable Note Transfer, or EGI-TRB Stock Transfer, it cannot find that EGI-TRB owed a "debt" to Tribune against which any setoff could be made. Quite the opposite:  the $315 million that EGI-TRB paid Tribune to purchase the Warrant and

---

[51] The Exchangeable Note was unsecured, deeply subordinated, had no fixed date of maturity, did not require fixed or periodic payments of interest or principal, and the proceeds of the Exchangeable Note were used to finance the LBO rather than to finance Tribune's ordinary business.  (FC ¶¶ 615-619, 622.)  Moreover, the Exchangeable Note was not a market-standard instrument, but was instead a *sui generis* document tailored to the transaction EGI-TRB was entering into.  (FC ¶ 621.)  Notably, it was exchangeable at any time, at Tribune's option, into equity shares, and if Step Two of the LBO failed to close, the outstanding principal amount owed on the Exchangeable Note would be automatically exchanged for shares of Tribune stock.  (FC ¶¶ 78, 619.)  Upon redemption of the Exchangeable Note, the amount paid or credited by Tribune to EGI-TRB was based upon the price that would have been paid to EGI-TRB had the Exchangeable Note been converted to stock.  (FC ¶¶ 620-21.)  For all of those reasons, the Exchangeable Note is in reality an equity instrument and Tribune's credit to EGI-TRB of $206 million on account of the note is akin to a repurchase of stock.  *See Adelphia*, 365 B.R. at 74 (listing factors for recharacterization from debt to equity) (*citing In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 747 (6th Cir. 2001)).

Subordinated Note was funding that EGI-TRB gave Tribune, with the result that Tribune incurred obligations *to* EGI-TRB.  There is no allegation that EGI-TRB owed this money to Tribune.[52]

In sum, the EGI-TRB Transfers effectively depleted the Tribune estate in the same manner as the rest of the Shareholder Transfers, and Section 553 of the Bankruptcy Code does not provide a defense to the Trustee's well-pled claims to avoid these transfers.

### C.  Section 546(e) Does Not Apply

The Zell Defendants' suggestion that Counts Seven and Nine (addressing the EGI-TRB Transfers), and Counts Ten and Eleven (addressing the EGI Reimbursements) are barred by Section 546(e) of the Bankruptcy Code is fatally flawed.  Section 546(e) only protects "Settlement Payments," or transfers made in connection with a securities contract, that are "by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency . . ."  11 U.S.C. § 546(e).  None of the EGI-TRB Transfers or EGI Reimbursements are alleged to have been made "by or to (or for the benefit of)" any of those persons or entities.  *E.g.*, *In re OODC, LLC*, 321 B.R. 128, 144-45 (Bankr. D. Del. 2005).  Thus, Section 546(e) does not preclude the Trustee from avoiding the EGI-TRB Transfers and EGI Reimbursements as preferences and constructive fraudulent transfers.  (FC ¶¶ 439, 469.)

Moreover, by its terms, Section 546(e) has no application to claims of *intentional* fraudulent transfer "under section 548 (a)(1)(A)."  11 U.S.C. § 546(e).  Counts Seven and Eleven assert that the EGI-TRB Transfers and EGI- Reimbursements were intentional fraudulent

---

[52] Additionally, the EGI Reimbursements cannot be setoff against the $315 million that EGI-TRB paid Tribune for the Warrant and Subordinated Note, as it is well-established that a setoff under Section 553 may only be made with respect to debts owing between the same parties.  *In re Sentinel Prods. Corp.*, 192 B.R. 41, 45, 47 (N.D.N.Y. 1996).

transfers under Section 548(a)(1)(A), as they were part and parcel of the larger intentional

fraudulent transfers made to all Tribune shareholders as part of the LBO.  Count One's claim to

recover the payments to repurchase or redeem Tribune shares as intentionally fraudulent

encompasses the EGI-TRB Stock Transfer, and the Exchangeable Note Transfer to the extent that

the Exchangeable Note is ultimately recharacterized as equity.  (FC ¶¶ 78, 435-38, 466-68, 613-

24.[53]

      Finally, the EGI-TRB Fee Transfers and the EGI Reimbursements were payments to

reimburse legal fees and other expenses and thus clearly are not transfers made in connection

with a securities contract.  Nor are they "settlement payments," which have been defined as

"[t]he completion of a transaction, wherein securities and corresponding funds are delivered and

credited to the appropriate accounts" and as the "[c]onclusion of a securities transaction when a

customer pays a broker/dealer for securities purchased or delivers securities sold and receives

from the broker the proceeds of a sale."  *Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913

F.2d 846, 849 (10th Cir. 1990) (internal quotations omitted) (cited by Zell Defendants for the

definition of "settlement payment" at Mot. 2 at 23). [54]

      Finally, the Section 546(e) safe harbor is an affirmative defense that should not be

resolved on a Rule 12(b)(6) motion absent allegations in the complaint that irrefutably establish

---

[53] Section 546(e) may not be invoked at this stage for the additional reason that the Court has
made no final determination respecting the Trustee's claim to avoid the Exchangeable Note
Obligation itself or to recharacterize the Exchangeable Note as equity.  If the Trustee is
unsuccessful in these claims, the Exchangeable Note Transfer clearly will not be covered by
the safe harbor, which does not cover private lending arrangements.  *Enron Creditors Recovery
Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 337 (2d Cir. 2011).

[54] All of the cases cited by the Zell Defendants simply involved payments for stock or
commercial paper.  (Mot. 2 at 23.)  The Zell Defendants cite no authority that supports the notion
that the definition of settlement payments is broad enough to cover payments made to reimburse
legal fees.

that it applies.  *See Madoff*, 458 B.R. at 115.  The EGI-TRB Transfers, involve myriad unsettled

and complex issues of fact and law.  On this incomplete record and at this pleading stage, the

Court should not make a determination regarding the applicability of Section 546(e) that is so

dependent on as-yet unknown facts regarding the unique and esoteric payments at issue.  For all

of these reasons, the Zell Defendants' invocation of Section 546(e) should be rejected.

### D.  <u>The Complaint May Not Be Dismissed On The Basis Of A New Value Defense</u>

In Count Nine, the Trustee alleges in the alternative to Count Seven that the

Exchangeable Note Transfer and EGI-TRB Fee Transfer were preferences.  (FC ¶¶ 454-59.)

That is, in the event that the Exchangeable Note is not avoided (Count Seven), or recharacterized

as an equity investment (Count 32), the Exchangeable Note Transfer would then be payment on

account of antecedent debt, made to an insider within one year of the bankruptcy filing, and thus

a preference.  11 U.S.C. § 547.  The Zell Defendants' bid to dismiss Count Nine based on the

affirmative defense of "new value" presents an issue of fact that cannot be resolved on this

motion.  (Mot. 2 at 24-5.)  As one court has explained, "success on a contemporaneous exchange

defense requires a finding that the debtor and the transferee or third-party beneficiary intended a

substantially contemporaneous exchange for new value," and "[t]he existence of such intent

under § 547(c)(1) is a question of fact."  *In re 360networks (USA) Inc.*, 338 B.R. 194, 209

(Bankr. S.D.N.Y. 2005).  With no allegation in the Complaint of the facts that Zell admits are

necessary to his affirmative defense, Zell is left with the ordinary burden of pleading and proving

that affirmative defense at trial.[55]

---

[55] Zell's contention that he is not properly included as a defendant in Count Nine is incorrect
(Mot. 2 at 22 n.21).  Zell is named as someone for whose benefit the subject transfers were made
(FC ¶ 457) and based on Count Eight which alleges that Zell is liable for, *inter alia*, the EGI-
TRB Transfers as an alter ego of EGI-TRB.  (FC ¶¶ 441-55.)

**IX.      THE COMPLAINT ADEQUATELY ALLEGES ALTER EGO CLAIMS AGAINST ZELL, EGI, AND SAM INVESTMENT TRUST**

Count Eight of the Complaint alleges that Zell, EGI, and Sam Investment Trust are alter egos of one another and of EGI-TRB such that each is liable for any liabilities of EGI-TRB.  (FC ¶¶ 441-53.)  The Zell Defendants ask the Court to dismiss that claim, contending that veil piercing is permitted only if EGI-TRB's form was a "sham" or if EGI-TRB was completely dominated by the others and that the Complaint does not contain the requisite factual allegations. (Mot. 2 at 16-19.)  That contention misconstrues the law and ignores critical allegations in the Complaint.

To prevail an on alter ego claim, a plaintiff need not prove actual fraud, but need only show a "mingling of the operations of the entity and its owner" plus an injustice or unfairness. *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008).  Relevant factors that "reveal how the corporation operates and the particular defendant's relationship  to that operation" include "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder." *Id.* at 176-77.  The factors are not exhaustive, and no single factor is dispositive, although "complete domination" may be decisive.  *Autobacs*, 473 B.R. at 556.

Stated generally, the inquiry initially focuses on whether those in control of a corporation treated the corporation as a distinct entity, and, if they did not, the court evaluates the specific facts with a standard of "fraud" or "misuse" or some other general term of reproach in mind, such as whether the corporation was used to engage in conduct that was "inequitable."  *NetJets*,

120

537 F.3d at 177.  A court may also disregard the corporate form in "the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations among members of the corporation are involved."  *In re Phillips Petroleum Sec. Litig.*, 738 F. Supp. 825, 839 (D. Del. 1990) (finding that reasonable trier of fact could determine that entity was formed for purpose of takeover attempt, was dominated, and was created to insulate the parent corporation from possible securities fraud liability).  A plaintiff need not prove that the corporation was created with fraud or unfairness in mind; it is sufficient to prove that it was so used.  *See NetJets*, 537 F.3d at 177.

The Complaint sufficiently alleges an alter ego claim under these principles.  According to the allegations, EGI-TRB is and was at all relevant times dominated by and merely an instrument for the operations of Zell, the Sam Investment Trust, and EGI, and was further used as an instrument of fraud in an effort to insulate Zell, the Sam Investment Trust, and EGI from liability relating to or arising from the LBO.  (FC ¶¶ 83, 448-49.)  Zell, a billionaire investor, was the controlling party of EGI-TRB, a Delaware limited liability company located in Illinois.  (FC ¶¶ 76, 78.)[56]  Zell also holds a controlling interest in EGI, a private investment company located in Illinois, and is its President and Chairman.  (FC ¶ 77.)  Zell at all relevant times used EGI-TRB as a mere instrument and ignored the formalities between EGI-TRB and EGI;  EGI-TRB has no board of directors or similar board of managers.  (FC ¶¶ 83, 444.)

EGI-TRB also has no office of its own, and no employees of its own other than Zell and employees of EGI.  (FC ¶¶ 83, 447.)  At all relevant times, Zell was the President and Chief Executive Officer of EGI-TRB, with responsibility for the general and active management of

---

[56] Sam Investment Trust, an irrevocable Illinois trust established for the benefit of Zell and his family, is the sole member and 100% owner of EGI-TRB.  (FC ¶¶ 82, 442.)  For tax purposes, EGI-TRB is disregarded as an entity separate from Sam Investment Trust, and Zell is in turn treated as the owner of all of the property of Sam Investment Trust.  (FC ¶¶ 82, 443.)

EGI-TRB, and William C. Pate, a managing director of EGI (which Zell controls), was the Vice-President of EGI-TRB.  (FC ¶¶ 83, 445-46.)  Zell held himself out as the principal engaged in the LBO, and held Sam Investment Trust, EGI, and EGI-TRB out as instruments for his own operations and for the operations of one another.  (FC ¶ 450.)  Zell and EGI took the lead in negotiating and designing the LBO.  (FC ¶¶ 13, 72-74, 145-51, 154, 158, 162, 170, 203, 208, 263, 267, 345-51.)  Tribune and its directors, officers, Controlling Shareholders, and agents understood that EGI-TRB was merely an instrument of Zell's operations and of the operations of Sam Investment Trust and EGI, using Zell's name to refer collectively to Zell, Sam Investment Trust, EGI, and EGI-TRB.  (FC ¶ 450.)

EGI-TRB was founded for the sole purpose of consummating the LBO and holding Zell's investments (limited as they were) in Tribune.  (FC ¶ 78.)  Knowing there was a significantly high risk that the LBO would fail, Zell limited his own investment to less than 3% of the total putative value of the transaction.  (FC ¶ 120.)  EGI-TRB at all relevant times lacked sufficient capital to meet any liabilities that might arise from the LBO and plainly is insolvent.  (FC ¶¶ 83, 451-52.)  On December 20, 2007, EGI-TRB received transfers of value from Tribune of $256 million from equity investments in Tribune made earlier in 2007.  (*See supra* § VIII(B).)  The Trustee alleges in Counts One, Seven and Nine that such payments were avoidable as intentional or constructive fraudulent transfers, or preferences.  (FC ¶¶ 376-81, 435-40, 454-59.)  Thus, if the Trustee is successful on his claims, those fraudulently transferred dollars would be subject to being clawed back for the benefit of Tribune's creditors.  Given EGI-TRB's insolvency, it would be a gross miscarriage of justice for the architect and mastermind of the LBO to render himself and his affiliates judgment-proof from the clawback of the fraudulent and preferential transfers he orchestrated by hiding behind a sham corporate formality (one that he has otherwise ignored),

when the thousands of other recipients of the Shareholder Transfers sued in Count One, who had

nothing to do with setting up the LBO, are not shielded because they failed to set up a sham

corporation to make their Tribune investments.

The law will not permit a person to insulate himself or herself from liability for the harm

caused by his or her own wrongdoing in this way.  *See Buckhead*, 178 B.R. at 968 (sustaining

cause of action to pierce parent's corporate veil to hold it liable for the debts of indirect

subsidiary).[57]

The Trustee's allegations thus state a claim.  First, "[t]he nature and extent of the

dominion and control" exercised by Zell, Sam Investment Trust, and EGI over EGI-TRB "is a

question of fact, not subject to resolution on a motion to dismiss." *Buckhead*, 178 B.R. at 968.

Courts have allowed veil-piercing claims to survive motions to dismiss where "plaintiffs alleged

that the boards of a parent company and its subsidiary were identical and one company appeared

to operate as an instrumentality of the other, as well as where the officers and directors of two

companies were the same, and the two companies shared a common address."  *Shandler v. DLJ*

*Merch. Banking, Inc.*, No. 4797-VCS, 2010 WL 2929654, at *15 (Del. Ch. July 26, 2010) (citing

*Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, No. Civ. A. 8578, 1990 WL 44267, at *5 (Del.

Ch. Apr. 12, 1990) (finding genuine issues of material fact existed on veil-piercing claim where

corporations had similar boards and the subsidiary seemed to operate as an instrumentality of the

parent company).

---

[57] These allegations are consistent with the allegation in the Complaint that EGI-TRB was
"founded for the sole purpose of consummating the LBO, [and] EGI-TRB's business was, at all
relevant times, to 'engage in any activities which pertain to acquiring, owning, operating,
managing, financing, selling and otherwise dealing with' Tribune and the Tribune LBO."  (*See*
Mot. 2 at 18 (citing FC ¶ 78).)  EGI-TRB was founded for the sole purpose of consummating the
LBO, a transaction that carried an overwhelming risk of destroying Tribune as a going concern.

The case cited by Defendants respecting inadequacy of pleadings at the motion to dismiss stage involved an action in which "[t]he complaint [wa]s completely silent about [the veil piercing] factors" and "allege[d] nothing about corporate formalities, capitalization, solvency or how there was any façade." *Trans Union LLC v. Credit Research, Inc.*, No. 00 C 3885, 2001 WL 648953, at *8 (N.D. Ill. June 1, 2001).  Moreover, in that case there was "no injustice to be prevented [because it wa]s not a case of a deep pocket hiding behind a judgment-proof sham entity." *Id* at *9.  That case is the opposite of this one, because this is precisely a case of "a deep pocket hiding behind a judgment-proof sham entity," and because the alter-ego factors are alleged in detail.  Zell's motion to dismiss Count Eight should be denied.

## X. THE COMPLAINT ADEQUATELY ALLEGES A CLAIM FOR UNJUST ENRICHMENT AGAINST ALL THE NAMED DEFENDANTS

Count Thirty-One asserts a claim for unjust enrichment against the D&O Defendants, Subsidiary D&O Defendants, Controlling Shareholders, and Zell Defendants.  (FC ¶¶ 608-12.)  By this count, the Trustee seeks restitution and disgorgement of the payments, transfers, credits, profits, fees, benefits, incentives, and other things of value obtained as a result of these Defendants' wrongful conduct and breaches of fiduciary duty—which include, *inter alia*, millions of dollars of Shareholder Transfers and Insider Payments to the D&O Defendants and Subsidiary D&O Defendants, approximately $2 billion in Shareholder Transfers made to the Controlling Shareholders, the EGI-TRB Transfers and EGI Reimbursements made to the Zell Defendants, and more than $77,000 transferred personally and directly to Zell.  (FC ¶¶ 72-73, 76-80, 203-24, 226-28, 389-422, 471-81, 490-502, 608-12.)[58]

---

[58] The payments encompassed by Count Thirty-One are also sought through other Counts in the Complaint as well, which the Defendants have challenged as part their Phase Two Motions.

Under Illinois law, "[t]o state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989) (citations omitted). Each of the Directors, the Controlling Shareholders, and the Zell Defendants have moved to dismiss the Trustee's unjust enrichment claims. (*See* Mot. 1 at 26-28; Mot. 2 at 19-21; Mot. 4 at 23; Mot. 5 at 22-24.)[59] The Defendants claim variously: (i) that the existence of an express contract bars quasi-contract claims like unjust enrichment; (ii) that the Trustee does not lack an adequate remedy at law; (iii) that the unjust enrichment claims respecting payments for Shareholder Transfers are preempted by federal bankruptcy law; (iv) that the Defendants were not enriched; or (v) that there are no allegations of underlying wrongful conduct. (*Id.*) The Defendants also incorrectly cite the law of Delaware (Mot. 1 at 26-28; Mot. 4 at 23-34; Mot. 5 at 22-26) and of New York (Mot. 2 at 19-20) in support of their arguments. Each of their arguments must fail.

### A. Illinois Law Governs The Trustee's Unjust Enrichment Claim

Illinois law governs the unjust enrichment claim. Delaware, where this suit was commenced, looks to the Restatement (Second) of Conflict of Laws to determine choice of law for unjust enrichment claims. *See Phoenix Can. Oil Co. Ltd. v. Texaco Inc.*, 560 F. Supp. 1372, 1381-82 (D. Del. 1983); *Hurst v. Gen. Dynamics Corp.*, 583 A.2d 1334, 1338 & n.5 (Del. Ch.

---

[59] Officer Defendants Amsden, Grenesko, and Kenney, and certain Subsidiary D&O Defendants, including FitzSimons among others, did not make a motion respecting Count Thirty-One, but joined the Motion 1 Directors' Motion to Dismiss the Trustee's unjust enrichment claims. (*See* Joinder of Certain Current and Former Directors & Officers to Independent Directors' Motion to Dismiss [ECF No. 5936] (the "D&O Joinder").) The Trustee's unjust enrichment claim against certain of the Advisor Defendants is addressed separately in the Trustee's response to Motions 8-11.

1990).  Under Restatement Section 221, "[i]n actions for restitution, the rights and liabilities of

the parties with respect to the particular issue are determined by the local law of the state which,

with respect to that issue, has the most significant relationship to the occurrence and the parties."

Factors to be considered include (i) "the place where a relationship between the parties was

centered, provided that the receipt of enrichment was substantially related to the relationship"

(here, Illinois), (ii) "the place where the benefit or enrichment was received" (varies among the

moving parties, but a significant majority in Illinois), (iii) "the place where the act conferring the

benefit or enrichment was done" (Illinois, the place where Tribune authorized the payments), and

(iv) "the domicil, residence, nationality, place of incorporation and place of business of the

parties" (varies among the moving parties, but a significant majority in Illinois).  *Id.* § 221(2).

Restatement Section 145, which applies generally to torts, also applies the most significant

relationship test, and emphasizes where the tortious conduct and the injury occurred (here, the

injury occurred in Illinois, where substantial tortious conduct in connection with Board and

Special Committee meetings also occurred).  Weighing all the factors, Illinois has the most

significant relationship with respect to the unjust enrichment claim.

### B.  The Existence Of Contracts Does Not Bar The Trustee's Unjust Enrichment Claim

The Zell Defendants (but none of the other Count Thirty-One Defendants covered by this

memorandum) argue that the existence of "express contracts governing the subject matter at

issue precludes quasi-contractual claims" (Mot. 2 at 20), but fail to specify which contract(s)

they believe support this argument.  Even if they had, however, the fact that Tribune made

payments to the Defendants that might have been linked to various contracts does not preclude

the Trustee's unjust enrichment claim.  Under Illinois law, "unjust enrichment may be predicated

on either quasi-contract or tort."  *Peddinghaus v. Peddinghaus*, 692 N.E.2d 1221, 1225 (App. Ct.

Ill. 1st Dist. 1998).  Where "plaintiff's unjust enrichment claim is based on tort, instead of quasi-contract, the existence of a specific contract does not defeat his cause of action."  *Id.*; *see Liberty Mut. Ins. Co. v. Decking & Steel, Inc.*, 301 F. Supp. 2d 830, 835 (N.D. Ill. 2004).  Thus, Illinois courts have denied motions to dismiss unjust enrichment claims, despite the fact that the parties entered into express contracts governing their relationships, where the unjust enrichment claims were premised on tortious conduct that caused the defendant to unfairly retain a benefit to the plaintiff's detriment.  *See, e.g.*, *ShopLocal LLC v. Cairo, Inc.*, No. 05 Civ. 6662, 2006 WL 495942, at *2 (N.D. Ill. Feb. 27, 2006) (denying motion to dismiss unjust enrichment claim premised on defendant's tortious, unauthorized use of online data); *Am. Hardware Mfrs. Ass'n v. Reed Elsevier, Inc.*, No. 03 Civ. 9421, 2004 WL 3363844, at *16 (N.D. Ill. Dec. 28, 2004) (denying motion to dismiss unjust enrichment claim, despite allegations of an express contract between the parties and a breach of contract claim, because unjust enrichment claim was premised on defendants' fraudulent conduct).

The unjust enrichment claim is based on the Defendants' receipt of billions of dollars as a result of their own tortious conduct, without reference to the terms of any contract between the parties.  (FC ¶ 609.)  Indeed, the Complaint does not assert any breach of contract claims against these Defendants.  Because the Defendants' tortious conduct animates the unjust enrichment claim, the fact that certain unspecified contracts may relate to some of the payments at issue is inconsequential under Illinois law, and does not bar the Trustee's unjust enrichment claim.

## C.  The Existence Of A Remedy At Law Does Not Bar The Trustee's Unjust Enrichment Claim

The consideration of "equity" as a factor in unjust enrichment, *see HPI Health Care*, 545 N.E.2d at 679, does not mean that such a cause of action is invariably "equitable" and thus available only when the plaintiff has no adequate remedy at law.  As the Illinois Supreme Court

has noted, "[t]he doctrine of unjust enrichment underlies a number of legal and equitable actions

and remedies. . . ."  545 N.E.2d at 678.  Where, as here, restitution of unjustly paid amounts is

sought, the action is one at law.  *See Partipilo v. Hallman*, 510 N.E.2d 8, 10-11 (App. Ct. Ill. 1st

Dist. 1987); *see also Burns Philp Food, Inc. v. Cavalea Cont'l Freight, Inc.*, 135 F.3d 526, 528

(7th Cir. 1998) ("[W]e do not find persuasive indications that the Supreme Court of Illinois

thinks of restitution as an action in equity rather than at law."); *Adkins v. Nestle Purina PetCare

Co.*, 973 F. Supp. 2d 905, 923 (N.D. Ill. 2013) (unjust enrichment is an action at law); *In re

Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, Nos. 05 Civ. 4742, 05 Civ. 2623,

2006 WL 3754823, at *3 (N.D. Ill. Dec. 18, 2006) (same).  Accordingly, the existence of other

damages remedies against the Defendants under Sections 547 and 548 of the Bankruptcy Code

does not preclude the Trustee's assertion of an unjust enrichment claim.

## D.  <u>Section 546(e) Does Not Bar The Trustee's Unjust Enrichment Claim Predicated On Conduct Akin To Intentional Fraudulent Transfer</u>

Certain of the Defendants argue that Section 546(e) of the Bankruptcy Code preempts the

Trustee's unjust enrichment claim with respect to payments received in exchange for tendering

Tribune shares, *i.e.* the Shareholder Transfers.  (Mot. 1 at 27-28; Mot. 2 at 20 n.19; Mot. 4 at 23;

Mot. 5 at 22-24.)  Section 546(e), however, does not preempt a trustee's ability to avoid an

intentionally fraudulent transfer under Section 548(a)(1)(A) of the Bankruptcy Code, nor does it

preempt a trustee's ability to bring claims that "have more in common with claims grounded in

actual fraudulent intent" than classic constructive fraudulent transfer claims.  *In re Lehman Bros.

Holdings Inc.*, 469 B.R. 415, 451 (Bankr. S.D.N.Y. 2012).

In *Lehman*, Judge Peck rejected defendants' arguments that plaintiffs' unjust enrichment

claims were preempted by federal bankruptcy law, noting that the cases in which such claims

were found to be preempted involved "unjust enrichment claims [that] were identical to the

plaintiffs' constructively fraudulent transfer claims under the Bankruptcy Code and also were based upon the same facts as these constructive fraud claims." *Id.* at 451.  The claims in *Lehman*, conversely, were brought against JPMorgan, which had allegedly abused the power of its position as the debtor's clearing bank to extract improperly billions of dollars in incremental collateral and other concessions from the debtor in the weeks leading up to the debtor's bankruptcy.  *Id.* at 419.  Judge Peck found these claims to be

> unlike classic avoidance claims for constructively fraudulent transfers. *Instead, these claims have more in common with claims grounded in actual fraudulent intent*. These claims are not to be treated as replicas of claims to recover constructively fraudulent transfers, and, along with the rest of the Other Remaining Counts, they survive the Motion for further adjudication.

*Id.* at 451 (emphasis added).  Judge Peck also noted that

> safe harbors provide incentives and protections to market participants, but they are not a license for major institutions to act in a commercially unreasonable manner.  If [a defendant] crossed the line of permissible conduct and did anything wrongful that damaged [the debtor], *Plaintiffs have recourse by means of those counts that involve intentional misconduct or that are based on other claims that are not expressly subject to the protections of the safe harbors*.

*Id.* at 423 (emphasis added).  This is consistent with this Court's prior opinion that "Congress has repeatedly indicated that it did not enact Section 546(e) to protect market stability to the exclusion of all other policies."  *In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310, 318 (S.D.N.Y. 2013) (Sullivan, J.).

Indeed, subsequent cases cited by the Defendants recognize the distinction between claims akin to classic constructive fraudulent conveyance (which would be preempted by Section 546(e)), and those more akin to claims grounded in actual fraudulent intent (which would not).  *See AP Servs. LLP v. Silva*, 483 B.R. 63, 71 n.65, 72 (S.D.N.Y. 2012) (acknowledging *Lehman*, court held state law unjust enrichment claims preempted because they were predicated on the exact same allegations as the trustee's avoidance claims); *In re U.S. Mortgage Corp.* 491 B.R.

642, 667 (Bankr. D.N.J. 2013) (recognizing *Lehman* holding that the safe harbor does not foreclose unjust enrichment and other state law claims when the conduct giving rise to those claims is "entirely distinct" from those necessary for a constructive fraud claim).

Here, as in *Lehman*, the Trustee's unjust enrichment claims are more like the intentional fraudulent transfer claims asserted in Counts One, Seven, and Eleven—which are not preempted—than to any other manner of claim covered by Section 546(e). The Trustee's unjust enrichment claims are decidedly not constructive fraudulent transfer claims masquerading under another name; the Trustee's unjust enrichment claims in the Complaint are asserted against *only* those Defendants who were the most culpable in designing, implementing, and consummating the ruinous LBO—the D&O Defendants, Subsidiary D&O Defendants, Controlling Shareholders, Zell Defendants, and Advisor Defendants. (FC ¶¶ 608-12.) Conversely, the unjust enrichment claim is *not* alleged against the shareholders at large, the Additional Officer Recipients or the Tag-Along Defendants. (*Compare* FC ¶¶ 50-53, 94 with FC ¶ 609. And the Trustee's unjust enrichment claims are predicated on the same allegations that underpin the Trustee's intentional fraudulent transfer claims, including, among others, allegations that the Defendants created and relied on unreasonable projections, structured the LBO to hinder, delay, or defraud creditors, cashed out the shareholders at a premium price to the detriment of the Company and its creditors, and otherwise breached their fiduciary duties and/or aided and abetted the same. (FC ¶¶ 376-81.) Should the Court determine that the Trustee's other claims to avoid the Shareholder Transfers fail to rise to the level of intentional fraudulent transfer (which the Trustee, of course, does not concede), the Court may still find that the Defendants named in Count Thirty-One that received Shareholder Transfers engaged in inequitable conduct that was intentional and integral to the wrongdoing that culminated in Tribune's downfall, that such

Defendants were unjustly enriched thereby, and that the statutory safe harbor does not apply to their bad conduct. (*See supra* §§ III- X.)

### E.   The Defendants Engaged In Inequitable Conduct And Were Unjustly Enriched Thereby

Certain of the Directors and the Zell Defendants argue that they were not unjustly enriched. (*See* Mot. 1 at 26-28; Mot. 2 at 19-20.)[60]  The Directors, however, received more than $6 million in proceeds in connection with the LBO.  (FC ¶ 39.)  Such payments wrongfully enriched the Directors because, in dereliction of their fiduciary duties, they were cashing out their equity interests at a premium price in an interested party transaction that rendered the Company insolvent and harmed its creditors, and because it was partly the promise of these payments themselves that lured the Directors to commit these breaches.  (*See supra* § III(B); FC ¶¶ 3, 280, 283, 390-95, 608-09.)

The Zell Defendants were unjustly enriched by a variety of different forms of payments, transfers, and credits.[61]  (FC ¶ 608-609)  First, the Zell Defendants have not made any argument challenging the Trustee's claim to recharacterize the Exchangeable Note and so it must be accepted as an equity investment for the purposes of these motions.  (FC ¶¶ 613-24.)  Any payments made or credits extended in connection with the LBO in exchange for that equity investment would have unjustly enriched the Zell Defendants.  (FC ¶¶ 376-81.)  The EGI-TRB Stock Transfer similarly constituted a receipt of an intentional fraudulent transfer by an insider of the Company (when Zell was already on the Board).  (FC ¶ 80.)  When the Zell Defendants "paid" for the $225 million Subordinated Note and Warrant by netting out the purchase price

---

[60] The Chandler Trust Representatives and Controlling Shareholders do not contest that they were enriched by the LBO.

[61] The Zell Defendants acknowledge the Trustee's allegation of the $77,452 paid to Zell directly. (Mot. 2 at 19-20.)

against the Exchangeable Note Transfer and EGI-TRB Stock Transfer, they effectively "paid" with the proceeds of an intentional fraudulent transfer for the recharacterized note and the stock. *See, e.g.*, *In re Musicland Holding Corp.*, 398 B.R. at 775.  (*See also* FC ¶ 81.)  In this way, the Zell Defendants were unjustly enriched by not having to pay $259 million due Tribune, using a credit comprising fraudulently transferred gains.[62]

Next, certain of the Directors and the other Zell Defendants contend that the Trustee's unjust enrichment claim must fail because he supposedly fails to allege they acted inequitably. (Mot. 1 at 27 n.16; Mot. 2 at 26; Mot. 4 at 24; Mot. 5 at 24-26.)  In reality, the Complaint is replete with allegations that these defendants took advantage of their positions as insiders to advance their own self-interest at the expense of Tribune and its creditors, ignored their duties of loyalty, care, and good faith, and otherwise engage in grossly inequitable conduct as discussed in detail in Sections III, VI, VIII.  The same is true for the Controlling Shareholders.  (*See supra* § IV.)  These allegations undoubtedly are sufficient to survive dismissal.[63]

---

[62] The Zell Defendants were further enriched by obtaining reimbursements of $2.5 million and $586,759 for the EGI-TRB Fee Transfers and the EGI Reimbursements respectively.  (FC ¶¶ 77, 79.)  The Zell Defendants orchestrated an enormous financial gamble that had the long-shot potential to enrich the Zell Defendants after minimal investment on their part (*see supra* SOF § H), but which, predictably, plunged Tribune into bankruptcy—and then managed to get the Company to cover their fees for setting up the disastrous transaction.  (FC ¶¶ 77, 356.)  The Zell Defendants were unjustly enriched by shifting the EGI and EGI-TRB expenses incurred in connection with the LBO onto the shoulders of the insolvent Company.

[63] The Subsidiary D&O Defendants and the Officers who filed a joinder to Motion 1 did not make any affirmative arguments respecting the equity or inequity of their conduct.  Nevertheless, the allegations in the Complaint show that these Defendants are also among the most culpable for wrongdoing in connection with setting up and consummating the LBO.  (FC ¶¶ 170, 203, 400-10, 471-89.)  (*See supra* § III(E), SOF §§ G, P.)

## XI.    THE COMPLAINT ADEQUATELY ALLEGES CLAIMS FOR EQUITABLE SUBORDINATION AND DISALLOWANCE

Certain Defendants, including some of the D&O Defendants, Subsidiary D&O Defendants, and Zell Defendants (the "Count Thirty-Three Defendants"), filed proofs of claim against Tribune and/or its subsidiaries in connection with the bankruptcy proceeding.[64]  (*See, e.g.*, FC ¶¶ 27-34, 43-47, 50-51, 55-68, 76-77.)  Under Tribune's confirmed plan of reorganization (the "Bankruptcy Plan"), responsibility to satisfy or set off allowed claims was imposed on the Litigation Trust, rather than the reorganized Company.  (*See* Bankruptcy Plan § 7.11.2.)  None of these claims have been allowed or considered on the merits, and the Bankruptcy Plan provides that the Trustee is authorized to object to the allowance of, and entitled to assert any claim, counterclaim, or defense of the Company to, any such claim.  *Id.*

Assuming, *arguendo*, any such claims could ultimately be allowed, the Trustee seeks to equitably subordinate and/or disallow on equitable grounds, *see* 11 U.S.C. § 510(c), all of the claims filed against Tribune by those Defendants who orchestrated and implemented the disastrous LBO—the D&O Defendants, Subsidiary D&O Defendants, and Zell Defendants.  (FC ¶¶ 625-34.)  The Trustee seeks to subordinate or disallow the Count Thirty-Three Defendants' claims in order to ensure that Tribune's creditors are paid from Trust proceeds before former Tribune insiders responsible for the LBO.  (FC ¶¶ 625-34.)

Among Motions 1 through 7, only certain Directors and the Zell Defendants have challenged the legal sufficiency of Count Thirty-Three.  (Mot. 1 at 28-30; Mot. 2 at 26-27.)  These motions address only the sufficiency of the Trustee's subordination under the Bankruptcy Code; they do not address the merits of the claims filed against Tribune.

---

[64] As pertains to the claims based on an asserted right to corporate indemnification, the Trustee seeks avoidance of any alleged indemnification obligation itself as constructive and/or actual fraudulent transfers in Count Thirty-Six of the Complaint.  (*See infra* § XII.)

Under Section 510(c) of the Bankruptcy Code "after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."  11. U.S.C. §510(c).  Courts consider the following factors when determining if equitable subordination of a claim or interest is appropriate: (1) whether the claimant engaged in some type of inequitable conduct; (2) whether the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (3) whether equitable subordination of the claim is consistent with bankruptcy law.  *Le Café Creme, Ltd.*, 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000).[65]

Certain Directors and the Zell Defendants argue only that the Complaint does not satisfy the first factor—*i.e.* that they engaged in inequitable conduct.[66]  (*See* Mot. 1 at 28-30; Mot. 2 at 26-27.)

---

[65] Neither the Directors in Motion 1 nor the Zell Defendants have challenged the sufficiency of the Trustee's allegations with respect to the second and third factors.  In order to satisfy the second prong, a proponent need only show that the creditor's inequitable conduct reduced the probability that another creditor's claims could be satisfied.  *In re KDI Holdings, Inc.*, 277 B.R. 493, 509 (Bankr. S.D.N.Y. 1999).  The proponent is not required to "identify the injured creditors or quantify their injury. . . ."  *Id.*  The Complaint sufficiently alleges that the Defendants' conduct injured creditors.  (FC ¶¶ 163, 170, 172, 215-17, 220, 259-60, 262-63, 269-72, 280, 282, 284-85, 308-10, 315-17, 327-29, 386-87, 397-98, 408-09, 420-21, 432-33, 479-80, 487-88, 629-30.)  With the codification of Section 510(c), the third prong is satisfied as well.  *In re KDI Holdings, Inc.*, 277 B.R. at 509.

[66] EGI-TRB also notes that its claims are already contractually subordinated by court order.  (Mot. 2 at 26-27.)  First, the Bankruptcy Court order referenced by EGI-TRB only subordinated the claims under the Subordinated Note, not all the claims submitted by the Zell Defendants or even other claims submitted by EGI-TRB.  (Mot. 2 at 6.)  The Complaint alleges that Zell, EGI, and EGI-TRB each filed more than one proof of claim in Tribune's bankruptcy proceeding.  (FC ¶¶ 76, 77, 81.)  Second, at the same time that it filed its motion to dismiss, EGI-TRB was prosecuting an appeal seeking reversal of portions of that same order subordinating its claim.  (Mot. Two at 6.)  Since that time, EGI-TRB's appeal was dismissed as it pertained to the Litigation Trust (*see* Mem. and Order at 17-20, *In re Tribune Co.*, No. 12-cv-128 GMS at 17-20

A claim of inequitable conduct must allege facts showing any of the following: (1) fraud, illegality or breach of fiduciary duty; or (2) undercapitalization of the debtor; or (3) a claimant's use of the debtor as a mere instrumentality or alter ego.  *See In re Granite Partners, L.P.*, 210 B.R. 508, 514-15 (Bankr. S.D.N.Y. 1997).  An insider's conduct is more closely scrutinized than the conduct of a non-insider.  *In re KDI Holdings, Inc*., 277 B.R. at 511.

The first factor is satisfied by, among other things, alleging claims for breach of fiduciary duty and/or aiding and abetting a breach of fiduciary duty.  *See In re Am. Bus. Fin. Servs., Inc*. 361 B.R. 747, 763 (Bankr. D. Del. 2007) (factual allegations sufficient to support trustee's breach of fiduciary duty and aiding and abetting claims also constitute allegations sufficient to support a claim for equitable subordination); *see also In re OODC, LLC*, 321 B.R. 128 (same); *In re Bernard L. Madoff Inv. Securities LLC,* 424 B.R. 122 (Bankr. S.D.N.Y. 2010) (same).[67]  The second factor is satisfied by alleging some inequitable conduct in addition to undercapitalization such as if a loan either "defraud[s] creditors or take[s] unfair advantage of them." *In re KDI Holdings, Inc.*, 277 B.R. 493, at 514-15 (committee's complaint alleged sufficient facts to establish inequitable conduct where the complaint asserted that certain insiders had an "unfair

---

(Bankr. D. Del. June 18, 2014), ECF No. 93), but EGI-TRB may still seek further review of this ruling and thus it cannot seek to rely on the order which it was seeking (and may still seek) to reverse.  Third, the Bankruptcy Court never ruled on the full extent of subordination, specifically whether Zell's claim on the Subordinated Note should be subordinated to the recovery of post-petition interest by Tribune's creditors who received Trust Interests under the Bankruptcy Plan.

[67] The Complaint alleges breaches of the duty of loyalty and good faith by the Directors, including Zell, which cannot be exculpated under by Section 102(b)(7) of the DGCL.  The Complaint also alleges breaches of the duty of care.  Even if the Directors ultimately are exculpated from damages liability for such breaches, it would not eliminate the actual breach and would not constitute a defense to the Trustee's equitable subordination and disallowance claims.  *See Rural Metro Corp.*, 88 A.3d at 85.  "[T]he presence of an exculpatory provision does not eliminate the underlying duty of care or the potential for fiduciaries to breach that duty."  *Id*. (citing *Malpiede*, 780 A.2d at 1095 n.68.)  Count Thirty-Three does not seek damages from the Defendants; it seeks only to prevent the Defendants from recovering damages from the Trust.

advantage" when they gained control over the debtors "without putting their capital at risk as an equity investment" and then sold assets, over which they had control under the terms of a loan, "for their own selfish reasons."); *see also In re Le Cafe Creme, Ltd.*, 244 B.R. 221, 236 (Bankr. S.D.N.Y. 2000) (finding inequitable conduct where defendants converted their equity interests into secured debt by entering into a contract with the debtor for the repurchase of their stock, and by taking a security interest in the assets of the debtor's business, all of which occurred at time when debtor was insolvent and generally not paying its debts; "in effect, the [defendants] shifted the risk of loss from themselves to the Debtor's creditors, to their obvious detriment").

The Complaint easily sets forth adequate allegations for this preliminary stage to show that all of the Count Thirty-Three Defendants engaged in inequitable conduct.  The Directors and the Zell Defendants, quintessential insiders who are among those most culpable for planning, negotiating, and facilitating the LBO, engaged multiple categories of inequitable conduct: breach of fiduciary duty and undercapitalization. (*See supra* §§ III(B), III(D).)[68]

These cases are on all fours with the allegations against the Directors and the Zell Defendants in the Complaint, all of whom were insiders at the time Step One and Step Two occurred, and who cashed out their equity interests with proceeds of the loans they caused Tribune to incur and which rendered the Company insolvent.  (*See supra* §§ III(B), III(D).)

For the reasons stated above, the Court should deny Defendants' Motions to Dismiss Count Thirty-Three.

---

[68] The Complaint sets forth particularized allegations of fraud against several Count Thirty-Three Defendants who have not even challenged such allegations, nor challenged the Trustee's claim to equitably subordinate their claims; such as, *inter alia*, the Officer Defendants who created the faulty projections on which the LBO was premised.  (FC ¶¶ 258-73, 306-18, 625-34.)

**XII.**     **THE COMPLAINT ADEQUATELY ALLEGES CLAIMS TO AVOID ANY INDEMNIFICATION OBLIGATION TRIBUNE MAY HAVE TO THE D&O DEFENDANTS, THE SUBSIDIARY D&O DEFENDANTS, AND OTHER SPECIFIED TRIBUNE OFFICERS**

Certain of the Moving Directors[69] have also moved to dismiss Count Thirty-Six, which seeks to avoid as fraudulent transfers Tribune's obligations to indemnify its directors and officers against any judgments, claims or other liabilities arising from or relating to the LBO (the "Indemnification Obligations").  The Motion 1 Directors argue that the Indemnification Obligations cannot be avoided as constructively fraudulent transfers because (i) they were incurred more than two years before Tribune filed for bankruptcy, and (ii) the Trustee has failed to plausibly allege that Tribune received less than reasonably equivalent value in exchange for them or was insolvent at the time they were incurred.  Additionally, the Motion 1 Directors argue that the Complaint fails to adequately allege that Tribune incurred the Indemnification Obligations with intent to hinder, delay, or defraud its creditors.  None of these arguments warrants dismissal of Count Thirty-Six.

> **A.**     **Tribune Incurred The Indemnification Obligations On April 1, 2007, At The Earliest**

The Complaint alleges that, at the earliest, Tribune incurred the Indemnification Obligations when it entered into the Merger Agreement, which provided that the post-LBO Company would be obligated to indemnify Tribune's directors and officers in connection with LBO-related claims.  (FC ¶ 650.)  Defendants dispute this allegation, arguing that the Indemnification Obligations were incurred outside of the Bankruptcy Code's two-year look-back period and thus cannot be avoided.  Specifically, pointing to the Company's Amended and Restated Certificate of Incorporation dated June 12, 2000 and Article Eighth of Tribune's

---

[69] Certain of the D&O Defendants, Subsidiary D&O Defendants, and Zell join these challenges to Count Thirty-Six.  (Mot. 2 at 26; D&O Joinder.)

Amended and Restated Certificate of Incorporation effective December 20, 2007—neither of which are referenced in the Complaint—Defendants argue that the Indemnification Obligations were incurred by Tribune "no later than" 2000.  (Mot. 1 at 31.)

Defendants' reliance on these extrinsic documents is improper at this stage.  (*See infra* § XIII.)  As a matter of law, the Court must accept as true the factual allegations contained in the Complaint.  *See Rose Assocs.*, 2013 WL 1387018, at *2.  Nevertheless, even if the Court was inclined to consider the Defendants' materials, it would need only compare the 2000 and 2007 Certificates to see that the obligations memorialized in the former are not identical to those set forth in the latter.  (*Compare, e.g.* Kipp Decl. Ex. A at 6 (indemnification of officers and directors limited to service as officers and directors) *with* Kipp Decl. Ex. B at 5 (indemnification of officers and directors expanded to service as employees or agents).)

The Motion 1 Directors are also incorrect as a matter of law that a company incurs an obligation when it first adopts an indemnification policy.  A debtor does not "incur" an obligation until it is actually obligated to pay a sum certain.  (*See supra* § VII (citing cases).)  With respect to indemnification obligations, courts have held that a debtor "incur[s]" a debt, and the officers and directors hold a contingent claim against the debtor, "upon the later of the passage of the indemnification regulation and the officers' and directors' employment . . . *or at the time when the acts occurred giving rise to a reasonable likelihood of indemnification causes of action*."  *In re Pratt & Whitney Co.*, 143 B.R. 19, 23 (Bankr. D. Conn. 1992) (emphasis added); *see In re Grossman's Inc.*, 607 F.3d 114, 125 (3d Cir. 2010) (same).  Here, the actions and inactions giving rise to "a reasonable likelihood of indemnification causes of action" took place in 2007 when the LBO was planned and consummated, well within the Bankruptcy Code's two-year look-back period for causes of action under Section 548.  To hold otherwise would be contrary to the

138

purpose of the fraudulent transfer laws and basic logic—a corporation cannot incur an obligation to indemnify employees it has not yet employed for claims that have yet to arise.

The Motion 1 Directors' assertion that the Indemnification Obligations cannot have been newly incurred in 2007 since Tribune was legally obligated to assume them under the DGCL also fails.  (Mot. 1 at 31-32.)  Section 145 of the DGCL *permits* a Delaware corporation to indemnify its employees, but does not *require* it.  Del. Code Ann. tit. 8, § 145(a) ("A corporation shall have power to indemnify any person who was or is a party . . .").  Moreover, as the case cited by the Motion 1 Directors holds, DGCL Section 259(a) simply requires a surviving corporation in a merger to honor obligations of the merged corporation "to the same extent as if it had incurred them itself."  *Tourangeau v. Uniroyal, Inc.*, 138 F. Supp. 2d 259, 268 (D. Conn. 2001); *see* Del. Code Ann. tit. 8, § 259(a).  The statute does not preclude corporations from amending or terminating their indemnification obligations, which they are free to do.[70]  Defendants' assertion that it was a forgone conclusion that the post-LBO Tribune would adopt indemnification obligations identical to those in the 2000 Certificate is wrong.  (FC ¶¶ 87, 146, 194, 355.)  Del. Code Ann. tit. 8, § 242(a).

### B.  The Trustee Has Alleged Ample Bases For Lack Of Reasonably Equivalent Value

As articulated in Section VII(B), the issue of lack of reasonably equivalent value is factually intensive and therefore inappropriate for resolution on a motion to dismiss.  (*See supra*

---

[70] While the DGCL was amended in 2009 to prohibit a Delaware corporation from eliminating or impairing a right to indemnification retroactively following the occurrence of acts or omissions that gives rise to an indemnification claim, this provision was not enacted until years after the LBO was consummated.  *Compare Schoon v. Troy Corp.*, 948 A.2d 1157, 1168 (Del. Ch. 2008) (enforcing bylaw amendment barring advancement for former director despite fact that bylaw was amended after acts giving rise to liability) *with* 77 Del. Laws. ch. 14 (2009) (prohibiting, by amendment of DGCL § 145(f), elimination or impairment of indemnification rights after act or omission giving rise to liability occurs, unless expressly permitted by bylaw or certificate of incorporation).

§ VII(A)(ii).)  Nonetheless, the Trustee has alleged ample facts to plausibly allege that the Moving Directors breached their fiduciary duties, and therefore provided less than reasonably equivalent value in exchange for Tribune's incurrence of the Indemnification Obligations.  As articulated above, the Moving Defendants abdicated their duties of care, loyalty and good faith in favor of their own pecuniary interests and those of other conflicted parties, by recommending that the LBO be approved, utilizing flawed and patently unreasonable projections and solvency opinions that were facially defective, and intentionally ignoring that the LBO would render Tribune insolvent.  (*See supra* §§ III-IV.)  This is more than adequate to allege a lack of reasonably equivalent value at the pleading stage.  *See Madoff*, 458 B.R. at 112.  (*See also generally supra* § VII(A)(ii).)

Moreover, even if the Moving Directors' breaches of fiduciary duties could be ignored, any benefit flowing from their service on the Board following the LBO that gave rise to the Indemnification Obligation cannot constitute reasonably equivalent value, as the Company was deeply insolvent and rapidly deteriorated following the Step Two close, and was in bankruptcy less than a year later.  (FC ¶¶ 357, 359.)  Future consideration is considered reasonably equivalent value only if it is "instrumental" in helping a debtor avoid bankruptcy.  *See In re Collegeville/Imagineering, L.P.*, No. 95–1619, 1999 WL 33220041, at *7-9 (D. Del. Oct. 5, 1999); *In re TSIC, Inc.,* 428 B.R. at 114-15.  The Moving Directors cannot credibly claim that this is the case here.

Finally, the Trustee alleges that Tribune's incurrence of an obligation to indemnify its officers or directors for their own misconduct in the LBO—in which they caused Tribune to engage in a suicidal intentional fraudulent transfer—is itself part and parcel of that intentional fraudulent transfer, undertaken with an intent to further hinder, delay or defraud Tribune

creditors.  (FC ¶¶ 379-80, 650, 653).  The D&O Defendants were certainly motivated, and able, to ensure that when the inevitable Tribune bankruptcy arrived, they would be able to claim that Tribune was obligated to indemnify them for liabilities arising out of their wrongdoing.  The assumption of the Indemnification Obligations was a bargained-for element of the Merger Agreement, and was designed to purportedly protect from personal liability the very directors and officers who, in bad faith, breached their fiduciary duties in approving and/or advocating for the LBO at the expense of Tribune's creditors.  (FC ¶ 160.)

By definition, any such indemnification would further divert resources from a bankrupt Tribune and thus hinder or delay its existing creditors.  (*See supra* §§ II, III(A); FC ¶¶ 211-212, 650-52.)  In addition to this express evidence of a fraudulent intent to hinder and delay, the Complaint alleges a number of badges of fraud, including that the indemnification payments were arranged by and intended to be made solely to Tribune insiders, that Tribune incurred an enormous amount of debt, and was insolvent, when it agreed to assume the Indemnification Obligations, and that it did not and will not receive reasonably equivalent value in exchange for any indemnification payment.  The Trustee has therefore adequately alleged that the incurrence of the Indemnification Obligations was an intentional fraudulent conveyance.  Tribune received no reasonably equivalent value for the Indemnification Obligations (FC ¶ 651), but in any event reasonably equivalent value is no defense to the intentional fraudulent transfer claim contained in Count Thirty-Six.  (*See* 11 U.S.C. § 548(a)(1)(A)-(B).)

## XIII.    DEFENDANTS' USE OF MATERIALS EXTRINSIC TO THE COMPLAINT IS INAPPROPRIATE ON A MOTION TO DISMISS

Throughout the Motions to Dismiss, the Defendants cite repeatedly to facts and materials outside the four corners of the Complaint for hearsay purposes.  A document not referenced in or attached to the pleadings may be considered by the Court on a motion to dismiss only if it is one

on which the plaintiff "solely relies and is integral to the complaint."  *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (internal quotations omitted).

Otherwise, "a district court errs when it considers affidavits and exhibits submitted by defendants

. . . in ruling on a 12(b)(6) motion to dismiss."  *Friedl v.  N.Y.C.*, 210 F.3d 79, 83-84 (2d Cir.

2000) (internal quotations omitted).  This Court has already so ruled in connection with the

MDL.  *See In re Tribune Fraudulent Conveyance Litig.*, No. 11-MD-2296 (RJS) (S.D.N.Y. May

9, 2013), ECF No. 2503, at 1. ("Because the filings [submitted by defendants in support of

pending motion to dismiss] were not relied upon or even mentioned in the pleadings, they are not

properly within the Court's scope of consideration for a motion to dismiss.");  *see also U.S. Bank*

*N.A. v. Bank of Am., N.A.*, No. 12 Civ. 4873 (CM), 2012 WL 6136017, at *2 (S.D.N.Y. Dec. 11,

2012) (refusing to consider materials not attached to or incorporated by reference into complaint)

(cited by Defendants at Mot. 12 at 15).

Even the limited class of documents that can be judicially noticed cannot be used to

establish the truth of the matter asserted.  *Global Network Commc'ns, Inc. v. N.Y.C.*, 458 F.3d

150, 156-57 (2d Cir. 2006).  The Defendants' citations to extrinsic materials for hearsay purposes

is therefore entirely improper.  (*See, e.g.*, Mot. 1 at 4 (citing extrinsic Proxy Statement for truth

of the matter asserted therein respecting number of occasions on which Board met); Mot. 5 at 8

(citing extrinsic offer to purchase for truth of the matter asserted therein).)

The Defendants' heavy reliance on a report issued by an examiner appointed in Tribune's

bankruptcy (the "Examiner's Report") is manifestly improper.  (*See, e.g.*, Mot. 2 at 27; Mot. 3 at

10; Mot. 4 at 25; Mot. 5 at 27-28; Mot. 11 at 1-4, 8-11, 17; Mot. 12 at 33-35.)  The Trustee does

not cite to the Examiner's Report in the Complaint, much less make it integral to his pleading,

and there is no basis to conclude that the Trustee relied at all—much less relied solely—on that

document.  Hence, the Examiner's Report should not be considered for any purpose in connection with the Motions.  If it could be used at all, moreover, it would only be "for the proposition that the statements it contains in fact were made by the examiner.  But that is quite a different matter from the propriety of its being considered for the truth of the statements it contains, let alone for accuracy of the opinions expressed by the examiner."  *See In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 178 (S.D.N.Y. 2012); *see also Francis ex rel. Francis v. N.Y.C.*, 197 F. App'x 26, 29-30 & n.2 (2d Cir. 2006) (reversible error where court looked beyond pleadings to other court proceedings).[71]

## XIV.  IN THE ALTERNATIVE, THE TRUSTEE SHOULD BE GRANTED LEAVE TO AMEND

Some, but not all, of the moving Defendants argue that the Trustee's claims not only should be dismissed, but that they should be dismissed with prejudice, providing the Trustee with no chance to address any issues that may have been identified by these motions.  (*See, e.g.,* Mot. 2 at 27; Mot. 3 at 10; Mot. 4 at 25–26; Mot. 5 at 26–28; Mot 8 at 1 n.1; Mot. 10 at 3 n.3; Mot. 11 at 30 n.24; Mot. 12 at 33-37.)  These Defendants say dismissal with prejudice is justified because the Complaint was previously amended several times by the Committee (the Trustee's predecessor) and once by the Trustee, because the Trustee had access to discovery concerning the LBO provided in the Bankruptcy Court, and because of the investigation and report of the Examiner.

---

[71] The Trustee refers to aspects of the Examiner Report in his memoranda and the accompanying Zensky Declaration solely to rebut Defendants' arguments as to the supposed scope of the Examiner's investigation and report, the document discovery available to the parties as a result, and its alleged impact on the Trustee's ability to amend.  (*See infra* § XIV.)  The Trustee does not cite to or rely on the Examiner Report in his Complaint or rely on it in connection with any portion of his response as to the sufficiency of the Complaint.  The Trustee notes, however, that the Defendants' characterizations of the Examiner's conclusions are one-sided and misleading.  Although not apparent from any of their submissions, the Examiner actually concluded that the chance that Defendants would be subject to liability in connection with the LBO was substantial.

None of these circumstances justifies dismissal with prejudice.  The Trustee himself has filed only one Complaint in *FitzSimons*—the currently operative Fifth Amended Complaint. While the Committee filed several amendments to the original complaint, only one of those amendments made substantial changes in the allegations; the others primarily added or deleted defendants alleged to have received Shareholder Transfers.  (*See* Zensky Decl. ¶ 11.)  Most significantly, no version of the Complaint has ever been put through the crucible of a motion to dismiss until now.  To the extent the Court finds any flaws in the Trustee's pleading, he should be given at least one chance to try to address them.  *See, e.g., Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that it is axiomatic that leave to amend pleadings should be liberally granted); *Lozada v. Warden Downstate Corr. Facility*, No. 10 Civ. 8425 (RWS), 2012 WL 2402069, at *3 (S.D.N.Y. June 26, 2012) ("When a motion to dismiss is granted, it is the usual practice . . . to allow leave to replead.") (internal quotations omitted); *In re Chandre Corp.*, No. 05–9009 (CGM), 2005 WL 3789129, at *1 (Bankr. S.D.N.Y. Oct. 28, 2005) (holding that it is "an abuse of discretion to dismiss . . . without giving leave to replead at least once").[72]

The Trustee's right to replead is also unaffected by the information adduced in the bankruptcy process.  The Trustee himself has never taken any merits discovery or depositions of any kind.  During the course of the bankruptcy, the Committee (the authors of the original *FitzSimons* complaint) deposed just *one* of the named defendants who are the subject of Motions 1 through 7 (Amsden, an officer of one of Tribune's subsidiaries) in connection with its assessment of claims that might be commenced on behalf of Tribune or its creditors, *none* of the

---

[72] Cases cited by the Defendants also allow at least one chance to replead after a successful motion to dismiss.  *E.g. In re Old Carco LLC*, 454 B.R. 38, 42 (Bankr. S.D.N.Y. 2011) (refusing leave to replead after second dismissal of complaint); *Official Comm. of Unsecured Creds. of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir. 2003) (same).

Director Defendants, *none* of the Zell entities, and *none* of the Controlling Shareholders.  (*See* Zensky Decl. ¶¶ 4-5.)

 While the Examiner conducted non-adversarial interviews of some (but not all) of these Defendants, he did so outside of the presence of the Committee and not all of the interviews were sworn or transcribed.  (*See id.* ¶ 5.)  And while the Examiner and parties in interest gathered documents from many sources, four of the Special Committee Directors failed to turn over a single document, either to the Examiner, or in connection with discovery in the Bankruptcy Court.  (*See* Zensky Decl. ¶ 10.)

 In his Report, the Examiner went out of his way to note the limitations he faced in gathering information, noting that "formal depositions" and "adversarial" discovery and more time would necessarily have yielded a far more complete record. (Examiner's Report, Vol. 1 at 37; Zensky Decl. ¶ 7, Ex. 1.)  To the extent any claims are dismissed, leave to replead should be granted notwithstanding the existence of the Examiner's Report.  *Chandre*, 2005 WL 3789129, at *11 (dismissing complaint but granting leave to replead despite fact that plaintiff had access to substantial discovery through bankruptcy process).[73]

---

[73] The Defendants' reliance on discovery taken in connection with the confirmation hearing before Bankruptcy Judge Carey is even less persuasive.  The focus of confirmation-related fact discovery was the claims against the banks and the process by which the bank settlement was entered.  (*See* Zensky Decl. ¶ 6.)  To be sure, discovery was pursued by Tribune creditors objecting to the Debtors' plan of reorganization on certain overlapping issues, such as Tribune's projections and the VRC solvency opinions, but the claims against the Named Defendants and their specific acts and omissions were not the object of the discovery, and only two of them were deposed.  (*See id.* ¶ 6.)  Thus, it would be wholly incorrect to suggest that all (or even a majority) of discovery relevant to the *FitzSimons* action has been taken, such that any asserted gaps or flaws in the Complaint would necessarily be irremediable.

## **CONCLUSION**

For the foregoing reasons, the Litigation Trustee respectfully requests that the Court deny the Motions to Dismiss in their entirety and grant such other and further relief as the Court deems just and proper.

Dated:  June 23, 2014
      New York, NY

AKIN GUMP STRAUSS HAUER
& FELD LLP

By:  **/s/ David M. Zensky**
    David M. Zensky

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP

By:  **/s/ Jeffrey T. Golenbock**
    Jeffrey T. Golenbock

ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP

By:  **/s/ Michael L. Waldman**
    Michael L. Waldman

**APPENDIX ONE**

| Case Name | Case Number |
|---|---|
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Dennis J. FitzSimons, et al. | 12-CV-02652 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Irene M.F. Sewell | 13-CV-03737 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. David P. Murphy | 13-CV-03742 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. James L. Ellis | 13-CV-03746 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Marc S. Schacher | 13-CV-03747 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Vincent A. Malcolm | 13-CV-03752 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Gina M. Mazzaferri | 13-CV-03753 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Brian F. Litman | 13-CV-03736 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Patrick Shanahan | 13-CV-03739 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Betty Ellen Berlamino | 13-CV-03741 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Joseph A. Young | 13-CV-03738 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Tom E. Ehlmann | 13-CV-03743 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. John F. Poelking | 13-CV-03744 |

| Case Name | Case Number |
|---|---|
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Pamela S. Pearson | 13-CV-03745 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Vincent R. Giannini | 13-CV-03748 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. William P. Shaw | 13-CV-03749 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Peter A. Knapp | 13-CV-03750 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. John R. Hendricks | 13-CV-03751 |
| Marc S. Kirschner, as Litigation Trustee for the Tribune Litigation Trust v. Gary Weitman | 13-CV-03740 |