**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: TRIBUNE COMPANY FRAUDULENT CONVEYANCE LITIGATION | Consolidated Multidistrict Action<br>11 MD 2296 (RJS)<br>12 MC 2296 (RJS)<br><br>ECF Case |
| THIS DOCUMENT RELATES TO:<br><br>*Kirschner v. FitzSimons* | 12 CV 2652 |

## NOTICE OF SUBMISSION OF LETTER

Pursuant to paragraph 47 of Master Case Order No. 3 (Sept. 7, 2012) [ECF No. 1395], please take notice that the undersigned submitted the attached letter to the Court in the above-captioned actions.

Dated: March 8, 2018
      New York, NY

By:    /s/ David M. Zensky

David M. Zensky, Esq.
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Tel: (212) 872-1000
Email: dzensky@akingump.com

*Counsel to the Tribune Litigation Trustee*

# Akin Gump

### STRAUSS HAUER & FELD LLP

**DAVID M. ZENSKY**
+1 212.872.1075/fax: +1 212.872.1002
dzensky@akingump.com

March 8, 2018

VIA ECF AND E-MAIL

The Honorable Richard J. Sullivan
United States District Court Judge
Southern District of New York
40 Foley Square, Room 2104
New York, NY 10007

Re:   *In re Tribune Co. Fraudulent Conveyance Litigation*, 11-MD-2296; *Kirschner v. FitzSimons, et al.*, No. 12-CV-2652 ("*FitzSimons*")

Dear Judge Sullivan:

We represent the Tribune Litigation Trustee, Marc S. Kirschner (the "Trustee"). In light of the Supreme Court's unanimous decision in *Merit Management Group, LP v. FTI Consulting, Inc.*, No. 16-784, 2018 WL 1054879 (U.S. Feb. 27, 2018) (copy attached as Exhibit "A"), we write to renew the Trustee's July 18, 2017 request (No. 11-md-02296 ECF No. 6994) for leave to file a motion to amend the Complaint in the *FitzSimons* action in order to assert a constructive fraudulent conveyance claim under 11 U.S.C. § 548(a)(1)(B) against the vast preponderance of the shareholder defendants named in Count One of the Complaint (the "Shareholder Defendants"). A blacklined copy of the proposed amended complaint (changed pages only, with certain confidential information redacted) is attached hereto as Exhibit "B."[1]

As the Trustee explained in the July 18 request, if the Supreme Court affirmed the Seventh Circuit in *FTI Consulting*, prevailing law in the Second Circuit would change such that the Trustee would no longer be barred from asserting a constructive fraudulent transfer claim against the Shareholder Defendants under 11 U.S.C. § 548, and such claim would relate back under Fed.

---

[1] If the Trustee is permitted to file the amended complaint, a new schedule attached thereto will identify those Shareholder Defendants that are omitted from the constructive fraudulent transfer claim (count I-B). The Shareholder Defendants that will be omitted from count I-B are Shareholder Defendants that benefitted from the challenged transfers and can be identified without the benefit of discovery as a "Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity," as *FTI Consulting* does not alter such Shareholder Defendants' entitlement to a § 546(e) defense in their individual capacity. *See* 11 U.S.C. § 546(e); 11 U.S.C. § 101(22) (defining "financial institution"). If and when the amendment is allowed, any other Shareholder Defendant claiming an entitlement to a § 546(e) defense to count I-B may raise it in their answer (or whatever other manner the Court may allow), as they would with any other affirmative defense.



**Akin Gump**
STRAUSS HAUER & FELD LLP

March 8, 2018
Page 2

R. Civ. P. 15 for statute of limitations purposes.[2]  Six detailed responses were submitted in opposition to the Trustee's July Request.[3]  With the Court's permission, the Trustee responded to the arguments set forth in these responses by letter dated August 4, 2017.  No. 11-md-02296 ECF No. 7008.

On August 24, 2017, the Court denied the Trustee's July 18 request "without prejudice to renewal in the event of an intervening change in the governing law of this Circuit."  No. 11-md-02296 ECF No. 7019, at 3.  The Court stated:  "If, and when, the Supreme Court affirms the Seventh Circuit in *FTI Consulting*, the Trustee would have a strong argument in support of amending his complaint to include the constructive fraudulent conveyance claim." *Id.*

The Supreme Court has now unanimously affirmed the Seventh Circuit's decision in *FTI Consulting*.  The Supreme Court held that "[t]he language of §546(e), the specific context in which that language is used, and the broader statutory structure all support the conclusion that the relevant transfer for purposes of the §546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions."  2018 WL 1054879 at *8.  As such, the fact that one or more financial institutions acted as conduits in connection with the Tribune LBO no longer precludes the Trustee from seeking to avoid the transfers between Tribune and the Shareholder Defendants.[4]

---

[2] *See, e.g.*, *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993) ("When [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review").

[3] *See* No. 11-md-02296 ECF Nos. 7000 (Blackport Capital Fund Ltd.), 7003 (Exhibit A Shareholder Defendants' Executive Committee), 7004 (EGI-TRB, L.L.C., Equity Group Investments, L.L.C., Sam Investment Trust, Samuel Zell), 7005 (JPMorgan Defendants), and 7011 (Rogers Worthington), and No. 12-cv-02652 ECF No. 5345 (Citigroup Global Markets Inc.).  The Court ordered any Defendant that wished to respond to the Trustee's July 18 request to do so by July 28, 2017.  No. 11-md-02296 ECF No. 6993.

[4] It is worth noting that the Supreme Court was unquestionably aware that an affirmance of *FTI Consulting* would likely result in, *inter alia*, the assertion of a constructive fraudulent conveyance claim against the Shareholder Defendants in the *FitzSimons* case, as the petitioner in *FTI Consulting*, and several *amici*, including certain of the Shareholder Defendants, argued in both briefing and at oral argument that the specter of such a claim by the Trustee in this case weighed against the Seventh Circuit's view of § 546(e).  *See* Br. of Pet'r at 33, *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, No. 16-784 (U.S. July 13, 2017) (citing *Tribune* for the proposition that the safe harbor should protect the entire transaction, instead of particular participants); *id.* at 40 (citing *Tribune* as an example of "long-tailed potential liability"); Reply Brief of Pet'r at 17 (Feb. 3, 2017) (addressing *Tribune* decision); Brief of Various Former Tribune and Lyondell Shareholders as *Amici Curiae* at 2 (July 20, 2017) (noting Trustee's July 18 request to amend the complaint to assert constructive fraudulent conveyance claims against certain defendants and that the "outcome [in *Merit Mgmt.*] could thus materially affect *amici*"); Brief of Nat'l Ass'n of Bankruptcy Trustees as *Amici Curiae* at 13, 18 (Sept. 18, 2017) (discussing *Tribune* as an example of why the safe harbor cannot be as broad as Petitioner argued).



**Akin Gump**
STRAUSS HAUER & FELD LLP

March 8, 2018
Page 3


The Trustee thus renews his request for leave to file a motion to amend the Complaint, or, alternatively, requests leave to file the amended complaint, for the reasons set forth herein, and in his July 18 request and August 4 letter.[5]

We are available at the Court's convenience should Your Honor wish to discuss this matter further.

Respectfully submitted,

David M. Zensky

cc:  Joshua Y. Sturm, Esq., Ropes & Gray LLP (via e-mail)
     All counsel of record (via ECF)
     All *pro se* Trust Defendants (via first-class mail or e-mail)

---

[5] As noted in his July 18 request and August 4, 2017 letter, the Trustee would also amend Schedule A to the existing complaint to eliminate the hundreds of defendants who have settled or otherwise been voluntarily dismissed, and update the remainder of the list as needed to correct any mistakes in defendant names or transfer amounts. The amendment would also make certain changes required by the Trustee's partial settlement with Morgan Stanley defendants on June 3, 2016 (No. 11-md-02296 ECF No. 6865).

# EXHIBIT A

2018 WL 1054879
Only the Westlaw citation is currently available.
Supreme Court of the United States

MERIT MANAGEMENT GROUP, LP, Petitioner

v.

FTI CONSULTING, INC.

No. 16–784.
|
Argued Nov. 6, 2017.
|
Decided Feb. 27, 2018.

**Synopsis**
**Background:** Trustee of litigation trust created pursuant to confirmed Chapter 11 plan of debtor, an entity that sought to develop a "racino" in Pennsylvania, brought adversary proceeding, seeking to avoid debtor's allegedly fraudulent transfers of $16,503,850 to transferee, the partial owner of debtor's competitor, as part of debtor's purchase of competitor's stock. The United States District Court for the Northern District of Illinois, Joan B. Gottschall, J., 541 B.R. 850, granted motion for judgment on the pleadings in transferee's favor. Trustee appealed. The Seventh Circuit Court of Appeals, Wood, Chief Judge, 830 F.3d 690, reversed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Sotomayor, held that:

[1] the only relevant transfer for purposes of the Bankruptcy Code's "securities safe harbor" provision is the transfer that the trustee seeks to avoid under a substantive avoiding power, abrogating *In re Quebecor World (USA) Inc.*, 719 F.3d 94, *In re QSI Holdings, Inc.*, 571 F.3d 545, *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, *In re Resorts Int'l, Inc.*, 181 F.3d 505, and *In re Kaiser Steel Corp.*, 952 F.2d 1230, and

[2] in the present case, the transfer between debtor and transferee was not "made by or to (or for the benefit of)" a financial institution and so fell outside the safe harbor.

Affirmed and remanded.

**West Headnotes (11)**

**[1]** **Bankruptcy**
👉 Trustee as Representative of Debtor or Creditors

Bankruptcy Code gives a trustee "avoiding powers," that is, the power to invalidate a limited category of transfers by the debtor or transfers of an interest of the debtor in property, in order to maximize the funds available for, and ensure equity in, the distribution to creditors in a bankruptcy proceeding.

Cases that cite this headnote

**[2]** **Bankruptcy**
👉 Avoidance Rights and Limits Thereon, in General

Avoiding powers set forth in the Bankruptcy Code may be exercised by debtors, trustees, or creditors committees, depending on the circumstances of the case.

Cases that cite this headnote

**[3]** **Bankruptcy**
👉 Trustee as Representative of Debtor or Creditors

Trustee's avoiding powers help implement the core principles of bankruptcy; some deter the race of diligence of creditors to dismember the debtor before bankruptcy and promote equality of distribution, while others set aside transfers that unfairly or improperly deplete assets or dilute the claims against those assets.

Cases that cite this headnote

**[4]** **Public Amusement and Entertainment**
👉 Horse and Dog Racing

Harness racing is a closely regulated industry in Pennsylvania, and the Commonwealth requires a license to operate a racetrack.

Cases that cite this headnote

**[5]** **Bankruptcy**
🔑 Avoidance Rights and Limits Thereon, in General

The only relevant transfer for purposes of the Bankruptcy Code's "securities safe harbor" provision is the transfer that the trustee seeks to avoid under one of the Code's substantive avoidance provisions, that is, the overarching or end-to-end transfer, not any component part of that transfer; abrogating *In re Quebecor World (USA) Inc.*, 719 F.3d 94, *In re QSI Holdings, Inc.*, 571 F.3d 545, *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, *In re Resorts Int'l, Inc.*, 181 F.3d 505, and *In re Kaiser Steel Corp.*, 952 F.2d 1230. 11 U.S.C.A. § 546(e).

Cases that cite this headnote

**[6]** **Statutes**
🔑 Language
**Statutes**
🔑 Context

In construing a statute, courts look to both the language itself and the specific context in which that language is used.

Cases that cite this headnote

**[7]** **Bankruptcy**
🔑 Avoidance Rights and Limits Thereon, in General

Bankruptcy Code's "securities safe harbor" provision operates as an exception to the avoiding powers afforded to the trustee under the Code's substantive avoidance provisions; that is, when faced with a transfer that is otherwise avoidable, it provides a safe harbor notwithstanding that avoiding power. 11 U.S.C.A. § 546(e).

Cases that cite this headnote

**[8]** **Statutes**
🔑 Titles, Headings, and Captions

Although section headings cannot limit the plain meaning of a statutory text, they supply cues as to what Congress intended.

Cases that cite this headnote

**[9]** **Bankruptcy**
🔑 Trustee as Representative of Debtor or Creditors

Bankruptcy trustee, in exercising its avoidance powers, is not free to define the transfer that it seeks to avoid in any way it chooses; instead, that transfer is necessarily defined by the carefully set out criteria in the Bankruptcy Code. 11 U.S.C.A. §§ 544(a), 545, 547(b), 548(a)(1).

Cases that cite this headnote

**[10]** **Bankruptcy**
🔑 Avoidance Rights and Limits Thereon, in General

Under the Bankruptcy Code's "securities safe harbor," if the transfer that the trustee seeks to avoid was made "by" or "to" a securities clearing agency, then the safe harbor will bar avoidance, and it will do so without regard to whether the entity acted only as an intermediary; the safe harbor will, in addition, bar avoidance if the transfer was made "for the benefit of" that securities clearing agency, even if it was not made "by" or "to" that entity. 11 U.S.C.A. § 546(e).

Cases that cite this headnote

**[11]** **Bankruptcy**
🔑 Avoidance Rights and Limits Thereon, in General

Prepetition transfer by Chapter 11 debtor to transferee, the partial owner of debtor's competitor, as part of debtor's purchase of competitor's stock, fell outside the Bankruptcy Code's "securities safe harbor"; trustee sought to avoid, as constructively fraudulent, the overarching transfer between debtor and transferee, not any of the

component transactions involving a bank and a lender by which that overarching transfer was executed, and it was undisputed that neither debtor nor transferee was a financial institution or any other covered entity. 11 U.S.C.A. §§ 546(e), 548(a)(1)(B).

Cases that cite this headnote

*Syllabus* [*]

[*] The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

*1 The Bankruptcy Code allows trustees to set aside and recover certain transfers for the benefit of the bankruptcy estate, including, as relevant here, certain fraudulent transfers "of an interest of the debtor in property." 11 U.S.C. § 548(a). It also sets out a number of limits on the exercise of these avoiding powers. Central here is the securities safe harbor, which, *inter alia,* provides that "the trustee may not avoid a transfer that is a ... settlement payment ... made by or to (or for the benefit of) a ... financial institution ... or that is a transfer made by or to (or for the benefit of) a ... financial institution ... in connection with a securities contract." § 546(e).

Valley View Downs, LP, and Bedford Downs Management Corp. entered into an agreement under which Valley View, if it got the last harness-racing license in Pennsylvania, would purchase all of Bedford Downs' stock for $55 million. Valley View was granted the license and arranged for the Cayman Islands branch of Credit Suisse to wire $55 million to third-party escrow agent Citizens Bank of Pennsylvania. The Bedford Downs shareholders, including petitioner Merit Management Group, LP, deposited their stock certificates into escrow. Citizens Bank disbursed the $55 million over two installments according to the agreement, of which petitioner Merit received $16.5 million.

Although Valley View secured the harness-racing license, it was unable to achieve its goal of opening a racetrack casino. Valley View and its parent company, Centaur,

LLC, filed for Chapter 11 bankruptcy. Respondent FTI Consulting, Inc., was appointed to serve as trustee of the Centaur litigation trust. FTI then sought to avoid the transfer from Valley View to Merit for the sale of Bedford Downs' stock, arguing that it was constructively fraudulent under § 548(a)(1)(B). Merit contended that the § 546(e) safe harbor barred FTI from avoiding the transfer because it was a "settlement payment ... made by or to (or for the benefit of)" two "financial institutions," Credit Suisse and Citizens Bank. The District Court agreed with Merit, but the Seventh Circuit reversed, holding that § 546(e) did not protect transfers in which financial institutions served as mere conduits.

*Held* : The only relevant transfer for purposes of the § 546(e) safe harbor is the transfer that the trustee seeks to avoid. Pp. ‒‒‒ – ‒‒‒.

(a) Before a court can determine whether a transfer was "made by or to (or for the benefit of)" a covered entity, it must first identify the relevant transfer to test in that inquiry. Merit posits that the relevant transfer should include not only the Valley–View–to–Merit end-to-end transfer, but also all of its component parts, *i.e.,* the Credit–Suisse–to–Citizens–Bank and the Citizens–Bank–to–Merit transfers. FTI maintains that the only relevant transfer is the transfer that it sought to avoid, specifically, the overarching transfer between Valley View and Merit. Pp. ‒‒‒ – ‒‒‒.

(1) The language of § 546(e) and the specific context in which that language is used support the conclusion that the relevant transfer for purposes of the safe-harbor inquiry is the transfer the trustee seeks to avoid. The first clause of the provision—"Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title"—indicates that § 546(e) operates as an exception to trustees' avoiding powers granted elsewhere in the Code. The text makes clear that the starting point for the § 546(e) inquiry is the expressly listed avoiding powers and, consequently, the transfer that the trustee seeks to avoid in exercising those powers. The last clause—"except under section 548(a)(1)(A) of this title"—also focuses on the transfer that the trustee seeks to avoid. Creating an exception to the exception for § 548(a)(1)(A) transfers, the text refers back to a specific type of transfer that falls within the avoiding powers, signaling that the exception applies to the overarching transfer that the trustee seeks to avoid, not any component part of that transfer. This reading

is reinforced by the § 546 section heading, "Limitations on avoiding powers," and is confirmed by the rest of the statutory text: The provision provides that "the trustee may not avoid" certain transfers, which naturally invites scrutiny of the transfers that "the trustee ... may avoid," the parallel language used in the avoiding powers provisions. The text further provides that the transfer that is saved from avoidance is one "that *is* " (not one that involves) a securities transaction covered under § 546(e). In other words, to qualify for protection under the securities safe harbor, § 546(e) provides that the otherwise avoidable transfer itself be a transfer that meets the safe-harbor criteria. Pp. —— – ——.

**\*2** (2) The statutory structure also supports this reading of § 546(e). The Code establishes a system for avoiding transfers as well as a safe harbor from avoidance. It is thus only logical to view the pertinent transfer under § 546(e) as the same transfer that the trustee seeks to avoid pursuant to one of its avoiding powers. In an avoidance action, the trustee must establish that the transfer it seeks to set aside meets the carefully set out criteria under the substantive avoidance provisions of the Code. The defendant in that avoidance action is free to argue that the trustee failed to properly identify an avoidable transfer under the Code, including any available arguments concerning the role of component parts of the transfer. If a trustee properly identifies an avoidable transfer, however, the court has no reason to examine the relevance of component parts when considering a limit to the avoiding power, where that limit is defined by reference to an otherwise avoidable transfer, as is the case with § 546(e). Pp. —— – ——.

(b) The primary argument Merit advances that is moored in the statutory text—concerning Congress' 2006 addition of the parenthetical "(or for the benefit of)" to § 546(e)— is unavailing. Merit contends that Congress meant to abrogate the Eleventh Circuit decision in *In re Munford, Inc.*, 98 F.3d 604, which held that § 546(e) was inapplicable to transfers in which a financial institution acted only as an intermediary. However, Merit points to nothing in the text or legislative history to corroborate its argument. A simpler explanation rooted in the text of the statute and consistent with the interpretation of § 546(e) adopted here is that Congress added the "or for the benefit of" language that is common in other substantive avoidance provisions to the § 546(e) safe harbor to ensure that the scope of the safe harbor and scope of the avoiding powers matched.

That reading would not, contrary to what Merit contends, render other provisions ineffectual or superfluous. Rather, it gives full effect to the text of § 546(e). If the transfer the trustee seeks to avoid was made "by" or "to" a covered entity, then § 546(e) will bar avoidance without regard to whether the entity acted only as an intermediary. It will also bar avoidance if the transfer was made "for the benefit of" that entity, even if it was not made "by" or "to" that entity.

**\*3** Finally, Merit argues that reading the safe harbor so that its application depends on the identity of the investor and the manner in which its investment is held rather than on the general nature of the transaction is incongruous with Congress' purportedly "prophylactic" approach to § 546(e). But this argument is nothing more than an attack on the text of the statute, which protects only certain transactions "made by or to (or for the benefit of)" certain covered entities. Pp. —— – ——.

(c) Applying this reading of the § 546(e) safe harbor to this case yields a straightforward result. FTI sought to avoid the Valley–View–to–Merit transfer. When determining whether the § 546(e) safe harbor saves that transfer from avoidance liability, the Court must look to that overarching transfer to evaluate whether it meets the safe-harbor criteria. Because the parties do not contend that either Valley View or Merit is a covered entity, the transfer falls outside of the § 546(e) safe harbor. Pp. —— – ——.

830 F.3d 690, affirmed and remanded.

SOTOMAYOR, J., delivered the opinion for a unanimous Court.

**Attorneys and Law Firms**

Brian C. Walsh, St. Louis, MO, for Petitioner.

Paul D. Clement, Washington, DC, for Respondent.

Jason J. DeJonker, Leslie A. Bayles, Justin A. Morgan, Bryan Cave LLP, Chicago, IL, Brian C. Walsh, John J. Schoemehl, Laura Uberti Hughes, Bryan Cave LLP, St. Louis, MO, for Petitioner.

William T. Reid, IV, Gregory S. Schwegmann, Joshua J. Bruckerhoff, Reid Collins & Tsai LLP, Austin, TX, Paul D. Clement, H. Christopher Bartolomucci, George W.

Hicks, Jr., Kirkland & Ellis LLP, Washington, DC, for Respondent.

**Opinion**

Justice SOTOMAYOR delivered the opinion of the Court.

**[1]** To maximize the funds available for, and ensure equity in, the distribution to creditors in a bankruptcy proceeding, the Bankruptcy Code gives a trustee the power to invalidate a limited category of transfers by the debtor or transfers of an interest of the debtor in property. Those powers, referred to as "avoiding powers," are not without limits, however, as the Code sets out a number of exceptions. The operation of one such exception, the securities safe harbor, 11 U.S.C. § 546(e), is at issue in this case. Specifically, this Court is asked to determine how the safe harbor operates in the context of a transfer that was executed via one or more transactions, e.g., a transfer from A → D that was executed via B and C as intermediaries, such that the component parts of the transfer include A → B → C → D. If a trustee seeks to avoid the A → D transfer, and the § 546(e) safe harbor is invoked as a defense, the question becomes: When determining whether the § 546(e) securities safe harbor saves the transfer from avoidance, should courts look to the transfer that the trustee seeks to avoid (i.e., A → D) to determine whether that transfer meets the safe-harbor criteria, or should courts look also to any component parts of the overarching transfer (i.e., A → B → C → D)? The Court concludes that the plain meaning of § 546(e) dictates that the only relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid.

**I**

**A**

**\*4 [2] [3]** Because the § 546(e) safe harbor operates as a limit to the general avoiding powers of a bankruptcy trustee, [1] we begin with a review of those powers. Chapter 5 of the Bankruptcy Code affords bankruptcy trustees the authority to "se[t] aside certain types of transfers ... and ... recaptur[e] the value of those avoided transfers for the benefit of the estate." Tabb § 6.2, p. 474. These avoiding powers "help implement the core principles of bankruptcy." Id., § 6.1, at 468. For example, some

"deter the race of diligence of creditors to dismember the debtor before bankruptcy" and promote "equality of distribution." Union Bank v. Wolas, 502 U.S. 151, 162, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991) (internal quotation marks omitted); see also Tabb § 6.2. Others set aside transfers that "unfairly or improperly deplete ... assets or ... dilute the claims against those assets." 5 Collier on Bankruptcy ¶ 548.01, p. 548–10 (16th ed. 2017); see also Tabb § 6.2, at 475 (noting that some avoiding powers are designed "to ensure that the debtor deals fairly with its creditors").

[1]    Avoiding powers may be exercised by debtors, trustees, or creditors' committees, depending on the circumstances of the case. See generally C. Tabb, Law of Bankruptcy § 6.1 (4th ed. 2016) (Tabb). Because this case concerns an avoidance action brought by a trustee, we refer throughout to the trustee in discussing the avoiding power and avoidance action. The resolution of this case is not dependent on the identity of the actor exercising the avoiding power.

Sections 544 through 553 of the Code outline the circumstances under which a trustee may pursue avoidance. See, e.g., 11 U.S.C. § 544(a) (setting out circumstances under which a trustee can avoid unrecorded liens and conveyances); § 544(b) (detailing power to avoid based on rights that unsecured creditors have under nonbankruptcy law); § 545 (setting out criteria that allow a trustee to avoid a statutory lien); § 547 (detailing criteria for avoidance of so-called "preferential transfers"). The particular avoidance provision at issue here is § 548(a), which provides that a "trustee may avoid" certain fraudulent transfers "of an interest of the debtor in property." § 548(a)(1). Section 548(a)(1)(A) addresses so-called "actually" fraudulent transfers, which are "made ... with actual intent to hinder, delay, or defraud any entity to which the debtor was or became ... indebted." Section 548(a)(1)(B) addresses "constructively" fraudulent transfers. See BFP v. Resolution Trust Corporation, 511 U.S. 531, 535, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). As relevant to this case, the statute defines constructive fraud in part as when a debtor:

"(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

"(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became

insolvent as a result of such transfer or obligation. 11 U.S.C. § 548(a)(1).

If a transfer is avoided, § 550 identifies the parties from whom the trustee may recover either the transferred property or the value of that property to return to the bankruptcy estate. Section 550(a) provides, in relevant part, that "to the extent that a transfer is avoided ... the trustee may recover ... the property transferred, or, if the court so orders, the value of such property" from "the initial transferee of such transfer or the entity for whose benefit such transfer was made," or from "any immediate or mediate transferee of such initial transferee." § 550(a).

## B

**\*5** The Code sets out a number of limits on the exercise of these avoiding powers. See, *e.g.,* § 546(a) (setting statute of limitations for avoidance actions); §§ 546(c)–(d) (setting certain policy-based exceptions to avoiding powers); § 548(a)(2) (setting limit to avoidance of "a charitable contribution to a qualified religious or charitable entity or organization"). Central to this case is the securities safe harbor set forth in § 546(e), which provides (as presently codified and in full):

> "Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or

forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title."

The predecessor to this securities safe harbor, formerly codified at 11 U.S.C. § 764(c), was enacted in 1978 against the backdrop of a district court decision in a case called *Seligson v. New York Produce Exchange,* 394 F.Supp. 125 (S.D.N.Y.1975), which involved a transfer by a bankrupt commodity broker. See S. Rep. No. 95–989, pp. 8, 106 (1978); see also Brubaker, Understanding the Scope of the § 546(e) Securities Safe Harbor Through the Concept of the "Transfer" Sought To Be Avoided, 37 Bkrtcy. L. Letter 11–12 (July 2017). The bankruptcy trustee in *Seligson* filed suit seeking to avoid over $12 million in margin payments made by the commodity broker debtor to a clearing association on the basis that the transfer was constructively fraudulent. The clearing association attempted to defend on the theory that it was a mere "conduit" for the transmission of the margin payments. 394 F.Supp., at 135. The District Court found, however, triable issues of fact on that question and denied summary judgment, leaving the clearing association exposed to the risk of significant liability. See *id.,* at 135–136. Following that decision, Congress enacted the § 764(c) safe harbor, providing that "the trustee may not avoid a transfer that is a margin payment to or deposit with a commodity broker or forward contract merchant or is a settlement payment made by a clearing organization." 92 Stat. 2619, codified at 11 U.S.C. § 764(c) (repealed 1982).

Congress amended the securities safe harbor exception over the years, each time expanding the categories of covered transfers or entities. In 1982, Congress expanded the safe harbor to protect margin and settlement payments "made by or to a commodity broker, forward contract merchant, stockbroker, or securities clearing agency." § 4, 96 Stat. 236, codified at 11 U.S.C. § 546(d). Two years later Congress added "financial institution" to the list of protected entities. See § 461(d), 98 Stat. 377, codified at 11 U.S.C. § 546(e). [2] In 2005, Congress again expanded the list of protected entities to include a "financial participant" (defined as an entity conducting certain high-value transactions). See § 907(b), 119 Stat. 181–182; 11 U.S.C. § 101(22A). And, in 2006, Congress amended the provision to cover transfers made in connection with securities contracts, commodity contracts, and forward contracts. § 5(b)(1), 120 Stat. 2697–2698. The 2006

amendment also modified the statute to its current form by adding the new parenthetical phrase "(or for the benefit of)" after "by or to," so that the safe harbor now covers transfers made "by or to (or for the benefit of)" one of the covered entities. *Id.,* at 2697.

2    The term "financial institution" is defined as:
     "(A) a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer (whether or not a 'customer', as defined in section 741) in connection with a securities contract (as defined in section 741) such customer; or
     "(B) in connection with a securities contract (as defined in section 741) an investment company registered under the Investment Company Act of 1940." 11 U.S.C. § 101(22).
     The parties here do not contend that either the debtor or petitioner in this case qualified as a "financial institution" by virtue of its status as a "customer" under § 101(22)(A). Petitioner Merit Management Group, LP, discussed this definition only in footnotes and did not argue that it somehow dictates the outcome in this case. See Brief for Petitioner 45, n. 14; Reply Brief 14, n. 6. We therefore do not address what impact, if any, § 101(22)(A) would have in the application of the § 546(e) safe harbor.

C

*6 [4]    With this background, we now turn to the facts of this case, which comes to this Court from the world of competitive harness racing (a form of horse racing). Harness racing is a closely regulated industry in Pennsylvania, and the Commonwealth requires a license to operate a racetrack. See *Bedford Downs Management Corp. v. State Harness Racing Comm'n,* 592 Pa. 475, 485–487, 926 A.2d 908, 914–915 (2007) (*per curiam* ). The number of available licenses is limited, and in 2003 two companies, Valley View Downs, LP, and Bedford Downs Management Corporation, were in competition for the last harness-racing license in Pennsylvania.

Valley View and Bedford Downs needed the harness-racing license to open a " 'racino,' " which is a clever moniker for racetrack casino, "a racing facility with

slot machines." Brief for Petitioner 8. Both companies were stopped before the finish line, because in 2005 the Pennsylvania State Harness Racing Commission denied both applications. The Pennsylvania Supreme Court upheld those denials in 2007, but allowed the companies to reapply for the license. See *Bedford Downs,* 592 Pa., at 478–479, 926 A.2d, at 910.

Instead of continuing to compete for the last available harness-racing license, Valley View and Bedford Downs entered into an agreement to resolve their ongoing feud. Under that agreement, Bedford Downs withdrew as a competitor for the harness-racing license, and Valley View was to purchase all of Bedford Downs' stock for $55 million after Valley View obtained the license. [3]

3    A separate provision of the agreement providing that Bedford Downs would sell land to Valley View for $20 million is not at issue in this case.

With Bedford Downs out of the race, the Pennsylvania Harness Racing Commission awarded Valley View the last harness-racing license. Valley View proceeded with the corporate acquisition required by the parties' agreement and arranged for the Cayman Islands branch of Credit Suisse to finance the $55 million purchase price as part of a larger $850 million transaction. Credit Suisse wired the $55 million to Citizens Bank of Pennsylvania, which had agreed to serve as the third-party escrow agent for the transaction. The Bedford Downs shareholders, including petitioner Merit Management Group, LP, deposited their stock certificates into escrow as well. At closing, Valley View received the Bedford Downs stock certificates, and in October 2007 Citizens Bank disbursed $47.5 million to the Bedford Downs shareholders, with $7.5 million remaining in escrow at Citizens Bank under the multiyear indemnification holdback period provided for in the parties' agreement. Citizens Bank disbursed that $7.5 million installment to the Bedford Downs shareholders in October 2010, after the holdback period ended. All told, Merit received approximately $16.5 million from the sale of its Bedford Downs stock to Valley View. Notably, the closing statement for the transaction reflected Valley View as the "Buyer," the Bedford Downs shareholders as the "Sellers," and $55 million as the "Purchase Price." App. 30.

In the end, Valley View never got to open its racino. Although it had secured the last harness-racing license, it was unable to secure a separate gaming license for the

operation of the slot machines in the time set out in its financing package. Valley View and its parent company, Centaur, LLC, thereafter filed for Chapter 11 bankruptcy. The Bankruptcy Court confirmed a reorganization plan and appointed respondent FTI Consulting, Inc., to serve as trustee of the Centaur litigation trust.

**\*7** FTI filed suit against Merit in the Northern District of Illinois, seeking to avoid the $16.5 million transfer from Valley View to Merit for the sale of Bedford Downs' stock. The complaint alleged that the transfer was constructively fraudulent under § 548(a)(1)(B) of the Code because Valley View was insolvent when it purchased Bedford Downs and "significantly overpaid" for the Bedford Downs stock. [4] Merit moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), contending that the § 546(e) safe harbor barred FTI from avoiding the Valley View–to–Merit transfer. According to Merit, the safe harbor applied because the transfer was a "settlement payment ... made by or to (or for the benefit of)" a covered "financial institution"— here, Credit Suisse and Citizens Bank.

[4]    In its complaint, FTI also sought to avoid the transfer under § 544(b). See App. 20–21. The District Court did not address the claim, see 541 B.R. 850, 852–853, n. 1 (N.D.Ill.2015), and neither did the Court of Appeals for the Seventh Circuit.

The District Court granted the Rule 12(c) motion, reasoning that the § 546(e) safe harbor applied because the financial institutions transferred or received funds in connection with a "settlement payment" or "securities contract." See 541 B.R. 850, 858 (N.D.Ill.2015). [5] The Court of Appeals for the Seventh Circuit reversed, holding that the § 546(e) safe harbor did not protect transfers in which financial institutions served as mere conduits. See 830 F.3d 690, 691 (2016). This Court granted certiorari to resolve a conflict among the circuit courts as to the proper application of the § 546(e) safe harbor. [6] 581 U.S. ——, 137 S.Ct. 2092, 197 L.Ed.2d 894 (2017).

[5]    The parties do not ask this Court to determine whether the transaction at issue in this case qualifies as a transfer that is a "settlement payment" or made in connection with a "securities contract" as those terms are used in § 546(e), nor is that determination necessary for resolution of the question presented.

[6]    Compare *In re Quebecor World (USA) Inc.,* 719 F.3d 94, 99 (C.A.2 2013) (finding the safe harbor applicable where covered entity was intermediary); *In re QSI Holdings, Inc.,* 571 F.3d 545, 551 (C.A.6 2009) (same); *Contemporary Indus. Corp. v. Frost,* 564 F.3d 981, 987 (C.A.8 2009) (same); *In re Resorts Int'l, Inc.,* 181 F.3d 505, 516 (C.A.3 1999) (same); *In re Kaiser Steel Corp.,* 952 F.2d 1230, 1240 (C.A.10 1991) (same), with *In re Munford, Inc.,* 98 F.3d 604, 610 (C.A.11 1996) (*per curiam* ) (rejecting applicability of safe harbor where covered entity was intermediary).

## II

[5]    The question before this Court is whether the transfer between Valley View and Merit implicates the safe harbor exception because the transfer was "made by or to (or for the benefit of) a ... financial institution." § 546(e). The parties and the lower courts dedicate much of their attention to the definition of the words "by or to (or for benefit of)" as used in § 546(e), and to the question whether there is a requirement that the "financial institution" or other covered entity have a beneficial interest in or dominion and control over the transferred property in order to qualify for safe harbor protection. In our view, those inquiries put the proverbial cart before the horse. Before a court can determine whether a transfer was made by or to or for the benefit of a covered entity, the court must first identify the relevant transfer to test in that inquiry. At bottom, that is the issue the parties dispute in this case.

On one side, Merit posits that the Court should look not only to the Valley View–to–Merit end-to-end transfer, but also to all its component parts. Here, those component parts include one transaction by Credit Suisse to Citizens Bank (*i.e.,* the transmission of the $16.5 million from Credit Suisse to escrow at Citizens Bank), and two transactions by Citizens Bank to Merit (*i.e.,* the transmission of $16.5 million over two installments by Citizens Bank as escrow agent to Merit). Because those component parts include transactions by and to financial institutions, Merit contends that § 546(e) bars avoidance.

FTI, by contrast, maintains that the only relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer between Valley View and Merit of $16.5 million for purchase of the stock, which is the transfer that the trustee seeks to avoid under § 548(a)(1)

(B). Because that transfer was not made by, to, or for the benefit of a financial institution, FTI contends that the safe harbor has no application.

**\*8** The Court agrees with FTI. The language of § 546(e), the specific context in which that language is used, and the broader statutory structure all support the conclusion that the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid under one of the substantive avoidance provisions.

### A

**[6]  [7]**  Our analysis begins with the text of § 546(e), and we look to both "the language itself [and] the specific context in which that language is used...." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). The pertinent language provides:

> "Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a ... settlement payment ... made by or to (or for the benefit of) a ... financial institution ... or that is a transfer made by or to (or for the benefit of) a ... financial institution ... in connection with a securities contract ..., except under section 548(a)(1)(A) of this title."

The very first clause—"Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title"—already begins to answer the question. It indicates that § 546(e) operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions. See A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 126 (2012) ("A dependent phrase that begins with *notwithstanding* indicates that the main clause that it introduces or follows derogates from the provision to which it refers"). That is, when faced with a transfer that is otherwise avoidable, § 546(e) provides a safe harbor notwithstanding that avoiding power. From the outset, therefore, the text makes clear that the starting point for the § 546(e) inquiry is the substantive avoiding power under the provisions expressly listed in the "notwithstanding" clause and, consequently,

the transfer that the trustee seeks to avoid as an exercise of those powers.

Then again in the very last clause—"except under section 548(a)(1)(A) of this title"—the text reminds us that the focus of the inquiry is the transfer that the trustee seeks to avoid. It does so by creating an exception to the exception, providing that "the trustee may not avoid a transfer" that meets the covered transaction and entity criteria of the safe harbor, "except" for an actually fraudulent transfer under § 548(a)(1)(A). 11 U.S.C. § 546(e). By referring back to a specific type of transfer that falls within the avoiding power, Congress signaled that the exception applies to the overarching transfer that the trustee seeks to avoid, not any component part of that transfer.

**[8]**  Reinforcing that reading of the safe-harbor provision, the section heading for § 546—within which the securities safe harbor is found—is: "Limitations on avoiding powers." Although section headings cannot limit the plain meaning of a statutory text, see *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* 554 U.S. 33, 47, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008), "they supply cues" as to what Congress intended, see *Yates v. United States,* 574 U.S. ——, ——, 135 S.Ct. 1074, 1083, 191 L.Ed.2d 64 (2015). In this case, the relevant section heading demonstrates the close connection between the transfer that the trustee seeks to avoid and the transfer that is exempted from that avoiding power pursuant to the safe harbor.

**\*9**  The rest of the statutory text confirms what the "notwithstanding" and "except" clauses and the section heading begin to suggest. The safe harbor provides that "the trustee may not avoid" certain transfers. § 546(e). Naturally, that text invites scrutiny of the transfers that "the trustee may avoid," the parallel language used in the substantive avoiding powers provisions. See § 544(a) (providing that "the trustee ... may avoid" transfers falling under that provision); § 545 (providing that "[t]he trustee may avoid" certain statutory liens); § 547(b) (providing that "the trustee may avoid" certain preferential transfers); § 548(a)(1) (providing that "[t]he trustee may avoid" certain fraudulent transfers). And if any doubt remained, the language that follows dispels that doubt: The transfer that the "the trustee may not avoid" is specified to be "a transfer that *is* " either a "settlement payment" or made "in connection with a securities contract." § 546(e) (emphasis added). Not a transfer that involves. Not a transfer that comprises. But

a transfer that is a securities transaction covered under § 546(e). The provision explicitly equates the transfer that the trustee may otherwise avoid with the transfer that, under the safe harbor, the trustee may not avoid. In other words, to qualify for protection under the securities safe harbor, § 546(e) provides that the otherwise avoidable transfer itself be a transfer that meets the safe-harbor criteria.

Thus, the statutory language and the context in which it is used all point to the transfer that the trustee seeks to avoid as the relevant transfer for consideration of the § 546(e) safe-harbor criteria.

B

The statutory structure also reinforces our reading of § 546(e). See *Hall v. United States,* 566 U.S. 506, 516, 132 S.Ct. 1882, 182 L.Ed.2d 840 (2012) (looking to statutory structure in interpreting the Bankruptcy Code). As the Seventh Circuit aptly put it, the Code "creates both a system for avoiding transfers and a safe harbor from avoidance—logically these are two sides of the same coin." 830 F.3d, at 694; see also *Fidelity Financial Services, Inc. v. Fink,* 522 U.S. 211, 217, 118 S.Ct. 651, 139 L.Ed.2d 571 (1998) ( "Section 206 of the Code puts certain limits on the avoidance powers set forth elsewhere"). Given that structure, it is only logical to view the pertinent transfer under § 546(e) as the same transfer that the trustee seeks to avoid pursuant to one of its avoiding powers.

[9]     As noted in Part I–A, *supra,* the substantive avoidance provisions in Chapter 5 of the Code set out in detail the criteria that must be met for a transfer to fall within the ambit of the avoiding powers. These provisions, as Merit admits, "focus mostly on the characteristics of the transfer that may be avoided." Brief for Petitioner 28. The trustee, charged with exercising those avoiding powers, must establish to the satisfaction of a court that the transfer it seeks to set aside meets the characteristics set out under the substantive avoidance provisions. Thus, the trustee is not free to define the transfer that it seeks to avoid in any way it chooses. Instead, that transfer is necessarily defined by the carefully set out criteria in the Code. As FTI itself recognizes, its power as trustee to define the transfer is not absolute because "the transfer identified must satisfy the terms of the avoidance provision the trustee invokes." Brief for Respondent 23.

*10     Accordingly, after a trustee files an avoidance action identifying the transfer it seeks to set aside, a defendant in that action is free to argue that the trustee failed to properly identify an avoidable transfer under the Code, including any available arguments concerning the role of component parts of the transfer. If a trustee properly identifies an avoidable transfer, however, the court has no reason to examine the relevance of component parts when considering a limit to the avoiding power, where that limit is defined by reference to an otherwise avoidable transfer, as is the case with § 546(e), see Part II–A, *supra.*

In the instant case, FTI identified the purchase of Bedford Downs' stock by Valley View from Merit as the transfer that it sought to avoid. Merit does not contend that FTI improperly identified the Valley View–to–Merit transfer as the transfer to be avoided, focusing instead on whether FTI can "ignore" the component parts at the safe-harbor inquiry. Absent that argument, however, the Credit Suisse and Citizens Bank component parts are simply irrelevant to the analysis under § 546(e). The focus must remain on the transfer the trustee sought to avoid.

III

A

The primary argument Merit advances that is moored in the statutory text concerns the 2006 addition of the parenthetical "(or for the benefit of)" to § 546(e). Merit contends that in adding the phrase "or for the benefit of" to the requirement that a transfer be "made by or to" a protected entity, Congress meant to abrogate the 1998 decision of the Court of Appeals for the Eleventh Circuit in *In re Munford, Inc.,* 98 F.3d 604, 610 (1996) (*per curiam* ), which held that the § 546(e) safe harbor was inapplicable to transfers in which a financial institution acted only as an intermediary. Congress abrogated *Munford,* Merit reasons, by use of the disjunctive "or," so that even if a beneficial interest, *i.e.,* a transfer "for the benefit of" a financial institution or other covered entity, is sufficient to trigger safe harbor protection, it is not necessary for the financial institution to have a beneficial interest in the transfer for the safe harbor to apply. Merit thus argues that a transaction "by or to" a financial institution such as Credit Suisse or Citizens Bank would meet the requirements of § 546(e), even if the financial institution is

acting as an intermediary without a beneficial interest in the transfer.

Merit points to nothing in the text or legislative history that corroborates the proposition that Congress sought to overrule *Munford* in its 2006 amendment. There is a simpler explanation for Congress' addition of this language that is rooted in the text of the statute as a whole and consistent with the interpretation of § 546(e) the Court adopts. A number of the substantive avoidance provisions include that language, thus giving a trustee the power to avoid a transfer that was made to "or for the benefit of" certain actors. See § 547(b)(1) (avoiding power with respect to preferential transfers "to or for the benefit of a creditor"); § 548(a)(1) (avoiding power with respect to certain fraudulent transfers "including any transfer to or for the benefit of an insider ..."). By adding the same language to the § 546(e) safe harbor, Congress ensured that the scope of the safe harbor matched the scope of the avoiding powers. For example, a trustee seeking to avoid a preferential transfer under § 547 that was made "for the benefit of a creditor," where that creditor is a covered entity under § 546(e), cannot now escape application of the § 546(e) safe harbor just because the transfer was not "made by or to" that entity.

**\*11** Nothing in the amendment therefore changed the focus of the § 546(e) safe-harbor inquiry on the transfer that is otherwise avoidable under the substantive avoiding powers. If anything, by tracking language already included in the substantive avoidance provisions, the amendment reinforces the connection between the inquiry under § 546(e) and the otherwise avoidable transfer that the trustee seeks to set aside.

Merit next attempts to bolster its reading of the safe harbor by reference to the inclusion of securities clearing agencies as covered entities under § 546(e). Because a securities clearing agency is defined as, *inter alia,* an intermediary in payments or deliveries made in connection with securities transactions, see 15 U.S.C. § 78c(23)(A) and 11 U.S.C. § 101(48) (defining "securities clearing agency" by reference to the Securities Exchange Act of 1934), Merit argues that the § 546(e) safe harbor must be read to protect intermediaries without reference to any beneficial interest in the transfer. The contrary interpretation, Merit contends, "would run afoul of the canon disfavoring an interpretation of a statute that renders a provision ineffectual or superfluous." Brief for Petitioner 25.

**[10]** Putting aside the question whether a securities clearing agency always acts as an intermediary without a beneficial interest in a challenged transfer—a question that the District Court in *Seligson* found presented triable issues of fact in that case—the reading of the statute the Court adopts here does not yield any superfluity. Reading § 546(e) to provide that the relevant transfer for purposes of the safe harbor is the transfer that the trustee seeks to avoid under a substantive avoiding power, the question then becomes whether that transfer was "made by or to (or for the benefit of)" a covered entity, including a securities clearing agency. If the transfer that the trustee seeks to avoid was made "by" or "to" a securities clearing agency (as it was in *Seligson*), then § 546(e) will bar avoidance, and it will do so without regard to whether the entity acted only as an intermediary. The safe harbor will, in addition, bar avoidance if the transfer was made "for the benefit of" that securities clearing agency, even if it was not made "by" or "to" that entity. This reading gives full effect to the text of § 546(e).

### B

**\*12** In a final attempt to support its proposed interpretation of § 546(e), Merit turns to what it perceives was Congress' purpose in enacting the safe harbor. Specifically, Merit contends that the broad language of § 546(e) shows that Congress took a "comprehensive approach to securities and commodities transactions" that "was prophylactic, not surgical," and meant to "advanc[e] the interests of parties in the finality of transactions." Brief for Petitioner 41–43. Given that purported broad purpose, it would be incongruous, according to Merit, to read the safe harbor such that its application "would depend on the identity of the investor and the manner in which it held its investment" rather than "the nature of the transaction generally." *Id.,* at 33. Moreover, Merit posits that Congress' concern was plainly broader than the risk that is posed by the imposition of avoidance liability on a securities industry entity because Congress provided a safe harbor not only for transactions "to" those entities (thus protecting the entities from direct financial liability), but also "by" these entities to non-covered entities. See Reply Brief 10–14. And, according to Merit, "[t]here is no reason to believe that Congress was troubled by the possibility that transfers *by* an industry hub could be unwound but yet was unconcerned about trustees' pursuit of transfers

made *through* industry hubs." *Id.,* at 12–13 (emphasis in original).

Even if this were the type of case in which the Court would consider statutory purpose, see, *e.g., Watson v. Philip Morris Cos.,* 551 U.S. 142, 150–152, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007), here Merit fails to support its purposivist arguments. In fact, its perceived purpose is actually contradicted by the plain language of the safe harbor. Because, of course, here we do have a good reason to believe that Congress was concerned about transfers "*by* an industry hub" specifically: The safe harbor saves from avoidance certain securities transactions "made by or to (or for the benefit of)" covered entities. See § 546(e). Transfers "through" a covered entity, conversely, appear nowhere in the statute. And although Merit complains that, absent its reading of the safe harbor, protection will turn "on the identity of the investor and the manner in which it held its investment," that is nothing more than an attack on the text of the statute, which protects only certain transactions "made by or to (or for the benefit of)" certain covered entities.

For these reasons, we need not deviate from the plain meaning of the language used in § 546(e).

IV

**[11]**    For the reasons stated, we conclude that the relevant transfer for purposes of the § 546(e) safe harbor is the same transfer that the trustee seeks to avoid pursuant to its substantive avoiding powers. Applying that understanding of the safe-harbor provision to this case yields a straightforward result. FTI, the trustee, sought to avoid the $16.5 million Valley View–to–Merit transfer. FTI did not seek to avoid the component transactions by which that overarching transfer was executed. As such, when determining whether the § 546(e) safe harbor saves the transfer from avoidance liability, *i.e.,* whether it was "made by or to (or for the benefit of) a ... financial institution," the Court must look to the overarching transfer from Valley View to Merit to evaluate whether it meets the safe-harbor criteria. Because the parties do not contend that either Valley View or Merit is a "financial institution" or other covered entity, the transfer falls outside of the § 546(e) safe harbor. The judgment of the Seventh Circuit is therefore affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**All Citations**

--- S.Ct. ----, 2018 WL 1054879

---

# EXHIBIT B

**REDACTED BLACKLINE**
**Changed Pages Only**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: TRIBUNE COMPANY FRAUDULENT CONVEYANCE LITIGATION | Consolidated Multidistrict Action No. 11 MD 2296 (RJS) No. 12 MC 2296 (RJS) |
| MARC S. KIRSCHNER, as Litigation Trustee for the TRIBUNE LITIGATION TRUST, Plaintiff, -against- | No. 12 CV 2652 (RJS) |
| DENNIS J. FITZSIMONS, ENRIQUE HERNANDEZ JR., BETSY D. HOLDEN, ROBERT S. MORRISON, WILLIAM A. OSBORN, J. CHRISTOPHER REYES, DUDLEY S. TAFT, MILES D. WHITE, JEFFREY CHANDLER, ROGER GOODAN, WILLIAM STINEHART JR., CHANDLER BIGELOW, DONALD C. GRENESKO, MARK W. HIANIK, DANIEL G. KAZAN, CRANE H. KENNEY, THOMAS D. LEACH, LUIS E. LEWIN, R. MARK MALLORY, HARRY AMSDEN, STEPHEN D. CARVER, THOMAS S. FINKE, ROBERT GREMILLION, DAVID DEAN HILLER, TIMOTHY P. KNIGHT, TIMOTHY J. LANDON, RICHARD H. MALONE, DURHAM J. MONSMA, IRVING L. QUIMBY, JOHN E. REARDON, SCOTT C. SMITH, JOHN J. VITANOVEC, KATHLEEN M. WALTZ, DAVID D. WILLIAMS, JOHN D. WORTHINGTON IV, CHANDLER TRUST NO. 1, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES; CHANDLER TRUST NO. 2 AND CHANDLER SUB-TRUSTS, SUSAN BABCOCK, JEFFREY CHANDLER, CAMILLA CHANDLER FROST, ROGER GOODAN, WILLIAM STINEHART, JR., JUDY C. WEBB, WARREN B. WILLIAMSON, TRUSTEES; PHILIP CHANDLER RESIDUARY TRUST NO. 2, MAY C. GOODAN TRUST NO. 2, RUTH C. VON PLATEN TRUST NO. 2, DOROTHY B. CHANDLER MARITAL TRUST NO. 2, DOROTHY B. CHANDLER RESIDUARY TRUST NO. 2, HOC TRUST NO. 2 FBO SCOTT HASKINS, HOC TRUST NO. 2 FBO JOHN HASKINS, HOC TRUST NO. 2 FBO ELIZA HASKINS, HOC GST EXEMPT TRUST NO. 2. FBO SCOTT HASKINS, HOC GST EXEMPT TRUST NO. 2. FBO JOHN HASKINS, HOC GST EXEMPT TRUST NO. 2. FBO ELIZA HASKINS, ALBERTA W. CHANDLER MARITAL TRUST | **[PROPOSED] ~~FIFTH~~SIXTH AMENDED COMPLAINT** |

NO. 2, EARL E. CROWE TRUST NO. 2, PATRICIA CROWE
WARREN RESIDUARY TRUST NO. 2, HELEN GARLAND
TRUST NO. 2 (FOR GWENDOLYN GARLAND BABCOCK),
HELEN GARLAND TRUST NO. 2 (FOR WILLIAM M.
GARLAND III), HELEN GARLAND TRUST NO. 2 (FOR
HILLARY DUQUE GARLAND), GARLAND FOUNDATION
TRUST NO. 2, MARIAN OTIS CHANDLER TRUST NO. 2,
ROBERT R. MCCORMICK FOUNDATION, CANTIGNY
FOUNDATION, SAMUEL ZELL, EQUITY GROUP
INVESTMENTS, L.L.C., EGI-TRB, L.L.C., SAM INVESTMENT
TRUST, ~~TOWER CH, L.L.C., TOWER DC, L.L.C., TOWER DL,
L.L.C., TOWER EH, L.L.C., TOWER GREENSPUN DGSPT, LLC,
TOWER GREENSPUN JGGSTP, LLC, TOWER GREENSPUN
SGFFT, LLC, TOWER GREENSPUN, L.L.C., TOWER HZ,
L.L.C., TOWER JB, L.L.C., TOWER JK, L.L.C., TOWER JP,
L.L.C., TOWER JS, L.L.C., TOWER KS, L.L.C., TOWER LL,
L.L.C., TOWER LM, L.L.C., TOWER LZ, L.L.C., TOWER MH,
L.L.C., TOWER MS, L.L.C., TOWER MZ, L.L.C., TOWER NL,
L.L.C., TOWER PH, L.L.C., TOWER PT, L.L.C., TOWER SF,
L.L.C., TOWER TT, L.L.C., TOWER VC, L.L.C., TOWER WP,
L.L.C.,~~ GREATBANC TRUST COMPANY, DUFF & PHELPS,
LLC, VALUATION RESEARCH CORPORATION, MORGAN
STANLEY & CO. LLC f/k/a MORGAN STANLEY & CO.
INCORPORATED, ~~MORGAN STANLEY CAPITAL SERVICES,
INC.,~~ and the defendants listed in the attached Exhibit A,

-and-

~~AUTOMOBILE MECHANICS' LOCAL 701 PENSION FUND~~
~~a/k/a AUTOMOBILE MECHANICS' LOCAL NO. 701 UNION~~
~~AND INDUSTRY PENSION FUND, FRANK W. DENIUS, THE~~
~~DFA INVESTMENT TRUST COMPANY, GDK INC., HUSSMAN~~
~~STRATEGIC GROWTH FUND a/k/a THE HUSSMAN~~
~~INVESTMENT TRUST, JOHN P. HUSSMAN, TRUSTEE,~~
~~EDWIN R LABUZ IRA, AMERIPRISE TRUST COMPANY f/k/a~~
~~H&R BLOCK FINANCIAL ADVISORS, CUSTODIAN, DENISE~~
~~MECK, NATIONWIDE S&P 500 INDEX FUND, A SERIES OF~~
~~NATIONWIDE MUTUAL FUNDS~~**FRANK W. DENIUS, GDK**
**INC., DENISE MECK**, NEW YORK STATE TEACHERS
RETIREMENT SYSTEM, ~~DOROTHY C. PATTERSON~~
~~IRREVOCABLE TRUST #2 U/A/D 12-21-93, THE NORTHERN~~
~~TRUST COMPANY, AS SUCCESSOR TRUSTEE,~~ BLANDINA
ROJEK, and VTRADER PRO, LLC, on behalf of themselves and a
class of similarly situated persons and legal entities,

Defendants.

Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

B.      The Company's Performance Raises Even More Concerns Among Certain Of
        The Defendants ................................................................................................ ~~52~~ 53

VI.     The Parties Charged With Protecting The Company Are Lured By Financial
        Incentives To Support Zell's Proposal ....................................................................... ~~54~~ 53

        A.      Zell Induces The Officer Defendants And Subsidiary D&O Defendants To
                Recommend And Facilitate The LBO .............................................................. ~~54~~ 53

        B.      The Company's Financial Advisors Are Incentivized To Favor The LBO ...... ~~57~~ 56

VII.    Incentivized To Favor The LBO, The Officer Defendants Create Fraudulent,
        Unrealistic Projections ............................................................................................... ~~59~~ 58

VIII.   The Company Struggles To Find A Firm Willing To Opine That The Company
        Would Be Solvent Following The LBO ....................................................................... ~~63~~ 62

        A.      Duff & Phelps Declines To Provide Tribune With A Solvency Opinion For The
                LBO, Instead Providing The ESOP With A "Viability Opinion" ..................... ~~63~~ 62

        B.      Tribune Retains VRC To Issue A Solvency Opinion After Houlihan Lokey
                Voices Concerns Over The LBO ...................................................................... ~~71~~ 70

IX.     Lured By The Financial Incentives Associated With The LBO, The Controlling
        Shareholders And Tribune Directors Facilitate And Approve The Transaction .......... ~~73~~ 72

        A.      Zell Induces The Controlling Shareholders And Chandler Trust Representatives
                To Support The LBO By Proposing A Higher ~~Purchase~~ Price For
                Shareholders ................................................................................................... ~~73~~ 72

        B.      The Special Committee And Tribune Board Breach Their Fiduciary Duties By
                Approving The LBO ......................................................................................... ~~76~~ 75

X.      The Company Begins Implementing The Disastrous LBO Amid A Growing Chorus Of
        Criticism Of The Transaction ..................................................................................... ~~82~~ 81

        A.      Tribune Announces The LBO And Begins Taking The Steps Necessary To
                Consummate The Transaction ........................................................................... ~~82~~ 81

        B.      In Connection With The LBO, Tribune Enters Into Loan Agreements That Are
                Designed To Hinder, Delay, And Defraud Its Existing Creditors .................... ~~83~~ 82

        C.      The LBO Was A Single Unitary Transaction With Two Steps .......................... ~~86~~ 85

        D.      Rating Agencies, Wall Street Analysts, News Publications, And Investors
                React Negatively To The LBO ......................................................................... ~~89~~ 88

XI.     The Company Engages In Intentional Fraud In Order To Close Step One ................. ~~92~~ 91

        A.      The D&O Defendants, Controlling Shareholders, Zell, And Advisor
                Defendants Purport To Rely On The Outdated, Unreasonably Optimistic
                February 2007 Projections In Order To Obtain A Step One Solvency
                Opinion ........................................................................................................... ~~92~~ 91

ii

B.    The Officer Defendants Instruct VRC To Deviate From Industry Practice In Issuing Its Solvency Opinions ............................................ ~~99~~**97**

XII.    VRC Improperly Renders The Step One Solvency Opinion ............................................ ~~99~~**98**

XIII.    The Company's Fiduciaries Ignore The Company's Performance And The Cacophony Of Voices Warning Against The LBO And Permit The Transaction To Proceed ............................................ ~~101~~**100**

A.    The Special Committee And The Tribune Board Breach Their Fiduciary Duties In Connection With Step One ............................................ ~~101~~**100**

B.    The Subsidiary D&O Defendants Approve The Subsidiary Guarantees Through A Grossly Deficient And Conflicted Process ............................................ ~~102~~**101**

C.    Step One Of The LBO Closes ............................................ ~~104~~**103**

XIV.    The Publishing Industry And Tribune Continue To Decline Between The Close Of Step One And Step Two ............................................ ~~105~~**104**

A.    The Secular Decline In The Publishing Industry Worsens ............................................ ~~105~~**104**

B.    Tribune Significantly Underperforms The February 2007 Projections And Is Further Downgraded ............................................ ~~106~~**105**

XV.    The LBO Lenders Begin To Question The Company's Solvency ............................................ ~~107~~**106**

XVI.    The Company Engages In Intentional Fraud In Order To Close Step Two ............................................ ~~110~~**109**

A.    The Officer Defendants Create Unreliable, Overly Optimistic Projections In Order To Obtain A Solvency Opinion At Step Two ............................................ ~~110~~**109**

B.    The Officer Defendants Reap The Benefits Of Altering The Definition Of Fair Value, And Instruct VRC To Artificially Lower The Amount Of Company Debt When Assessing Balance Sheet Solvency ............................................ ~~113~~**112**

C.    Certain Officer Defendants Misrepresent To VRC That An Outside  Financial Advisor Agreed That Tribune Would Be Able To Refinance Its Debt ............................................ ~~115~~**114**

XVII.    VRC Ignores Its Own Internal Analysis And Adopts Management's Inflated October 2007 Projections In Issuing Its Step Two Solvency Opinion ............................................ ~~116~~**115**

XVIII.    Tribune's Fiduciaries Fail, Once Again, To Protect The Company ............................................ ~~119~~**118**

A.    The Tribune Board And Special Committee Breach Their Fiduciary Duties In Connection With VRC's Step Two Solvency Opinion ............................................ ~~119~~**118**

B.    Morgan Stanley Fails To Inform Tribune ~~of~~**Of** Its Concerns  That Tribune Would Be Insolvent If Step Two Closed ............................................ ~~121~~**120**

C.    Zell Uses His Influence To Ensure That The LBO Is Consummated ............................................ ~~125~~**124**

iii

XIX.    The LBO Closes And Tribune Collapses Under Its Massive Debt Burden .......... ~~128~~127

~~XX.     Morgan Stanley's Insider Trading~~ .......... ~~131~~

GROUNDS FOR RELIEF .......... ~~134~~130

    COUNT ONE: .......... 

        **COUNT ONE - A [Dismissed; Subject to Appeal]** Avoidance And
        Recovery Of The Shareholder Transfers (Of At Least $8 Billion) As
        Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And 550(a) Of
        The Bankruptcy Code  Against The Shareholder Defendants And The
        Shareholder Class .......... ~~134~~130

        **COUNT ONE - B Avoidance And Recovery Of The Shareholder Transfers
        (Of At Least $8 Billion) As Constructive Fraudulent Transfers Under
        Sections 548(a)(1)(B) And 550(a) Of The Bankruptcy Code Against
        The Shareholder Defendants (Except Those Listed on Exhibit A-2)
        And The Shareholder Class** .......... **133**

    COUNT TWO: .......... 
        Violations Of Delaware General Corporation Law Sections 160 And/Or
        173  Against The Director Defendants And Zell .......... ~~138~~135

    COUNT THREE: .......... 
        Breach Of Fiduciary Duty Against The Director Defendants .......... ~~139~~136

    COUNT FOUR: .......... 
        Breach Of Fiduciary Duty Against The Officer Defendants .......... ~~142~~139

    COUNT FIVE: .......... 
        Breach Of Fiduciary Duty Against Zell .......... ~~145~~142

    COUNT SIX: .......... 
        Aiding And Abetting Breaches Of Fiduciary Duty By The D&O
        Defendants And By The Controlling Shareholder Defendants Against The
        Zell Defendants .......... ~~147~~144

    COUNT SEVEN: .......... 
        Avoidance And Recovery Of The EGI-TRB Transfers (Of At Least
        $258,918,859) As Constructive And/Or Actual Fraudulent Transfers
        Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy
        Code  Against EGI-TRB .......... ~~150~~147

    COUNT EIGHT: .......... 
        Alter Ego Liability Against EGI, Sam Investment Trust, And Zell .......... ~~151~~148

    COUNT NINE: .......... 
        Preference Against Zell And EGI-TRB To Recover The Exchangeable
        Note Transfer (Of At Least $206,418,859) And The EGI-TRB Fee
        Transfers (Of At Least $2.5 Million) .......... ~~153~~150

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint

COUNT TWENTY TWO:
    Professional Malpractice Against Morgan Stanley          ~~173~~**170**

COUNT TWENTY THREE:
    Preference Against Morgan Stanley To Recover  The Morgan Stanley
    Reimbursement (Of At Least $46,020)         ~~174~~**171**

COUNT TWENTY FOUR: **[Dismissed]**         **172**
~~Fraud/Insider Trading Against Morgan Stanley~~       ~~175~~

COUNT TWENTY FIVE:
    Breach Of Fiduciary Duty Against Morgan Stanley     ~~176~~**172**

COUNT TWENTY SIX: **[Dismissed]**         **173**
~~Aiding And Abetting Breach Of Fiduciary Duty Against MSCS~~   ~~178~~

COUNT TWENTY SEVEN: **[Dismissed]**       **173**
~~Breach Of Contract, Including Breach Of Covenant Of Good Faith And Fair~~
    ~~Dealing, Against MSCS~~         ~~178~~

COUNT TWENTY EIGHT: **[Dismissed]**       **173**
~~Willful Violation Of The Automatic Stay Against MSCS~~     ~~179~~

COUNT TWENTY NINE: **[Dismissed]**       **173**

**COUNT THIRTY [Dismissed]**         **173**
~~Equitable Subordination And Disallowance Of The MSCS Claim And Denial Of~~
    ~~Setoff Against MSCS~~         ~~180~~

~~COUNT THIRTY:~~
    ~~Turnover To Recover Under The Swap Agreement (Of At Least $59.6~~
    ~~Million) Against MSCS~~         ~~180~~

COUNT THIRTY ONE:
    Unjust Enrichment Against The D&O Defendants, Subsidiary D&O
    Defendants, Controlling Shareholders, Zell Defendants, ~~Tower~~
    ~~Defendants,~~ VRC, GreatBanc, Duff & Phelps, And Morgan Stanley   ~~181~~**173**

COUNT THIRTY TWO:
    Recharacterization Of The Exchangeable Note As Equity Pursuant To 11
    U.S.C. § 105           ~~182~~**174**

COUNT THIRTY THREE:
    Equitable Subordination And Disallowance Of The D&O Creditor
    Claims, Subsidiary Creditor Claims, Zell Claims, **And** EGI-TRB Claims~~,~~
    ~~And Tower Claims 184~~         **176**

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

center of the debacle, called "the deal from hell."  Substantial fault, ranging from gross negligence to intentional fraud, can be laid at the feet of virtually every participant in the transaction.  Consumed by self-interest, these defendants cared not what happened to Tribune and its existing creditors so long as they got their own money out or their fees paid.

3.      The defendants here include the members of Tribune's Board of Directors, who collectively received more than $~~28~~**40** million in LBO proceeds.  These directors breached their fiduciary duties of care, loyalty, and good faith in approving a transaction that loaded Tribune with unsustainable levels of debt in order to finance payments to shareholders, including themselves.

4.      The Tribune officers named as defendants were rewarded even more richly than Tribune's Board, receiving collectively more than $~~79~~**91** million in LBO proceeds and special compensation, all contingent on consummation of the LBO.  In order to reap this massive windfall, Tribune's managers created and clung to patently unrealistic projections of future earnings to give the illusion that Tribune would be able to handle the avalanche of debt it would incur in the LBO, despite the Company's underperformance in a declining industry.  Tribune's financial advisors turned a blind eye to management's transparent manipulations so the advisors could collect the large fees that would be due them only if the deal proceeded.  These advisors knew, or were reckless or grossly negligent in not knowing, that the LBO would render Tribune insolvent, but decided to pretend otherwise or keep silent.

5.      The directors and officers of Tribune's operating subsidiaries—the entities that owned virtually all of Tribune's assets—permitted the subsidiaries to guarantee the LBO debt incurred by Tribune without so much as a meeting or board vote, despite the fact that the

subsidiaries received no value of any kind in exchange for their guarantees.  The subsidiary directors and officers thereby advanced the LBO lenders' quest to unfairly prime Tribune's pre-existing creditors in the event of a bankruptcy, breached their own fiduciary duties to the subsidiaries, and aided and abetted breaches of duties owed by the other defendants.

6.      But the biggest beneficiaries of the LBO were Tribune's shareholders who, after seeing their shares drop in value by one-third from 2003 to 2006, were cashed out at a premium price of $34 per share, with roughly half the shares purchased in June 2007 and the rest **redeemed** in December 2007.  Topping the list of the shareholders were the Chandler Trusts, which got $1.5 billion for their shares.  They were followed by the McCormick and Cantigny Foundations—led by Tribune's Chief Executive Officer, Dennis J. FitzSimons—which received more than $1 billion.  Billions of dollars more were distributed to investment funds, trusts, pension funds, wealthy individuals, and others, all of whom "jumped the line" in order improperly to bail out of Tribune ahead of its lawful creditors.  (Although there were tens of thousands of shareholders, only the largest ones—those who received at least $50,000 each—are individually named in this complaint and are included in a proposed defendant class.)

7.      From the outset, Tribune was a terrible candidate for a highly leveraged buyout, a form of transaction in which a company's shares are purchased **or redeemed** with money borrowed by the corporation itself.  Because an LBO encumbers a company with substantial—or, in this case, massive—debt, it is risky even under the best of circumstances.  As was contemporaneously acknowledged by many observers, Tribune's LBO was doomed to fail from its inception, as it was effectuated during a time of dramatic, relentless, and irreversible declines in the newspaper industry, which was seeing both advertisers and subscribers abandon

4

~~16.~~ DELETED

**16.**   ~~17.~~ Both steps of the LBO were conditioned upon the issuance of solvency opinions stating that the Company would be balance-sheet solvent, adequately capitalized, and able to pay its debts as they came due following consummation.  This was an opportunity for Tribune's fiduciaries to halt the LBO if it became apparent that the transaction posed unacceptable risks to the Company.  Yet instead of treating the solvency opinion requirement as an opportunity to fully vet the wisdom of the LBO given the Company's steadily worsening financial condition, Tribune's management and the Company's advisors treated it only as an obstacle to circumvent.

**17.**   ~~18.~~ Tribune originally approached Duff & Phelps to provide a solvency opinion in the event of an LBO, but Duff & Phelps determined it could not do so without violating accepted practices for analyzing company solvency.  Still eager for fees, Duff & Phelps agreed to repackage its analysis as a "viability opinion," which it provided to the trustee of the Tribune employee stock ownership plan ("ESOP") that would become the new owner of Tribune after the LBO.  With the Duff & Phelps opinion in hand, the ESOP trustee facilitated the LBO by voting all of the ESOP's shares in favor of the transaction instead of seeking to stop it.

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

## THE PARTIES

**25.** ~~26.~~ Plaintiff is the Litigation Trustee of the Tribune Litigation Trust, which was created pursuant to the Fourth Amended Plan of Reorganization (the "Plan") for ~~the~~ Tribune Company ("Tribune" or the "Company") and its related Debtor subsidiaries. Following an evidentiary confirmation hearing respecting a prior version of the Plan that lasted more than two weeks, and a subsequent confirmation hearing respecting the Plan, the Bankruptcy Court confirmed the Plan on July 23, 2012. Pursuant to the Plan, certain causes of action commenced on behalf of the Debtors' estates, including those asserted herein, were transferred to the Litigation Trust. The Litigation Trustee has been granted authority and standing to pursue those causes of action on behalf of the beneficiaries of the Litigation Trust, the Debtors' creditors, which received only a fraction of their allowed claims against the Debtors in the Debtors' bankruptcy proceeding.

### A.    The Director Defendants

**26.** ~~27.~~ Defendant Dennis J. FitzSimons ("FitzSimons") was the President and Chief Executive Officer ("CEO") of Tribune and the Chairman of Tribune's Board of Directors (the "Tribune Board") at the time of the LBO. As an officer of Tribune, FitzSimons was integrally involved in planning, negotiating, and facilitating the LBO. As a director of Tribune, FitzSimons voted in favor of the LBO, and caused the Company to purportedly rely on financial projections and solvency opinions that FitzSimons knew, or was reckless or grossly negligent in not knowing, were materially flawed. Also at the time of the LBO, FitzSimons was the Chairman of the Robert R. McCormick Foundation (the "McCormick Foundation"), one of Tribune's largest shareholders prior to the LBO. Through that position, which he still holds,

12

Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

purportedly rely on financial projections and a solvency opinion that Goodan knew, or was reckless or grossly negligent in not knowing, were materially flawed.  Upon information and belief, Goodan lives in Washington.

**36.**  ~~37.~~ Defendant William Stinehart Jr. ("Stinehart") was a director of Tribune at the time of the LBO and until his resignation on or about June 4, 2007.  Stinehart served on the Tribune Board as a representative of the Chandler Trusts, of which he is a trustee.  As a director, Stinehart discussed and advocated in favor of the LBO, and caused the Company to purportedly rely on financial projections and a solvency opinion that Stinehart knew, or was reckless or grossly negligent in not knowing, were materially flawed.  Upon information and belief, Stinehart lives in California.

**37.**  ~~38.~~ Defendants Chandler, Goodan and Stinehart are sometimes collectively referred to as the "Chandler Trust Representatives."  Defendants FitzSimons, Hernandez, Holden, Morrison, Osborn, Reyes, Taft, White, Chandler, Goodan, and Stinehart are sometimes collectively referred to as the "Director Defendants."

**38.**  ~~39.~~ The Director Defendants each had a significant monetary incentive to approve and facilitate the LBO.  The Director Defendants, individually or through trusts, retirement plans, or related entities, received at least the following material amounts ~~by selling~~**from the purchase or redemption of** their Tribune shares in connection with the LBO, for a total of more than $~~28.1~~**40** million:

| Director Defendants | |
|---|---|
| **Defendant Name** | **Amount Received ~~by Selling or Redeeming~~from Shares Purchased or Redeemed in the LBO** |
| FitzSimons | ███████████ ███████ |
| Hernandez | $462,701 |

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

| Holden | $371,950 |
| Morrison | $524,528 |
| Osborn | $484,058 |
| Reyes | $586,441 |
| Taft | $3,431,892 |
| White | ████████ |
| Chandler | $380,358 |
| Goodan | $257,550 |
| Stinehart | $137,394 |
| **Total** | **$28,148,603$40,779,365** |

**39.**      40. Defendant FitzSimons also received more than $28 million in additional

special monetary incentives that were triggered by the LBO.  The Foundations, on whose behalf

FitzSimons sat on the Tribune Board, received more than $1 billion ~~by selling or redeeming~~**from

the purchase or redemption of** their Tribune shares in connection with the LBO.  The Chandler

Trusts, whose interests were represented on the Tribune Board by defendants Chandler, Goodan,

and Stinehart, received more than $1.5 billion by selling their Tribune shares in connection with

the LBO.

**B.      The Officer Defendants**

**40.**      ~~41.~~ The defendants listed in the following paragraphs ~~42~~**41**-~~47~~**46**, together with

FitzSimons, are collectively referred to as the "Officer Defendants."  The Officer Defendants

were keenly involved in the Company's review, acceptance, and facilitation of the LBO; created

the fraudulent projections on which the LBO was premised; and worked closely with the

Company's solvency advisor—defendant VRC—to manipulate the solvency opinions they

issued and ensure that VRC would opine, falsely, that the Company was solvent at each step of

the LBO.

**41.**      ~~42.~~ Defendant Chandler Bigelow ("Bigelow") was Tribune's Treasurer at the time

of the LBO, and ~~is currently~~**later was** Tribune's Chief Financial Officer.  Bigelow was also an

17

officer of one or more of the Subsidiary Guarantors (defined below) at the time of the LBO, and executed the Subsidiary Guarantees (defined below) on behalf of all of the Subsidiary Guarantors.  Upon information and belief, Bigelow lives in Illinois.  The Debtors listed Bigelow as the holder of one or more unsecured claims on Schedule G of the Debtors' Schedules.

**42.**  43. Defendant Donald C. Grenesko ("Grenesko") was Tribune's Senior Vice President of Finance and Administration at the time of the LBO.  Upon information and belief, Grenesko lives in Illinois.  Grenesko filed two proofs of claim in the Debtors' Chapter 11 cases.

**43.**  44. Defendant Mark W. Hianik ("Hianik") was Tribune's Assistant General Counsel and Assistant Secretary at the time of the LBO.  Hianik was also a director and officer of one or more of the Subsidiary Guarantors at that time.  Upon information and belief, Hianik lives in Illinois.  Hianik filed two proofs of claim in the Debtors' Chapter 11 cases.

**44.**  45. Defendant Daniel G. Kazan ("Kazan") was Tribune's Vice President of Development at the time of the LBO, and ~~currently is~~**later was** Tribune's Senior Vice President, Investments.  Upon information and belief, Kazan lives in Illinois.  Kazan filed one proof of claim in the Debtors' Chapter 11 cases.

**45.**  46. Defendant Crane H. Kenney ("Kenney") was Tribune's Senior Vice President, General Counsel and Secretary at the time of the LBO.  Kenney was also a director and officer of one or more of the Subsidiary Guarantors at that time.  Upon information and belief, Kenney lives in Illinois.  Kenney filed one proof of claim in the Debtors' Chapter 11 cases.

**46.**  47. Defendant Harry Amsden ("Amsden") was the Vice President of Finance of Tribune Publishing Company, a subsidiary of Tribune, and an officer of Tribune National

18

48.   ~~49.~~ Each of the Officer Defendants had a substantial monetary incentive to approve the LBO.  First, the Officer Defendants, individually or through trusts, retirement plans, or related entities, knew that they would collectively receive more than $~~36~~**48** million ~~by selling or redeeming~~**from the purchase or redemption of** their Tribune shares in connection with the LBO; second, the Officer Defendants knew they would collectively receive more than $42 million in additional special monetary incentives if the LBO was consummated.  The breakdown of the amounts received by the Officer Defendants in connection with the LBO was as follows:

| Officer Defendants | | |
|---|---|---|
| **Defendant Name** | **Amount Received ~~by Selling or Redeeming~~from Shares Purchased or Redeemed in the LBO** | **Special Monetary Incentives Triggered by the LBO** |
| Amsden | $0 | $867,324 |
| Bigelow | ███████ | $1,335,620 |
| FitzSimons | ████████ | $28,729,798 |
| Grenesko | $10,668,400 | $6,733,557 |
| Hianik | ██████ | $809,019 |
| Kazan | ██████ | $1,253,027 |
| Kenney | $3,570,087 | $3,129,789 |
| **Total** | **$~~36,192,626~~48,755,388** | **$42,858,134** |

C.     **Additional Officers Who Received Monetary Transfers Related To The LBO**

49.   ~~50.~~ Defendant Thomas D. Leach ("Leach") was Tribune's Senior Vice President of Development at the time of the LBO.  Upon information and belief, Leach lives in Illinois. Leach filed one proof of claim in the Debtors' Chapter 11 cases.

50.   ~~51.~~ Defendant R. Mark Mallory ("Mallory") was Tribune's Vice President and Controller at the time of the LBO.  Upon information and belief, Mallory lives in Illinois. Mallory filed two proofs of claim in the Debtors' Chapter 11 cases.

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

**51.**   ~~52.~~ Defendant Luis E. Lewin ("Lewin") was Tribune's Senior Vice President of Human Resources at the time of the LBO.  Upon information and belief, Lewin lives in Illinois.

**52.**   ~~53.~~ Defendants Leach, Mallory, and Lewin are sometimes collectively referred to as the "Additional Officer Recipients."  Each of the Additional Officer Recipients received proceeds ~~by selling or redeeming~~**from the purchase or redemption of** their shares in the LBO, and special monetary incentives triggered by the LBO.

### D.   The Subsidiary D&O Defendants

**53.**   ~~54.~~ The defendants listed in the following paragraphs ~~55~~**54**-~~69~~**68**, along with FitzSimons, Bigelow, Hianik, and Kenney**,** are collectively referred to as the "Subsidiary D&O Defendants."  In complete dereliction of their fiduciary duties, the Subsidiary D&O Defendants authorized certain of the Tribune Subsidiaries (the "Subsidiary Guarantors") to enter into guarantees (the "Subsidiary Guarantees") that transferred all of their post-LBO value to the parties financing the LBO, but provided no value or benefit to the Subsidiary Guarantors.  The Subsidiary D&O Defendants authorized the Subsidiary Guarantees without any consideration of whether they furthered the interests of the Subsidiary Guarantors or their creditors.  As set forth in detail below, the Subsidiary D&O Defendants, individually or through trusts, retirement plans, or related entities, received a total of more than $~~50~~**64** million ~~by selling or redeeming~~**from the purchase or redemption of** their Tribune shares in connection with the LBO, and more than $71 million in additional special monetary incentives premised upon consummation of the LBO.

**54.**   ~~55.~~ Defendant Stephen D. Carver ("Carver") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO.  Upon information and belief, Carver lives in Connecticut.  Carver filed one proof of claim in the Debtors' Chapter 11 cases.

21

LBO.  Upon information and belief, Vitanovec lives in Illinois.  Vitanovec filed one proof of claim in the Debtors' Chapter 11 cases.

**66.**  67. Defendant Kathleen M. Waltz ("Waltz") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO.  Upon information and belief, Waltz lives in Florida.  Waltz filed one proof of claim in the Debtors' Chapter 11 cases.

**67.**  68. Defendant David D. Williams ("Williams") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO.  Upon information and belief, Williams lives in Illinois.  Williams filed one proof of claim in the Debtors' Chapter 11 cases.

**68.**  69. Defendant John D. Worthington, IV ("Worthington") was a director and officer of one or more of the Subsidiary Guarantors at the time of the LBO.  Upon information and belief, Worthington lives in Maryland.

**69.**  70. The Subsidiary Guarantors for which each Subsidiary D&O Defendant served as director and/or officer, and the relevant time period in which each Subsidiary D&O Defendant held that position, are listed in Exhibit B.  The Subsidiary D&O Defendants, by virtue of their positions as directors and/or officers of one or more Subsidiary Guarantors, owed fiduciary duties to each Subsidiary Guarantor he or she served.  All claims of the Subsidiary D&O Defendants reflected on the Debtors' Schedules or any proofs of claim filed by, or on behalf of, any of the Subsidiary D&O Defendants are collectively referred to herein as the "Subsidiary D&O Creditor Claims."

**70.**  71. The Subsidiary D&O Defendants, individually or through trusts, retirement plans, or related entities, received at least the following amounts by selling**from the purchase or redemption of** their Tribune shares in connection with the LBO, as well as at least the

24

following amounts in special monetary incentives that were triggered by the completion of the

LBO, for a total of more than $~~122~~**135** million:

| Subsidiary D&O Defendants | | |
|---|---|---|
| **Defendant Name** | **Amount Received ~~by Selling or Redeeming~~from Shares Purchased or Redeemed in the LBO** | **Special Monetary Incentives Triggered by the LBO** |
| Bigelow | ██████ | $1,335,620 |
| Carver | | $512,710 |
| Finke | $0 | $377,462 |
| FitzSimons | ██████████ | $28,729,798 |
| Gremillion | $0 | $1,735,639 |
| Hianik | ████ | $809,019 |
| Hiller | | $8,768,972 |
| Kenney | $3,570,087 | $3,129,789 |
| Knight | $0 | $3,743,646 |
| Landon | $3,059,380 | $3,685,548 |
| Malone | ██████ | $587,691 |
| Monsma | ████████ | $0 |
| Quimby | | $74,668 |
| Reardon | $3,975,910 | $4,191,059 |
| Smith | ██████████ | $5,277,369 |
| Vitanovec | ████ | $4,113,042 |
| Waltz | $0 | $2,092,178 |
| Williams | ████ | $1,933,946 |
| Worthington | | $42,693 |
| **Total** | **$~~50,972,675~~64,101,095** | **$71,140,849** |

E.    The ~~Controlling Shareholder Defendants~~Controlling Shareholder Defendants

**71.**    ~~72. Defendants Chandler Trust~~**Defendants Chandler Trust** No. 1, Chandler

Trust No. 2, and the Chandler Sub-Trusts[2] (collectively, the "Chandler Trusts") are California

---

[2] The Chandler Sub-Trusts are:  Philip Chandler Residuary Trust No. 2, May C. Goodan Trust No. 2, Ruth C. Von Platen Trust No. 2, Dorothy B. Chandler Marital Trust No. 2, Dorothy B. Chandler Residuary Trust No. 2, HOC Trust No. 2 FBO Scott Haskins, HOC Trust No. 2 FBO John Haskins, HOC Trust No. 2 FBO Eliza Haskins, HOC GST Exempt Trust No. 2. FBO Scott Haskins, HOC GST Exempt Trust No. 2. FBO John Haskins, HOC GST Exempt Trust No. 2. FBO Eliza Haskins, Alberta W. Chandler Marital Trust No. 2, Earl E. Crowe Trust No. 2,

25

explore potential transactions and actively engaged with the Special Committee in reviewing and assessing various strategic alternatives presented to and considered by the Special Committee, and in connection with the Special Committee's ultimate determination to recommend the LBO to the Tribune Board.  The McCormick Foundation also negotiated with Zell to modify the LBO so that it would provide the McCormick Foundation with more money sooner.  Additionally, the McCormick Foundation was actively involved in Tribune's management through, among others, defendant FitzSimons, who was intimately involved in helping to facilitate the LBO.  The McCormick Foundation ~~sold or redeemed 28,023,788 shares of Tribune stock in connection with the LBO, from which it~~ received approximately $952,808,792 in cash proceeds **from the 28,023,788 shares of Tribune stock purchased or redeemed from it in connection with the LBO**.

**73.**  ~~74.~~ Defendant Cantigny Foundation is a tax-exempt charitable foundation located in Illinois that held shares of Tribune at the time of the LBO.  The investment and voting power of the Cantigny Foundation is vested in a board of five directors, all of whom are current or former Tribune executives (as mandated by the Foundations' incorporation documents), and included defendants FitzSimons, Hiller, and Smith at the time of the LBO.  The Cantigny Foundation is an affiliate of the McCormick Foundation, and at the time of the LBO, the Foundations' collective holdings in Tribune stock made them, collectively, Tribune's second largest shareholder.  The Cantigny Foundation demanded that Tribune explore potential transactions and actively engaged with the Special Committee in reviewing and assessing various strategic alternatives presented to and considered by the Special Committee, and in connection with the Special Committee's ultimate determination to recommend the LBO to the

27

Tribune Board.  The Cantigny Foundation also negotiated with Zell to modify the LBO so that it would provide the Cantigny Foundation with more money sooner.  Additionally, the Cantigny Foundation was actively involved in Tribune's management through, among others, defendant FitzSimons, who was intimately involved in helping to facilitate the LBO.  The Cantigny Foundation ~~sold or redeemed 3,259,000 shares of Tribune stock in connection with the LBO, from which it~~ received approximately $110,806,000 in cash proceeds **from the 3,259,000 shares of Tribune stock purchased or redeemed from it in connection with the LBO**.

**74.**    ~~75.~~ The Chandler Trusts, the McCormick Foundation, and the Cantigny Foundation are collectively referred to as the "Controlling Shareholders."  Together, the Controlling Shareholders held at least 33% of Tribune's stock immediately prior to the LBO.

### F.    The Zell Defendants

**75.**    ~~76.~~ Defendant Zell is a billionaire investor who is the controlling party of EGI-TRB, L.L.C. ("EGI-TRB")—the entity that entered into the Agreement and Plan of Merger (the "Merger Agreement") with Tribune on April 1, 2007, memorializing the ~~materials~~**material** terms of the LBO.  Zell was elected to the Tribune Board on May 9, 2007, before consummation of the first step of the LBO, and became the Chairman of the Tribune Board and Tribune's President and Chief Executive Officer in December 2007 when the second step of the LBO was consummated.  Zell personally and directly received at least $77,452 in cash proceeds in connection with the LBO.  Upon information and belief, Zell lives in Illinois.  Zell filed two proofs of claim in the Debtors' Chapter 11 cases.

**76.**    ~~77.~~ Defendant Equity Group Investments, L.L.C. ("EGI") is a private investment company located in Illinois.  Zell holds a controlling interest in EGI and is its President and

28

Chairman.  During the period that is on or within the 90 days prior to December 8, 2008 (the "90-Day Preference Period"), the date on which the Debtors filed for protection under the Bankruptcy Code (the "Petition Date"), Tribune made payments of not less than $586,759 to EGI to reimburse EGI for expenses it allegedly incurred in connection with the LBO (the "EGI Reimbursements").  EGI filed two proofs of claim in the Debtors' Chapter 11 cases.

**77.**  78. Defendant EGI-TRB is a Delaware limited liability company located in Illinois.  Founded for the sole purpose of consummating the LBO, EGI-TRB's business was, at all relevant times, to "engage in any activities which pertain to acquiring, owning, operating, managing, financing, selling and otherwise dealing with" Tribune and the Tribune LBO.  In connection with step one of the LBO, EGI-TRB received a $200 million unsecured subordinated note that was exchangeable for Tribune stock at Tribune's option (the "Exchangeable Note").  As set forth herein, EGI-TRB's investment in exchange for the Exchangeable Note had the attributes of an equity investment and should be recharacterized as such.

**78.**  79. In or about December 2007 and in connection with the LBO, Tribune transferred to EGI-TRB money or assets worth $206,418,859 (the "Exchangeable Note Transfer") to satisfy its purported debt obligation under the Exchangeable Note (the "Exchangeable Note Obligation").  This transaction was akin to a sale of stock, in that the**The** amount paid or credited by Tribune to EGI-TRB was based upon the price**amount** that would have been paid to EGI-TRB had the Exchangeable Note been converted to stock and the stock redeemed by Tribune (although such conversion did not actually occur).  Tribune also transferred money or assets worth approximately $2.5 million to EGI-TRB for its legal fees and other expenses in connection with the LBO (the "EGI-TRB Fee Transfers").

29

**79.**  ~~80. EGI TRB sold or~~**Tribune** redeemed 1,470,588 shares of Tribune stock **from EGI-TRB** in connection with Step Two (as defined below) of the LBO, for which ~~it~~**EGI-TRB** received $50,000,000 (the "EGI-TRB Stock ~~Sale~~**Redemption**," and, together with the EGI-TRB Fee Transfers, the Exchangeable Note Obligation, and the Exchangeable Note Transfer, the "EGI-TRB Transfers")).  ~~Upon information and belief, none of the EGI-TRB Fee Transfers were cleared or transferred to EGI-TRB through a financial institution, financial participant, or securities clearing agency.~~

**80.**  ~~81.~~ On December 20, 2007, in connection with the LBO, EGI-TRB purchased from Tribune a $225 million subordinated promissory note due December 20, 2018 (the "Subordinated Note").  The amounts purportedly owed or paid in connection with the Exchangeable Note Transfer, the Subordinated Note purchase, the EGI-TRB Stock ~~Sale~~**Redemption**, and a Tribune warrant purchased by Zell that is described below were netted against one another, resulting in a payment by EGI-TRB to the Company of approximately $56 million on December 20, 2007.  Pursuant to a subordination agreement dated as of December 20, 2007, entered into by EGI-TRB (the "Subordination Agreement"), the claims arising from the Subordinated Note, including principal and interest and all other obligations and liabilities of Tribune to EGI-TRB, are subordinate and junior to all obligations, indebtedness, and other liabilities of Tribune with certain inapplicable exceptions.  Following execution of the Subordination Agreement, EGI-TRB assigned minority interests in the Subordinated Note to ~~the Tower Defendants (defined below).~~**various entities.**  EGI-TRB filed two proofs of claim in the Debtors' Chapter 11 cases (the "EGI-TRB Proofs of Claim").  All claims of EGI-TRB reflected

30

of the Zell Defendants (other than EGI-TRB) are collectively referred to herein as the "Zell Claims."

~~85. Upon information and belief, defendants Tower CH, L.L.C., Tower DC, L.L.C., Tower DL, L.L.C., Tower EH, L.L.C., Tower Greenspun DGSPT, LLC, Tower Greenspun JGGSTP, LLC, Tower Greenspun SGFFT, LLC, Tower Greenspun, L.LC., Tower HZ, L.L.C., Tower JB, L.L.C., Tower JK, L.L.C., Tower JP, L.L.C., Tower JS, L.L.C., Tower KS, L.L.C., Tower LL, L.L.C., Tower LM, L.L.C., Tower LZ, L.L.C., Tower MH, L.L.C., Tower MS, L.L.C., Tower MZ, L.L.C., Tower NL, L.L.C., Tower PH, L.L.C., Tower PT, L.L.C., Tower SF, L.L.C., Tower TT, L.L.C., Tower VC, L.L.C., and Tower WP, L.L.C. (collectively, the "Tower Defendants") are assignees of EGI-TRB's interests in the Subordinated Note.  Upon information and belief, the Tower Defendants are affiliated or closely aligned with EGI and EGI-TRB.  Each of the Tower Defendants filed at least one proof of claim in the Debtors' Chapter 11 cases (the "Tower Proofs of Claim").  All claims of the Tower Defendants reflected on the Debtors' Schedules or the Tower Proofs of Claim are collectively referred to herein as the "Tower Claims."~~

### G.    The Advisor Defendants

**84.**    ~~86.~~ The defendants listed in the following paragraphs ~~87~~**85**-~~90~~**88** are collectively referred to as the "Advisor Defendants."

**85.**    ~~87.~~ Defendant GreatBanc Trust Company ("GreatBanc") is an Illinois corporation headquartered in Illinois.  GreatBanc was engaged by Tribune as trustee of its employee stock ownership plan ("ESOP") trust in connection with the LBO.  GreatBanc negotiated the terms of

the ESOP's investment in the LBO, including the price to be paid by the ESOP for the shares of Tribune Common Stock to be purchased by the ESOP.

**86.**    ~~88.~~ Defendant Duff & Phelps, LLC ("Duff & Phelps") is a Delaware limited liability company headquartered in Illinois.  Duff & Phelps was initially engaged by Tribune to provide a solvency opinion to Tribune in connection with either a spin-off of the Company's broadcasting operations and internal recapitalization, or the LBO.  Tribune and the Special Committee then engaged Duff & Phelps to explore Tribune's adoption of an ESOP and the ESOP's potential participation in the proposed LBO.  Shortly thereafter, GreatBanc engaged Duff & Phelps as its financial advisor in connection with the LBO.

**87.**    ~~89.~~ Defendant VRC is a financial advisory firm that provides fairness and solvency opinions in support of transactions.  VRC is headquartered in Wisconsin.  Tribune retained VRC to provide solvency opinions, and VRC provided solvency opinions, in connection with the LBO.  VRC received payments from Tribune for certain fees and expenses in connection with the LBO (the "VRC Transfers"), in an amount to be determined at trial but no less than $1,500,000.

**88.**    ~~90.~~ Defendant Morgan Stanley & Co. LLC f/k/a Morgan Stanley & Co. Incorporated ("Morgan Stanley") was engaged by the Company to act as a financial advisor to the Special Committee of the Tribune Board in connection with the LBO.  In addition, Morgan Stanley acted as a financial advisor to the Company both in 2007 and 2008.

~~91.~~ DELETED

**89.**    ~~92.~~ Non-party Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill")

acted as a financial advisor to Tribune in connection with the LBO and served as one of the lead

arrangers for the credit facilities governing the LBO financing.  Merrill is named as a defendant

in a separate action by the Litigation Trustee entitled *Kirschner v. Citigroup Global Markets,*

*Inc. and Merrill, Lynch, Pierce, Fenner & Smith Incorporated*, No. 12 CV 6055 (RJS) (the

"Advisor Action"), which was originally filed by the Committee in the Bankruptcy Court and

was transferred to this Court by the JPML for coordinated and consolidated pretrial proceedings

with this and other related actions.

**90.**    ~~93.~~ Non-party Citigroup Global Markets, Inc. ("Citigroup") acted as a financial

advisor to Tribune in connection with the LBO and served as one of the lead arrangers for the

credit facilities governing the LBO financing.  Citigroup is named as a defendant in the Advisor

Action.

### H.    The Shareholder Defendants

**91.**    ~~94.~~ Tens of thousands of persons and entities received transfers in connection

with the purchase, repurchase, or redemption of Tribune stock as a result of the LBO (the

"Shareholder Transfers").  Upon information and belief, the defendants listed on Exhibit A,

which is attached hereto and incorporated herein, received at least the Shareholder Transfers

shown therein.[3] The Litigation Trust sues the parties listed on Exhibit A as individually named

defendants.  The Controlling Shareholders, the D&O Defendants, the Additional Officer

---

[3] To comply with a protective order entered by the Bankruptcy Court as well as this Court's local rules, Plaintiff has redacted certain information from this Complaint and Exhibit A.  Pursuant to paragraph 40 of Master Case Order No. 3 [ECF No. 1395], Plaintiff will file unredacted versions of the Complaint and Exhibit A under seal contemporaneously with the filing of this ~~Fifth~~**Sixth** Amended Complaint.  A list of the names of each defendant listed on Exhibit A is attached as Exhibit A-1, which will be publicly filed with no redactions.

3333015.6

Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

Recipients, the Subsidiary D&O Defendants, Zell, and EGI-TRB also received Shareholder

Transfers as set forth herein, and, together with the defendants listed on Exhibit A, are referred

to herein as the "Shareholder Defendants."  As set forth below, the Litigation Trust sues certain

remaining, unnamed recipients of Shareholder Transfers as absent class members.

I.      **The Class Representative Defendants**

~~95. Upon information and belief, defendant Automobile Mechanics' Local 701 Pension~~

~~Fund a/k/a Automobile Mechanics' Local No. 701 Union and Industry Pension Fund is an~~

~~Illinois fund that received at least~~ ███████ ~~in cash proceeds in connection with the LBO.~~

**92.**      ~~96.~~ Upon information and belief, defendant Frank W. Denius is an individual who

resides in Texas who received at least $1,797,988 in cash proceeds in connection with the LBO.

~~97. Upon information and belief, defendant The DFA Investment Trust Company is a~~

~~Delaware statutory trust that received in connection with its Tax-Managed U.S. Equity Series,~~

~~Tax-Managed U.S. Marketwide Value Series, and U.S. Large Cap Value Series at least~~

███████ ~~in cash proceeds in connection with the LBO.~~

**93.**      ~~98.~~ Upon information and belief, defendant GDK, Inc. is a Delaware corporation

that received at least ██████████████ in cash proceeds in connection with the LBO.

~~99. Upon information and belief, defendant Hussman Strategic Growth Fund a/k/a The~~

~~Hussman Investment Trust, John P. Hussman, Trustee is a Maryland fund that received at least~~

███████ ~~in cash proceeds in connection with the LBO.~~

~~100. Upon information and belief, defendant Edwin R. Labuz IRA, Ameriprise Trust~~

~~Company f/k/a H&R Block Financial Advisors, Custodian is a Florida IRA that received at least~~

███████ ~~in cash proceeds in connection with the LBO.~~

35

**94.**   ~~101.~~ Upon information and belief, defendant Denise Meck is an individual who resides in Texas who received at least ███████ in cash proceeds in connection with the LBO.

~~102. Upon information and belief, defendant Nationwide S&P 500 Index Fund, a series of Nationwide Mutual Funds, is a Pennsylvania fund that received at least ███████ in cash proceeds in connection with the LBO.~~

**95.**   ~~103.~~ Upon information and belief, defendant New York State Teachers Retirement System is a New York pension fund that received at least ███████ in cash proceeds in connection with the LBO.

~~104. Upon information and belief, defendant Dorothy C. Patterson Irrevocable Trust #2 U/A/D 12-21-93, of which The Northern Trust Company is the successor trustee, is an Illinois trust that received at least ███████ in cash proceeds in connection with the LBO.~~

**96.**   ~~105.~~ Upon information and belief, defendant Blandina Rojek is an individual who resides in Vermont who received at least ███████ in cash proceeds in connection with the LBO.

**97.**   ~~106.~~ Upon information and belief, defendant VTrader Pro, LLC is a California limited liability corporation that received at least ███████ in cash proceeds in connection with the LBO.

**98.**   ~~107.~~ Defendants ~~Automobile Mechanics' Local 701 Pension Fund a/k/a Automobile Mechanics' Local No. 701 Union and Industry Pension Fund, Frank W. Denius, The DFA Investment Trust Company, GDK, Inc., Hussman Strategic Growth Fund a/k/a The Hussman Investment Trust, John P. Hussman, Trustee, Edwin R. Labuz IRA, Ameriprise Trust Company f/k/a H&R Block Financial Advisors, Custodian, Denise Meck, Nationwide S&P 500~~

36

~~Index Fund, a series of Nationwide Mutual Funds~~**Frank W. Denius, GDK, Inc., Denise Meck**,
New York State Teachers Retirement System, ~~Dorothy C. Patterson Irrevocable Trust #2 U/A/D~~
~~12-21-93,~~ Blandina Rojek, and VTrader Pro, LLC are collectively referred to as the "Class
Representative Defendants."

## CLASS ALLEGATIONS

**99.**   ~~108.~~ Pursuant to Rule 23(b)(1) & (b)(3) of the Federal Rules of Civil Procedure,
made applicable to this adversary proceeding by Rule 7023 of the Federal Rules of Bankruptcy
Procedure, the claims set forth in ~~Count~~**Counts** One **- A and One - B** of this Complaint are
brought against the Class Representative Defendants, individually and as representatives of a
defendant class of similarly situated persons and legal entities (the "Shareholder Class").

**100.**   ~~109.~~ The Shareholder Class is comprised of (i) all persons or legal entities that
directly or indirectly received payments, including the initial recipients and subsequent
transferees, made in exchange for the purchase and/or redemption by Tribune of at least 1,471
shares of Tribune common stock in connection with the LBO, and that in consequence were the
beneficial or legal recipients of at least $50,000 in payments by Tribune, and (ii) the guardians,
trustees, partners, administrators, custodians, fiduciaries, estates, executors, owners,
representatives, beneficiaries, members, and managers of such persons or legal entities, to the
extent they must be named as defendants in order to pursue the ~~claim~~**claims** set forth in Count
One **- A and One - B** of this Complaint against such persons or legal entities**, (iii) except (in the
case of Count One - B) for such persons or legal entities whose Shareholder Transfers are
exempt from avoidance pursuant to 11 U.S.C. § 546(e)**.  All persons and legal entities (other
than the Class Representative Defendants) that are timely and effectively served with a summons

37

and complaint in this action are excluded from the Shareholder Class as of the date of such

service ~~(the "Excluded Persons")~~.

**101.** ~~110.~~ Tribune's total payments in connection with the LBO for the purchase or

redemption of the approximately 243,121,164 outstanding shares of Tribune stock in connection

with the LBO exceeded $8 billion.  The Shareholder Transfers left the Company insolvent,

inadequately capitalized, and unable to pay its debts as they came due.

**102.** ~~111.~~ Upon information and belief, the Shareholder Class includes hundreds or

thousands of recipients.  Accordingly, the Shareholder Class is so numerous that joinder of all of

its members is impracticable.

**103.** ~~112.~~ There are questions of law and fact common to the Shareholder Class that

predominate over any issues that may involve individual members of the Shareholder Class,

including without limitation:

a. Whether Tribune, by and through certain of its officers and directors, made the Shareholder Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors;

b. Whether Tribune received less than reasonably equivalent value in exchange for the Shareholder Transfers;

c. Whether Tribune was insolvent at the time of the Shareholder Transfers, or became insolvent as a result of the Shareholder Transfers;

d. Whether, at the time of the Shareholder Transfers, Tribune was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and

e. Whether, at the time of the Shareholder Transfers, Tribune intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

104.   ~~113.~~ The Class Representative Defendants will fairly and adequately protect the interests of the entire Shareholder Class.  Any possible defenses of the Class Representative Defendants are typical of those of the Shareholder Class.  Additionally, if the Litigation Trustee obtains a judgment in his favor on the claims to avoid and recover the Shareholder Transfers set forth in ~~Count~~**Counts** One **- A and One - B** herein, then the Class Representative Defendants alone will be liable for a minimum of $~~195,196,739~~**76,061,876**.

105.   ~~114.~~ The prosecution of separate actions against the individual members of the Shareholder Class would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the Shareholder Class that would establish incompatible standards of conduct, and/or (b) adjudications with respect to individual members of the Shareholder Class that, as a practical matter, could be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

106.   ~~115.~~ A defendant class action is superior to other available methods for fairly and efficiently adjudicating this controversy because, *inter alia*, it avoids a multiplicity of individual adjudications with respect to the many thousands of individual members of the Shareholder Class, thereby conserving the resources of the Debtors' estates and of the Court.

## FACTS

**I.**   **Tribune's Business And Its Operations**

107.   ~~116.~~ Prior to filing for bankruptcy protection in December 2008, Tribune was America's largest media and entertainment company, reaching more than 80% of U.S. households through its newspapers and other publications, its television and radio broadcast

39

stations and cable channels, and its other entertainment offerings.  Headquartered in Chicago, Illinois, Tribune's operations were conducted through two primary business segments: (i) publishing, and (ii) broadcasting and entertainment.  Tribune's publishing segment owned major newspapers in many of the most significant markets in the United States, including the *Chicago Tribune*, the *Los Angeles Times*, the *Baltimore Sun*, the *South Florida Sun-Sentinel*, the *Orlando Sentinel*, and the *Hartford Courant*.  Tribune's broadcasting and entertainment segment owned numerous radio and television stations in major markets.

**108.**   ~~117.~~ As of the date that Tribune initiated its bankruptcy case, the publishing segment employed approximately 12,000 full-time equivalent employees, and the broadcasting and entertainment segment employed an additional 2,600 full-time equivalent employees.

## II.   Overview Of The Tribune LBO

**109.**   ~~118.~~ A leveraged buyout is a transaction in which the shares of a corporation—the "target"—are purchased **or redeemed** with debt that is borrowed by the target corporation itself.  The effect of a leveraged buyout is to encumber the assets of the target corporation with debt that benefits not that corporation, but rather its new owner and former shareholders, and to substitute a significant amount of debt in the place of equity in the corporation's capital structure.  In this case, Tribune incurred nearly $11 billion in debt to finance its two-step leveraged buyout (the "LBO"), bringing its total debt to more than $13 billion.  At least 25% of the payouts to shareholders in the LBO went to **the** D&O Defendants, the Subsidiary D&O Defendants, the Controlling Shareholders, and the Zell Defendants.  The LBO debt was used to line the pockets of Tribune's shareholders, directors, officers, and advisors, and left Tribune's creditors holding the proverbial bag.

40

**110.** ~~119.~~ The Tribune LBO was a unitary transaction implemented in two steps at the behest of the Company's Controlling Shareholders.  As the diagram below illustrates, prior to the LBO, Tribune had approximately $5.6 billion in funded debt obligations (*i.e.* bank or bond debt, or debt arising from similar financial instruments), and the Subsidiary Guarantors—where the majority of the Company's value resided—had none.  At the first step of the transaction ("Step One"), which closed on June 4, 2007, Tribune borrowed approximately $7 billion.  That new debt was guaranteed by the Subsidiary Guarantors, thereby ensuring that the LBO lenders would be paid before the Company's existing creditors in the event of a bankruptcy.  Of that new debt, approximately $4.3 billion was used to purchase shares from Tribune's existing shareholders at $34 per share.  At the second step of the transaction ("Step Two"), which closed on December 20, 2007, Tribune borrowed an additional approximately $3.7 billion, which was also guaranteed by the Subsidiary Guarantors.  Tribune then paid out that $3.7 billion, plus $300 million from other sources, to ~~purchase~~**redeem** the remainder of its outstanding shares from its shareholders ~~at the~~**for** $34 per share ~~price~~.

~~120.~~ Over the course of the two steps, an additional approximately $2.8 billion of the LBO Debt was used to retire Tribune's existing bank debt (the "2006 Bank Debt"), which had to be paid in full upon consummation of a transaction like the LBO pursuant to the governing credit agreements.  Approximately $284 million more was paid in fees to advisors and lenders financing the LBO, and approximately $150 million was paid as special monetary incentives to the Tribune insiders who helped facilitate and consummate the deal.  Thus, the entirety of the LBO debt—and then some—was used to pay Tribune's shareholders, LBO advisors, LBO lenders, and management, and left Tribune saddled with nearly $2.8 billion of pre-LBO debt,

41

C.      **The Tribune Board[4] Acquiesces In The Chandler Trusts' Demands, And The Controlling Shareholders Inject Themselves Into The Special Committee Process**

**127.**   ~~136.~~ In response to the demands made by the Chandler Trusts, in September

2006, the Tribune Board announced that it had established the Special Committee to oversee the

Company's exploration of alternatives.  Defendants Hernandez, Holden, Morrison, Osborn,

Reyes, Taft, and White, a majority of whom were deemed to be "'audit committee financial

experts' as defined in applicable securities laws," were named to the Special Committee.  Officer

Defendants FitzSimons, Grenesko, and/or Kenney attended all but one of the Special Committee

meetings.

**128.**   ~~137.~~ In or around October 2006, the Company retained Morgan Stanley to act as

the financial advisor to the Special Committee.  The Company agreed to, and did, pay Morgan

Stanley more than $10 million in fees and expenses (the "Morgan Stanley Advisor Fees") for

serving in that role.

**129.**   ~~138.~~ On October 2, 2006, defendant Stinehart again wrote to the Tribune Board,

on behalf of the Chandler Trusts, to ensure that the Chandler Trusts would play a significant role

in the Special Committee's deliberations.  Stinehart wrote:

> We appreciate Bill Osborn's [the Chairman of the Special Committee] call to
> [me] last week.  . . . We believe such collaboration is important to assure that the
> Chandler Trusts will be in a position to support the conclusions of the special
> committee.  This is especially important since several of the alternatives under
> consideration would likely require a vote of the stockholders and possibly other
> affirmative action by the [Chandler] Trusts.

---

[4] The term "Board," as used in paragraphs ~~136~~**127** through ~~151~~**142**, means defendants FitzSimons, Hernandez, Holden, Morrison, Osborn, Reyes, Taft, White, Chandler, Goodan, and Stinehart.

the LBO.  Consummation of the LBO would (and did) activate the premature vesting of millions of dollars in restricted stock units and stock options through an incentive compensation plan. The LBO also triggered enormous "change of control" severance payments (the "Executive Transition Payments," and together with the Phantom Equity Payments and Success Bonus Payments, collectively, the "Insider Payments") for officers let go after the LBO that were equal to three times the employee's highest annual salary during the past three years and six times the employee's target bonus for the current year.  The Merger Agreement expressly provided that the LBO would constitute a "Change of Control" under all of Tribune's various employee benefit plans, and that the surviving company—not just pre-LBO Tribune—was obligated to pay the Executive Transition Payments (the "Executive Transition Obligation").  These Executive Transition Payments resulted in more than $10 million for FitzSimons, who knew by late March that he would be terminated following the LBO.

**152.**   ~~161.~~ As set forth in paragraphs ~~49~~**48** and ~~71~~**70**, all of the Officer Defendants—each of whom played a critical role in ensuring that the LBO was consummated—and several of the Subsidiary D&O Defendants, benefitted greatly from these special monetary incentives.  The final terms of the LBO provided that the Officer Defendants and Subsidiary D&O Defendants would collectively receive nearly $80 million in special monetary incentives for closing the deal, in addition to the aggregate payments of more than $60 million that they would receive ~~for selling or redeeming~~**from the purchase or redemption of** their Tribune shares in connection with the LBO.

**153.**   ~~162.~~ Upon information and belief, Zell and EGI also communicated to certain of the D&O Defendants that they would be rewarded with a future role at Tribune if they helped

60

had never before worked on a solvency opinion that modified the definition of fair value in that fashion.  The decision to manipulate the definition of fair value in this manner completely eviscerated the protections that should have been afforded to the Company and its creditors by the solvency opinion requirements set forth in the LBO transaction documents.

**193.**  ~~202.~~ Although the engagement letter stated that VRC could assume and rely upon the reasonableness of the Company's financial forecasts and projections, and the correctness of the Company's determination of favorable federal income tax treatment to be received as part of the LBO, the engagement letter expressly provided as follows:

> VRC will, however, advise, after discussion with management with respect thereto, and based on its inquiries and its experience in reviewing such liabilities, (i) whether anything has come to VRC's attention in the course of its engagement which has led it to believe that any such financial forecasts and projections are unreasonable or that any such information or data is inaccurate in any material respect, or (ii) whether VRC has reason to believe that it was unreasonable for VRC to utilize and rely upon such financial forecasts, projections, information and data, or that there has been any material adverse change with respect to the Company.

## IX.  Lured By The Financial Incentives Associated With The LBO, The Controlling Shareholders And Tribune Directors Facilitate And Approve The Transaction

### A.  Zell Induces The Controlling Shareholders And Chandler Trust Representatives To Support The LBO By Proposing A Higher ~~Purchase~~ Price For Shareholders

**194.**  ~~203.~~ On March 30, 2007, the Special Committee directed defendant Osborn, who worked through Company management, including defendants FitzSimons and Kenney, to improve and finalize the Zell proposal.  Over the course of the next 24 hours, Tribune, the ESOP, EGI, and the Chandler Trusts negotiated the agreements respecting Zell's proposal.  In the course of these negotiations, EGI-TRB agreed to increase the price to be paid to Tribune's stockholders to $34 per share.  EGI-TRB further agreed that its initial $250 million investment in

**B.    The Special Committee And Tribune Board Breach Their Fiduciary Duties By Approving The LBO**

**202.**    ~~211.~~ On April 1, 2007, the Special Committee unanimously recommended that the Tribune Board approve the "Zell/ESOP transaction to acquire Tribune for $34 per share." The Director Defendants (other than Taft who was absent and Stinehart, Goodan, and Chandler, who abstained from voting) then voted to agree to Zell's proposal, and caused Tribune to enter into the Merger Agreement contemplating that the LBO would proceed in a two-step transaction. In the first step, Tribune would incur approximately $7.015 billion in debt to retire its existing bank facility, and purchase approximately 50% of the Company's outstanding shares (126,000,000 shares) in a tender offer for $34 per share.  In the second step, Tribune would incur approximately $3.7 billion in additional debt to ~~purchase~~**redeem** its remaining outstanding shares for $34 per share in a go-private merger following certain regulatory and shareholder approvals.

**203.**    ~~212.~~ The LBO enabled the members of the Special Committee to reap aggregate payments of more than $6 million, and enabled the other members of the Tribune Board to collectively pocket tens of millions of dollars more from **the purchase or redemption of their** stock ~~sales~~ and **from** special incentives, all at Tribune's expense.  The members of the Special Committee and the Tribune Board, in respectively recommending and approving the LBO, breached the fiduciary duties of care, good faith, and loyalty that they owed to the Company and to its creditors.

**204.**    ~~213.~~ Minutes from the Special Committee and Tribune Board meetings show that the Special Committee and Tribune Board completely disregarded the interests of the Company and its existing creditors, and focused exclusively on providing shareholders with the highest

82

complexity of accounting issues that can reasonably be expected to be raised by the company's financial statements.

**212.** ~~221.~~ Other Special Committee members were equally sophisticated.  For example, White held a Stanford MBA, worked as a management consultant at McKinsey, and became Chairman and CEO of Abbott Laboratories; Morrison received an MBA from Wharton, and served as CEO of the 3M Company, Kraft Foods, and Quaker Oats, and as Vice Chairman of the ~~Coca Cola~~**Coca-Cola** Company; and Hernandez is or has been the President and Chief Executive Officer of Inter-Con Security Systems, Chairman of the ~~board~~**Board** of Nordstrom, Inc., and a director on the boards of McDonald's Corp., Chevron Corp., and Wells Fargo & Co.

**213.** ~~222.~~ In short, the absurdity of the proposed LBO should have been even more obvious to the highly sophisticated, financially literate members of the Tribune Board and Special Committee than it was to the rest of the world.

**214.** ~~223.~~ Significantly, prior to the submission of Zell's proposal, the Special Committee spent substantial time reviewing the Company's projections and its ability to handle increased leverage (albeit, materially less leverage than the LBO Debt) in connection with its consideration of various strategic alternatives in which shareholders would continue to maintain an ownership interest in the Company.



86

**XI.**   **The Company Engages In Intentional Fraud In Order To Close Step One**

    **A.**   **The D&O Defendants, Controlling Shareholders, Zell, And Advisor Defendants Purport To Rely On The Outdated, Unreasonably Optimistic February 2007 Projections In Order To Obtain A Step One Solvency Opinion**

    **249.**   ~~258.~~ Incentivized to ensure that the LBO was consummated so that they could obtain the lucrative payments associated with ~~selling~~**the purchase or redemption of** their shares in the LBO and the special monetary incentives offered by Zell, the D&O Defendants, the Controlling Shareholders, Zell, and the Advisor Defendants purported to rely on the unrealistic February 2007 Projections even as each month's below-projection performance showed conclusively that they could not be achieved.

    **250.**   ~~259.~~ As should have been reasonably expected, the Company's actual operating cash flows through May 2007, right before Step One closed, materially failed to meet even the relatively modest projections for early 2007 set forth in the February 2007 Projections, and definitively showed that the projections were unreasonable.  As of May 2007, operating cash flow for six newspapers accounting for more than 91% of the Company's publishing business was 24% off of 2006 results, and 14% off of the February 2007 projections.  Similarly, the Company's publishing segment as a whole was 21.5% off of its 2006 results, and 12% off of the February 2007 Projections.

    **251.**   ~~260.~~ To make up the ground the publishing segment lost through May and achieve the February 2007 Projections for the full calendar year, the publishing segment's weekly operating cash flow for June through December 2007 would have to have been 38% higher than it was from January through May.  This meant that the Company would have had to

99

**XIII.**   **The Company's Fiduciaries Ignore The Company's Performance And The Cacophony Of Voices Warning Against The LBO And Permit The Transaction To Proceed**

**A.**   **The Special Committee And The Tribune Board[5] Breach Their Fiduciary Duties In Connection With Step One**

**271.**   ~~280.~~ The Tribune Board met only twice between the time that the LBO was approved and the time that Step One closed, and the Special Committee met only once during that period. The Director Defendants were all financially sophisticated, and information demonstrating the folly of the February 2007 Projections was provided to them. The Tribune Board received regular reports of the Company's performance and thus had the information necessary to determine that the February 2007 Projections were not realistic. Nevertheless, neither the Tribune Board nor the Special Committee minutes reflect any meaningful analysis of the February 2007 Projections on which the VRC Step One Solvency Opinion was based, nor consideration of whether the Company's actual performance, which was significantly below that forecast in the February 2007 Projections, rendered the VRC Step One Solvency Opinion unreliable or the LBO inadvisable. Additionally, although the Director Defendants knew, or were reckless or grossly negligent in not knowing, of all of the flaws in the VRC analysis, including VRC's extraordinary change to the definition of fair value, none of the Director Defendants questioned why VRC had made the modification or whether or how it would affect VRC's conclusions. Rather, enticed by the financial incentives and the ability to escape the Company's downward spiral at a premium price, both the Special Committee and the Tribune Board charged head-long into a transaction that reaped tens of millions of dollars for their

---

[5] The term "Board," as used in paragraph ~~280~~**271** means defendants FitzSimons, Hernandez, Holden, Morrison, Osborn, Reyes, Taft, White, Chandler, Goodan, Stinehart, and Zell.

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

members, but left the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due.  In so doing, the Special Committee and the Tribune Board breached the fiduciary duties of care, good faith, and loyalty that they owed to the Company.

**272.** ~~281.~~ Moreover, neither Stinehart, Goodan, nor Chandler, who knew that the optimistic outlook embodied in the February 2007 Projections was, in Stinehart's words, "hard to believe," voiced any concern respecting the LBO.  Satisfied that the interests of their "special constituency" were protected, the Chandler Trust Representatives remained silent.

### B. The Subsidiary D&O Defendants Approve The Subsidiary Guarantees Through A Grossly Deficient And Conflicted Process

**273.** ~~282.~~ On June 4, 2007, the Subsidiary D&O Defendants also abdicated their fiduciary duties by authorizing the Subsidiary Guarantors to guarantee the LBO Debt used to consummate Step One and part of Step Two of the LBO.[6]  These Subsidiary Guarantees were essential to the LBO.  The LBO Lenders would not lend the LBO Debt unless they obtained guarantees from the Subsidiary Guarantors to guarantee the LBO Debt used to consummate the LBO.  Thus, without the guarantees, Tribune could not obtain the LBO Debt, and without the LBO Debt, Tribune could not consummate the LBO.

**274.** ~~283.~~ The Subsidiary Guarantors received none of the proceeds of the LBO Debt that the Subsidiary Guarantees unconditionally obligated them to repay.  Instead, more than $8 billion of the proceeds were immediately used to consummate the LBO, such as buying Tribune's shares, paying inducements to Tribune's directors and officers, and paying tens of

---

[6] The following Subsidiary Guarantors were not signatories to the guarantees executed on June 4, 2007, but executed joinders to those guarantees on December 20, 2007:  Eagle Publishing Investments, LLC; Eagle New Media Investments, LLC; Newport Media, Inc. (~~now~~later known as Tribune MD, Inc.); Star Community Publishing Group, LLC; Stemweb, Inc.; ForSaleByOwner.com; Homeowners Realty, Inc.; and Internet Foreclosure Service, Inc.

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

dollars ~~by selling or redeeming~~**from the purchase or redemption of** their Tribune stock in connection with the LBO, but again, only if the LBO was consummated.  The Subsidiary D&O Defendants were aware that the LBO could be consummated only if the Subsidiary D&O Defendants approved the Subsidiary Guarantees.  The unanimous written consents the Subsidiary D&O Defendants signed approving the guarantees expressly stated that the Subsidiary Guarantees were a "condition precedent to the Lenders making advances" on the obligations incurred in connection with the LBO.

### C.    Step One Of The LBO Closes

**278.**    ~~287.~~ On June 4, 2007, the Company consummated Step One of the LBO, and Tribune repurchased and retired 126 million shares of common stock at a purchase price of $34 per share using proceeds from the Senior Loan Agreement.  Presented with an opportunity to cash out of a rapidly deteriorating company at a premium price, Tribune's shareholders tendered 92% of Tribune's stock, rendering the tender offer significantly oversubscribed.  Tribune used the remainder of the Step One proceeds to refinance the 2006 Bank Debt and commercial paper and to pay transaction fees.  The new debt carried significantly higher interest rates than the 2006 Bank Debt, causing material harm to Tribune.

**279.**    ~~288.~~ Consummation of Step One rendered the Company balance sheet insolvent, unable to pay its debts as they came due, and inadequately capitalized.

111

315. ~~324.~~ In addition to its unreasonable adoption of the October 2007 Projections, VRC's Step Two solvency analysis carried over many of the same flaws and skewed assumptions that infected its Step One solvency analysis, including VRC's novel and unjustified definition of "fair value," the improper equal weighting that VRC assigned to its different valuation methodologies, VRC's failure to apply any minority or marketability discounts in connection with its determination of the value of Tribune's equity investments, and VRC's reliance on comparable company and transaction valuation approaches that used companies materially different from Tribune or its investments.

316. ~~325.~~ VRC's Step Two analysis included the following additional significant flaws:

   a.   VRC accepted the Officer Defendants' direction to use a value nearly 50% lower than the face amount of the PHONES Notes for purposes of calculating the liability arising from those obligations.

   b.   VRC used discount rates in its DCF analysis that did not properly reflect the risk of achieving forecasted future cash flows, particularly regarding assumptions for growth in Tribune's Interactive business.

   c.   VRC ignored market-based information that was (or should have been) readily available to VRC that contradicted VRC's Step Two opinion that Tribune was solvent as of December 20, 2007.

## XVIII. Tribune's Fiduciaries Fail, Once Again, To Protect The Company

   ### A.   The Tribune Board[7] And Special Committee Breach Their Fiduciary Duties In Connection With VRC's Step Two Solvency Opinion

317. ~~326.~~ As noted above, the Tribune Board (excluding Zell, and with Taft absent and the Chandler Trust Representatives abstaining), voted to approve the LBO, including Step Two,

---

[7] The term "Board," as used in paragraphs ~~326~~317 through ~~342~~333, means defendants FitzSimons, Hernandez, Holden, Morrison, Osborn, Reyes, Taft, White, and Zell.

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

on April 1, 2007.  On December 18, 2007, ~~The~~the Tribune Board (including Zell and Taft) met again in connection with Step Two.  The Special Committee purportedly gathered separately for a meeting that lasted, at most, fifteen minutes, and, according to draft minutes that were never finalized, resolved to recommend to the Tribune Board that it rely on the VRC Step Two solvency opinion and direct management to take all steps necessary to consummate Step Two. The Tribune Board did not hold an additional vote as to whether the Company should proceed with Step Two.

**318.**    ~~327.~~ As with the Step One solvency opinion, neither the Tribune Board nor the Special Committee board minutes reflect any meaningful analysis of the projections on which the VRC Step Two solvency opinion was based, or discussion of the faulty assumptions employed by VRC.  Given the Company's worsening financial performance, the declining state of the publishing industry, and the worsening state of the economy, no reasonable person could have believed that incurring an additional $4 billion of debt would not plunge the Company further into insolvency.  Enabling the Company to consummate Step Two of the LBO did, however, ensure that the Director Defendants, Officer Defendants, and Foundations would be able to ~~sell~~**have Tribune redeem** their remaining shares in ~~Tribune at a price~~**the Company for an amount** that was well above the shares' actual value, despite the inevitable consequences of placing the mountainous LBO Debt on the Company.  This was the ESOP "escape" plan that Stinehart laid out in July 2006.  By failing to act to prevent such consequences, the Director Defendants breached the fiduciary duties of loyalty, good faith, and due care that they owed to the Company.

127

Subsidiary D&O Defendants stood to receive if—but only if—the LBO closed, as well as the millions of dollars the Subsidiary D&O Defendants stood to receive ~~by selling or redeeming~~**from the purchase or redemption of** their Tribune stock in Step Two of the LBO.  In approving the Subsidiary Guarantees, the Subsidiary D&O Defendants breached the fiduciary duties of loyalty, good faith, and due care that they owed to the Subsidiary Guarantors.

**B.    Morgan Stanley Fails To Inform Tribune Of Its Concerns
          That Tribune Would Be Insolvent If Step Two Closed**

**321.**    ~~330.~~ ████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████

**322.**    ~~331.~~ Morgan Stanley understood from the beginning that this work concerning Step Two included evaluating issues concerning Tribune's solvency.  A September 20, 2007 email between senior Morgan Stanley representatives noted that:  "The scope of the work will be:  i) reviewing the 5/9/07 solvency opinion rendered by Valuation Research Corp, ii) replicating their analysis, and iii) making sure that VRC (based on their initial analysis) would still today render an opinion that Tribune remains a solvent entity." ████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████

banking on him to make this work, and he said 'I don't make commitments I can't keep."  In an email later the same day to JPMorgan's CEO, Lee reiterated his support for the LBO based on Zell's personal "commitment" to Lee, and his spin on the deal, rather than on financial fundamentals:  "Jamie I spoke to sam this am to get his confirmation that the company was solvent and he was going to make good on his commitment to me to make this deal work . . . .  It was an excellent call—he said all the right things."

**341.**  ~~350.~~ Others involved in the LBO also recognized Zell's ability to make the deal happen notwithstanding that it would render the Company insolvent.  As one Morgan Stanley banker viewed it after concluding that the Company would have "negative equity value" following the LBO:  "[T]his deal is happening because zell is soo f-n rich."

**342.**  ~~351.~~ As defendant FitzSimons stated in a December 19, 2007 press release, the transaction could not have happened had it not been for Zell.

## XIX.  The LBO Closes And Tribune Collapses Under Its Massive Debt Burden

**343.**  ~~352.~~ On August 21, 2007 Tribune's remaining shareholders voted on the merger. Although the substantial risks to the Company arising out of the LBO were obvious, 97% percent of voting shareholders voted in favor of the merger.

**344.**  ~~353.~~ On December 20, 2007, the Company completed Step Two of the LBO and ~~repurchased~~**redeemed** the remaining 119 million shares of common stock outstanding ~~at a purchase price of~~**for** $34 per share.  **It did so by cancelling those shares and automatically converting them into the right to receive $34 per share.**

**345.**  ~~354.~~ In order to fund the ~~repurchase~~**redemption**, Tribune took on another approximately $3.7 billion of debt, bringing its total funded debt to approximately $13.7 billion.

136

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

**349.** ~~358.~~ In early 2008, just weeks after the close of Step Two, the Company implemented a 5% workforce reduction in its publishing segment.  In announcing this reduction in a memo dated February 13, 2008, Zell discussed "the reality of [the Company's] significant debt levels," and "significant declines in advertising volume at our newspapers . . . putting downward pressure on our cash flow.  On July 14, 2008, the Associated Press reported that the *Los Angeles Times* planned to cut 250 positions, explaining "[l]ast December, Tribune bought out its public shareholders in an $8.2 billion deal orchestrated by real estate mogul Sam Zell. Now, he and Tribune are struggling to service that debt."

**350.** ~~359.~~ On or about March 5, 2008, *less than three months after Step Two closed*, Tribune hired bankruptcy lawyers from the law firm of Sidley Austin LLP to advise the Company on ways to escape the detrimental ramifications of the LBO Debt, including a potential bankruptcy filing.  ~~On~~

**351.**     **At the December 1, 2008 meeting of the Tribune Board, the Tribune Board terminated Morgan Stanley's engagement as financial advisor to Tribune.**

**352.**     **On or about December 2, 2008—less than one week before Tribune's bankruptcy filing—Tribune paid Morgan Stanley the amount of $46,020.47, by wire transfer, in respect of certain expenses Morgan Stanley purportedly incurred in connection**

138

**with its engagement as financial advisor to Tribune (the "Morgan Stanley**

**Reimbursement").**

353.   **On** December 8, 2008, less than a year after Step Two closed, Tribune and nearly

all of the Subsidiary Guarantors filed voluntary petitions for relief under the Bankruptcy Code.[8]

In an affidavit filed in connection with the bankruptcy filing, defendant Bigelow stated that for

the quarterly period ended September 28, 2008, Tribune had approximately $7.6 billion in

assets—$6.9 billion less than the midpoint of the asset value set forth in VRC's Step Two

solvency opinion—and $13.9 billion of total liabilities—a number that, unlike the VRC Step

Two solvency opinion, properly included the PHONES debt at face value.  Bigelow stated

further that "the newspaper industry generally is in the midst of an unprecedented decline which

has only been exacerbated by the current recession," and noted the constraints placed on the

Company by virtue of the mountainous debt it had incurred in connection with the LBO.

Bigelow specified that "[i]n December, 2008 alone, the Debtors face debt service and related

payments of approximately $200 million, with another $1.3 billion due in 2009."  Bigelow stated

that these "substantial debt service requirements," among other things, required the Debtors to

seek bankruptcy protection.

354.   360. The Debtors remained in bankruptcy for more than four years.  On August

10, 2012, Tribune's then President and Chief Executive Officer stated in a sworn affidavit that as

of that date, the Company had incurred approximately $400 million in fees and expenses in

connection with the bankruptcy proceeding.  During the pendency of the bankruptcy proceeding,

---

[8] The Subsidiary Guarantors that filed bankruptcy petitions are indicated on Exhibit B.

neither Tribune nor the LBO Lenders presented any evidence that the Company was solvent at

Step Two.

DELETED

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

DELETED

—                                        —                      .

141

DELETED

—

—

—

370. At the December 1, 2008 meeting of the Tribune Board, the Tribune Board terminated Morgan Stanley's engagement as financial advisor to Tribune.

371. On or about December 2, 2008—less than one week before Tribune's bankruptcy filing—Tribune paid Morgan Stanley the amount of $46,020.47, by wire transfer, in respect of certain expenses Morgan Stanley purportedly incurred in connection with its engagement as financial advisor to Tribune (the "Morgan Stanley Reimbursement").

142

DELETED

143

## GROUNDS FOR RELIEF

### COUNT ONE - A [Dismissed; Subject to Appeal]
### Avoidance And Recovery Of The Shareholder Transfers (Of At Least $8 Billion) As Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And 550(a) Of The Bankruptcy Code Against The Shareholder Defendants And The Shareholder Class

355. ~~376.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

356. ~~377.~~ The Shareholder Transfers are all of the transfers made in connection with the purchase, repurchase, or redemption of Tribune stock as a result of the LBO, as identified in Paragraph ~~94~~**91**.

357. ~~378.~~ The Shareholder Transfers were made within two years of the Petition Date.

358. ~~379.~~ Tribune, by and through certain of its officers, directors, shareholders, and agents, made the Shareholder Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts that:

    a.    The D&O Defendants stood to receive millions of dollars through the ~~sale~~**purchase or redemption** of their Tribune shares and the receipt of special monetary incentives if the LBO was consummated;

    b.    The Officer Defendants recommended that the Tribune Board approve the LBO notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that the LBO would render the Company insolvent, inadequately capitalized, and/or unable to pay its debts as they came due;

    c.    Certain of the Officer Defendants prepared, instructed, and/or induced VRC to rely on the patently unreasonable February 2007 Projections and October 2007 Projections, notwithstanding that these Officer Defendants knew, or were reckless or grossly negligent in not knowing, that the projections were not prepared by, and were actively concealed from, the members of Tribune management with direct knowledge of facts that rendered them unreasonable, and that these Officer Defendants knew, or were reckless or grossly negligent in not knowing, that Tribune would have to vastly outperform its own 2006 performance and its 2007 performance to date in order to meet the February 2007 Projections and October 2007 Projections, that the February 2007 Projections and October 2007

144

and October 2007 Projections from members of management who had knowledge of facts that rendered them unreasonable; concealing from VRC and from the Board that the February 2007 Projections and October 2007 Projections were inaccurate, unjustified, based on unreasonable assumptions, and inconsistent with the Company's performance; and misrepresenting to VRC that Morgan Stanley had agreed with management's unreasonable assumptions concerning the prospective ability of Tribune to refinance its debt.

360. ~~381.~~ Accordingly, each of the Shareholder Transfers was a transfer in fraud of the rights of the creditors of Tribune and its subsidiaries, and the Shareholder Transfers should be avoided and recovered pursuant to Sections 548(a)(1)(A) and 550(a) of the Bankruptcy Code.

### COUNT ONE - B
### Avoidance And Recovery Of The Shareholder Transfers (Of At Least $8 Billion) As Constructive Fraudulent Transfers Under Sections 548(a)(1)(B) And 550(a) Of The Bankruptcy Code Against The Shareholder Defendants (Except Those Listed on Exhibit A-2) And The Shareholder Class

**361.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.**

**362.     The Shareholder Transfers are all of the transfers made in connection with the purchase, repurchase, or redemption of Tribune stock as a result of the LBO, as identified in Paragraph 91.**

**363.     The Shareholder Transfers were made within two years of the Petition Date.**

**364.     On or about June 4, 2007, Tribune transferred approximately $4.3 billion in Shareholder Transfers to its shareholders, including the Shareholder Defendants and members of the Shareholder Class, in connection with Step One.  Tribune paid the Shareholder Defendants and the members of the Shareholder Class a premium price of $34 per share in the tender offer.  Prior to the LBO, Stinehart observed that the Company's per share value could be as low as (or even lower than) $21 per share.**

147

**365.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion in Shareholder Transfers to its shareholders, including the Shareholder Defendants and members of the Shareholder Class, in connection with Step Two.  Tribune redeemed the remaining shares of the Shareholder Defendants and the members of the Shareholder Class at the same premium amount of $34 per share.**

**366.    Because Tribune was rendered insolvent, the shares that Tribune purchased, repurchased, or redeemed at Step One and Step Two were worthless to Tribune.  Tribune received less than reasonably equivalent value in exchange for the Shareholder Transfers at each of Step One and Step Two.**

**367.    At the time of Step One, Tribune (i) was insolvent or became insolvent as a result of the Shareholder Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.**

**368.    At the time of Step Two, Tribune (i) was insolvent or became insolvent as a result of the Shareholder Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.**

**369.    Accordingly, each of the Shareholder Transfers was a transfer in constructive fraud of the rights of the creditors of Tribune and its subsidiaries, and the**

148

**Shareholder Transfers should be avoided and recovered pursuant to Sections 548(a)(1)(B) and 550(a) of the Bankruptcy Code.**

### COUNT TWO
### Violations Of Delaware General Corporation Law Sections 160 And/Or 173
### Against The Director Defendants And Zell

**370.** ~~382.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

**371.** ~~383.~~ Section 160(a)(1) of the Delaware General Corporation Law (the "DGCL") provides, in relevant part, that "no corporation shall . . . [p]urchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation."

**372.** ~~384.~~ Section 173 of the DGCL provides that "[n]o corporation shall pay dividends except in accordance with this chapter."

**373.** ~~385.~~ Pursuant to Section 174 of the DGCL, the directors of a corporation are jointly and severally liable for "willful or negligent violation of § 160 or § 173."

**374.** ~~386.~~ Tribune provided cash and/or property to its shareholders as a result of the LBO.  The payments made by Tribune in connection with the LBO were, in substance, unlawful dividends and/or stock purchases **or redemptions** in violation of Sections 160 and/or 173 of the DGCL.  The Director Defendants and Zell are jointly and severally liable for the amount of such dividends and/or stock purchases **or redemptions** due to their willful or negligent approval and/or facilitation of the transfer of the payments, while Tribune lacked a sufficient surplus or net profits or was otherwise insolvent, in violation of the DGCL, including without limitation Sections 160, 173, and 174.

149

from the ~~sale~~**purchase or redemption** of their stock in connection with the LBO.  These financial benefits were not available to many Company stakeholders who were to remain stakeholders following the LBO.  Due to these direct financial incentives, the Director Defendants were interested in, and/or lacked independence with respect to, the LBO.

**383.**  ~~395.~~ The Director Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty, by, among other things:

a.  Acting in their own interests by approving the LBO and LBO Transfers, and permitting Steps One and Two to close even though they knew, or were reckless or grossly negligent in not knowing, that it would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due;

b.  Succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO, which benefitted the Controlling Shareholders but was detrimental to the Company the Director Defendants were obligated to serve;

c.  Transferring virtually all of the Company's value to Tribune's shareholders and/or the LBO Lenders, by causing the Subsidiary Guarantors to enter into the Subsidiary Guarantees;

d.  Seeking to ensure that the LBO Lenders would be paid in advance of Tribune's and its subsidiaries' existing creditors, by creating Holdco and Finance and authorizing the complex transactions resulting in intercompany obligations from the Company's publishing subsidiaries to Finance;

e.  Relying on the advice of outside advisors that the Director Defendants knew, or were reckless or grossly negligent in not knowing, was proffered by parties with a financial interest in the consummation of the LBO and was not credible;

f.  Relying on the patently unreasonable February 2007 Projections and October 2007 Projections, notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that those projections were proffered to the Tribune Board by officers with a financial interest in the consummation of the LBO, and that they knew, or were reckless or grossly negligent in not knowing, that Tribune would have to vastly outperform its own 2006 performance, and its 2007

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

**391.** ~~403.~~ As an officer of Tribune, each Officer Defendant was obligated by his duty of loyalty to place Tribune's interests above any interest possessed by the Officer Defendant that was not shared by the corporation generally.

**392.** ~~404.~~ As an officer of Tribune, each Officer Defendant was obligated by his duty of good faith not to intentionally fail to act in the face of a known duty to act.

**393.** ~~405.~~ Nearly all of the Officer Defendants owned shares in Tribune prior to and after approval of the LBO, and received material cash proceeds, in many instances millions of dollars, from the ~~sale~~**purchase or redemption** of their stock in connection with the LBO.  In addition, the Officer Defendants collectively received millions of dollars in special incentives for completing the LBO.  These financial benefits were not available to many Company stakeholders who were to remain stakeholders following the LBO.  Due to these direct financial benefits, the Officer Defendants were interested in, and/or lacked independence with respect to, the LBO.

**394.** ~~406.~~ The Officer Defendants, acting both individually and collectively, failed to exercise the necessary care, and breached their respective duties of good faith, care, and loyalty, by, among other things:

    a.    Acting in their own interests by recommending the LBO to the Tribune Board, facilitating the closing of Steps One and Two, and ultimately allowing the LBO to close, even though they knew, or were reckless or grossly negligent in not knowing, that it would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due;

    b.    Succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO, which favored interests other than those of the Company they were obligated to serve;

    c.    Preparing, instructing, and inducing VRC to rely on the patently unreasonable February 2007 Projections and October 2007 Projections, notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that the

154

dollars, from the ~~sale~~**purchase or redemption** of their stock in connection with the LBO.  The

Zell Defendants knew that these cash proceeds were not available to many Company

stakeholders who were to remain stakeholders following the LBO.  The Zell Defendants knew

that, due to these direct financial benefits, each of the Director Defendants, the Officer

Defendants, and the Controlling Shareholders was interested in, and/or lacked independence

with respect to, the LBO.

**416.**  ~~428.~~ The Zell Defendants proposed, as part of the LBO, substantial financial

incentives for the Officer Defendants to consummate the transaction, and otherwise knew that

each of the Officer Defendants stood to receive additional substantial financial incentives upon

completion of the LBO, and that these financial incentives were not available to many Company

stakeholders who were to remain stakeholders following the LBO.  The Zell Defendants knew

that, due to these direct financial benefits, the Officer Defendants were interested in, and/or

lacked independence with respect to, the LBO.

**417.**  ~~429.~~ The Zell Defendants knew that the Chandler Trust Representatives had a

fiduciary duty to represent the interests of Tribune to the exclusion of other interests, and that

they separately had duties to the Chandler Trusts that were different from and inconsistent with

their duties to Tribune.  The Zell Defendants also knew that the Chandler Trust Representatives

had an interest in obtaining the highest purchase price possible for Tribune's shares as quickly as

possible, irrespective of the amount of leverage involved, and that that interest was inconsistent

with the Company's interest in remaining viable following the LBO.

**418.**  ~~430.~~ The Zell Defendants knowingly exploited these conflicts of interest and

participated in the breaches of fiduciary duty of the Director Defendants, the Officer Defendants,

160

**421.** ~~433.~~ Tribune has been substantially damaged as a direct and proximate result of the actions of the Zell Defendants in aiding and abetting the breaches of fiduciary duties set forth fully herein.

**422.** ~~434.~~ Accordingly, Plaintiff is entitled to judgment against the Zell Defendants in an amount to be determined at trial, including but not limited to the amount of the harm incurred by the Company as a result of the LBO, and disgorgement of any amounts paid to the Zell Defendants or from which Zell benefited that were made in connection with the LBO.

**COUNT SEVEN**
**Avoidance And Recovery Of The EGI-TRB Transfers (Of At Least $258,918,859) As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code**
**Against EGI-TRB**

**423.** ~~435.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

**424.** ~~436.~~ The EGI-TRB Transfers include the EGI-TRB Stock ~~Sale~~**Redemption**, the Exchangeable Note Obligation, the Exchangeable Note Transfer (which, as set forth herein and in Count Thirty Two, was actually a transfer made on account of equity and not antecedent debt), and the EGI-TRB Fee Transfers, as defined in Paragraphs **78 and** 79 ~~and 80~~, which EGI-TRB received in connection with the LBO.

**425.** ~~437.~~ The EGI-TRB Transfers were made within two years of the Petition Date.

**426.** ~~438.~~ Tribune, by and through certain of its officers, directors, shareholders, and agents, made the EGI-TRB Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts set forth in Paragraphs ~~379~~**358** and ~~380~~**359**, which are incorporated herein by reference.

162

**COUNT ELEVEN**

**Avoidance And Recovery Of The EGI Reimbursements (Of At Least $586,759) As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code Against EGI**

**454.** ~~466.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

**455.** ~~467.~~ The EGI Reimbursements were made within two years of the Petition Date.

**456.** ~~468.~~ Tribune, by and through certain of its officers, directors, shareholders, and agents, made the EGI Reimbursements with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts set forth in Paragraphs ~~379~~**358** and ~~380~~**359**, which are incorporated herein by reference.

**457.** ~~469.~~ Tribune received less than reasonably equivalent value for the EGI Reimbursements, and Tribune, at the time of the EGI Reimbursements, (i) was insolvent or became insolvent as a result of the EGI Reimbursements; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

**458.** ~~470.~~ Accordingly, the EGI Reimbursements were transfers in fraud of the rights of the creditors of Tribune and its subsidiaries, and the EGI Reimbursements should be avoided and recovered pursuant to Sections 548(a)(1)(A), 548(a)(1)(B), and 550(a) of the Bankruptcy Code.

167

hundreds of thousands or millions of dollars, from the ~~sale~~**purchase or redemption** of their

stock in connection with the LBO.  In addition, the Subsidiary D&O Defendants collectively

received millions of dollars in special incentives for completing the LBO.  None of these

financial incentives were available to Company stakeholders who were to remain stakeholders

following the LBO.  Due to these direct financial benefits, the Subsidiary D&O Defendants were

interested in, and/or lacked independence with respect to, the LBO and the approval of the

Subsidiary Guarantees on behalf of the Subsidiary Guarantors.

**465.**   ~~477.~~ The Subsidiary D&O Defendants, acting both individually and collectively,

failed to exercise the necessary care, and breached their respective duties of good faith, care, and

loyalty, by, among other things:

a.   Acting in their own interests by approving the Subsidiary Guarantees on behalf of
the Subsidiary Guarantors, facilitating the closing of Steps One and Two, and
ultimately allowing the LBO to close, even though they knew, or were reckless or
grossly negligent in not knowing, that their conduct would render the Subsidiary
Guarantors insolvent, inadequately capitalized, and unable to pay their debts as
they came due;

b.   Approving the Subsidiary Guarantees on behalf of the Subsidiary Guarantors
without conducting any due diligence or independent investigation whatsoever,
and failing to engage in any deliberative process or to exercise any business
judgment as to whether the Subsidiary Guarantees were in the best interest of the
Subsidiary Guarantors or their creditors, even though the Subsidiary Guarantees
rendered the Subsidiary Guarantors insolvent and provided no value to the
Subsidiary Guarantors;

c.   Succumbing to financial incentives and catering to external influences in
approving the Subsidiary Guarantees on behalf of the Subsidiary Guarantors, and
thereby facilitating the LBO, which favored interests other than those of the
Subsidiary Guarantors they were obligated to serve;

d.   Engaging in self-dealing by approving the Subsidiary Guarantees on behalf of the
Subsidiary Guarantors, and thereby facilitating the LBO which harmed the
Subsidiary Guarantors, in order to obtain a personal gain; and

169

507.   ~~519.~~ VRC was retained by Tribune to serve as one of Tribune's professional financial advisors in connection with the LBO and to, among other things, provide a series of solvency opinions with respect thereto.

508.   ~~520.~~ As Tribune's professional financial advisor, VRC had a duty to use the same degree of knowledge, skill, and ability as would an ordinarily careful professional in similar circumstances.

509.   ~~521.~~ VRC deviated from the standard of care expected of a professional financial advisor or solvency opinion provider under these circumstances, and acted in bad faith, engaged in willful misconduct, and/or was grossly negligent, by, among other things, taking the actions, or failing to act, as set forth in paragraph ~~515~~503, which is incorporated herein by reference.

510.   ~~522.~~ Tribune has been substantially damaged as a direct and proximate result of VRC's professional malpractice, as set forth fully herein.  The D&O Defendants could not have consummated the LBO without the solvency opinions provided by VRC.

511.   ~~523.~~ Accordingly, Plaintiff is entitled to judgment against VRC in an amount to be determined at trial.

### COUNT EIGHTEEN
### Avoidance And Recovery Of The VRC Transfers (Of At Least $1.5 Million) As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code Against VRC

512.   ~~524.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

513.   ~~525.~~ The VRC Transfers are the payments from Tribune to VRC for certain fees and expenses in connection with the LBO identified in Paragraph ~~89~~87.

514.   ~~526.~~ The VRC Transfers were made within two years of the Petition Date.

180

**515.** ~~527.~~ Tribune, by and through certain of its officers, directors, shareholders, and agents, made the VRC Transfers with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts set forth in Paragraphs ~~379~~**358** and ~~380~~**359**, which are incorporated herein by reference.

**516.** ~~528.~~ Tribune received less than reasonably equivalent value for the VRC Transfers, and Tribune (i) at the time of the VRC Transfers was insolvent or became insolvent as a result of the VRC Transfers; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

**517.** ~~529.~~ Accordingly, the VRC Transfers were transfers in actual and constructive fraud of the rights of the creditors of Tribune and its subsidiaries, and the VRC Transfers should be avoided and recovered pursuant to Sections 548(a)(1)(A), 548(a)(1)(B), and 550(a) of the Bankruptcy Code.

### COUNT NINETEEN
### Aiding And Abetting Breach Of Fiduciary Duty
### Against GreatBanc And Duff & Phelps

**518.** ~~530.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

**519.** ~~531.~~ As officers and directors of Tribune, the D&O Defendants owed Tribune fiduciary duties of good faith, care, and loyalty.  As Tribune was rendered insolvent as a result of the LBO, the D&O Defendants owed fiduciary duties to all of Tribune's stakeholders, including its creditors, who were harmed due to Tribune's inability to pay them in full.

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

**526.** ~~538.~~ Accordingly, Plaintiff is entitled to judgment against GreatBanc and Duff &

Phelps in an amount to be determined at trial.

## COUNT TWENTY
**Avoidance And Recovery Of The Morgan Stanley Advisor Fees (At Least $10 Million) As Constructive And/Or Actual Fraudulent Transfers Under Sections 548(a)(1)(A) And (B) And 550(a) Of The Bankruptcy Code Against Morgan Stanley**

**527.** ~~539.~~ Plaintiff repeats and realleges each and every allegation set forth in the

foregoing paragraphs as though fully set forth herein.

**528.** ~~540.~~ The Morgan Stanley Advisor Fees are the payments from Tribune to Morgan

Stanley for certain fees and expenses identified in Paragraph ~~137~~**128**.

**529.** ~~541.~~ By October 2006, the Company engaged Morgan Stanley to advise the

Special Committee to the Tribune Board in connection with a potential financial transaction.

**530.** ~~542.~~ Pursuant to the Company's engagement of Morgan Stanley, Tribune

transferred or caused to be transferred the Morgan Stanley Advisor Fees to Morgan Stanley.

**531.** ~~543.~~ The Morgan Stanley Advisor Fees were paid within two years of the Petition

Date.

**532.** ~~544.~~ Tribune, by and through certain of its officers, directors, shareholders, and

agents, transferred the Morgan Stanley Advisor Fees with the actual intent to hinder, delay, and

defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts set

forth in Paragraphs ~~379~~**358** and ~~380~~**359**, which are incorporated herein by reference.

**533.** ~~545.~~ Tribune received less than reasonably equivalent value for the Morgan

Stanley Advisor Fees, and Tribune, at the time of the payment of the Morgan Stanley Advisor

Fees, was (i) insolvent or became insolvent as a result of the Morgan Stanley Advisor Fees;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction,

184

**550.** ~~562.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

**551.** ~~563.~~ The Morgan Stanley Reimbursement is the payment from Tribune to Morgan Stanley for certain expenses purportedly incurred by Morgan Stanley identified in Paragraph ~~371~~**352**.

**552.** ~~564.~~ The Morgan Stanley Reimbursement was made to Morgan Stanley within 90 days of the Petition Date.

**553.** ~~565.~~ The Morgan Stanley Reimbursement was made for the benefit of Morgan Stanley, for or on account of antecedent debt and made while Tribune was insolvent.

**554.** ~~566.~~ The Morgan Stanley Reimbursement enabled Morgan Stanley to receive more than it would have received if (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Morgan Stanley Reimbursement had not been made; and (iii) Morgan Stanley received payment of its debts under the provisions of the Bankruptcy Code.

**555.** ~~567.~~ Accordingly, the Morgan Stanley Reimbursement should be avoided and recovered pursuant to Sections 547(b) and 550(a) of the Bankruptcy Code.

## COUNT TWENTY FOUR
## [Dismissed]

DELETED

188

DELETED

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

DELETED

—

## COUNT TWENTY FIVE
### Breach Of Fiduciary Duty Against Morgan Stanley

**556.** ~~576.~~ Plaintiff repeats and realleges each and every allegation set forth in the

foregoing paragraphs as though fully set forth herein.

**557.** ~~577.~~ As described above, Morgan Stanley was engaged by the Company in 2006

as a financial advisor to advise the Special Committee with respect to various issues relating to

the LBO and other potential restructuring transactions, including issues concerning the solvency

of the Company assuming completion of the LBO.  In late 2007, Morgan Stanley also agreed to

advise the Company with respect to various issues relating to the LBO.  **The Company**

**provided Morgan Stanley, in its capacity as financial advisor, with highly confidential**

**financial information concerning the Company, including internal financial projections.**  In

its role as financial advisor to the Company and Special Committee from 2006 to 2007, ~~and as~~

~~financial advisor to the Company in 2008,~~ Morgan Stanley occupied a special position of trust

and confidence in relation to the Company and in the conduct of the Company's business and

190

thereby owed fiduciary obligations to the Company and the Special Committee, including the duty of loyalty.

**558.**   ~~578.~~ Morgan Stanley breached its duty of loyalty to the Company and Special Committee by taking the actions, or failing to act, as set forth in ~~paragraphs 552~~**paragraph 540**, which is incorporated herein by reference.

~~579. The Company provided Morgan Stanley, in its capacity as financial advisor, with highly confidential financial information concerning the Company, including internal financial projections and information concerning bankruptcy planning.~~

DELETED

191

DELETED

**559.** ~~583.~~ The Company has been substantially damaged as a direct and proximate result of Morgan Stanley's breaches of fiduciary duties set forth herein.

**560.** ~~584.~~ Accordingly, Plaintiff is entitled to recover damages from Morgan Stanley in an amount to be determined at trial.

**COUNT TWENTY SIX**
**[Dismissed]**

DELETED

**COUNT TWENTY SEVEN**
**[Dismissed]**

192

DELETED

## COUNT TWENTY EIGHT
### [Dismissed]

DELETED

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

DELETED

## COUNT TWENTY NINE
## [Dismissed]

DELETED

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

DELETED

## COUNT THIRTY
### [Dismissed]

DELETED

## COUNT THIRTY ONE
### Unjust Enrichment Against The D&O Defendants,
### Subsidiary D&O Defendants, Controlling Shareholders, Zell Defendants,
### ~~Tower Defendants,~~ VRC, GreatBanc, Duff & Phelps, And Morgan Stanley

**561.** ~~608.~~ Plaintiff repeats and realleges each and every allegation set forth in the

foregoing paragraphs as though fully set forth herein.

**562.** ~~609.~~ By virtue of their own wrongful acts and omissions, and through the

wrongful receipt of payments and distributions from Tribune at a time when Tribune was

insolvent or became insolvent as a result of the LBO, the D&O Defendants, the Subsidiary D&O

Defendants, Controlling Shareholders, Zell Defendants, ~~Tower Defendants,~~ VRC, GreatBanc,

195

Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

Duff & Phelps, and Morgan Stanley have unjustly retained cash, credit, and other things of value that belong to Tribune, their retention of which violates fundamental principles of justice, equity, and good conscience.

**563.** ~~610.~~ The Subsidiary D&O Defendants, Controlling Shareholders, Zell Defendants, ~~Tower Defendants,~~ VRC, GreatBanc, Duff & Phelps, and Morgan Stanley are therefore liable to Tribune for unjust enrichment.

**564.** ~~611.~~ Plaintiff seeks restitution from these defendants and an order of this Court disgorging all payments, transfers, credit, profits, fees, benefits, incentives, and other things of value obtained by the defendants as a result of their wrongful conduct and breaches of fiduciary duties.

**565.** ~~612.~~ By virtue of the foregoing, these defendants are liable to reimburse Tribune by the amount of the payments, profits, fees, benefits, incentives, and other compensation they received in connection with the LBO.

**COUNT THIRTY TWO**
**Recharacterization Of The Exchangeable Note As Equity**
**Pursuant To 11 U.S.C. § 105**

**566.** ~~613.~~ Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

**567.** ~~614.~~ EGI-TRB contributed $200 million to Tribune in exchange for the Exchangeable Note. EGI-TRB was not a true creditor nor was the Exchangeable Note a true debt instrument. As reflected in Tribune's April 2, 2007 press release and Tribune's internal documents, this money was an "invest[ment]" by Zell in Tribune, which was intended to be used to pay shareholders who tendered their shares at Step One of the LBO. This money was in fact

196

would be automatically exchanged for shares of Tribune stock without any further action by

Tribune or EGI-TRB.  Repayment of the principal and accrued interest was only required upon,

and was therefore dependent upon, the success of the LBO.

**573.** ~~620.~~ The amount paid or credited by Tribune to EGI-TRB in exchange for the

Exchangeable Note was based upon the ~~price~~**amount** that would have been paid to EGI-TRB

had the Exchangeable Note been converted to stock and the stock redeemed by Tribune.

**574.** ~~621.~~ The Exchangeable Note was a *sui generis* instrument tailored to Zell's and

EGI-TRB's participation in the LBO, and under the circumstances a reasonable outside creditor

would not have made a loan to the Company on similar terms.

**575.** ~~622.~~ The proceeds that the Company received in return for the Exchangeable

Note were used to finance and pay fees for the LBO, rather than to finance the Company's

ordinary business.

**576.** ~~623.~~ No sinking fund was established in connection with the Exchangeable Note.

**577.** ~~624.~~ Based on the real nature of the Exchangeable Note, the Exchangeable Note

should be recharacterized as equity pursuant to Section 105 of the Bankruptcy Code.

### COUNT THIRTY THREE
**Equitable Subordination And Disallowance Of The D&O Creditor
Claims, Subsidiary Creditor Claims, Zell Claims, <u>And</u>
EGI-TRB Claims~~, And Tower Claims~~**

**578.** ~~625.~~ Plaintiff repeats and realleges each and every allegation set forth in the

foregoing paragraphs as though fully set forth herein.

**579.** ~~626.~~ The D&O Defendants, the Subsidiary D&O Defendants, Zell, **and** EGI-

TRB~~, and the Tower Defendants~~ were insiders as defined by Section 101(31) of the Bankruptcy

Code at the time of the transaction.

198

580.   ~~627.~~ None of the D&O Defendants, Subsidiary D&O Defendants, Zell

Defendants, **or** EGI-TRB~~, or Tower Defendants~~ have paid the amount, or turned over any

property, for which any such defendant is liable.

581.   ~~628.~~ The D&O Defendants, Subsidiary D&O Defendants, and Zell Defendants

engaged in a pattern of misconduct designed to enrich themselves at the expense of Tribune, the

Subsidiary Guarantors, and their stakeholders, including creditors, by, among other things:

a.   Approving the LBO, and permitting Steps One and Two to close even though they knew, or were reckless or grossly negligent in not knowing, that the LBO would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due;

b.   Failing, at every stage of the LBO, to adequately analyze the impact that the LBO would have on the Company and those parties who would continue to be creditors and/or constituents of the Company, and voting in favor of and/or advocating for the LBO, notwithstanding that they knew, or were reckless or grossly negligent in not knowing, that it would render the Company insolvent, inadequately capitalized, and unable to pay its debts as they came due;

c.   Advocating for and facilitating consummation of Step Two of the imprudent and highly leveraged LBO that rendered Tribune insolvent, and knowingly, recklessly, grossly negligently, and/or willfully blindly disregarding the foreseeable disastrous consequences of the LBO; and

d.   Succumbing to financial incentives and catering to external influences in facilitating and advocating for the LBO, which benefited the Controlling Shareholders, the D&O Defendants, the Subsidiary D&O Defendants, and Zell Defendants, but was detrimental to the Company and those parties who would continue to be creditors and/or constituents of the Company.

582.   ~~629.~~ The misconduct of the D&O Defendants, Subsidiary D&O Defendants, and

Zell Defendants described herein was inequitable, and resulted in injury to Tribune's and the

Subsidiary Guarantors' stakeholders, including creditors.

583.   ~~630.~~ EGI-TRB ~~and the Tower Defendants~~ knew, or were reckless or grossly

negligent in not knowing, of the inequitable misconduct of the D&O Defendants, Subsidiary

199

Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

D&O Defendants, and Zell Defendants described herein, and that such misconduct would result in injury to Tribune's and the Subsidiary Guarantors' stakeholders, including creditors.

**584.** ~~631.~~ Any claims arising from the Subordinated Note, including principal and interest, and all other obligations and liabilities of Tribune to EGI-TRB ~~or the Tower Defendants~~, are contractually subordinate and junior to all obligations, indebtedness and other liabilities of Tribune with certain inapplicable exceptions.  To the extent that any such claims are not already fully contractually subordinated, however, they should be equitably subordinated to all other claims, and/or disallowed.

~~632. Because EGI-TRB assigned minority interests in the Subordinated Note to the Tower Defendants, EGI-TRB thereby assigned the Tower Claims to the Tower Defendants.  If the Tower Claims had not been assigned to the Tower Defendants — and instead had been asserted by, on behalf of, or for the benefit of EGI-TRB — each Tower Creditor Claim would have been subject to equitable subordination and disallowance pursuant to Sections 510(c) and 502(d), respectively, of the Bankruptcy Code.  Thus, each Tower Creditor Claim should be equitably subordinated and/or disallowed to the same extent that it would have been had EGI-TRB not assigned the Tower Claims and, instead, continued to hold such claims.~~

**585.** ~~633.~~ Equitable subordination and disallowance of the D&O Creditor Claims, Subsidiary Creditor Claims, Zell Claims, **and** EGI-TRB Claims~~, and Tower Claims~~ is consistent with the provisions and purposes of the Bankruptcy Code.

**586.** ~~634.~~ Accordingly, the D&O Creditor Claims, Subsidiary Creditor Claims, Zell Claims, **and** EGI-TRB Claims~~, and Tower Claims~~ should be equitably subordinated and/or disallowed.

200

590. ~~638.~~ Within two years before the Petition Date, Tribune:  (i) incurred or

reaffirmed the obligations to make the Insider Payments listed on Exhibit C; and (ii) made the

Insider Payments summarized below and detailed in Exhibit C.

| Recipient | Total Insider Payments Received |
|---|---|
| Amsden | $150,000 |
| Bigelow | $709,825 |
| FitzSimons | $18,850,800 |
| Gremillion | $250,000 |
| Grenesko | $9,591,707 |
| Hianik | $175,000 |
| Hiller | $8,708,843 |
| Kazan | $626,226 |
| Kenney | $600,000 |
| Knight | $5,553,513 |
| Landon | $5,261,105 |
| Leach | $6,102,303 |
| Lewin | $3,359,821 |
| Mallory | $1,053,500 |
| Malone | $1,200,000 |
| Reardon | $7,672,605 |
| Smith | $9,214,806 |
| Vitanovec | $4,950,166 |
| Waltz | $2,153,467 |
| **Total** | **$86,183,687** |

591. ~~639.~~ Tribune, by and through certain of its officers, directors, shareholders, and

agents, incurred or reaffirmed the obligations to make the Insider Payments and made the Insider

Payments with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is

demonstrated by, among other things, the facts set forth in Paragraphs ~~379~~**358** and ~~380~~**359**,

which are incorporated herein by reference.

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

**604.** ~~652.~~ Tribune, by and through certain of its officers, directors, shareholders, and agents, incurred the Indemnification Obligations with the actual intent to hinder, delay, and defraud Tribune's creditors, which intent is demonstrated by, among other things, the facts set forth in Paragraphs ~~379~~**358** and ~~380~~**359**, which are incorporated herein by reference.

**605.** ~~653.~~ Accordingly, the Indemnification Obligations were incurred in actual and constructive fraud of the rights of the creditors of Tribune and its subsidiaries, and the Indemnification Obligations should be avoided pursuant to Sections 548(a)(1)(A) and 548(a)(1)(B) of the Bankruptcy Code.

## RESERVATION OF RIGHTS

**606.** ~~654.~~ The Litigation Trustee reserves the right, to the extent permitted under the Bankruptcy Code, the Federal Rules of Civil or Bankruptcy Procedure, or by agreement, to assert any claims relating to the subject matter of this action or otherwise relating to the Debtors and their estates against any third party.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff respectfully requests that this Court enter judgment against defendants as follows:

(a) certifying the Shareholder Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b) awarding Plaintiff damages in an amount to be determined at trial;

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

(c)     declaring each of the Shareholder Transfers to be a transfer or incurrence of an obligation in actual **and/or constructive** fraud of the rights of the creditors of Tribune and its subsidiaries and/or a transfer that preferred certain creditors to the detriment of others;

(d)     declaring each of the VRC Transfers, EGI-TRB Transfers, EGI Reimbursements, Morgan Stanley Advisor Fees, Morgan Stanley Reimbursement, Indemnification Obligations, and Insider Payments to be a transfer or incurrence of an obligation in actual and/or constructive fraud of the rights of the creditors of Tribune and its subsidiaries and/or a transfer that preferred certain creditors to the detriment of others;

(e)     avoiding and/or granting recovery of all amounts paid and/or obligations incurred in connection with the Shareholder Transfers, VRC Transfers, EGI-TRB Transfers, EGI Reimbursements, Morgan Stanley Advisor Fees, Morgan Stanley Reimbursement, Indemnification Obligations, and Insider Payments pursuant to Bankruptcy Code Sections 547 and/or 548 and/or 550;

(f)     imposing a constructive trust on assets of the defendants in the amount of all proceeds received by each such defendant in connection with the LBO;

(g)     recharacterizing the Exchangeable Note as equity;

(h)     equitably subordinating and disallowing the ~~MSCS Claim, the~~ D&O Creditor Claims, Subsidiary Creditor Claims, Zell Claims, **and** EGI-TRB Claims~~, and Tower Claims~~;

~~(i)     denying the MSCS setoff and ordering the payment of MSCS's Swap Agreement debt;~~

207

(j~~i~~) awarding Plaintiff ~~its~~**his** attorneys' fees, costs, and other expenses

incurred in this action;

(~~k~~**j**) awarding Plaintiff pre- and post-judgment interest at the maximum rate

permitted by law; and

(~~l~~**k**) awarding Plaintiff such other and further relief as the Court deems just and

proper.

Dated: ~~August 2, 2013~~_____**, 2018**
New York, New York

_____
Lawrence S. Robbins
Michael L. Waldman
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411L
Washington, D.C. 20006
(202) 775-4500
lrobbins@robbinsrussell.com
mwaldman@robbinsrussell.com

*Counsel for the Tribune Litigation Trust with
respect to claims against all defendants except
Bank of America and any of its affiliates in their
individual and custodial capacities, The Bank of
New York Mellon Corporation and any of its
affiliates in their individual and custodial
capacities, Duff & Phelps, LLC,* ~~*Fidelity
Management Trust Co. and any of its affiliates in
their individual and custodial capacities,*~~
*GreatBanc Trust Company, David Dean Hiller,
Intel Corporation, Liberty Mutual Insurance
Co., Merrill Lynch & Co., Inc. and any of its
affiliates in their individual and custodial
capacities, Morgan Stanley & Co. LLC and any
of its affiliates in their individual and custodial
capacities,* ~~*Morgan Stanley Capital Services,
Inc. and any of its affiliates in their individual
and custodial capacities,*~~ *Perry Partners L.P.,*

208

*TD Bank, NA, UBS AG and any of its affiliates in their individual and custodial capacities, UBS SA and any of its affiliates in their individual and custodial capacities, and Valuation Research Corporation*

_____

Robert J. Lack
~~Hal Neier~~
~~Amy C. Brown~~
Jeffrey R. Wang
**Christopher M. Colorado**
FRIEDMAN KAPLAN SEILER
& ADELMAN LLP
7 Times Square
New York, NY 10036-6516
(212) 833-1100
rlack@fklaw.com
~~hneier@fklaw.com~~
**jwang@fklaw.com**
~~abrown~~**ccolorado**@fklaw.com
~~jwang@fklaw.com~~

*Counsel for the Tribune Litigation Trust with respect to claims against* **Miles D. White,** *GreatBanc Trust Company, Duff & Phelps, LLC, Valuation Research Corporation, Morgan Stanley & Co. LLC,* ~~*Morgan Stanley Capital Services, Inc.,*~~ *and those defendants with respect to which "FKSA" is identified as "LT Counsel" in Exhibit A*

209

_____

David M. Zensky
Mitchell P. Hurley
Deborah J. Newman
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
 (212) 872-1000
dzensky@akingump.com
mhurley@akingrump.com
djnewman@akingump.com

*Counsel for the Tribune Litigation Trust with respect to claims against Dennis J. FitzSimons, Enrique Hernandez Jr., Betsy D. Holden, Robert S. Morrison, William A. Osborn, J. Christopher Reyes, Dudley S. Taft, Jeffrey Chandler, Roger Goodan, William Stinehart Jr., Chandler Bigelow, Donald C. Grenesko, Mark W. Hianik, Daniel G. Kazan, Crane H. Kenney, Thomas D. Leach, Luis E. Lewin,  R. Mark Mallory, Harry Amsden, Stephen D. Carver, Thomas S. Finke, Robert Gremillion, David Dean Hiller, Timothy P. Knight, Timothy J. Landon, Richard H. Malone, Durham J. Monsma, Irving L. Quimby, John E. Reardon, Scott C. Smith, John J. Vitanovec, Kathleen M. Waltz, David D. Williams, John D. Worthington IV, Samuel Zell, Equity Group Investments, L.L.C., EGI-TRB, L.L.C., Sam Investment Trust, Tower CH, L.L.C., Tower DC, L.L.C., Tower DL, L.L.C., Tower EH, L.L.C., Tower Greenspun DGSPT, LLC, Tower Greenspun JGGSTP, LLC, Tower Greenspun SGFFT, LLC, Tower Greenspun, L.L.C., Tower HZ, L.L.C., Tower JB, L.L.C., Tower JK, L.L.C., Tower JP, L.L.C., Tower JS, L.L.C., Tower KS, L.L.C., Tower LL, L.L.C., Tower LM, L.L.C., Tower LZ, L.L.C., Tower MH, L.L.C., Tower MS, L.L.C., Tower MZ, L.L.C., Tower NL, L.L.C.,*

210

*~~Tower PH, L.L.C., Tower PT, L.L.C., Tower SF, L.L.C., Tower TT, L.L.C., Tower VC, L.L.C., Tower WP, L.L.C.,~~ Chandler Trust No. 1, Chandler Trust No. 2,  Philip Chandler Residuary Trust No. 2, May C. Goodan Trust No. 2, Ruth C. Von Platen Trust No. 2, Dorothy B. Chandler Marital Trust No. 2, Dorothy B. Chandler Residuary Trust No. 2, HOC Trust No. 2 FBO Scott Haskins, HOC Trust No. 2 FBO John Haskins, HOC Trust No. 2 FBO Eliza Haskins, HOC GST Exempt Trust No. 2. FBO Scott Haskins, HOC GST Exempt Trust No. 2. FBO John Haskins, HOC GST Exempt Trust No. 2. FBO Eliza Haskins, Alberta W. Chandler Marital Trust No. 2, Earl E. Crowe Trust No. 2, Patricia Crowe Warren Residuary Trust No. 2, Helen Garland Trust No. 2 (For Gwendolyn Garland Babcock), Helen Garland Trust No. 2 (For William M. Garland III), Helen Garland Trust No. 2 (For Hillary Duque Garland), Garland Foundation Trust No. 2, Marian Otis Chandler Trust No. 2, Robert R. McCormick Foundation, Cantigny Foundation, ~~Automobile Mechanics' Local 701 Pension Fund a/k/a Automobile Mechanics' Local No. 701 Union and Industry Pension Fund, Frank W. Denius, The DFA Investment Trust Company, GDK Inc., Hussman Strategic Growth Fund a/k/a The Hussman Investment Trust, John P. Hussman, Trustee, Edwin R Labuz IRA, Ameriprise Trust Company f/k/a H&R Block Financial Advisors, Custodian, Denise Meck, Nationwide S&P 500 Index Fund, a Series of Nationwide Mutual Funds~~* **Frank W. Denius, GDK Inc., Denise Meck**, *New York State Teachers Retirement System, ~~Dorothy C. Patterson Irrevocable Trust #2 U/A/D 12-21-93, The Northern Trust Company, as Successor Trustee,~~ Blandina Rojek, VTrader Pro, LLC, and those defendants with respect to which "Akin" is identified as "LT Counsel" in Exhibit A*

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM

_____
David S. Rosner
Sheron Korpus
Christine **A.** Montenegro
Matthew B. Stein
Paul J. Burgo
KASOWITZ BENSON TORRES ~~&~~
~~FRIEDMAN~~ LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
drosner@kasowitz.com
skorpus@kasowitz.com
cmontenegro@kasowitz.com
mstein@kasowitz.com
pburgo@kasowitz.com

*Counsel for the Tribune Litigation Trust with
respect to claims against those defendants with
respect to which "Kasowitz" is identified as "LT
Counsel" in Exhibit A*

3333015.6
Fifth Amended FitzSimons Complaint and Proposed Sixth Amended FitzSimons Complaint
3/5/2018 3:11:44 PM