19-3049-cv; 19-449-cv
*In re: Tribune Co. Fraudulent Conv. Litig.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **August 20, 2021**

August Term 2020

(Argued: August 24, 2020    Decided: August 20, 2021)

Docket Nos. 19-3049-cv; 19-449-cv

IN RE: TRIBUNE COMPANY FRAUDULENT CONVEYANCE LITIGATION

MARC S. KIRSCHNER, AS LITIGATION TRUSTEE FOR THE TRIBUNE LITIGATION TRUST,
*Plaintiff-Appellant,*

*- against -*

LARGE SHAREHOLDERS, FINANCIAL ADVISORS, FINANCIAL INSTITUTION HOLDERS,
FINANCIAL INSTITUTION CONDUITS, PENSION FUNDS, INDIVIDUAL BENEFICIAL
OWNERS, MUTUAL FUNDS,
*Defendants-Appellees.*

CERTIFIED COPY ISSUED ON 08/20/2021

MARC S. KIRSCHNER, AS LITIGATION TRUSTEE FOR THE TRIBUNE LITIGATION TRUST,
*Plaintiff-Appellant,*

*- against -*

CITIGROUP GLOBAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED,
*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:

RAGGI and CHIN, *Circuit Judges.*[*]

Appeals from a judgment and orders of the United States District

Court for the Southern District of New York (Sullivan and Cote, *JJ.*) dismissing

claims arising out of the leveraged buyout of the Tribune Company in 2007 and

its bankruptcy filing in 2008.   The bankruptcy litigation trustee contends on

---

[*]   Our late colleague Judge Ralph K. Winter was originally assigned to this panel.
The two remaining members of the panel, who are in agreement, have decided this case
in accordance with Second Circuit Internal Operating Procedure E(b).  *See* 28 U.S.C.
§ 46(d); *United States v. Desimone*, 140 F.3d 457, 458–59 (2d Cir. 1998).

appeal that the district court erred in dismissing his claims against the Tribune

Company's shareholders and financial advisors for fraudulent transfer, breach of

fiduciary duty, and related causes of action. The bankruptcy litigation trustee

also contends that the district court erred in denying leave to amend his

complaint.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

---

LAWRENCE S. ROBBINS (Roy T. Englert, Jr., *on the brief*), Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, DC; Robert J. Lack, Jeffrey R. Wang, Friedman Kaplan Seiler & Adelman LLP, New York, New York; David M. Zensky, Akin Gump Strauss Hauer & Feld LLP, New York, New York, *for Plaintiff-Appellant*.

DOUGLAS HALLWARD-DRIEMEIR, (Jonathan Ference-Burke *on the brief*), Ropes & Gray LLP, Washington, DC; Andrew Devore, Joshua Sturm, Ropes & Gray LLP, Boston, MA; Philip D. Anker, Alan E. Schoenfeld, Ryan Chabot, Wilmer Cutler Pickering Hale & Dorr LLP, New York, New York; Joel W. Millar, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC; Matthew L. Fornshell, Ice Miller LLP, Columbus, Ohio; Andrew J. Entwistle, Entwistle & Cappucci LLP, New York, New York; Mark A. Neubauer, Carlton Fields, LLP, Los Angeles, California; P. Sabin Willett, Michael C. D'Agostino, Morgan, Lewis & Bockius LLP, Boston, Massachusetts;

Michael S. Doluisio, Dechert LLP, Philadelphia, Pennyslvania, *for Defendants-Appellees Pension Funds, Financial Institution Holders, Individual Beneficial Owners, Mutual Funds, Certain Large Shareholders, and Financial Institution Conduits.*

ERIN E. MURPHY, Kirkland & Ellis LLP, Washington, DC; Gabor Balassa, Brian Borchard, Kirkland & Ellis LLP, Chicago, Illinois; Oscar Garza, Douglas G. Levin, Gibson, Dunn & Crutcher LLP, Irvine, California; Matthew D. McGill, Gibson, Dunn & Crutcher LLP, Washington, D.C., *for Defendants-Appellees Large Shareholders.*

KANNON K. SHANMUGAM (Masha G. Hansford, Joel S. Johnson, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, D.C.; Andrew G. Gordon, Kira A. Davis, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York; Daniel L. Cantor, Daniel S. Shamah, O'Melveny & Myers LLP, New York, New York, *for Defendants-Appellees Citigroup Global Markets, Inc. and Merrill Lynch, Pierce, Fenner & Snith Inc.*

JONATHAN D. POLKES (Gregory Silbert, Stacy Nettleton, *on the brief*), Weil, Gotshal & Manges LLP, New York, New York; George E. Mastoris, Winston & Strawn LLP, New York, New York, *for Defendants-Appellees Financial Advisors.*

- 4 -

CHIN, *Circuit Judge*:

In 2007, the Tribune Company ("Tribune"), then-publicly traded, executed a leveraged buyout (the "LBO") to go private. Less than a year later, Tribune filed for Chapter 11 bankruptcy. Plaintiff-appellant Marc Kirschner, the bankruptcy litigation trustee (the "Trustee"), brought fraudulent conveyance and other claims on behalf of creditors against shareholders who sold their stock in the LBO and against the financial advisors that helped Tribune navigate and complete the LBO. In several orders and decisions, the district court dismissed the Trustee's claims for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

For the reasons set forth below, we **AFFIRM in part, VACATE in part**, and **REMAND** for further proceedings.

# BACKGROUND

## I. *The Facts*

The facts alleged in the operative complaints are assumed to be true for purposes of this appeal.[2]

Prior to its bankruptcy in 2008, Tribune was a media company that owned numerous radio and television stations and major national newspapers, including *The Chicago Tribune*, *The Los Angeles Times*, and *The Baltimore Sun*. In 2005, the newspaper publishing industry faced severe decline and, by 2006, Tribune, which derived approximately 75% of its total revenues from such publishing, started faltering financially. In September 2006, Tribune's board of directors (the "Board") created a special committee (the "Special Committee") to consider ways to return value to Tribune's shareholders. The Special Committee was comprised of all seven of the Board's independent directors (the "Independent Directors").

---

[2]     In Appeal No. 19-3049, the operative complaint is the Fifth Amended Complaint in No. 12-CV-2652, referred to by the district court as the *FitzSimons* action. In Appeal No. 19-449, the operative complaint is the First Amended Complaint in No. 12-CV-6055, referred to by the district court as the *Citigroup* action.

A.     *Tribune Retains Advisors*

Before the formation of the Special Committee, the Board hired two financial advisors, defendant-appellee Merrill, Lynch, Pierce, Fenner, and Smith, Inc. ("Merrill Lynch") on October 17, 2005 and defendant-appellee Citigroup Global Markets, Inc. ("Citigroup") on October 26, 2005, to conduct a strategic review and to recommend possible responses to the ongoing changes in the media industry.  Both Merrill Lynch and Citigroup signed engagement letters, which promised each a "Success Fee" of $12.5 million if a "Strategic Transaction" was completed.  The engagement letters also allowed each firm to play a role in helping to finance any such "Strategic Transaction," despite the potential conflict of interest inherent in the firms' distinct roles in any such deal.  The engagement letters further specified that neither Merrill Lynch nor Citigroup was a fiduciary.

On October 17, 2006, the Special Committee hired Morgan Stanley & Co. LLC f/k/a Morgan Stanley & Co. Inc. ("Morgan Stanley") to serve as its independent financial advisor.  Morgan Stanley's engagement letter specified that the firm owed no fiduciary duty to Tribune.

### B.   *Proposed LBO*

In early 2007, Sam Zell, an investor, proposed to take Tribune private.  At this time, defendants-appellees Chandler Trust No. 1, Chandler Trust No. 2, and certain Chandler sub-trusts (collectively, the "Chandler Trusts") held approximately 20% of Tribune's publicly-held shares.  The Robert R. McCormick Foundation and the Cantigny Foundation (collectively, the "Foundations") held another 13% of shares.  The Special Committee sought the views of the Chandler Trusts and the Foundations (together, the "Large Shareholders") on Zell's proposal.  Concerned that Tribune's stock price would fall before they could sell their shares, the Large Shareholders indicated that they would only vote for a two-step LBO that allowed them to cash out during the first step.  In response, Zell suggested a two-step LBO, in which, at Step One, Tribune would borrow money to buy back roughly half of its shares and, at Step Two, Tribune would borrow more money to purchase all remaining shares.  Tribune would then merge with a specially created shell corporation.  The new entity would become an S Corporation, resulting in nearly $1 billion in anticipated tax savings.  In considering whether to approve the LBO, the Board consulted Citigroup and Merrill Lynch.

To secure financing for the LBO, Tribune needed an opinion stating that it would be solvent after each step of the proposed LBO.  On February 13, 2007, the Board hired Duff & Phelps to provide such a solvency opinion.  Toward that end, Tribune gave Duff & Phelps financial projections predicting that Tribune would fare better in the second half of 2007 as compared to the same period from the year prior (the "February Projections").  These figures were created by Tribune's management team, which, according to the Trustee, had a conflict of interest because its members stood to cash out Tribune shares worth $36 million and reap other gains if an LBO were executed.

After conducting its analysis, Duff & Phelps concluded it could not provide a solvency opinion without considering the $1 billion in tax savings that Tribune expected at Step Two.  Duff & Phelps, however, also determined that considering such tax savings in a solvency opinion was not appropriate.  Accordingly, on April 1, 2007, Duff & Phelps instead provided a "viability opinion," which concluded that the fair market value of Tribune's assets would exceed its liabilities after the close of the LBO.

The same day, Morgan Stanley and Merrill Lynch issued fairness opinions that the price to be paid for Tribune's stock was fair.  These opinions

were filed with the SEC as proxy statements.  Also, on April 1, 2007, the Special

Committee unanimously voted to recommend the two-step LBO, which the

Board ultimately approved.

## C.    *Implementation of LBO*

Still in need of a solvency opinion to secure financing for the

approved LBO, Tribune approached Houlihan Lokey, which declined, on March

29, 2007, to bid for the engagement.  On April 11, 2007, Tribune retained

Valuation Research Company ("VRC") to provide two solvency opinions, one for

Step One and one for Step Two.  To secure the engagement, VRC, "a virtually

unknown firm," agreed to use a non-standard approach in formulating its

solvency opinions.  3049 Appellant's Br. at 12–13.[3]  VRC charged Tribune $1.5

million -- VRC's highest fee ever for such an engagement -- to issue the solvency

opinions.

On May 24, 2007, VRC issued an opinion that Tribune would be

solvent after completing Step One.  According to the Trustee, however, after

---

[3]    References to "3049 Appellant's Br." and "449 Appellant's Br." refer to the
Trustee's briefs in Appeal Nos. 19-3049 and 19-449, respectively.

VRC issued this solvency opinion, Tribune's management team realized that the February Projections, upon which VRC's opinion was based, were no longer an accurate forecast of Tribune's 2007 second half performance. No one alerted VRC that Tribune was unlikely to meet the February Projections. Indeed, the Trustee alleges that Citigroup and Merrill Lynch reviewed VRC's solvency analysis but "failed to fulfill their responsibilities as 'gatekeepers' retained to objectively analyze the LBO." 449 Appellant's Br. at 8.

Despite the issue with VRC's solvency opinion, Tribune delivered it to the financing banks on June 4, 2007. That same day, Step One closed. Tribune borrowed $7 billion to pay off its existing bank debt and to complete a tender offer, buying back just over half of its publicly held shares. The Large Shareholders sold all their shares, and the members of the Board appointed by those shareholders resigned. After Step One, Tribune issued a proxy statement, which explained that while the LBO was in the company's best interest, it was risky and might not create the anticipated value.

In October 2007, management again updated its financial projections (the "October Projections") in preparation for Step Two. The October Projections

still forecasted that Tribune's performance would improve, but not as quickly as the February Projections had predicted.

Even with the October Projections, VRC was reluctant to author a second solvency opinion because it did not appear that Tribune would be able to repay its debts without refinancing its existing debts. Tribune management represented to VRC that Morgan Stanley -- the Special Committee's financial advisor -- believed that Tribune would be able to refinance its debts, even though Morgan Stanley had not drawn that conclusion. On December 18, 2007, VRC issued a solvency opinion stating that Tribune would be solvent after Step Two.

The Board's retained financial advisors did not agree with VRC's second solvency opinion. In fact, analyses from Citigroup and Merrill Lynch showed that, at the close of Step Two, Tribune would be insolvent by more than $1.4 billion and $1.5 billion respectively, but neither advisor tried to stop the transaction. On December 20, 2007, Step Two closed, and Tribune borrowed an additional $3.7 billion, which it used to buy back its remaining publicly held shares.

After the close of Step Two, Tribune had roughly $13 billion in debt. Tribune's directors and officers received approximately $107 million from selling

their stock and from bonuses.  Citigroup and Merrill Lynch were each paid their

$12.5 million success fee because they helped effectuate a "Strategic Transaction."

A group of pension funds (the "Pension Funds"), who are defendants-appellees

in this case, also received cash proceeds in connection with the LBO.

**II.**   *Procedural History*

On December 8, 2008 -- less than one year after Step Two closed --

Tribune filed for Chapter 11 bankruptcy in Delaware.  Claims were eventually

filed in the Delaware Bankruptcy Court on behalf of creditors, including for

fraudulent conveyance.  Tribune emerged from bankruptcy in 2012; pursuant to

Tribune's plan of reorganization, the claims were transferred to the Tribune

Litigation Trust, and the Trustee was appointed to pursue the claims on behalf of

Tribune's creditors.

In the meantime, some seventy-four federal and state lawsuits

asserting fraudulent conveyance and related claims were filed around the

country by Tribune's creditors.  Eventually, the Judicial Panel on Multidistrict

Litigation transferred the bankruptcy claims as well as the federal and state

actions to the Southern District of New York, where they were consolidated on

the basis that the claims all arose out of the LBO and Tribune's 2008 Chapter 11

- 13 -

bankruptcy filing.  *See In re: Tribune Co. Fraudulent Conv. Litig.*, 831 F. Supp. 2d 1371, 1372 (J.P.M.L. 2011).

On September 23, 2013, the district court (Sullivan, *J.*) dismissed several state law constructive fraudulent conveyance claims that were brought against Tribune.  The parties appealed, and on March 29, 2016, this Court affirmed the district court's dismissal of the state law fraudulent conveyance claims.  *See In re Tribune Co. Fraudulent Conv. Litig.*, 818 F.3d 98, 105 (2d Cir. 2016) ("*Tribune I*").  After further proceedings in this Court and the Supreme Court, we issued an amended opinion on December 19, 2019, affirming the district court's dismissal of the state law constructive fraudulent conveyance claims on the basis that these claims were preempted by section 546(e) of the Bankruptcy Code, which provides that a trustee may not avoid a transfer made by or to a "financial institution" in connection with "a securities contract."  *In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 78, 96 (2d Cir. 2019) ("*Tribune II*").[4]

---

[4]    On July 22, 2016, this Court denied rehearing *en banc*, and our mandate issued on August 1, 2016.  On September 9, 2016, the Trustee petitioned for certiorari to the Supreme Court.  In April 2018, the Supreme Court advised the parties that their petition

- 14 -

In the meantime, the district court proceeded to consider defendants'
motions to dismiss the remaining claims. On January 6, 2017, the district court
(Sullivan, *J.*) dismissed the Trustee's intentional fraudulent conveyance claims
with prejudice because it found that the complaint failed to allege that Tribune
had the actual intent to defraud its creditors when it bought back shares from
shareholders at both steps of the LBO. In particular, the district court concluded
that the intent of the Tribune officers who created the February and October
Projections could not be attributed to the Special Committee, which approved the
LBO. The district court also declined to grant the Trustee leave to amend its
complaint in the *FitzSimons* action, "without prejudice to renewal in the event of
an intervening change in the law." 3049 S. App'x at 28.

On November 30, 2018, the district court (Sullivan, *J.*) dismissed the
Trustee's state law claims for breach of fiduciary duty asserted in the *FitzSimons*

_____

for certiorari as to *Tribune I* would be deferred to allow this Court to consider whether
to recall the mandate in light of the Supreme Court's decision in *Merit Mgmt. Grp., LP v.
FTI Consulting, Inc.*, 138 S. Ct. 883, 892 (2018), which held, *inter alia*, that Section 546(e)
does not protect transfers in which financial institutions served as mere conduits. *See
Deutsche Bank Tr. Co. Americas v. Robert R. McCormick Found.*, 138 S. Ct. 1162, 1163 (2018)
(statement of Justices Kennedy and Thomas). As a result, this Court recalled its
mandate and eventually issued *Tribune II*.

- 15 -

Complaint and certain "tag-along" actions. In particular, the district court declined to collapse the two-step LBO into a unitary transaction, thereby concluding that (1) Tribune was solvent at Step One, and (2) the Large Shareholders were not liable at Step Two because they had relinquished their board seats and Tribune stock by that point.

On December 1, 2018, the case was reassigned to Judge Cote. On January 23, 2019, the district court (Cote, *J.*) granted Citigroup and Merrill Lynch's motions to dismiss certain claims in the *FitzSimons* and *Citigroup* actions. As relevant here, the district court dismissed the aiding-and-abetting and professional malpractice claims under the *in pari delicto* doctrine and it dismissed the fraudulent conveyance claims on the ground that the advisory fees received did not constitute actual or constructive fraudulent conveyances. On April 23, 2019, the district court denied the Trustee's request to amend his complaint in the *FitzSimons* action, denying leave to file what would have been a Sixth Amended Complaint.

These appeals followed.

- 16 -

## DISCUSSION

Three categories of claims are at issue: (1) intentional fraudulent conveyance claims against the shareholders based on the buy-back of their shares; (2) breach of fiduciary duty and aiding and abetting breach of fiduciary claims against the allegedly controlling shareholders; and (3) aiding and abetting breach of fiduciary duty, professional malpractice, intentional fraudulent conveyance, and constructive fraudulent conveyance claims against Citigroup, Merrill Lynch, Morgan Stanley, and VRC (collectively, the "Financial Advisors"). We discuss these claims in turn, as well as the district court's denial of leave to amend.

We review *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "accepting the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (internal quotation marks omitted). "We review the district court's denial of leave to amend for abuse of discretion." *Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019) (internal quotation marks omitted). If, however, "the denial was based on futility, . . . we review that legal conclusion *de novo*." *City of*

*Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014).

## I. *Intentional Fraudulent Conveyance Claims*

We first consider whether the district court erred in dismissing the Trustee's intentional fraudulent transfer claims against the shareholders based on the buy-back of their shares.

### A. *Applicable Law*

The Bankruptcy Code allows a bankruptcy trustee to recover fraudulent transfers where a transfer has been made with "actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). An intentional fraudulent conveyance claim must be pled with specificity, as required by Fed. R. Civ. P. 9(b). *See In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). The alleged fraud must relate to the specific payment or transfer the plaintiff is seeking to avoid, rather than to the overall course of business. *See id.* (differentiating between alleged fraud in obtaining funding from noteholders and subsequent payment of some proceeds to defendant). And by "actual intent," the statute contemplates intent "existing in fact or reality" and not merely the imputed intent that would suffice for a constructive fraudulent conveyance claim. *Intel Corp.*

- 18 -

*Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020) (holding, in context of ERISA, that "actual" means "existing in fact or reality," more than "potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal") (citations and internal quotation marks omitted); *compare* 11 U.S.C. § 548(a)(1)(A) (intentional fraudulent conveyance) *with id.* § 548(a)(1)(B) (constructive fraudulent conveyance); *see also United States v. Finkelstein*, 229 F.3d 90, 95 (2d Cir. 2000) ("[T]he should-have-known alternative connotes a concept more akin to negligence than to knowledge.").

Because of the difficulties in proving intent to defraud, a pleader may rely on "badges of fraud," *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent. *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983). Courts have inferred intent to defraud from the "concealment of facts and false pretenses by the transferor," "reservation by [the transferor] of rights in the transferred property," the transferor's "absconding with or secreting the proceeds of the transfer immediately after their receipt," "the existence of an unconscionable discrepancy between the value of property transferred and the consideration received therefor," the oppressed debtor's creation "of a closely-held corporation to receive the transfer of his

- 19 -

property," as well as the oppressed debtor's transfer of property while insolvent. *Id.* (citation omitted); *see also Sharp*, 403 F.3d at 56.

A corporation can only act through its directors and officers, and we look to state law to determine who has the authority to act on behalf of a corporation (and therefore whose actions to review to see whether there was fraudulent intent or badges of fraud). *See Burks v. Lasker*, 441 U.S. 471, 478 (1979) ("[T]he first place one must look to determine the powers of corporate directors is in the relevant State's corporation law."). Under Delaware law -- Tribune's state of incorporation -- only the board of directors (or a committee to which the board has delegated its authority) has the power to approve an extraordinary transaction such as a merger or consolidation. *See* Del. Gen. Corp. Law §§ 141(a), (c), 160(a), 251(b). Here, the Board delegated its authority to approve a merger and redemption of Tribune's stock to the Special Committee, and thus the Trustee was required to plead allegations that gave rise to a strong inference that the Special Committee had the "actual intent to hinder, delay, or defraud" Tribune's creditors, as required by 11 U.S.C. § 548(a)(1)(A).

The Trustee does not argue that the members of the Special Committee had "actual intent" to harm Tribune's creditors but instead contends

- 20 -

that Tribune's senior management had the necessary fraudulent intent, and that

this intent must be imputed to the Special Committee.  The issue of whether a

company's officers' intent to defraud creditors can be imputed to an independent

special committee for purposes of a fraudulent conveyance claim under the

Bankruptcy Code is a question of first impression in this Circuit.  The First

Circuit has addressed the issue and applied a "control" test -- a court "may

impute any fraudulent intent of [an actor] to the transferor  . . . [if the actor] was

in a position to control the disposition of [the transferor's] property."  *In re Roco*

*Corp.*, 701 F.2d 978, 984 (1st Cir. 1983).  The district court here applied the control

test, holding that "this test appropriately accounts for the distinct roles played by

directors and officers under corporate law, while also factoring in the power

certain officers and other actors may exercise over the corporation's decision to

consummate a transaction."  3049 S. App'x at 9.

The Trustee argues that the district court erred in applying the

control test, and that the correct standard is either a scope-of-employment

agency standard or a "proximate cause" standard.  We are not persuaded.  In the

circumstances here, we affirm the district court's use of a "control" test for

imputation.  We agree that for an intentional fraudulent transfer claim, which

- 21 -

requires "actual intent," a company's intent may be established only through the "actual intent" of the individuals "in a position to control the disposition of [the transferor's] property." *Roco*, 701 F.2d at 984; *see also In re Lehman Bros. Holdings, Inc.*, 541 B.R. 551, 576 (S.D.N.Y. 2015) ("[T]he Court's analysis regarding imputation must turn on *actual control* of [the debtor].").[5]

## B.    *Application*

The Trustee makes two arguments in support of his intentional fraudulent transfer claims.  First, he argues that Tribune's senior management possessed actual intent to defraud, and that intent should be imputed to the Special Committee.  Second, even assuming the imputation argument fails, the Trustee maintains that Independent Directors on the Special Committee had the required intent as demonstrated by "badges of fraud."

---

[5]     In arguing for a lesser imputation standard, the Trustee relies heavily on *Staub v. Proctor Hospital*, 562 U.S. 411 (2011).  That case, however, applied a "motivating factor" standard under the Uniformed Services Employment and Reemployment Rights Act, *id.* at 417–18, and we are not persuaded that it carries much weight in a case requiring "actual intent" under the Bankruptcy Code.

### 1.   *Imputation of Intent*

We conclude that the Trustee failed to plausibly allege that the intent of Tribune's senior management should be imputed to the Special Committee because the Trustee failed to allege that Tribune's senior management controlled the transfer of the property in question.

As discussed above, the Board created an independent Special Committee to evaluate the LBO.  The Special Committee, in turn, hired Morgan Stanley to serve as its independent financial advisor.  As the district court observed, the Trustee failed to allege that senior management inappropriately pressured the Independent Directors -- who included former senior officers of major corporations -- to approve the transactions or that senior management dominated the Special Committee.

The Trustee failed to allege any financial or personal ties between senior management and the Independent Directors that could have affected the impartiality of the Special Committee.  And to the extent that the officers misled the Special Committee by presenting it with the February Projections and a flawed viability and solvency opinions, Morgan Stanley and the Special Committee itself checked these figures.  Therefore, to impute the officers' intent

- 23 -

onto the Special Committee, which was working independently with an outside financial advisor and independently reviewed opinions provided by Duff & Phelps and VRC, would stretch the "actual intent" requirement as set forth in § 548(a)(1)(A) to include the merely possible or conceivable or hypothetical as opposed to existing in fact and reality.

### 2.   *The Badges of Fraud*

On appeal, the Trustee contends that five of the traditional "badges of fraud" weigh in favor of finding actual intent -- (1) lack of consideration for the shareholder transfers; (2) Tribune's financial condition; (3) the relationship among the parties; (4) the "pattern of transactions"; and (5) the "general chronology" of the events.  3049 Appellant's Br. at 37–38.  While some of these factors arguably weigh in favor of the Trustee, in the end we conclude that the district court correctly held that the Trustee failed to plead "badges of fraud" sufficient to raise a strong inference of actual fraudulent intent on the part of the Special Committee.  *See Kaiser*, 722 F.2d at 1582–83.

The Trustee's assertion that Independent Directors stood to earn $6 million for selling their shares if they approved the LBO is insufficient to satisfy the stringent pleading standard of Rule 9(b).  First, it would be

- 24 -

unreasonable to assume actual fraudulent intent whenever the members of a board of directors (or a committee created by that board) stood to profit from a transaction they recommended or approved. *See, e.g., Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("Motives that are generally possessed by most corporate directors and officers do not suffice [to demonstrate fraud]. . . . Insufficient motives, we have held, can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation."). Second, the Independent Directors owned only a small fraction (0.08%) of Tribune's shares, and the Independent Directors' shares were sold at a price only slightly above the price at which Tribune stock had been trading. These assertions, even assuming they are true, do not give rise to a strong inference of actual fraudulent intent.

The Trustee's arguments that the Independent Directors "knew that Tribune was falling far short of projections and thus was unlikely to generate enough cash to service its debt" and the risky nature of the proposed LBO were indications of fraud are also unpersuasive. 3049 Appellant's Br. at 38. Even assuming the Independent Directors were wrong in believing that Tribune's financial condition would improve, their approval of a risky transaction when

- 25 -

Tribune and other newspaper companies were struggling would arguably support a negligence or constructive fraud claim but not, in the circumstances here, an intentional fraudulent transfer claim. *See, e.g., In re Lehman Bros. Holdings, Inc.*, 541 B.R. at 577 ("Indeed, there is nothing unlawful about a company transacting business during unusually difficult financial times in an attempt to prevent its own collapse. To find otherwise would place in question any contract executed during a financial downturn and invite upheaval in the financial markets."). Moreover, Tribune's contemporaneous public filings warned that its projections could fall short, and the Independent Directors had an obligation to try to achieve the highest price for Tribune's shareholders. *See, e.g., Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986) (directors have duty to obtain highest price for shareholders).

Again, the Trustee was required to plausibly allege *actual* fraudulent intent on the part of the members of the Special Committee. We agree with the district court that the Trustee failed to do so.

## II. *State Law Fiduciary Duty Claims*

We next consider the Trustee's claims that the Large Shareholders breached their fiduciary duties under Delaware law by pushing for the LBO

- 26 -

based on projections they knew to be false and by causing Tribune to incur debt

they knew would leave the company insolvent.  The Trustee also alleges that

through this conduct the Large Shareholders aided and abetted senior

management's own breach of fiduciary duty and were unjustly enriched.  The

Trustee argues that Steps One and Two of the LBO should be collapsed so that

the LBO is viewed as a single unitary transaction.  The Trustee contends that, if

the LBO is so viewed and Tribune's Step Two obligations taken into account at

the start, Tribune was insolvent as of April 1, 2007, the day that Tribune's Board

originally voted to approve the LBO.  The Trustee alleges that the Large

Shareholders were controlling shareholders with attendant fiduciary duties

before Step One and that these fiduciary duties were breached by advocating for

and executing the LBO.

      The district court dismissed Trustee's claims, holding that Steps One

and Two could not be collapsed into a unitary transaction and that Tribune's

purported insolvency had to be analyzed separately at each of the LBO's two

steps.  The district court concluded that the Trustee's allegations failed at Step

One because he could not plausibly allege that Tribune was insolvent at that

point.  While the district court concluded that the Trustee had adequately

pleaded Tribune's insolvency at Step Two, it held that the fiduciary duty claims

nevertheless failed because, after Step One, the Large Shareholders no longer

owned any Tribune stock and their appointed directors had resigned from the

Board.

The principal issue with respect to these claims is thus whether the

Trustee's pleadings support collapsing Step One and Step Two into one event.

### A.    *Applicable Law*

Under Delaware law, a shareholder owes the company a fiduciary

duty "only if it owns a majority interest in or exercises control over the business

affairs of the corporation." *Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d

1334, 1344 (Del. 1987).  If such a fiduciary duty exists, a shareholder breaches that

duty if, for its own benefit, it approves a transaction that renders the corporation

insolvent.  *See, e.g.*, *In re Tropicana Entm't, LLC*, 520 B.R. 455, 471 (Bankr. D. Del.

2014) (holding that creditor must allege either that corporation was or became

insolvent as result of fiduciary's misconduct to bring suit for breach of fiduciary

duty); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir.

2014) (noting this Court may "affirm the judgment on any basis that is supported by the record").[6]

To determine whether the two steps should be viewed as a single transaction, the district court applied the *Sabine* factors, which consider (i) "[w]hether all of the parties involved had knowledge of the multiple transactions"; (ii) "[w]hether each transaction would have occurred on its own"; and (iii) "[w]hether each transaction was dependent or conditioned on other transactions." *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 541 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016).

In performing this analysis, Delaware courts have sometimes applied a "step-transaction doctrine," under which collapse is warranted if a party can satisfy any one of three tests: (1) the "end result test," which authorizes collapse "if it appears that a series of separate transactions were prearranged

---

[6]    We assume, without deciding, that the Large Shareholders had a fiduciary duty to Tribune.  We note, however, that together the Chandler Trusts and the Foundations owned only 33% of Tribune's publicly held shares.  *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994) ("[A] shareholder who owns less than 50% of a corporation's outstanding stocks does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status." (quoting *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989)).

parts of what was a single transaction, cast from the outset to achieve the ultimate result"; (2) the "interdependence test," which authorizes collapse if "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series"; and (3) the "binding-commitment test," which allows collapse "only if, at the time the first step is entered into, there was a binding commitment to undertake the later steps." *Bank of N.Y. Mellon Tr. Co. v. Liberty Media Corp.*, 29 A.3d 225, 240 (Del. 2011) (internal quotation marks omitted).

Delaware courts have also noted that, regardless of the test to be applied, the substance of the transaction is what matters, not the form. *See Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007). Further, they have noted that "courts have found that a set of transactions may be viewed as one integrated transaction if the transactions reasonably collapse into a single integrated plan and either defraud creditors or leave the debtor with less than equivalent value post-exchange." *In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 91 (D. Del. 2002) (internal quotation marks omitted). In *Hechinger*, the court denied a motion to dismiss and noted that it was "reluctant to conclude that because the defendants structured the set of transactions in a certain manner, they [were] immune from a

claim of breach of fiduciary duty, especially where the [complaint] allege[d] that the harms it complain[ed] of were foreseeable results of the acts of the defendants." *Id*.

**B.    *Application***

**1.    *Was the LBO a Unitary Transaction?***

Although we must accept as true all plausible allegations set forth in the complaint, we need not accept "threadbare recitals of a cause of action's elements" that are "supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  Here, the Trustee failed to sufficiently allege that the two steps should be collapsed into one.

First, it is undisputed that there were several obstacles that Tribune needed to clear after Step One and before completing Step Two.  At Step One, Tribune borrowed approximately $7 billion and executed a tender offer, by which the company repurchased half of Tribune's outstanding common stock and refinanced its existing debt.  Even if Step Two were never consummated,

Step One would have amounted to a standalone recapitalization plan -- similar to transactions Tribune had engaged in prior to the LBO.[7]

Additionally, the "knowledge and intent of the parties" weigh heavily against the Trustee's collapse argument as neither Tribune nor the Large Shareholders knew for certain whether both steps would be completed. Step Two required shareholder approval, which was not received until months after Step One closed, and the Trustee does not allege that the Large Shareholders had anything to do with the "pie-in-the-sky" February Projections. 3049 J. App'x at 146–47. Similarly, Tribune never knew that Step Two was a foregone conclusion, as its merger would need government approval.

Further, the complaint acknowledges that there were several additional hurdles Tribune had to clear to effectuate Step Two, including receiving a solvency opinion, and that the Large Shareholders were concerned that the deal would not actually close. Indeed, Tribune's July 13, 2007 proxy statement warned that there was a "risk that the conditions to the [Step Two]

---

[7]    In May 2006, Tribune engaged in a leveraged recapitalization by which it purchased 55 million shares of outstanding stock for $1.8 billion in May 2006. In March 2007, Tribune again considered a "more modest recapitalization plan." 3049 J. App'x at 198.

Merger will not be met, including the conditions requiring receipt of FCC approval, the receipt of financing and receipt of a solvency opinion." 3049 J. App'x at 1740. Finally, as the Large Shareholders point out, the two-step transaction was designed to guard against the possibility that the second step might not close if conditions precedent were not satisfied. The Trustee even acknowledges that the LBO was structured in two steps *because* the Board "express[ed] concerns regarding the delays and completion risk associated with Zell's [initial single-step] proposal." 3049 J. App'x at 191. Therefore, the Board decided instead on the two-step LBO to "provide an upfront distribution to Tribune's stockholders," even if Step Two were never consummated. *Id*.

The parties do not dispute that *Sabine* applies federally, though ultimately we conclude that, regardless of whether *Sabine* or Delaware's "step-transaction doctrine" applies, the two steps of this LBO should not be collapsed. As the facts alleged in the complaint make clear, the third *Sabine* factor weighs against collapse. Further, collapse is inappropriate under all three of the step-transaction tests, because the parties intended to structure the two steps as independent transactions, Step One was able to stand alone, and there was no

- 33 -

binding commitment to undertake Step Two. Accordingly, we affirm the district court's conclusion that the two steps must be considered independently.

### 2. *Was Tribune Insolvent at Step One?*

The Trustee argues that even if the two steps are not treated as a unitary transaction, he sufficiently alleged Tribune's insolvency at Step One, to support a claim that the Large Shareholders breached their fiduciary duties when approving of a transaction that resulted in insolvency. The district court held that the Trustee failed to sufficiently allege that Tribune was insolvent at Step One of the LBO under either the "balance sheet" or the "inability to pay debt when due" tests. We agree.

In Delaware, "[u]nder the balance sheet test, an entity is insolvent if it has liabilities in excess of a reasonable market value of assets held." *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 176 (Del. Ch. 2014) (internal quotation marks omitted). We are not persuaded by the Trustee's argument that the district court erred in failing to take into account "the commitments Tribune had *already* made -- notably to borrow an additional $3.7 billion of debt and to make an additional $4 billion distribution to its shareholders -- for which performance was due at Step Two." 3049 Appellant's Br. at 65. This argument

rests on the same logic undergirding the Trustee's argument in favor of collapsing the two steps, which we have rejected for the reasons outlined above. Moreover, the Trustee himself admits that he "did not allege that the $8 billion borrowed at Step One, standing alone, rendered Tribune insolvent." *Id.* at 62.

As to the "inability to pay debts when due" test, the Trustee's argument again hinges upon his assertion that the district court should have considered whether Tribune was able to pay upcoming debts or raise additional capital in the future -- *i.e.*, by taking "Step Two into account, along with Tribune's ability to access additional funds." *Id.* at 70. In other words, the Trustee argues that courts should not limit their consideration to past debt payments and instead also consider whether companies will be able to pay upcoming debts or raise additional capital in the future.

There appears to be no consensus in Delaware courts, however, as to whether this test is forward-looking. *See, e.g.*, Robert J. Stearn, Jr. & Cory D. Kandestin, *Delaware's Solvency Test: What Is It and Does It Make Sense? A Comparison of Solvency Tests Under the Bankruptcy Code and Delaware Law*, 36 Del. J. Corp. L. 165, 182 (2011) ("The [inability to pay debts when due] test is not entirely clear: the unanswered question is whether the test is present or forward-looking.

- 35 -

. . . The case law does not answer this question definitively.").  The Trustee cites

several Delaware cases, *see* 3049 Appellant's Br. at 69, but they are inapposite as

none definitively establishes that courts *must* consider future debts to be incurred

as part of its insolvency analysis.  Moreover, as the district court observed, this

Court offered a definitive answer in *Pereira v. Farace*, 413 F.3d 330 (2d Cir. 2005).

There, we rejected a forward-looking approach, noting that such a test would

"project[] into the future to determine whether capital will remain adequate over

time while the Delaware [inability to pay debts when due] test looks solely at

whether the corporation has been paying bills on a timely basis."  *Id*. at 343.  We

see no reason to overturn that holding here.

Accordingly, we conclude that the district court did not err in

dismissing the Trustee's state law claims against the Large Shareholders.  We

additionally conclude that the district court did not abuse its discretion in

dismissing these claims with prejudice, as the Trustee has not explained what

specific facts he would plead to salvage these claims.

III.    *Claims Against Financial Advisors*

We next consider whether the district court erred in dismissing the

following claims against the Financial Advisors: (1) aiding and abetting breaches

of fiduciary duty and professional malpractice[8]; (2) intentional fraudulent

conveyance; and (3) constructive fraudulent conveyance.  For the reasons set

forth below, we affirm the district court's dismissal of the aiding and abetting

and professional malpractice claims as to all Financial Advisors; we affirm the

district court's dismissal of the intentional fraudulent conveyance claims as to

Morgan Stanley, Citigroup, and Merrill Lynch, and vacate the dismissal of these

claims as to VRC; and we affirm the dismissal of the constructive fraudulent

conveyance claims as to Morgan Stanley and VRC and vacate the dismissal of

these claims as to Citigroup and Merrill Lynch.

**A.**     *Aiding and Abetting Breach of Fiduciary Duty and Professional Malpractice Claims*

**1.**     *Applicable Law*

Under Delaware law,[9] a third party may be liable for aiding and

abetting a breach of fiduciary duty if there is "(i) the existence of a fiduciary

---

[8]     Additionally, the Trustee asserted a breach of fiduciary claim, but against only Morgan Stanley.  The district court did not explicitly address this claim in its January 23, 2019 opinion.  In a February 13, 2019 order, however, the district court stated that this claim was "barred for the same reasons discussed in the January 23 Opinion with respect to the other common law claims asserted against Morgan Stanley . . . namely, the doctrine of *in pari delicto*."  3049 S. App'x at 180.

[9]     The parties agree that Delaware law governs the Trustee's aiding and abetting claim.

relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach." *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015).

The *in pari delicto* doctrine acts as an affirmative defense to an aiding and abetting claim by barring a plaintiff "from recovering damages if his losses are substantially caused by activities the law forbade him to engage in." *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 301–02 (Del. Ch.), *aff'd*, 126 A.3d 1115 (Del. 2015) (internal quotation marks omitted). In other words, a plaintiff can generally only sue for aiding and abetting a breach of fiduciary duty if the plaintiff's hands are clean. As applied to corporations, the illegal actions of a corporation's officers and directors are imputed to the corporation itself. *Id.* at 303. There are, however, exceptions that render the *in pari delicto* doctrine inapplicable and therefore permit a plaintiff to sue, even if its hands are not clean.

First, under the adverse interest exception, a corporation is permitted to sue those alleged to have aided an agent's wrongdoing when "the corporate agent responsible for the wrongdoing was acting *solely* to advance his own personal financial interest, rather than that of the corporation itself." *In re*

- 38 -

*Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 891 (Del. Ch. 2009)

("*AIG II*"), *aff'd sub nom. Teachers' Ret. Sys. of La. v. Gen. Re Corp.*, 11 A.3d 228 (Del.

2010) (emphasis added).  The adverse interest exception, however, does not

enable a plaintiff to recover if the wrongdoing benefits the corporation.  *Stewart*,

112 A.3d at 309.

Further, the exception does "not apply even when the 'benefit'

enjoyed by the corporation is ultimately outweighed by the long-term damage

that is done when the agent's mischief comes to light"; instead, it only covers the

"unusual" case where allegations support a reasonable inference of "total

abandonment of the corporation's interests."  *Id.* at 303, 309 (describing

"siphoning corporate funds or other outright theft" as such "unusual" cases); *see*

*also In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 827 (Del. Ch. 2009) ("*AIG I*") (holding

that the adverse interest test is directed at insiders who are "essentially stealing

from the corporation as opposed to engaging in improper acts that, even if also

self-interested, have the effect of benefiting the corporation financially"), *aff'd sub*

*nom. Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del.

2011).

Second, the fiduciary/insider exception to the *in pari delicto* doctrine allows a suit to be brought against corporate fiduciaries who "knowingly caused the corporation to commit illegal acts and, as a result, caused the corporation to suffer harm." *AIG II*, 976 A.2d at 889. The *AIG II* court appeared, on public policy grounds, to limit the application of the fiduciary exception to "gatekeepers," third parties employed by a corporation to help ensure the lawful operation of the corporation. *Id.* at 890 n.49, 892–93; *see also RBC Cap. Mkts.*, 129 A.3d at 865 n.191 (rejecting the proposition that financial advisors are inherently "gatekeepers," explaining that "the role of a financial advisor is primarily contractual in nature" and defined by its engagement letter). Similarly, the fiduciary exception precludes application of the *in pari delicto* doctrine to aiding and abetting claims against "non-fiduciaries . . . who occupy a position of trust and materially participate in the traditional insiders' discharge of their fiduciary duties." *Stewart*, 112 A.3d at 320 (holding that the auditor defendants played a "gatekeeper" role).

The *in pari delicto* doctrine also applies to the Trustee's professional malpractice claims. Under both New York law and Illinois law,[10] professional malpractice claims are viewed as a species of negligence. *See Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000); *Hassebrock v. Bernhoft*, 815 F.3d 334, 341 (7th Cir. 2016).

It is settled in both New York and Illinois that the *in pari delicto* doctrine bars claims against co-conspirators for negligence. *See, e.g., Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010) ("The justice of the in pari delicto rule is most obvious where a willful wrongdoer is suing someone who is alleged to be merely negligent."); *Peterson v. McGladrey & Pullen, LLP*, No. 10 C 274, 2010 WL 4435543, at *4 (N.D. Ill. Nov. 3, 2010) ("[T]he *in pari delicto* principles that preclude plaintiff from seeking redress for [the trustee's] alleged negligence . . . apply equally to plaintiff's claims against [the defendant auditor.]"), *vacated on other grounds*, 676 F.3d 594 (7th Cir. 2012). Thus, the *in pari delicto* doctrine

---

[10]     In the district court, the parties disputed whether New York (where Citigroup and Merrill Lynch are headquartered) or Illinois (where Tribune was headquartered) law governed the Trustee's professional malpractice claim. This argument has been largely abandoned, likely because, as the district court explained, the states' laws are nearly the same.

precludes a corporation engaged in wrongdoing from suing its co-conspirators on the grounds of negligence.

### 2. Application

As an initial matter, accepting the Trustee's factual assertions to be true, he plausibly alleges that the Financial Advisors aided and abetted Tribune's directors and officers in breaching their fiduciary duties when they hid Tribune's true financial state to complete the LBO. In particular, the Trustee's complaint alleges that Citigroup and Merrill Lynch reviewed VRC's solvency analysis and failed to alert anyone that the February Projections, which formed the bedrock of VRC's first solvency opinion, were no longer accurate. Instead, they allowed VRC's analysis to be delivered to the financing banks at Step One of the LBO. Likewise, the Trustee contends that Citigroup's analysis showed that Tribune was insolvent by more than $1.4 billion before the close of Step Two, and Merrill Lynch's analysis showed that Tribune was insolvent by more than $1.5 billion. Still, neither tried to stop the LBO.

Indeed, for purposes of these appeals, Citigroup and Merrill Lynch do not challenge the allegations of wrongdoing or negligence. Instead, they contend that any aiding and abetting breach of fiduciary duty and malpractice

claims must be dismissed based on the *in pari delicto* doctrine. And for his part, the Trustee does not argue on appeal that the *in pari delicto* doctrine is inapplicable; instead, he argues that two exceptions to that doctrine should apply to allow the claims to go forward -- the adverse interest exception, which it argued below to the district court, and the fiduciary/insider exception, which it argues for the first time on appeal. This Court has discretion to consider arguments waived below where necessary to avoid a manifest injustice. *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008). In circumstances where those arguments were available to the party below and no reason is proffered for their failure to raise them, such an exercise of discretion is not favored. *Id.*

### a.  *Adverse Interest Exception*

Here, the adverse interest exception does not apply because the LBO conferred at least some "benefit" on Tribune. *AIG II*, 976 A.2d at 891. Tribune received over $300 million in additional capital from Zell's investment, and there was also the potential for $1 billion in tax savings. Even putting aside the tax savings -- which Moody's called a "key assumption" for the LBO, 449 J. App'x at 112, but which were ultimately never realized **--** the transaction still infused

- 43 -

hundreds of millions of dollars of capital into the business at a time when Tribune was struggling, provided value to many shareholders by helping cash them out, and gave Tribune a chance to continue as a going concern by allowing it to pay off at least some existing debt. Indeed, Tribune itself explained in a proxy statement that the LBO was in its best interest.

The Trustee also makes no specific allegations that support an inference that Tribune received *no* benefit from the LBO; instead, it contends that the net effect of the LBO was negative. But the net effect is not relevant when considering whether the adverse interest exception will apply. *Stewart*, 112 A.3d at 303. Therefore, despite any "long-term damage," *id.*, the adverse interest exception to the *in pari doctrine* does not apply in this case.[11]

### b.    *Fiduciary/Insider Exception*

The Delaware Chancery Court has explained that for the fiduciary/insider exception to apply, the party must "occupy a position of trust

---

[11]    Notwithstanding the Trustee's argument to the contrary, the district court did not resolve any issues of fact by holding that the adverse interest exception did not apply here. Instead, it simply observed that the infusion of $300 million in capital stated in the Complaint conferred some benefit on Tribune, and therefore, the defendants had not acted "*solely* to advance [their] own personal financial interest." *AIG,* 976 A.2d at 891 (emphasis added).

and materially participate in the traditional insiders' discharge of their fiduciary duties," thereby playing a "'gatekeeper' role vis-à-vis the [corporation]." *Stewart*, 112 A.3d at 319. Here, the Trustee has failed to sufficiently allege that any of the Financial Advisors played such a role.

While a corporation's auditors "assume[] a public responsibility transcending any employment relationship," *United States v. Arthur Young & Co.*, 465 U.S. 805, 817–18 (1984) (emphasis omitted), and act as the gatekeepers of standards designed to avoid damage to corporations, the Delaware Supreme Court has emphasized that "the role of a financial advisor is primarily contractual in nature" and that a financial advisor's "engagement letter typically defines the parameters of the financial advisor's relationship and responsibilities with its client," *RBC Cap. Mkts.*, 129 A.3d at 865 n.191. Here, the engagement letters between Tribune and Citigroup and between Tribune and Merrill Lynch expressly provide that they did not create fiduciary relationships and that Citigroup and Merrill Lynch were not acting as Tribune's agents. The letters instead made clear that Tribune would "make an independent analysis and decision regarding any Transaction based on [their] advice." 449 J. App'x at 366. Citigroup and Merrill Lynch were financial advisors, not "gatekeepers," *AIG II*,

976 A.2d at 890 n.49, and, further, neither Citigroup nor Merrill Lynch "materially participate[d]" in the discharge of fiduciary duties, *Stewart*, 112 A.3d at 320.

Moreover, the Delaware Supreme Court has cautioned against "inappropriately . . . suggest[ing] that any failure by a financial advisor to prevent directors from breaching their duty of care gives rise to an aiding and abetting claim against the advisor." *RBC Cap. Mkts.*, 129 A.3d at 865 n.191. Instead, such a claim may arise where "the [financial advisor] knows that the board is breaching its duty of care and participates in the breach by misleading the board or creating [an] informational vacuum." *Id.* at 862.

Here, although the Trustee lodges numerous allegations of misconduct on the Financial Advisors' part, there is little to suggest that their conduct created an "'informational gap[]' . . . l[eading] to the Board's breaches of fiduciary duties," as occurred in *Stewart*, 112 A.3d at 322, much less the "fraud on the Board" and "intentional[] dup[ing]" of directors that warranted liability of the financial advisor in *RBC Cap. Mkts.*, 129 A.3d at 865. Rather, the Trustee alleges that Tribune's officers and advisors conspired with their financial advisors (among others) to carry out the LBO.

Accordingly, the district court did not err in dismissing the Trustee's aiding and abetting breach of fiduciary duty and professional malpractice claims against the Financial Advisors.

### B.    *Intentional Fraudulent Conveyance Claims*

As discussed above, the Bankruptcy Code allows a bankruptcy trustee to recover transfers made with "actual intent to hinder, delay, or defraud" creditors.  11 U.S.C. § 548(a)(1)(A).  The complaint does not sufficiently allege that the transfers to Citigroup, Merrill Lynch, and Morgan Stanley as financial advisors were made with an "actual intent to hinder, delay, or defraud" creditors. *Id*.  It does, however, sufficiently plead such an actual intent as to VRC.

As to Morgan Stanley, the complaint alleges that Tribune paid the firm $10 million for a fairness opinion, but the complaint then barely mentions the fairness opinion again, much less suggest that payment for the opinion was motivated by fraudulent intent.  Without additional allegations, the Trustee cannot satisfy Rule 9(b)'s heightened pleading standard as to Morgan Stanley.

As to Citigroup and Merrill Lynch, the Trustee's allegations -- that these firms "were incentivized to promote the LBO over other proposals being considered by [Tribune]," 3049 J. App'x at 59, and that they "purported to rely on

- 47 -

the unrealistic February 2007 Projections even as each month's below-projection

performance showed conclusively that they could not be achieved," 3049 J. App'x

at 118 -- are insufficient to support an inference of intent to defraud as to the

payment of their financial advisory fees.  *Kaiser*, 722 F.2d at 1582.

Specifically, the Trustee maintains that "multiple badges of fraud"

support the requisite strong inference of fraudulent intent against Citigroup and

Merrill Lynch, including that (1) the advisory fees were paid to these firms in

December 2007, following the close of Step Two when Tribune was insolvent;

(2) Tribune received less than reasonably equivalent value for the fees paid;

(3) the fees were not paid in the ordinary course of Tribune's business; and

(4) Tribune's management engaged in deceptive conduct by concealing the

February and October Projections from certain others in management, and

induced Citigroup and Merrill Lynch to use those projections to bring the LBO to

a close.  449 Appellant's Br. at 53.

Regarding this first alleged badge of fraud, payments to Citigroup

and Merrill Lynch when Tribune was insolvent weigh in favor of finding actual

fraudulent intent.  As to the second badge of fraud, whether Tribune received

reasonably equivalent value for these payments is a disputed factual question, which also weighs in the Trustee's favor at this stage.

As to third badge of fraud, nothing in the pleadings supports the notion that fees paid to Citigroup and Merrill Lynch pursuant to their respective engagement letters were outside the ordinary course of Tribune's business. Rather, the pleadings on these payments relate to the tortious performance of financial advisory services and the alleged fraudulent nature of the LBO transaction as a whole. They do not admit an inference of fraudulent intent as to Tribune's specific payment of the advisory fees, *see Sharp*, 403 F.3d at 56, which occurred pursuant to engagement letters entered into with Citigroup and Merrill Lynch in October 2005, long before the LBO was proposed.

As to the fourth badge of fraud, the Trustee's allegations of deceptive conduct by Tribune's management are too attenuated from the advisory fee payments to Citigroup or Merrill Lynch to indicate Tribune's intent as to those payments. At most, the Trustee's allegations indicate that Citigroup and Merrill Lynch did not report Tribune's management's concealment of facts. But other checks on such behavior existed as Morgan Stanley and the Special Committee independently reviewed the relevant figures.

- 49 -

In sum, the Trustee's highlighted badges of fraud fail to raise a strong inference of fraudulent intent. In the absence of other common badges of fraud -- reserving rights in the property, hiding funds, and paying an unconscionable price, *Kaiser*, 722 F.2d at 1582 -- the Trustee has not satisfied the heightened pleading standard for demonstrating an actual fraudulent conveyance as to Citigroup and Merrill Lynch.

The Trustee contends that these same "multiple badges of fraud" also support the requisite strong inference of fraudulent intent as to VRC. The first alleged badge of fraud weighs against finding actual fraudulent intent because VRC received the majority of its payment before Step Two closed and, therefore, prior to Tribune's insolvency.

As to the second alleged badge of fraud, whether Tribune received reasonably equivalent value for these payments is again a disputed factual question, weighing in the Trustee's favor at this stage.

The third alleged badge of fraud favors a finding of actual fraudulent intent for the payments made to VRC. Specifically, the Trustee alleges that: Tribune hastily hired VRC after Duff & Phelps, the company initially hired to perform a solvency analysis, informed Tribune that it could not provide

- 50 -

a favorable solvency opinion, and after another "prominent" valuation firm rebuffed Tribune, 3049 J. App'x at 211; VRC charged Tribune the highest fee it had ever charged for a solvency opinion; and VRC agreed, among other things, to define "fair value," *id.* at 212, inconsistently with the industry standard upon which VRC had relied for its previous solvency opinions. These allegations are sufficient to admit an inference that the VRC payments were outside the ordinary course of Tribune's business. *See In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 447–49 (Bankr. S.D.N.Y. 2012) (concluding that actual intent was sufficiently pled where allegations included, *inter alia*, that "each transaction . . . was unprecedented in the prior course of business between the parties, and the industry generally").

As to the fourth badge of fraud, the Trustee persuasively argues that Tribune's management's manipulation of the definition of "fair value" in its engagement letter with VRC was deceptive conduct that was (1) necessary for the LBO to proceed and (2) directly tied to Tribune's payments to VRC, in that VRC was retained precisely because it was willing to employ such a definition in formulating a solvency opinion. Further, the questionable nature of the "fair

value" definition is highlighted by VRC's charge of an unprecedented fee to take the assignment.

In sum, as to Morgan Stanley, Citigroup, and Merrill Lynch, we agree with the district court that the pleaded badges of fraud are insufficient to create a strong inference of actual fraudulent intent. As to VRC, however, we conclude that the Trustee has sufficiently pleaded actual fraudulent intent.

## C.    *Constructive Fraudulent Conveyance Claims*

A trustee may recover "constructive" fraudulent transfers where "the debtor . . . received less than a reasonably equivalent value in exchange for such transfer or obligation" and: (1) "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation"; (2) "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital"; (3) "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured"; or (4) "made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an

insider, under an employment contract and not in the ordinary course of business." *See* 11 U.S.C. § 548(a)(1)(B).

The Bankruptcy Code does not define "reasonably equivalent value," only defining "value" as the "satisfaction . . . of a present or antecedent debt of the debtor." *Id.* § 548(d)(2)(A). This court, however, has stated that "reasonably equivalent value is determined by the value of the consideration exchanged between the parties *at the time of the conveyance or incurrence of debt* which is challenged." *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 56 (2d Cir. 1999) (internal quotation marks omitted). Hence, in determining whether the debtor received "reasonably equivalent value," the court "need not strive for mathematical precision" but "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed . . . will have significantly harmed the innocent creditors." *Rubin v. Mfrs. Hanover Tr. Co.*, 661 F.2d 979, 994 (2d Cir. 1981) (discussing § 67(d) of the Bankruptcy Act of 1898, predecessor to § 548 of the Bankruptcy Code); *see also United States v. McCombs*, 30 F.3d. 310, 326 (2d Cir. 1994) ("[T]he concept [of fair consideration] can be an elusive one that defies any one precise formula." (discussing N.Y. Debt. & Cred. Law § 272)).

- 53 -

To determine whether reasonably equivalent value was provided, "the Court must ultimately examine the totality of the circumstances, including the arms-length nature of the transaction; and . . . the good faith of the transferee." *In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317, 334 (Bankr. S.D.N.Y. 2011) (internal quotation marks omitted).

Where the reasonably equivalent value analysis requires "more than a simple math calculation," such a computation usually should not be made at the motion to dismiss stage. *Id.*; *see also In re Agape World, Inc.*, 467 B.R. 556, 571 (Bankr. E.D.N.Y. 2012). Still, while the determination of whether reasonably equivalent value was exchanged is "largely a question of fact," *Am. Tissue Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 105 (S.D.N.Y. 2004) (internal quotation marks omitted); *accord In re Jesup & Lamont, Inc.*, 507 B.R. 452, 470 (Bankr. S.D.N.Y. 2014), courts have dismissed constructive fraudulent transfer claims where the complaint does not plausibly allege that the debtor received less than reasonably equivalent value, *see, e.g., In re Trinsum Grp., Inc.*, 460 B.R. 379, 388–89 (Bankr. S.D.N.Y. 2011) (dismissing constructive fraudulent transfer claims due to the trustee's failure to sufficiently plead the less than reasonably equivalent value requirement); *In re Bernard L. Madoff Inv. Sec. LLC*,

- 54 -

458 B.R. 87, 113–15 (Bankr. S.D.N.Y. 2011) (dismissing certain of Trustee's claims that failed to meet the particularity requirement and relied on transfers outside the applicable time period).

Here, the various Financial Advisors are differently situated.  Upon *de novo* review, we conclude that the constructive fraudulent conveyance claims against Citigroup and Merrill Lynch cannot be dismissed on the pleadings, but those against Morgan Stanley and VRC were properly dismissed.

As to Citigroup and Merrill Lynch, the Trustee alleges that the $12.5 million success fee paid to each firm upon consummation of the LBO was a constructive fraudulent conveyance.  We first consider "the time of the conveyance or incurrence of debt" to determine whether there was reasonably equivalent value.  *NextWave*, 200 F.3d at 56 (emphasis and citation omitted).  The district court found that the debt was incurred when Citigroup's and Merrill Lynch's engagement letters were signed, years before the LBO's completion, thus rendering the success fees that the Trustee seeks to claw back unavoidable antecedent debt.  We conclude otherwise.

The pleadings record indicates that Citigroup's and Merrill Lynch's success fees were not debts incurred or owed until December 2007 when the LBO

closed at Step Two, at which point a triggering "Strategic Transaction" took place.
Indeed, under their engagement letters, Citigroup and Merrill Lynch were
entitled to payment of their success fees only "upon consummation of a
Transaction involving" Tribune. 449 J. App'x at 368. Accordingly, the financial
firms were only paid their success fees after the completion of Step Two and the
closure of the LBO. Further, the engagement letters required Tribune to
reimburse Citigroup and Merrill Lynch for all reasonable expenses incurred in
providing financial advisory services prior to the consummation of the LBO,
"[r]egardless of whether any [t]ransaction [was] proposed or consummated." 449
J. App'x at 368; *see also id.* at 376. This suggests that Tribune's obligations to pay
the two $12.5 million success fees were separate, additional debts that were only
payable in the event of a successful transaction. Accordingly, because the
success fees were only incurred upon consummation of the LBO, they were not
antecedent debt constituting categorically reasonably equivalent value.

Because the Trustee has adequately pleaded Tribune's insolvency
upon the completion of Step Two, it is plausible that Tribune: (1) was "insolvent
on the date" that the success fees were paid; (2) was engaged in the transaction of
paying the success fees while it retained "unreasonably small capital"; and/or (3)

- 56 -

"incurred" the success fees, which may have been "beyond [its] ability to pay."

Therefore, the issue of whether Citigroup's and Merrill Lynch's success fees

constitute a constructive fraudulent transfer hinges on whether the services that

Tribune received in exchange were of "reasonably equivalent value." 11 U.S.C. §

548(a)(1)(B).

Turning then to the question of "reasonably equivalent value," we

note that according to Citigroup and Merrill Lynch's engagement letters, Tribune

owed success fees only if the advisors performed satisfactorily. Specifically,

Citigroup's engagement letter states that it will "perform such financial advisory

and investment banking services for [Tribune] in connection with the proposed

Transaction as are customary and appropriate in transactions of this type."

Merrill Lynch's engagement similarly states that it "will perform such financial

advisory and investment banking services for [Tribune] as are customary and

appropriate in transactions of this type." The Trustee alleges that Citigroup and

Merrill Lynch fell short of "customary and appropriate" industry standards, were

grossly negligent in carrying out their responsibilities, and rendered their

services in bad faith. Thus, according to the Trustee, because these firms

provided "no value" to Tribune, consummation of the LBO would not trigger the

contractual obligation to pay fees and the success fees should be clawed back.

On a motion to dismiss, we must accept factual allegations as true as

long as they are not "threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d

Cir. 2014) (alteration and internal quotation marks omitted).

The complaint alleges plausible facts that Citigroup and Merrill

Lynch knew or should have known the February Projections would not be met

and that each firm thought Tribune was insolvent by over $1 billion, and that

they yet failed to act.

To determine whether the Financial Advisors' guidance met the

standard of reasonably equivalent value, courts evaluate the totality of the

circumstances, considering, *inter alia*, the number of hours worked, industry

standards, fees paid compared to the overall size of the transaction, when the

engagement letters were signed, and opportunity costs. Here, the determination

of whether the Citigroup and Merrill Lynch provided reasonably equivalent

value likely requires more than "a simple math calculation." *Madoff*, 454 B.R. at

334. Unlike in *In re Old Carco LLC*, where the trustee's allegations simply

"appl[ied] implausible values" or "omit[ted] other key assets," 509 F. App'x 77, 79

(2d Cir. 2013) (summary order), the Trustee in this case alleges, amongst other

failings, that Citigroup and Merrill Lynch failed to advise Tribune about the

flaws in VRC's Step One solvency analysis, which stemmed from the February

Projections that the firms knew would not be met.  The Trustees also alleges that

both Citigroup's and Merrill Lynch's analyses showed Tribune was insolvent by

more than $1 billion before the close of Step Two.  How much, if at all, this ought

to detract from the fees they were paid should not have been decided on a

motion to dismiss.  *See In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 804 (Bankr.

S.D.N.Y. 2005) ("[T]he question of 'reasonably equivalent value' and 'fair

equivalent' is fact intensive, and usually cannot be determined on the

pleadings."); *see also In re Andrew Velez Const., Inc.*, 373 B.R. 262, 271 (Bankr.

S.D.N.Y. 2007) (declining to dismiss constructive fraudulent transfer claim given

the complexities of the factual background giving rise to the issue of "reasonably

equivalent value").

        While it is a close call, because we are required to accept the

allegations in the Trustee's complaint as true, we conclude the factual question of

whether Citigroup and Merrill Lynch provided reasonably equivalent value for

their success fees cannot be decided without first assessing whether the banks

satisfactorily performed their duties. Thus, dismissal of the constructive

fraudulent conveyance claims against these parties was premature.

In contrast, we find no error in the dismissal of these claims against

Morgan Stanley and VRC. While these firms adopt the arguments set forth by

Citigroup and Merrill Lynch, their actions differ in several important respects.

First, Morgan Stanley was hired as advisor for and was responsive to a different

part of Tribune -- the Special Committee. Second, Morgan Stanley and VRC did

not have the same incentives as Citigroup and Merrill Lynch. Because both

Morgan Stanley and VRC earned their respective fees upon delivery of their

contracted-for opinions, they had no financial stake in the LBO's consummation.

Finally, and most important, the Morgan Stanley and VRC payments were in

large part due *before* Step One closed. Because there is hardly an allegation that

Tribune was insolvent before the first step, the constructive fraudulent transfer

claims against Morgan Stanley and VRC must fail.

## VI.    *Leave to Amend*

The Trustee sought leave to amend his complaint as to the

shareholders in two respects: first, to provide additional allegations in support of

his intentional fraudulent conveyance claims and, second, to add a constructive

fraudulent conveyance claim.  The district court denied both requests.

> "[L]eave [to amend] shall be freely given when justice so requires."

*Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) (citing Fed. R. Civ.

P. 15(a)(2)).  A court may deny leave to amend, however, for a "valid ground," *id.*,

such as futility or undue prejudice, *see Foman v. Davis*, 371 U.S. 178, 182 (1962).

"Futility is a determination, as a matter of law, that proposed amendments

would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the

Federal Rules of Civil Procedure."  *Empire Merchs., LLC v. Reliable Churchill LLLP*,

902 F.3d 132, 139 (2d Cir. 2018).  To determine whether granting leave to amend

would be futile, we consider the proposed amendments and the original

complaint.  *See Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 225–26 (2d Cir.

2017).

### A.  *Intentional Fraudulent Conveyance Claims*

> In denying the Trustee leave to amend his intentional fraudulent

conveyance claims, the district court noted that the Trustee gave "no clue as to

how the complaint's defects would be cured."  3049 S. App'x at 26 (alteration

omitted).  On appeal, the Trustee argues that if given the opportunity to amend,

- 61 -

he would have been able to satisfy the imputation standard applied by the district court.

We are not persuaded. The Trustee had ample opportunity to plead a viable claim in the district court -- indeed, the operative pleading was the *Fifth Amended Complaint* -- but he failed to propose any amendments that would cure the pleading defects. Nor has he identified on appeal any additional factual allegations that would give rise to a strong inference of fraudulent intent on the part of the Special Committee. Accordingly, we find no abuse of discretion in the district court's denial of leave to amend the Trustee's intentional fraudulent transfer claims.

### B. *Constructive Fraudulent Conveyance Claims*

The Trustee did not initially assert a constructive fraudulent transfer claim against the shareholders but sought leave to file a Sixth Amended Complaint to add such a claim. On April 23, 2019, the district court (Cote, *J.*) denied the request, on two independent grounds: (1) the shareholders would suffer substantial prejudice; and (2) the proposed amendments to the constructive fraudulent transfer claim would be futile.

- 62 -

Under the Bankruptcy Code, certain transactions fall within a safe harbor and the payments that are part of those transactions cannot be clawed back via a federal constructive fraudulent transfer claim. *See* 11 U.S.C. §§ 544, 546(e). These include a payment made "in connection with a securities contract" if that payment was made by "a financial institution." *Id.* at § 546(e). As we held in *Tribune II*, however, Tribune's payments to its shareholders fell within this safe harbor. *See* 946 F.3d at 77–81, 90–97 (holding that Tribune was a "financial institution" within meaning of safe harbor provision and that payments to shareholders were payments "in connection with a securities contract"). On appeal, the Trustee argues that the district court and the *Tribune II* panel improperly concluded that Tribune was a financial institution, first by incorrectly taking judicial notice of certain documents and second by misinterpreting those documents. We are not persuaded.

As an initial matter, we are bound by the *Tribune II* panel's decision that Computershare Trust Company ("CTC"), a financial institution for purposes of § 546(e), was Tribune's agent when it served as a depository to help effectuate the LBO, which was a securities contract. *Tribune II*, 946 F.3d at 78-81; *see also* 4 *Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 211 n.8 (2d Cir. 2019)

- 63 -

("We are bound by the decision of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." (internal quotation marks omitted)).

The Trustee takes issue with how the district court took judicial notice of certain documents to conclude that CTC was Tribune's agent. That argument is without merit, as "[w]e have recognized . . . that in some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect." *Id.* (internal quotation marks omitted). Here, the documents the district court relied on were the contracts that set forth the relationship between Tribune and CTC, and they were therefore integral to the complaint.

Similarly, the Trustee's argument that CTC was not Tribune's agent because it was given no discretion and was not a fiduciary lacks merit. Here, Tribune entered into an agreement with CTC whereby CTC was hired to be a steward of Tribune's money and its shareholders' stock. It was clearly acting on

behalf of Tribune, which is enough to satisfy § 546(e).  Accordingly, even on *de novo* review, the district court did not err when it denied the Trustee leave to amend its complaint as futile.

Separately, the district court did not abuse its discretion when it alternatively refused to grant leave to amend because doing so would be unduly prejudicial.  There are thousands of shareholders who have been impacted by this ongoing litigation, all of whom relinquished control of their stock more than twelve years ago.  As both this Court and the district court pointed out, allowing another amended complaint would prevent "certainty, speed, finality, and stability" in the market.  3049 S. App'x at 27 (citing *Tribune II*); *see also Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 568 (2d Cir. 2016) (discussing the importance of finality).

Accordingly, we conclude that the district court did not abuse its discretion in denying the Trustee leave to amend his complaint to add a constructive fraudulent claim under federal law.

## CONCLUSION

For the foregoing reasons, the judgment and orders of the district court are **AFFIRMED in part** and **VACATED in part** as follows:

- 65 -

1.      the district court's dismissal of the intentional fraudulent conveyance claims against the shareholders based on the buy-back of their shares is **AFFIRMED**;

2.      the district court's dismissal of the breach of fiduciary duty and aiding and abetting breach of fiduciary claims against the allegedly controlling shareholders is **AFFIRMED**;

3.      (a)      the district court's dismissal of the aiding and abetting breach of fiduciary duty and professional malpractice claims against the Financial Advisors is **AFFIRMED**;

(b)      the district court's dismissal of the actual fraudulent conveyance claims is **AFFIRMED** as to Morgan Stanley, Citigroup, and Merrill Lynch and **VACATED** as to VRC; and

(c) the district court's dismissal of the constructive fraudulent conveyance claims is **AFFIRMED** as to Morgan Stanley and VRC and **VACATED** as to Citigroup and Merrill Lynch; and

4.      the district court's denial of the Trustee's motion for leave to amend to amplify his intentional fraudulent conveyance claim against the

shareholders and to add a constructive fraudulent conveyance claim against the

shareholders is **AFFIRMED**.

The case is hereby **REMANDED** for further proceedings in

accordance with the above.